**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
  Email: tbrown@thebrownlawfirm.net
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLAN SCOTT,  DERIVATIVELY AND ON BEHALF OF 6D GLOBAL TECHNOLOGIES INC., <br><br> Plaintiff, <br><br> v. <br><br> BENJAMIN TIANBING WEI  A/K/A/ BENJAMIN WEY, NEW YORK GLOBAL GROUP, INC., NYGG (ASIA), LTD., TEJUNE KANG, MARK SZYNKOWSKI, ADAM HARTUNG, DAVID S. KAUFMAN, TERRY MCEWEN, ANUBHAV SAXENA, PIOTR A. CHRZASZCZ, MICHAEL BANNOUT, BEI LV, DIANFU LV, ARNOLD STALOFF, SHUYUAN LIU, ZILT ZHAO, FENGJUN SUN and SHENG MA, <br><br> Defendants, <br><br> And <br><br> 6D GLOBAL TECHNOLOGIES INC., <br><br> Nominal Defendant. | Case No. 15-CV-9691 <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) BREACH OF FIDUCIARY DUTY;** <br> **(2) UNJUST ENRICHMENT; AND** <br> **(3) VIOLATIONS OF SECTION 14 OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Allan Scott ("Plaintiff"), by his undersigned attorneys, derivatively and on

behalf of Nominal Defendant 6D Global Technologies Inc. ("6D Global" or the "Company"),

files this Verified Shareholder Derivative Complaint against defendants Benjamin Tianbing Wei a/k/a/ Benjamin Wey, Tejune Kang, Mark Szynkowski, Adam Hartung, David S. Kaufman, Terry McEwen, Anubhav Saxena, Piotr A. Chrzaszcz, Michael Bannout, Bei Lv, Dianfu Lv, Arnold Staloff, Shuyuan Liu, Zilt Zhao, Fengjun Sun and Sheng Ma (collectively, the "Individual Defendants") and defendants New York Global Group, Inc. ("NYGG") and NYGG (Asia), Ltd. ("NYGG-Asia"), (which together with the Individual Defendants are the "Defendants"), for breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of 6D Global and its predecessor, and unjust enrichment for his complaint against Individual Defendants, NYGG, and NYGG-Asia, and alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, the Indictment of Benjamin Tianbing Wei  a/k/a/ Benjamin Wey ("Wei") in this Court, the pleadings filed in this Court by the SEC against Defendant Wei and others, and the action filed in this Court by Discover Growth Fund against Defendant Wei and others, wire and press releases published by and regarding 6D Global, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by 6D Global's directors, officers and/or controlling stockholders who, from November 3, 2010 through September 10, 2015 (the "Relevant Period"), breached their fiduciary duties to 6D Global, formally known as CleanTech Innovations, Inc, ("CleanTech") by: a) permitting Defendant Wei to engage in a scheme to manipulate the price and trading volume of 6D Global's stock by using undisclosed nominee accounts to purchase and sell the stock; b) by failing to maintain for the Company adequate internal and financial controls; and c) by making false and misleading statements by failing to disclose to the investing public: i) that Defendant Wei, in effect, controlled all of the Company's stock;  ii) that Defendant Wei was engaged in a scheme to manipulate the price and trading of 6D Global's stock; and iii) that the Company lacked adequate internal and financial controls.

2.      6D Global is a digital business solutions company serving the digital marketing and technology needs of enterprise-class organizations world-wide.   6D Global's services include web analytics, marketing automation, mobile applications, business intelligence, marketing cloud, and IT infrastructure staffing solutions.

3.      On September 8, 2015, the U.S. Attorney's Office for the Southern District of New York filed an Indictment against Defendant Wei and others on charges including stock manipulation and fraud.  *See United States v. Benjamin Wei, et al.*, 15-crim-611 (2015) (the "Indictment").  The Indictment alleged, that from at least in or about 2007 through 2011, Defendant Wei and others conspired to defraud the investing public by orchestrating and facilitating (1) Defendant Wei's undisclosed amassing of beneficial ownership of more than five

percent of the stock of certain publicly traded companies, including 6D Global; and (2) Defendant Wei's manipulation of the market price and demand for the stock of those companies in which Defendant Wei had covertly amassed substantial beneficial ownership interests.

4.      The SEC also commenced an action against Defendant Wei and others for their participation in a scheme to profit from undisclosed controlling ownership interests in several U.S. companies created by reverse mergers, including 6D Global, which were actually controlled by Defendant Wei and his company.

5.      On September 10, 2015, NASDAQ halted trading in the Company's stock.

6.      As a result of the Defendants' complicity in, and failure to stop, Defendant Wei's illicit scheme, and their false and misleading statements, the price of 6D Global stock fell from a high of $3.50 per share during intraday trading on September 9, 2015 to close at $2.90 per share on September 10, 2015, after NASDAQ halted trading of the Company's stock.

7.      The Defendants' breaches of fiduciary duty have subjected the Company, the Company's Chief Executive Officer and Chairman, the Company's Chief Financial Officer, and the Company's Directors to a securities fraud class action in this Court and to a private action brought by a 6D Global institutional investor in a private offering,  have subjected its controlling shareholder to criminal charges in this Court, have subjected its controlling shareholders to a complaint filed in this Court by the SEC, have caused NASDAQ's halting of trading of Company stock, have caused the need to undertake internal investigations, subjected the Company to losses due to the unjust enrichment of Defendants who benefitted from their illegal stock manipulation scheme and/or who were improperly over-compensated by the Company, including through bonuses and other compensation connected to the Defendants' scheme of

intentional and/or reckless misconduct, and will cost the Company going forward many millions of dollars.

8.      The Company has been substantially damaged as a result of the Defendants' knowing breaches of fiduciary duty and other misconduct.

9.      In light of the breaches of fiduciary duty engaged in by the Defendants who are the Company's current Directors, Officers, and/or controlling stockholders, and/or the Directors and Officers of the predecessor company, all of which acted under the direction of Defendant Wei -- to whom they were beholden, of the substantial likelihood of their liability in this derivative action, in the federal securities law class action and in the private action brought by a 6D Global institutional investor in a private offering, of their not being disinterested and/or independent Directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

10.      This Court has over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction of the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11.      Additionally, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff is a citizen of a different state than the Defendants

and 6D Global, and the amount in controversy exceeds $75,000 exclusive of interest and costs. Plaintiff is a citizen of Nevada and no defendant is a citizen of that state.

12.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation and/or profits in this district by engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

14.     Plaintiff is a current shareholder of shares of 6D Global.   Plaintiff has continuously held 6D Global common stock at all relevant times.  Plaintiff is a citizen of Nevada.

**Nominal Defendant 6D Global**

15.     Nominal Defendant 6D Global is a Delaware corporation with principal executive offices located in this District at 17 State Street, Suite 2550, New York, N.Y. 10004.  6D Global is a citizen of New York and Delaware.

16.     6D Global is the successor entity of CleanTech, which was a Nevada corporation. During CleanTech's years of operation, it designed, manufactured, tested and sold structural towers for on-land and off shore wind turbines. Clean Tech became a publicly-traded company

that traded on NASDAQ under the ticker symbol "CTEK" through a reverse merger with shell company Everton Capital Corporation ("Everton"), prior to its merger into 6D Global.

17.     On June 16, 2014, CleanTech filed a Form 8-K with the SEC announcing that on June 13, 2014 it had entered into a merger agreement with Six Dimensions, Inc. ("Six Dimensions"), a Nevada corporation formerly known as Initial Koncepts, Inc.  Six Dimensions became the wholly-owned subsidiary of CleanTech.  After the merger, CleanTech converted into a Delaware corporation and changed its name to 6D Global Technologies, Inc. ("6D Global").

**Defendant NYGG-Asia**

18.     Defendant NYGG (Asia), Ltd. ("NYGG-Asia") is subsidiary of Defendant NYGG and is located in Beijing, China.

19.     According to the Company's 2015 proxy statement filed with the SEC on April 30, 2015 on Form 14A (the "2015 Proxy Statement"), "On September 29, 2014, in connection with the Exchange, NYGG (Asia) Ltd. ("NYGG Asia"), CleanTech's largest creditor, pursuant to a Debt Conversion Agreement ("Debt Conversion Agreement"), converted all of CleanTech's indebtedness to NYGG Asia, in the aggregate approximate amount of $16,000,000, in exchange for the issuance of 35,149,883 shares of Common Stock to NYGG Asia and the cancellation of CleanTech's indebtedness to NYGG Asia."

20.     According to the Company's 2015 proxy statement, as of April 20, 2015, Defendant NYGG-Asia held 44.9% of 6D Global's outstanding shares. Additionally, Defendant NYGG-Asia actively exerted control over the Company.  Thus, Defendant NYGG-Asia was a controlling shareholder of the Company.

21.     The Company admitted in its annual reported for the year ending December 31, 2014 that it filed with the SEC on March 30, 2015 ("2014 10-K") that NYGG-Asia was its controlling shareholder in stating, "NYGG (Asia), Ltd. holds, in the aggregate, approximately 45.0% of the outstanding shares of our common stock for the year ended March 19, 2015.  As a result, NYGG (Asia) has the ability to substantially influence and, in some cases, may effectively control the outcome of corporate actions requiring stockholder approval, including the election of directors.  This concentration of ownership may also have the effect of delaying or preventing a change in control of 6D Global, even if such a change in control would benefit other investors."

**Defendant NYGG**

22.     Defendant NYGG is a Delaware corporation headquartered in New York, New York and has an additional office is in Beijing, China. 6D Global is a citizen of New York and Delaware. During the relevant period, Defendant NYGG offered consulting services, among other things, to China-based operating companies that endeavored to raise funds in the U.S. capital markets.

23.     Through Defendant NYGG-Asia, NYGG, which actively exerted control over NYGG-Asia and the Company, was a controlling shareholder of the Company.

**Defendant Wei**

24.     Defendant Wei is the founder and President of Defendant NYGG and oversaw the operations of Defendant NYGG-Asia during the Relevant Period. Defendant Wei was indicted by the United States Attorney for the Southern District of New York on September 8, 2015, for stock manipulation and the massing of undisclosed beneficial ownership of more than five

percent of the stock of 6D Global, among other companies, and on September 10, 2015 was placed under arrest.  Defendant Wei is a citizen of New York.

25.     Through Defendant NYGG, and, in turn, through Defendant NYGG-Asia, Defendant Wei, who actively exerted control over NYGG, NYGG-Asia, and the Company, was a controlling shareholder of the Company.

26.     The services Defendants Wei and NYGG provided to NYGG's clients included handpicking accountants, auditors, directors, and attorneys for the companies; finding shell companies for and facilitating reverse mergers; and advising NYGG's clients regarding financing transactions.

27.     In addition to these advertised and disclosed services, Defendant Wei and NYGG, with the involvement of Defendant Wei's sister, Tianyi Wei, his wife, Michaela Wey, and others engaged in deceptive conduct to obtain and profit from undisclosed, controlling ownership interests in NYGG's clients and increase the value of NYGG's clients' securities, thereby increasing the value of the significant holdings of those securities by Defendant Wei and his wife and sister.

**<u>Defendant Kang</u>**

28.     Defendant Tejune Kang ("Kang") served as the Chief Executive Officer of Six Dimensions, the predecessor company to 6D Global, since the company's founding in 2004.  He was appointed Chairman of the Board of Directors and Chief Executive Officer of 6D Global in September 2014.

29.     According to the Company's 2015 Proxy Statement, as of April 20, 2015, Defendant Kang beneficially owned 23,250,561 shares of the Company's issued and outstanding

common stock.   This accounts for 29.7% of the outstanding common stock of the company. Given that, as of the close of business on September 10, 2015, one share of common stock traded for $2.90, Defendant Kang's stock is worth $67,426,626.90.

30.     In 2015, Defendant Kang, acting on behalf of the Company, entered into an unwritten agreement with Defendant Wei for Defendant Wei to act as a "consultant" for the Company and use his contacts to connect the Company with potential investors.

31.     In August 2015, Defendant Kang borrowed $100,000 from the wife of Defendant Wei to purchase additional 6D Global stock. The term of the loan from Defendant Wei's wife expired on December 3, 2015 and it incurred interest at the rate of 4%.

32.     The Company's 2015 Proxy Statement stated the following about Defendant Kang:

Mr. Kang has served as the Chief Executive Officer of Six Dimensions, the predecessor company to 6D Global, since the company's founding in 2004, and was appointed chairman of the Board of Directors of 6D Global in September 2014. Before founding Six Dimensions, Mr. Kang was a principal of Kang Management Group, a commercial real estate developer in Nevada, until 2009 when it was closed down due to the global financial crisis that negatively affected the real estate markets in the West Coast. In early 2010, Mr. Kang filed a bankruptcy petition under Chapter 7 of Title 11 of the United States Code in connection with his personal guarantee of land projects and the inability to refinance related indebtedness. Since then, Mr. Kang has devoted his efforts to growing Six Dimensions. Prior to Kang Management Group, Mr. Kang was an engineer for five years with PeopleSoft (now Oracle Corporation). While at PeopleSoft, Mr. Kang managed Human Resources, Financial, Supply Chain, and Enterprise Performance Management software implementations for Fortune 500 companies including Boeing, Apple, AT&T, HP. Mr. Kang is an active member of Inc. Business Owners Council (IBOC), Vistage, Entrepreneurs' Organization (EO), Alliance of CEOs, National Association of Asian American Professionals (NAAAP), Massachusetts Institute of Technology's Key Executive Program and UBS Elevating Entrepreneur's Small Business Mentoring Program. Mr. Kang graduated from The University of California, Davis with a Bachelor of Science degree in Managerial Economics.

33.     Upon information and belief, Defendant Kang is a citizen of California.

**Defendant Szynkowski**

34.     Defendant Mark Szynkowski ("Szynkowski") has served as the Chief Financial Officer of 6D Global since December 2014.

35.     The Company's 2015 Proxy Statement stated the following about Defendant Szynkowski:

Prior to joining the Company, from December 2005 to July 2014, Mr. Szynkowski was Vice President of Finance for Epiq Systems, a provider of integrated technology products and services for the legal profession. Prior to his tenure at Epiq Systems, Mr. Szynkowski served as Chief Financial Officer and Controller for multiple high-growth organizations and began his career with Ernst & Young. Mr. Szynkowski graduated from Alfred University with a Bachelor degree in Accounting.

36.     Upon information and belief, Defendant Szynkowski is a citizen of New York

**Defendant Hartung**

37.     Defendant Adam Hartung ("Hartung") has served as a member of the Board of Directors since September 2014 and currently serves as Chairperson of the Audit Committee and a member of the Compensation and Governance and Nominating Committees.

38.     The Company's 2015 Proxy Statement stated the following about Defendant Hartung:

Mr. Hartung has served as the CEO and Managing Partner of Spark Partners, a strategy and transformation consultancy, since 2004. In 2010, Mr. Hartung became the founding CEO of Soparfilm Energy, a corporation that invests in oil and gas exploration. Additionally, Mr. Hartung has written columns for Forbes.com and CIO Magazine, and has been a contributing editor for the International Journal of Innovation Science since its founding in 2008. Mr. Hartung is the Chairperson of our Audit Committee and a member of our Compensation and Governance and Nominating Committees. Mr. Hartung received a Master in Business Administration degree from Harvard Business School.

39.     Upon information and belief, Defendant Hartung is a citizen of Illinois.

**Defendant Kaufman**

40.     Defendant Davis S. Kaufman ("Kaufman") has served as a member of the Board of Directors since September 2014 and is Chairperson of the Governance and Nominating Committee and a member of the Audit and Compensation Committees.  On September 30, 2015, Defendant Kaufman gave written notice to the Company of his resignation from his position as a member of the Board of Directors of the Company.

41.     The Company's 2015 Proxy Statement stated the following about Defendant Kaufman:

Mr. Kaufman is currently an Executive Consultant and Partner at FIN Strategy Advisers. Mr. Kaufman was Senior Vice President and Chief Information Officer at ARAMARK Corporation from 2005 to 2013. Prior to this role, Mr. Kaufman served as the Vice President, Global Supply Chain and Quality Information Technology of Schering-Plough Corporation. Earlier, Mr. Kaufman had a 17 year career with PepsiCo Inc. Mr. Kaufman has served as a member of several advisory boards, including the Oracle CIO Advisory Board, Sprint CIO Advisory Board, Temple Fox School of Business MIS Advisory Board, and Villanova School of Business MIS Advisory Board. Mr. Kaufman is the Chairperson of our Governance and Nominating Committee and a member of our Audit and Compensation Committees. Mr. Kaufman received a Bachelor of Science degree in Computer Science from New York University.

42.     Upon information and belief, Defendant Kaufman is a citizen of Pennsylvania.

**Defendant McEwen**

43.     Defendant Terry McEwen ("McEwen") served as a member of the Board of Directors of CleanTech Innovations, Inc. ("CleanTech") and Chairman of the Audit Committee and member of Nominating and Compensation Committees since September 2013. On October 5, 2015, Defendant McEwen gave written notice to the Company of his resignation from his position as a member of the Board.

44.     Defendant McEwen was interim Chief Executive Officer and Chairman of the Board from June 11, 2014 until September 2014.

45.     According to the Company's 2015 Proxy Statement, as of July 14, 2014 Defendant McEwen owned 5,076,468 shares of CleanTech stock, which amounted to 61.0 % of the total share of the CleanTech's issued and outstanding common stock.   His beneficial ownership was ultimately terminated as part of the merger that formed the Company.

46.     The Company's 2015 Proxy Statement stated the following about Defendant McEwen:

Mr. McEwen is the Business Administrator for the City of Trenton, NJ. Prior to this role, he served as a Managing Partner of Preservation Capital Services, LLC. From May 2006 to May 2010, Mr. McEwen served as the Director of Banking for the State of New Jersey Department of Banking and Insurance, a Governor-appointed position that required confirmation by the Senate of the State of New Jersey. Mr. McEwen is a 1980 graduate of the University of Pittsburgh, Pittsburgh, PA, where he was awarded a Bachelor of Science in Business Administration, with a minor in economics and psychology, and received a Master in Business Administration from Rider University in 1998.

47.     Upon information and belief, Defendant McEwen is a citizen of New York.

**Defendant Saxena**

48.     Defendant Anubhav Saxena ("Saxena") served as a member of the Board of Directors since September 2014 and served as the Chairperson of Compensation Committee and a member of the Audit and Governance and Nominating Committees. On September 30, 2015, Defendant Saxena gave written notice to the Company of his resignation from his position as a member of the Board.

49.     The Company's 2015 Proxy Statement stated the following about Defendant Saxena:

Mr. Saxena is president of the Global Managed Services division of Information Services Group (ISG), a NASDAQ listed company (symbol: III), where he also manages the Global Research and Data Services business. Before joining ISG, Mr. Saxena held a series of senior executive positions with HCL Technologies. Mr. Saxena earlier worked with Wipro Ltd. He began his career with Fujitsu ICIM Ltd. A founding member of the G2000 IT Client Executive Councils,

Mr. Saxena has been a presenter at the World Economic Forum and a recipient of a number of CXO awards. Mr. Saxena is the Chairperson of our Compensation Committee and he is a member of our Audit and Governance and Nominating Committees. Mr. Saxena earned a Bachelor of Engineering (Electronics) degree from the University of Pune, India.

50.     Upon information and belief, Defendant Saxena is a citizen of California.

**Defendant Chrzaszcz**

51.     Defendant Piotr Chrzaszcz ("Chrzaszcz") has served as a member of the Board of Directors since October 24, 2015 to fill the vacancy created by the resignation of David Kaufman, and currently serves as a member of the Board's Audit Committee and Compensation Committee and as Chairperson of the Board's Governance and Nominating Committee.

52.     The Company's 2015 8-K Statement stated the following about Defendant Chrzaszcz:

Mr. Chrzaszcz is currently an active investor trading his own portfolio. Mr. Chrzaszcz served as the CEO of Commercial Masterminds Inc., a commercial real estate investment and advisory firm from 2007-2012 and holds the advanced real estate investor designation, Certified Commercial Investment Member (CCIM). Mr. Chrzaszcz was an active leader in the CCIM community and a guest lecturer for the UC Berkeley Extension, Personal Financial Planning Program discussing due diligence in commercial real estate. Mr. Chrzaszcz is an Air Force veteran and holds a Bachelor of Science in Aerospace Engineering from Boston University.

53.     Upon information and belief, Defendant Chrzaszcz is a citizen of California.

**Defendant Bannout**

54.     Defendant Michael Bannout ("Bannout") has served as a member of the Board of Directors since October 24, 2015 to fill the vacancy created by the resignation of Defendant Saxena and currently serves as a member of the Board's Audit Committee and Governance and Nominating Committee and as Chairperson of the Board's Compensation Committee.

55.     The Company's 2015 8-K Statement stated the following about Defendant Bannout:

For the past 25 years, Mr. Bannout has been the CEO and President of M. London Group, Inc., a privately owned men's and women's fashion accessories and apparel company, which he started in New York City as a small cut and sew manufacturing company and built into a multi-million dollar enterprise with world-wide distribution. Mr. Bannout attended Brooklyn College in Brooklyn, NY.

56.     Upon information and belief, Defendant Bannout is a citizen of New York.

**Defendant B. Lv**

57.     Defendant Bei Lv ("B. Lv") served as the Chairperson of CleanTech's Board and Chief Executive Officer from July 10, 2010 through June 11, 2014.

58.     According to the Company's Form 10-K filed with the SEC on April 15, 2014 ("2013 10-K"), as of April 4, 2014, Defendant B. Lv beneficially owned 9,375,348 shares of the CleanTech's issued and outstanding common stock. This accounted for 37.53% of the outstanding common stock of the company in April 2014.

59.     The Company's 2013 10-K stated the following about Defendant B. Lv:

 Ms. Lv was appointed our Chairman and Chief Executive Officer on July 2, 2010. Ms. Lv was one of the founders of Liaoning Creative Bellows Co., Ltd., or Creative Bellows, in September 2007, which is now our wholly owned subsidiary, and was appointed its Chairman of the Board and Chief Executive Officer in September 2007. From September 1993 to July 2007, Ms. Lv served as General Manager of Shenyang Xinxingjia Bellows Manufacture Co., Ltd. Since 2006, Ms. Lv has served as the Vice Chairman of the Professional Manager Association of Liaoning Province. In 2005, the China Professional Manager Research Center of State-owned Assets Supervision and Administration Commission (SASAC) and China National Center for Human Resources Ministry of Personnel selected Ms. Lv as a National Excellent Professional Manager. Ms. Lv has designed two patented bellows expansion joint products. Ms. Lv received her bachelor's degree from Shenyang University of Technology in 1992. Ms. Lv is the daughter of Dianfu Lv, one of our directors. As one of our founders, Ms. Lv brings to the Board of Directors her extensive knowledge of our operations and long-term strategy. The Board of Directors believes Ms. Lv's vision, leadership and extensive knowledge of us is essential to our future growth. Her skills include operations, marketing, business strategy and product development.

60.     Upon information and belief, Defendant B. Lu is a citizen of China.

**Defendant D. Lv**

61.     Defendant Dianfu Lv ("D. Lv") served as a member of the Board of Directors of CleanTech from July 2, 2010 through June 11, 2014.  According to the Company's 2013 10-K, as of April 4, 2014, Defendant B. Lv beneficially owned 2,117,691 shares of the CleanTech's issued and outstanding common stock. This accounts for 8.48% of the outstanding common stock of the company as of April 2014.

62.     According to the Company's 2013 10-K, Defendant B. Lv is the daughter of Defendant D. Lv.  Together, the father and daughter owned 46.01% of the outstanding common stock of CleanTech before it merged into 6D Global.  According to CleanTech's June 16, 2014 8-K, Defendants B. Lv and D. Lv agreed to exchange all of their outstanding shares of CleanTech in exchange for the transfer by CleanTech of its wholly-owned subsidiary Liaoning Creative Bellows Co. Ltd.  pursuant to the Divestiture and Exchange Agreement dated June 11, 2014.

63.     The Company's 2013 10-K stated the following about Defendant D. Lv:

Mr. Lv was appointed to our Board of Directors on July 2, 2010, and also serves as our Vice President of Operations. Mr. Lv was one of the founders of Creative Bellows in 2007, which is now our wholly owned subsidiary, and was appointed its Director in September 2007. From 1991 to 2007, Mr. Lv served as the Director of Shenyang Xinxingjia Bellows Manufacture Co., Ltd. From 1989 to 1990, Mr. Lv served as the General Engineer of Shenyang Bellows Group. From 1985 to 1989, Mr. Lu served as the Research Director of Shenyang Machinery Design & Research Institute. From 1963 to 1985, Mr. Lv served as a Senior Engineer of the Shenyang Second Tractor Plant. Mr. Lv received his bachelor's degree in Machinery Manufacture and Design from the Shenyang University of Technology in 1963. Mr. Lv is the father of Bei Lv , our Chairman and Chief Executive Officer. Mr. Lv brings to the Board of Directors extensive knowledge of industrial product development through his nearly 40 years of design and manufacturing experience in China. The Board of Directors believes Mr. Lv's knowledge of us and our operations, long-term strategy and industry as one of our founders is essential to our future growth. His skills include operations, business and product development, industry analysis and risk assessment.

64.     Upon information and belief, Defendant D. Lu is a citizen of China.

**Defendant Staloff**

65.      Defendant Arnold Staloff ("Staloff") served as a member of the Board of Directors of CleanTech from July 13, 2010 through April 2, 2012.

66.      The Company's Form 10-K filed with the SEC on March 30, 2012 ("2011 10-K") stated the following about Defendant Staloff:

Mr. Staloff was appointed to our Board of Directors on July 13, 2010, and serves currently as the Chairman of our Audit Committee and member of our Compensation Committee and Nominating and Corporate Governance Committee. Mr. Staloff brings to the Board of Directors a long and successful business career, with extensive experience at both the management and board levels. Mr. Staloff has served as a director and the Chairman of the Audit Committee at NASDAQ-listed SmartHeat Inc., a plate heat exchange system manufacturer, since 2008, and NASDAQ-listed Deer Consumer Products, Inc., a small home and kitchen electronic products manufacturer, since 2009. From 2007 until his resignations in July 2010, Mr. Staloff served as a director and the Chairman of the Audit Committee at NASDAQ-listed Shiner International, Inc., a packaging and anti-counterfeit plastic film company, and NASDAQ-listed AgFeed Industries, Inc., a feed and commercial hog producer. Mr. Staloff served as a director for Lehman Brothers Derivative Products Inc. from 1994 until October 2008. From December 2005 to May 2007, Mr. Staloff served as Chairman of the Board of SFB Market Systems, Inc., a New Jersey-based company that provided technology solutions for the management and generation of options series data. From June 1990 to March 2003, Mr. Staloff served as President and Chief Executive Officer of Bloom Staloff Corporation, an equity and options market-making firm and foreign currency options floor broker. During 1989 and 1990, Mr. Staloff served as President and Chief Executive Officer of Commodity Exchange, Inc., or COMEX. Mr. Staloff started his professional career in 1968 at the U.S. Securities and Exchange Commission. Mr. Staloff has been credited with the introduction of Options on Foreign Currencies and the precursor to Spydrs. His skills include financial analysis and accounting expertise.

67.      Upon information and belief, Defendant Staloff is a citizen of New Jersey.

**Defendant Liu**

68.      Defendant Shuyuan Liu ("Liu") served as a member of the Board of Directors of CleanTech from July 13, 2010 through June 11, 2014.

69.      The Company's 2013 10-K stated the following about Defendant Liu:

Mr. Liu was appointed to our Board of Directors on July 13, 2010, and serves currently as the Chairman of our Nominating and Corporate Governance Committee and member of our Audit

Committee and Compensation Committee. Mr. Liu brings to the Board of Directors extensive business and financial experience in the energy and steel industries in China. Mr. Liu is a former director at China Huaneng Power International, Inc., one of the five largest power producers in China engaging in the development, construction and operation of large power plants. Since 2000, Mr. Liu has served as the Chairman of Liaoning Energy Investment (Group) Co., Ltd., a large government-authorized investment company in China specializing in investments in the energy sector. From 2004 to 2008, Mr. Liu served as the Chairman of Liaoning Guoneng Group (Holding) Co., Ltd., a large government-authorized steel product logistics company. Mr. Liu was named Outstanding Entrepreneur by the Central Government of China in 2006 and was also awarded the Medal of Prominent Entrepreneur. Mr. Liu is an accomplished economist and he is currently the President of the Liaoning Entrepreneurs Association. His skills include logistics, industry analysis and financial analysis.

70. Upon information and belief, Defendant Lu is a citizen of China.

**Defendant Zhao**

71. Defendant Zilt Zhao ("Zhao") served as a member of the Board of Directors of CleanTech from July 13, 2010 through June 11, 2014.

72. The Company's 2013 10-K stated the following about Defendant Zhao:

Mr. Zhao was appointed to our Board of Directors on July 13, 2010, and serves currently as the Chairman of our Compensation Committee and member of our Audit Committee and Nominating and Corporate Governance Committee. Mr. Zhao brings to the Board of Directors his over 25 years of extensive experience in the energy industry in China. Mr. Zhao currently serves as the Deputy General Manager and Deputy Secretary of Liaoning Electric Power Company Ltd., a subsidiary of China State Grid, the largest electric power transmission and distribution company in China. From 1995 to 2000, Mr. Zhao served as the Director of Dalian Electric Power Bureau. Prior to 1995, Mr. Zhao devoted 20 years to academia. From 1991 to 1995, Mr. Zhao served as the Headmaster of Dalian Electric Power Economic Management University. From 1985 to 1991, he served as the Headmaster of Dalian Electric Power University. Prior to 1991, he held multiple positions within the Dalian Electric Power University, including Deputy Party Secretary, Director of Committee Organization, and Professor of Power Generation. Mr. Zhao received a bachelor's degree in Education Principles from HuaZhong Normal University and a master's degree in Electric Power Generation from Dongbei Electric Power University.

73. Upon information and belief, Defendant Zhao is a citizen of China.

**Defendant Sun**

74.     Defendant Fengjun Sun ("Sun") served as the Chief Financial Officer of CleanTech during at least a portion of the Relevant Period.

75.     The Company's 2013 10-K stated the following about Defendant Sun:

Ms. Sun was appointed our Chief Financial Officer in October of 2010. From April 2007 – April 2019, Ms. Sun worked as a project manager at Jinkai Group,  and from May 2009 – August 2012 as a project manager at China Audit International, CPA Ltd.  Ms. Sun is a Certified Public Accountant, Certified Tax Agent and a Certified Public Appraiser in China. In her prior positions as project manager, Ms. Sun was responsible for auditing public companies in China and assets appraisal. Ms. Sun has extensive experience in professional financial management and internal controls.

76.     Upon information and belief, Defendant Sun is a citizen of China.

**Defendant Ma**

77.     Defendant Sheng Ma ("Ma") served as the Chief Financial Officer of CleanTech during at least a portion of the Relevant Period.

78.     The Company's Form 10-K filed with the SEC on March 30, 2012 stated the following about Defendant Ma:

Mr. Sheng Ma, age 59, is a senior accountant in China and has more than 30 years of experience in financial controls, internal controls and accounting management. He has been head of the Company's accounting department since August 2011. From 2006 to August 2011, Mr. Ma served as a chief accountant at the northeast division of China Power Investment Corporation, one of the five largest state-owned power producers in China. Mr. Ma received his Bachelor's degree in Finance and Economics from Mudanjiang Business College in 1978.

79.     Upon information and belief, Defendant Ma is a citizen of China.

**RELEVANT NON-PARTY**

80.     Seref Dogan Erbek, a/k/a Dogan Erbek ("Erbek") is a resident of Switzerland and was employed by a Geneva-based financial services firm. During the Relevant Period, Erbek assisted the Wei family to conceal and control and structure their holdings in 6D Global to evade securities reporting requirements.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

81.     By reason of their positions as officers, directors, fiduciaries and/or controlling stockholders of 6D Global and because of their ability to control the business and corporate affairs of 6D Global, the Individual Defendants owed 6D Global and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage 6D Global in a fair, just, honest, and equitable manner.  The Defendants were and are required to act in furtherance of the best interests of 6D Global and its shareholders so as to benefit all shareholders equally.

82.     Each director and officer of the Company owes to 6D Global and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

83.     The Defendants, because of their positions of control and authority as directors, officers and/or controlling stockholders of 6D Global, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

84.     To discharge their duties, the officers, directors and/or controlling stockholders of 6D Global were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

85.     Each Defendant, by virtue of his, her, or its position as a director, officer, and/or controlling stockholder owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing

and culpable violation of their obligations to 6D Global, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Defendants who were also officers, directors and/or controlling shareholders of the Company has been ratified by the remaining Individual Defendants who collectively comprised 6D Global's Board at all relevant times.

86. As senior executive officers, directors and/or controlling stockholders of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the NASDAQ, the Defendants had a duty: a) to prevent Defendant Wei from engaging in a scheme to manipulate the price and trading volume of 6D Global's stock by using nominee accounts to purchase and sell the stock; b) to maintain for the Company adequate internal and financial controls; and c) to prevent the Company from making false and misleading statements by failing to disclose to the investing public: i) that Defendant Wei, in effect, controlled all of the Company's stock; ii) that Defendant Wei was engaged in a scheme to manipulate the price and trading of 6D Global's stock; and iii) that the Company lacked adequate internal and financial controls.

87. To discharge their duties, the officers, directors and/or controlling stockholders of 6D Global were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers, directors and/or controlling shareholders of 6D Global were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to the 6D Global's own Code of Ethics and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how 6D Global conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of 6D Global and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that 6D Global's operations would comply with all laws and 6D Global's financial statements filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)      examine and evaluate any reports of examinations, audits, or other financial information

concerning the financial affairs of the Company and to make full and accurate disclosure of all

material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)      conduct the affairs of the Company in an efficient, business-like manner so as to make it

possible to provide the highest quality performance of its business, to avoid wasting the

Company's assets, and to maximize the value of the Company's stock.

88.      Each of the Defendants further owed to 6D Global and the shareholders the duty

of loyalty requiring that each favor 6D Global's interest and that of its shareholders over their

own while conducting the affairs of the Company and refrain from using their position, influence

or knowledge of the affairs of the Company to gain personal advantage.

89.      At all times relevant hereto, the Defendants were the agents of each other and of

6D Global and were at all times acting within the course and scope of such agency.

90.      Because of their advisory, executive, managerial, and directorial positions with

6D Global, each of the Defendants had access to adverse, non-public information about the

Company.

91.      The Defendants, because of their positions of control and authority, were able to

and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as

well as the contents of the various public statements issued by 6D Global.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

92.      In committing the wrongful acts alleged herein, the Defendants have pursued, or

joined in the pursuit of, a common course of conduct, and have acted in concert with and

conspired with one another in furtherance of their wrongdoing.  The Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

93.     The purpose and effect of the conspiracy, common enterprise and/or common course of conduct was, among other things, to: (i) to engage in, facilitate, conceal, and/or fail to stop Defendant Wei's scheme to manipulate the price and trading volume of 6D Global's stock by using undisclosed nominee accounts to purchase and sell the stock; (ii) facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; (iii) to conceal adverse information concerning the Company's directors and officers and their failure to maintain adequate internal and financial controls; and (iv) to fail to maintain adequate internal and financial controls.

94.     The Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by, among other things, causing the Company to purposefully, recklessly or negligently fail to maintain effective accounting and internal control policies and procedures, and fail to prevent Defendant Wei's stock manipulation scheme.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

95.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

96.     At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of 6D Global, and was at all times acting within the course and scope of such agency.

## CODE OF ETHICS

97.     Pursuant to the Company's Code of Ethics (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

98.     The Code of Ethics provides, under a section titled "Avoid Conflicts of Interest," that:

We must avoid any relationship or activity that might impair, or even appear to impair, our ability to make objective and fair decisions when performing our jobs. At times, we may be faced with situations where the business actions we take on behalf of the Company may conflict with our own personal or family interests because the course of action that is best for us personally may not also be the best course of action for the Company. We owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises. We must never use the Company's property or information for personal gain or personally take for ourselves any opportunity that is discovered through our position with the Company.

Here are some other ways in which conflicts of interest could arise:

- Being employed (you or a close family member) by, or acting as a consultant to, competitor or potential competitor, supplier or contractor, regardless of the nature of the employment, while you are employed by the Company.
- Hiring or supervising family members or closely related persons.
- Serving as a board member for an outside commercial company or organization.
- Owning or having a substantial interest in a competitor, supplier or contractor.
- Having a personal interest, financial interest or potential gain in any transaction of the Company.
- Placing company business with a firm owned or controlled by an employee of the Company or his or her family.
- Accepting gifts, discounts, favors or services from a customer/potential customer, competitor or supplier, unless equally available to employees.

Determining whether a conflict of interest exists is not always easy to do. Employees with a conflict of interest question should seek advice from management. Before engaging in any activity, transaction or relationship that might give rise to a conflict of interest, employees must seek review from their managers or Human Resources. Directors and executive officers must

seek determinations and prior authorizations or approvals of potential conflicts exclusively from the Audit Committee.

Situations may occur where the Company transacts business with a party that is directly involved with the company or related to and employee of the company. A related party transaction must be disclosed to the Company's Chief Financial Officer to determine whether or not it is material to the company. In the event the related party transaction is determined to be material, it must be reviewed and approved in writing by the Audit Committee in advance of the consummation of such related party transaction. Significant related party transactions, including those involving the Company's directors or executive officers, must be reviewed and approved in writing in advance by the Board of Directors.

99.    The Code of Ethics provides, under a section titled "Protect Confidential and

Proprietary Information," that:

Integral to the Company's business success is our protection of confidential company information, as well as nonpublic information entrusted to us by employees, customers and other business partners. Confidential and proprietary information includes such things as pricing and financial data, customer names/addresses or nonpublic information about other companies, including current or potential supplier and vendors. We will not disclose confidential and nonpublic information without a valid business purpose and proper authorization.

We will not selectively disclose (whether in one-on-one or small discussions, meetings, presentations, proposals or otherwise) any material nonpublic information with respect to the Company, its securities, business operations, plans, financial condition, results of operations or any development plan. We should be particularly vigilant when making presentations or proposals to customers to ensure that our presentations do not contain material nonpublic information.

100.    The Code of Ethics provides, under a section titled "Uphold the Law," that:

The Company's commitment to integrity begins with complying with laws, rules and regulations where we do business. Further, each of us must have an understanding of company policies, rules and regulations that apply to our specific roles. If we are unsure of whether a contemplated action is permitted by law or the Company's policies, we should seek the advice of the [resource expert.] We are responsible for preventing violations of law and for speaking up if we see possible violations. Consequently, in conducting business, we shall:

a. Strictly Adhere to All Antitrust Laws. We are dedicated to ethical, fair and vigorous competition, and as such, officers, directors and employees must strictly adhere to all antitrust laws in the United States and wherever we may do business. We will sell services based on their merit, superior quality, functionality and competitive pricing. We will make independent pricing and marketing decisions and will not improperly cooperate or coordinate our activities with our

competitors. We will not offer or solicit improper payments or gratuities in connection with the purchase of goods or services for the Company or the sales of its products or services, nor will we engage or assist in unlawful boycotts of particular customers.

b. <u>Strictly Comply With All Securities Laws.</u> In our role as a publicly traded company, we must always be alert to, and comply with, the securities laws and regulations of the United States, including those relating to the trading of securities of the Company while in receipt of "insider" information, as more fully described in the Company's Policy Statement on Insider Trading.

c. <u>Respect the Property Rights of Others.</u> It is important that we respect the property rights of others. We will not acquire or seek to acquire improper means of a competitor's trade secrets or other proprietary or confidential information. We will not engage in unauthorized use, copying, distribution or alteration of software or other intellectual property.

d. <u>Be Timely and Accurate In All Public Reports.</u> We will make certain that all disclosures made in financial reports and public documents are full, fair, accurate, timely and understandable. This obligation applies to all employees, including all finance employees, with any responsibility for the preparation for such reports, including drafting, reviewing and signing or certifying the information contained therein. No business goal of any kind is ever an excuse for misrepresenting facts or falsifying records.

Employees should inform executive management and the Human Resources department if they learn that information in any filing or public communication was untrue or misleading at the time it was made or if subsequent information would affect a similar future filing or public communication.

101.    In violation of the Code of Ethics, the Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Defendants' scheme to manipulate the price and trading volume of 6D Global's stock by using undisclosed nominee accounts to purchase and sell the stock, their scheme to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment, and their scheme to conceal adverse information concerning the Company and failure to maintain adequate internal and financial controls.  In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, protect corporate assets, engage

in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### False and Misleading Class Period Statements

102.    On November 3, 2010, CleanTech filed with the SEC a Form 10-Q for the third quarter of 2010 ending September 30, 2010 (the "3Q10 10-Q").  The 3Q10 10-Q was signed by Defendant B. Lv.

103.    Attached to the 3Q10 10-Q were Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Defendant B. Lv and non-defendant Nan Liu attesting to the accuracy of the financial statements and that all fraud was disclosed.

104.    On February 22, 2011, CleanTech filed with the SEC a Form 10-K for the year ending December 31, 2010 (the "2010 10-K"). The 2010 10-K was signed by non-defendant Nan Liu and Defendants B. Lv, D. Lv, Staloff, Liu, and Zhao.

105.    Attached to the 2010 10-K were SOX certifications signed by Defendant B. Lv and non-defendant Nan Liu attesting to the accuracy of the financial statements and that all fraud was disclosed.

106.    On May 16, 2011, CleanTech filed with the SEC a Form 10-Q for the first quarter of 2011 ending March 31, 2011 (the "1Q11 10-Q").  The 1Q11 10-Q was signed by Defendant B. Lv.

107.    Attached to the 1Q11 10-Q were SOX certifications signed by Defendant B. Lv and non-defendant Nan Liu attesting to the accuracy of the financial statements and that all fraud was disclosed.

108.    On August 15, 2011, CleanTech filed with the SEC a Form 10-Q for the second quarter of 2011 ending June 30, 2011 (the "2Q11 10-Q").  The 2Q11 10-Q was signed by Defendant B. Lv.

109.    Attached to the 2Q11 10-Q were SOX certifications signed by Defendant B. Lv and non-defendant Nan Liu attesting to the accuracy of the financial statements and that all fraud was disclosed.

110.    On September 30, 2011, the Company filed with the SEC a Form 10-K/A for the year ending December 31, 2010 (the "2010 10-K/A"). The 2010 10-K/A was signed by Defendants B. Lv, Ma, D. Lv, Staloff, Liu, and Zhao.

111.    Attached to the 2010 10-K/A were SOX certifications signed by Defendant B. Lv and Ma attesting to the accuracy of the financial statements and that all fraud was disclosed.

112.    On November 14, 2011, CleanTech filed with the SEC a Form 10-Q for the third quarter of 2011 ending September 30, 2011 (the "3Q11 10-Q").  The 3Q11 10-Q was signed by Defendant B. Lv.

113.    Attached to the 3Q11 10-Q were SOX certifications signed by Defendants B. Lv and Ma attesting to the accuracy of the financial statements and that all fraud was disclosed.

114.    On March 30, 2012, CleanTech filed with the SEC the 2011 10-K. The 2011 10-K was signed by Defendants B. Lv, Ma, D. Lv, Staloff, Liu, and Zhao.

115.    Attached to the 2011 10-K were SOX certifications signed by Defendants B. Lv and Ma attesting to the accuracy of the financial statements and that all fraud was disclosed.

116.    On June 25, 2012, CleanTech filed with the SEC a Form 10-Q for the first quarter of 2012 ending March 31, 2012 (the "1Q12 10-Q").  The 1Q12 10-Q was signed by Defendant B. Lv.

117.    Attached to the 1Q12 10-Q were SOX certifications signed by Defendants B. Lv and Ma attesting to the accuracy of the financial statements and that all fraud was disclosed.

118.    On January 6, 2014, CleanTech filed with the SEC a Form 10-Q for the second quarter of 2012 ending June 30, 2012 (the "2Q12 10-Q").   The 2Q12 10-Q was signed by Defendant B. Lv.

119.    Attached to the 2Q12 10-Q were SOX certifications signed by Defendants B. Lv and Sun attesting to the accuracy of the financial statements and that all fraud was disclosed.

120.    Also on January 6, 2014, CleanTech filed with the SEC a Form 10-Q for the third quarter of 2012 ending September 30, 2012 (the "3Q12 10-Q").  The 3Q12 10-Q was signed by Defendant B. Lv.

121.    Attached to the 3Q12 10-Q were SOX certifications signed by Defendants B. Lv and Sun attesting to the accuracy of the financial statements and that all fraud was disclosed.

122.    Also on January 6, 2014, the Company filed with the SEC a Form 10-K for the year ended December 31, 2012 (the "2012 10-K"). The 2012 10-K was signed by Defendants B. Lv, Sun, D. Lv, McEwen, Liu, and Zhao.

123.    Attached to the 2012 10-K were SOX certifications signed by Defendants B. Lv and Sun attesting to the accuracy of the financial statements and that all fraud was disclosed.

124.    Also on January 6, 2014, CleanTech filed with the SEC a Form 10-Q for the first quarter of 2013 ending March 31, 2013 (the "1Q13 10-Q").  The 1Q13 10-Q was signed by Defendant B. Lv.

125.    Attached to the 1Q13 10-Q were SOX certifications signed by Defendants B. Lv and Sun attesting to the accuracy of the financial statements and that all fraud was disclosed.

126.    Also on January 6, 2014, CleanTech filed with the SEC a Form 10-Q for the second quarter of 2013 ending June 30, 2013 (the "2Q13 10-Q").  The 2Q13 10-Q was signed by Defendant B. Lv.

127.    Attached to the 2Q13 10-Q were SOX certifications signed by Defendants B. Lv and Sun attesting to the accuracy of the financial statements and that all fraud was disclosed.

128.    Also on January 6, 2014, CleanTech filed with the SEC a Form 10-Q for the third quarter of 2013 ending September 30, 2013 (the "3Q13 10-Q").  The 3Q13 10-Q was signed by Defendant B. Lv.

129.    Attached to the 3Q13 10-Q were SOX certifications signed by Defendants B. Lv and Sun attesting to the accuracy of the financial statements and that all fraud was disclosed.

130.    On April 15, 2014, CleanTech filed with the SEC a Form 10-K for the year ending December 31, 2013 (the "2013 10-K"). The 2013 10-K was signed by Defendants B. Lv, Sun, D. Lv, McEwen, Liu, and Zhao.

131.    Attached to the 2013 10-K were SOX certifications signed by Defendants B. Lv and Sun attesting to the accuracy of the financial statements and that all fraud was disclosed.

132.   On May 13, 2014, CleanTech filed with the SEC a Form 10-Q for the first quarter of 2014 ending March 31, 2014 (the "1Q14 10-Q").  The 1Q14 10-Q was signed by Defendant B. Lv.

133.   Attached to the 1Q14 10-Q were SOX certifications signed by Defendants B. Lv and Sun attesting to the accuracy of the financial statements and that all fraud was disclosed.

134.   On August 14, 2014, CleanTech filed with the SEC a Form 10-Q for the second quarter of 2014 ending June 30, 2014 (the "2Q14 10-Q").  The 2Q14 10-Q was signed by Defendant McEwen.

135.   Attached to the 2Q14 10-Q were SOX certifications signed by Defendant McEwen attesting to the accuracy of the financial statements and that all fraud was disclosed.

136.   On November 12, 2014, CleanTech filed with the SEC a Form 10-Q for the third quarter of 2014 ending September 30, 2014 (the "3Q14 10-Q").  The 3Q14 10-Q was signed by Defendant Kang.

137.   Attached to the 3Q14 10-Q were SOX certifications signed by Defendant Kang attesting to the accuracy of the financial statements and that all fraud was disclosed.

138.   On March 30, 2015, the Company filed with the SEC a Form 10-K for the year ending December 31, 2014 ("2014 10-K").  The 2014 10-K was signed by the Defendants Kang, Szynkowski, Hartung, Kaufman, McEwen, and Saxena.

139.   Attached to the 2014 10-K were SOX certifications signed by Defendants Kang and Szynkowski attesting to the accuracy of the financial statements and that all fraud was disclosed.

140.     On March 31, 2015, the Company filed with the SEC a Form 10-K/A for the year ending December 31, 2014 (the "2014 10-K/A"). The 2014 10-K/A was signed by Defendant Kang.

141.     Attached to the 2014 10-K/A were SOX certifications signed by Defendants Kang and Szynkowski attesting to the accuracy of the financial statements and that all fraud was disclosed.

142.     On April 30, 2015, the Company filed with the SEC  the 2015 Proxy Statement, which was signed by Defendant Kang.

143.     On May 15, 2015, the Company filed with the SEC a Form 10-Q for the first quarter of 2015 ending March 31, 2015 (the "1Q15 10-Q"). The 1Q15 10-Q was signed by the Defendants Kang and Szynkowski.

144.     Attached to the 1Q15 10-Q were SOX certifications signed by Defendants Kang and Szynkowski attesting to the accuracy of the financial statements and that all fraud was disclosed.

145.     On August 14, 2015, the Company filed with the SEC a Form 10-Q for the second quarter of 2015 ending June 30, 2015 (the "2Q15 10-Q"). The 2Q15 10-Q was signed by Defendants Kang and Szynkowski.

146.     Attached to the 2Q15 10-Q were SOX certifications signed by Defendants Kang and Szynkowski attesting to the accuracy of the financial statements and that all fraud was disclosed.

147.     The Form 10-Qs and 10-Ks and the 2015 Proxy Statement, and the statements made therein, that are referenced in ¶¶ 102-146 above were materially false and/or misleading

because they misinterpreted and failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to the Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company had deficient internal controls, (2) the lack of internal controls allowed Defendant Wei to exert influence and control over the Company, (3) Defendants were engaged in a scheme to manipulate the Company's stock price, and (4) as a result, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### DEFENDANTS' MISCONDUCT IS REVEALED

148.    The extent of the Defendants' misconduct has been revealed in the three actions that were filed against many of the Defendants explaining the ongoing scheme of stock price manipulation, fraud and violations of SEC rules and regulations. These actions, discussed below, include an indictment, an SEC action, and a private action brought by a 6D Global institutional investor in a private offering.

**The Indictment Against Defendant Wei and Erbek**

149.    On September 8, 2015, the United States Attorney for the Southern District of New York filed an indictment against Defendant Wei and Erbek on charges including stock manipulation and fraud. *United States v. Benjamin Wey, et al.*, 15-crim-611 (the "Indictment"). Defendant Wei was arrested on September 10, 2015, the same day the indictment was unsealed. The Indictment is attached hereto as Exhibit 1 and incorporated by reference herein.

150.    The Indictment alleges that Defendant Wei and others conspired to defraud the investing public by orchestrating and facilitating Wei's undisclosed amassing of beneficial

ownership of more than five percent of the stock of certain publicly traded companies, including CleanTech, and manipulation of the market price and demand for the stock of those companies in which Defendant Wei had covertly amassed substantial beneficial ownership interests.

151.    During the Relevant Period, Defendant Wei used nominee entities that were owned or otherwise controlled by Defendant Wei, Wei's family member or employees of Defendant NYGG-Asia to obtain substantial portions of shares of U.S. shell companies. One of the shell companies that the nominees obtained a substantial percentage of shares was Everton.

152.    The Indictment further alleges that, although records associated with the offshore nominee entities identify certain of the nominee owners as the sole shareholders, directors, and/or signatories of the nominee entities, in fact, and unknown to the investing public, the nominee entities were actually controlled by Wei. Among other things, Defendant Wei possessed and exercised investment authority over shares of stock held in the names of the nominees; closely tracked the nominees' holdings, including gains and losses on stock positions; and directed other parties to take action in matters pertaining to the nominees, including, for example, the transfer of shares of stock between nominees. In executing the scheme to defraud, Defendant Wei routinely used Erbek to conduct stock trading for accounts held in the names of the nominees.

153.    Further, Defendant Wei caused the nominees to retain control of more than 5% of the shares of CleanTech by virtue of the reverse merger with Everton. In accordance with Section 13(d) of the Exchange Act, Defendant Wei was required to report his beneficial ownership within 10 days of the acquisition of shares in excess of 5% because he had investment

authority over the nominees. Defendant Wei, however, intentionally failed to file the requisite reports under Section 13(d).

154.    In fact, to further hide from the investing public the extent to which he owned and exercised control over CleanTech's stock (among others), Defendant Wei purposefully caused the nominees' holdings to be structured in such a way as to ensure that no single one of the nominees held a greater-than-five percent beneficial ownership interest.

155.    As a further part of the conspiracy and scheme to defraud, Defendant Wei caused the share price of CleanTech's stock to be manipulated in various ways. For example, on multiple occasions, Defendant Wei caused two retail brokers located in Manhattan to solicit their customers to buy shares of common stock, often on margin, while those brokers simultaneously actively discouraged the sale of these stocks by their customers, so as to artificially maintain the stock price. Similarly, Defendant Wei explicitly instructed Erbek to maintain the share prices of CleanTech's stock held in certain of the nominees' accounts.

156.    According to the Indictment, on or about February 7, 2011, Defendant Wei sent an email to Erbek stating, "CleanTech just traded at $4.50 per share. Please make sure the trader buys the stock at $5 per share, stay at $5 per share bid price, not less. Please make sure this happens right away." Erbek agreed to do so.

157.    The purpose of Defendants Wei and Erbek's emails was to artificially manipulate the market price and demand of CleanTech common stock.

158.    Additionally, according to the Indictment, Defendant Wei orchestrated certain match trades in CleanTech securities for the purpose of manipulating the stock price. The Indictment provides the following example: in July 2010, soon after CleanTech was listed at an

initial offering price of $3.00 per share, Defendant Wei caused the purchase for a U.S. brokerage account in the name of Defendant Wei's siblings of approximately 1,000 shares of CleanTech stock while also causing a Singapore brokerage account in the name of one of the nominee entities he controlled to sell the exact same number of shares. The sale and the purchase were done at $5.10 per share which was 70% above the $3.00 initial offering price. After he executed these transactions, Defendant Wei sent emails to prospective investors promoting the apparent 70% increase in CleanTech stock.

159.    Finally, the Indictment alleges that from at least December 2010 through at least December 2011, Defendant Wei willfully and knowingly failed to file with the SEC notice of acquisition of beneficial ownership of CleanTech, which is violation of SEC rules and regulations.

**The SEC Action**

160.    On September 10, 2015, the SEC filed a complaint in this Court, against Defendant Wei, his wife, his sister, Defendant NYGG, Erbek, and others, for their participation in a scheme to profit from undisclosed controlling ownership interests in several U.S. companies created by reverse mergers, including 6D Global, which were actually controlled by Defendant Wei and Defendant NYGG, and the SEC amended the complaint on November 9, 2015. *United States Securities and Exchange Commission v. Benjamin Wey, et al.*, 15-cv-07116 (PKC) (the "SEC Action"). The SEC Action is attached hereto as Exhibit 2 and incorporated by reference herein.

161.    The SEC Action described the fraudulent scheme as follows: Defendant Wei would use nominees controlled by him to take clandestine control of certain U.S. shell

companies, including Everton.  After taking control of the shell company, Defendant Wei would arrange one of Defendant NYGG's clients, such as CleanTech, to reverse merge with the shell company that Defendant Wei controlled through his nominees. Following the mergers, Defendant Wei and his family members indirectly held beneficial ownership interest exceeding 5% in the NYGG client.  Defendant Wei then used his control over the NYGG companies such as CleanTech to manipulate the stock price, while misleading the investing public about his control of the companies.

162.   In 2010, NASDAQ delisted CleanTech partly because of Defendant Wei's failure to disclose his involvement in a December 2010 financing in which nominees he controlled received shares of CleanTech. The SEC set aside the delisting decision on July 22, 2013 based on NASDAQ's failure to provide evidence that it had specifically requested all documentation about Defendant Wei's financing transactions.

163.   During CleanTech's appeal of the NASDAQ delisting, Defendant Wei submitted a letter to NASDAQ dated June 30, 2011 in which he made false and misleading statements in order to conceal his financial stake in CleanTech's December 2010 offering. The letter stated that "[n]either I nor NY Global has any beneficial ownership of the securities issued in the financing." This was a false statement because of Benjamin Wey's, Tianyi Wei's, and Michaela Wey's ownership and control of nominees Strong Growth Capital, Ltd., Han Hua, Ltd., and Roosen Commercial Corporation. Benjamin Wey also falsely claimed in the letter that NYGG's Beijing and New York offices were "separately owned and operated." He also stated that the Beijing office was run by an NYGG employee, who Benjamin Wey failed to disclose was Tianyi Wei's domestic partner. In fact, Benjamin Wey ran both offices, and Tianyi Wei's domestic

partner was an NYGG employee who reported to Benjamin Wey. Benjamin Wey also described Han Hua as an "Asian investment fund" when, in fact, it was a nominee that Tianyi Wei owned.

164.    The SEC action charges Defendant Wei and others with numerous violations of the Securities Exchange Act for engaging in the conduct described above.

165.    Through Defendant Wei's and his family members' scheme, they received millions of dollars in illicit profits. The proceeds of sales of the securities and other profits from the scheme were deposited in various nominee brokerage and bank accounts and transferred around the world to mask their sources. Millions of dollars of those funds were then returned to the United States via transfers from accounts that were at least nominally controlled by his sister, Tianyi Wei, to accounts in the name of his wife, Michaela Wey. Defendant Wei and his wife used the proceeds to fund NYGG's operations and their lavish lifestyle.

166.    Some details of their scheme, some of which are set forth also in the Indictment, follow. The market manipulation was aimed at achieving and maintaining a share price above $5.00 for NYGG's client CleanTech. In July 2010, the first trades in Clean Tech securities involved a match trade of 1,000 shares purchased by a certain broker account in the name of Tianyi Wei from a foreign brokerage account maintained in the name of Guo Sheng, a Nominee for which Tianyi Wei was listed as the owner and signatory. The purchase price of $5.10 was 70 percent higher than CleanTech's recent $3.00 offering price; however, nothing had occurred between the offering and this first sale on the secondary market to justify the price increase. Soon thereafter, Benjamin Wei touted the 70-percent increase in an email to potential investors.

167.    Similarly, a February 2011 email recovered during execution of search warrants and sent from Benjamin Wei or someone else at his direction to Erbek revealed an intention to

maintain the share price of CleanTech at $5.00. It read, "Dogan, Cleantech just traded at $4.50 per share. Please make sure the trader buys the stock at $5 per share, stay at $5 per share bid price, not less. Please make sure this happens right away." Trading records for the Swiss accounts managed by Erbek show purchases on February 7, 2011, of CleanTech shares in 100 to 198 share tranches at $4.86 and $4.93. These purchases were part of Benjamin Wei's effort to drive the stock's price upward.

**6D Global Stock Halted Damaging Investors**

168.  As a result of the unsealing of the Indictment and the filing of the SEC Action, on September 10, 2015, NASDAQ halted trading of 6D Global securities, freezing the stock price at $2.90.

169.  To date, trading in the Company's stock remains halted, making the Company's stock illiquid and virtually worthless, thereby damaging investors.

**Additional Action Filed: The Private Stock Purchase Agreement Action**

170.  On September 28, 2015, Discover Growth Fund ("Discover") filed an action against Defendants 6D Global, Defendant Wei and the officers and directors of 6D Global in this Court. *Discover Growth Fund v. 6D Global Technologies, Inc., et al.*, 15-cv-07618 (the "Private Action"). The Private Action is attached hereto as Exhibit 3 and incorporated by reference herein.

171.  The Private Action alleges that on August 10, 2015, Discover entered into a Stock Purchase Agreement ("SPA") with 6D Global in which Discover paid $10,000,000 in exchange for 1,088 convertible preferred shares of 6D Global.

172.  6D Global induced Discover to enter into the SPA by misrepresenting its status as an award-winning digital business, marketing, and technology company and failing to disclose

that it was being investigated by the SEC and the Department of Justice, and further failing to disclose the role of Defendant Wei and his nominees in controlling the Company and manipulating its stock price.

173.    It was only after the execution of the SPA, during an August 18, 2015 meeting that 6D Global revealed the status of Defendant Wei as 6D Global's controlling stockholder.

174.    The August 18 meeting was prompted by an e-mail from Defendant Kang to John Kirkland, investment advisor to Discover, in which Kang proposed the meeting and suggested bringing "a representative from NYGG Asia the other large shareholder in 6D Global", i.e., Defendant Wei.

175.    Discover had never heard of Defendant Wei and at the August 18th meeting, Defendant Wei stated that he controlled Defendant NYGG, and, through Defendant NYGG, he controlled all of 6D Global stock. Defendant Wei continued to say that Defendant Kang worked for him and that there was "no real public float" and basically all free trading shares of 6D Global were controlled by him and his "friends in China."

176.    At the August 18th meeting, Defendant Kang said about his relationship to Defendant Wei: "basically, I work for him."

177.    Discover's complaint seeks both compensatory and punitive damages, as well as rescission of the SPA and return of the $10,000,000 payment for the Company's shares.

## DAMAGES TO 6D GLOBAL

178.    As a direct and proximate result of the Individual Defendants' conduct, 6D Global has lost and has expended and will continue to expend many millions of dollars.

179.    Such expenditures include, but are not limited to, legal fees associated with the federal securities fraud class action lawsuit filed against the Company and its management, and with the Private Action, NASDAQ's halting of trading of Company stock, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

180.    Such losses include those due to the unjust enrichment of the Defendants and Company employees who illicitly received proceeds and fees from the stock manipulation scheme and/or were improperly over-compensated by the Company, including through bonuses and other compensation connected to the Defendants' intentional false and misleading statements and stock manipulation scheme.

181.    As a direct and proximate result of the Individual Defendants' conduct, 6D Global has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## **DERIVATIVE ALLEGATIONS**

182.    Plaintiff brings this action derivatively and for the benefit of 6D Global to redress injuries suffered, and to be suffered, as a result of the Defendants' breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of 6D Global and unjust enrichment, as well as the aiding and abetting thereof.

183.    6D Global is named solely as a nominal party in this action.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

184.    Plaintiff is, and at all relevant times has been, a 6D Global shareholder.   Plaintiff will adequately and fairly represent the interests of 6D Global in enforcing and prosecuting its

rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

185.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

186.     A pre-suit demand on the Board of 6D Global is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following four Individual Defendants: Kang, Hartung, Chrzaszcz, and Bannout (collectively, the "Current Directors").  Plaintiff needs only to allege demand futility as to two of the four Current Directors that are on the Board at the time this action is commenced.

187.     Demand is excused as to all of the Current Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme and false and misleading statements and omissions of material fact, which render them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

188.     In complete abdication of their fiduciary duties, the Current Directors either participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price: A) by permitting Defendant Wei to engage in a scheme to manipulate the price and trading volume of 6D Global's stock by using undisclosed nominee accounts to purchase and sell the stock; B) by failing to maintain for the Company adequate internal and financial controls; and C) by making and/or causing the Company to make false and misleading statements by failing to disclose to the investing public 1) the above scheme, and 2) that the Company lacked

adequate internal and financial controls.   The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.   As a result of the foregoing, the Current Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

189.   Defendant Kang admitted that he works for Defendant Wei, and together they own about 75% of Company stock.   Even without Kang's huge Company stock interest, the Company admitted in its SEC filings that, "NYGG (Asia), Ltd. [controlled by Defendant Wei] holds, in the aggregate, approximately 45.0% of the outstanding shares of our common stock for the year ended March 19, 2015.   As a result, NYGG (Asia) has the ability to substantially influence and, in some cases, may effectively control the outcome of corporate actions requiring stockholder approval, including the election of directors.   This concentration of ownership may also have the effect of delaying or preventing a change in control of 6D Global, even if such a change in control would benefit other investors."   Together with Defendant Kang's additional 30% stock interest, Defendant Wei owns 3/4 of the Company and fully controls it.

190.   In September 2015, Defendants Wei and Kang caused 3 out of 5 of the members of the Board at the time to "resign," and the 4th resigned in early October 2015.   This active exertion of their control of the Board, together with their majority ownership, demonstrates that the three Current Directors, in addition to Defendant Kang, that they appointed to replace those who "resigned" were actually Defendants' Wei's and Kang's puppets, who were beholden to them.

191.   Therefore, all of the Current Directors but Defendant Kang are not independent or disinterested, but are beholden to Defendants Kang and Wei.

192.    Defendant Kang is not independent or disinterested, but is beholden to Defendant Wei, as he admitted that he works for Defendant Wei, and as he is the CEO of the Company and depends on Defendant Wei for his primary source of income.

193.    Additional reasons that demand on Defendant Kang is futile follow.  Defendant Kang, as the Company's Chairman and Chief Executive Officer is thus a non-independent director.  He was ultimately responsible for the Company's operations, internal controls, and a number of the false and misleading statements and omissions that were made, including those contained in the SEC filings, all of which he signed.  His large Company stock holding -- 29.7% of the Company's issued and outstanding common stock -- reveals his interest in keeping the Company's stock price as high as possible and his control over the Company.  Moreover, Defendant Kang is beholden to, and controlled by, Defendant Wei: he borrowed money from Defendant Wei's wife; and he "hired" Defendant Wei to act as an allegedly unpaid "consultant" to the Company, during which time it is possible he imparted material, confidential information about the Company to Defendant Wei.

194.    Defendant Kang is also a defendant in the securities fraud class action lawsuit.  Thus, for these reasons, too, Defendant Kang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

195.    Before the Current Directors were appointed together, the Board consisted of the following five Individual Defendants: Kang, Hartung, Kaufman, McEwen and Saxena (the "Former Directors").

196.    The Current Directors and the Former Directors are collectively referred to herein as the Directors.

197.    Alternatively, Plaintiff pleads demand futility due to his alleging that four of the five Former Directors, who were on the Board at the time the stock manipulation scheme took place and the false financial statements were made, breached their fiduciary duties by abandoning the Company when they resigned as Company directors in order to insulate themselves from shareholder derivative claims.  Courts hold that such clever conduct establishes an exception to the requirement to plead that demand on directors who were appointed after wrongdoing occurred is futile.

198.    Indeed, the Former Directors breached their fiduciary duties by, in the wake of public exposure of Defendant Wei's stock manipulation scheme, collectively resigning in order to insulate themselves from shareholder derivative claims.  Instead of endeavoring to recover on behalf of the Company the damages the Company suffered and will suffer from those responsible for fraud and manipulation, they dropped out and appointed a new board that had no first-hand knowledge of the wrongdoing or of the Company itself.  Patently, the Former Directors conspired with the Current Directors by the Former Directors collectively resigning, the result of which, they all expected, would be the receipt of get-home free tickets by the Former Directors.

199.    For the foregoing reasons, demand is excused because Courts do not permit directors who breached their fiduciary duties to defeat demand futility allegations by collectively resigning from and abandoning the company to which they owe allegiance.

200.    The Current and Former Directors, as members of the Board, were and are subject to the Code of Ethics.  The Code of Ethics goes well beyond the basic fiduciary duties required

by applicable laws, rules, and regulations. The Code of Ethics required the Current and Former Directors to also adhere to 6D Global's standards of business conduct. The Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict with our interests or adversely affect the Company's reputation. The Current and Former Directors did not comply with the requirements of the Code of Ethics. The Current and Former Directors violated the Code of Ethics because they participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price. Because the Current and Former Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

201.    The Current and Former Directors also breached their fiduciary duty of loyalty by failing to ensure that the Company had an adequate system of internal controls in place to prevent the misrepresentations made by the Individual Defendants and to prevent the scheme to artificially inflate the Company stock price. Indeed, the Current and Former Directors knowingly or recklessly disregarded any such controls by causing and facilitating the scheme. Accordingly, the Current and Former Directors breached their fiduciary duties in failing to implement such internal controls and, therefore, face a substantial likelihood of liability, and demand upon them is futile.

202.    The Current and Former Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Current and Former Directors from adequately monitoring the Company's

operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Current and Former Directors would be futile.

203.    6D Global has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for 6D Global any part of the damages 6D Global suffered and will continue to suffer thereby.  Thus, any demand on the Current Directors would be futile.

204.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Current or Former Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Current Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

205.    The acts complained of herein constitute violations of fiduciary duties owed by 6D Global's officers, directors and/or controlling shareholders, and these acts are incapable of ratification.

206.    The Current Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate

funds, i.e., monies belonging to the stockholders of 6D Global.  If there is a directors' and officers' liability insurance policy covering the Current Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Current Directors, known as, inter alia, the "insured-versus-insured exclusion."  As a result, if the Current Directors were to sue themselves or certain of the officers of 6D Global, there would be no directors' and officers' insurance protection.  Accordingly, the Current Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Current Directors is futile and, therefore, excused.

207.   If there is no directors' and officers' liability insurance, then the Current Directors will not cause 6D Global to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

208.   Thus, for all of the reasons set forth above, all of the Current Directors, and, if not all of them, certainly at least two of the Current Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the Defendants for Breach of Fiduciary Duties**

209.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

210.    Each Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of 6D Global's business and affairs.

211.    Each of the Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

212.    The Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.   The Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of 6D Global.

213.    In breach of their fiduciary duties owed to 6D Global, the Defendants willfully participated in misrepresentation of the Company's business operations and prospects, failed to correct the Company's public statements about the Company, and failed to properly oversee 6D Global's business and internal controls, rendering them liable to the Company for breaching their fiduciary duties.

214.    The Defendants had actual or constructive knowledge that that they had caused the Company to improperly misrepresent its business operations and prospects and they failed to correct the Company's public statements about the Company.   The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of 6D Global's securities and disguising self-dealing transactions.

215.    The Defendants had actual or constructive knowledge that that they had permitted Defendant Wei to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of 6D Global's securities and engaging in self-dealing transactions.

216.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

217.    As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, 6D Global has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Defendants are liable to the Company.

## SECOND CLAIM

### Against Defendants for Unjust Enrichment

218.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

219.    By their wrongful acts and the omissions of material fact that they caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment of, 6D Global.

220.   The Defendants either benefitted financially from the improper conduct, including through proceeds or fees received from the stock manipulation scheme, or received bonuses, stock options, or similar compensation from 6D Global that was tied to the performance or artificially inflated valuation of 6D Global, or received compensation that was unjust in light of the Defendants' bad faith conduct.

221.   Plaintiff, as a shareholder and a representative of 6D Global, seeks restitution from the Defendants and seeks an order from this Court disgorging all proceeds, fees, profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

### THIRD CLAIM

**Against the Defendants for Violations of Section 14 of the
Securities Exchange Act of 1934**

222.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223.   Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's 2015 Proxy Statement violated §14(a) and Rule 14a-9 because it omitted material information regarding the wrongdoing of defendants and their background, and included by reference materially false and misleading financial statements.

224.    In the exercise of reasonable care, defendants should have known that the statements contained in the 2015 Proxy Statement were materially false and misleading.

225.    The misrepresentations and omissions in the 2015 Proxy Statement were material to Company shareholders in voting on the proxy statement. The 2015 Proxy Statement was an essential link in the accomplishment of the continuation of Defendants' continued violation of their fiduciary duties in connection with the stock manipulation scheme, the making of false and misleading statements, and the failure to institute sufficient controls over financial reporting.

226.    The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2015 Proxy Statement.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of 6D Global, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Defendants have breached and/or aided and abetted the breach of their fiduciary duties to 6D Global;

(c)    Determining and awarding to 6D Global the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing 6D Global and the Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect 6D Global and its shareholders from a repeat of the damaging events

described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.      a proposal to strengthen the board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.      a provision to permit the shareholders of 6D Global to nominate at least three candidates for election to the board; and

3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding 6D Global restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 10, 2015                    Respectfully submitted,

                                            **THE BROWN LAW FIRM, P.C.**

                                            By:    /s Timothy W. Brown
                                                   _____

                                            Timothy W. Brown, Esq.
                                            Email: tbrown@thebrownlawfirm.net
                                            127A Cove Road
                                            Oyster Bay Cove, New York 11771
                                            Telephone: (516) 922-5427

                                            *Counsel for Plaintiff*

<u>VERIFICATION</u>

I, Allan Scott, am the plaintiff in the within action and am a citizen of the State of Nevada. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 10th day of December, 2015.


_____
Allan Scott