**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLAN SCOTT, DERIVATIVELY AND ON BEHALF OF 6D GLOBAL TECHNOLOGIES INC., | ) ) ) ) |
| | Case No. 1:15-cv-09691-RWS |
| Plaintiff, | ) ) | **AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** |
| v. | ) ) ) | |
| | | **(1) BREACH OF FIDUCIARY DUTY;** |
| BENJAMIN TIANBING WEI A/K/A/ BENJAMIN WEY, NEW YORK GLOBAL GROUP, INC., NYGG (ASIA), LTD., TEJUNE KANG, MARK SZYNKOWSKI, ADAM HARTUNG, DAVID S. KAUFMAN, TERRY MCEWEN, ANUBHAV SAXENA, PIOTR A. CHRZASZCZ, and MICHAEL BANNOUT, | ) ) ) ) ) ) ) ) ) ) | **(2) UNJUST ENRICHMENT; AND (3) VIOLATIONS OF SECTION 14 OF THE SECURITIES EXCHANGE ACT OF 1934** |
| | | **JURY TRIAL DEMANDED** |
| Defendants, | ) ) | |
| And | ) ) | |
| 6D GLOBAL TECHNOLOGIES INC., | ) ) | |
| Nominal Defendant. | ) ) ) ) ) | |

Plaintiff Allan Scott ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf

of Nominal Defendant 6D Global Technologies Inc. ("6D Global" or the "Company"), files this

Verified Shareholder Derivative Complaint against defendants Benjamin Tianbing Wei a/k/a/ Benjamin Wey, Tejune Kang, Mark Szynkowski, Adam Hartung, David S. Kaufman, Terry McEwen, Anubhav Saxena, Piotr A. Chrzaszcz, and Michael Bannout (collectively, the "Individual Defendants") and defendants New York Global Group, Inc. ("NYGG") and NYGG (Asia), Ltd. ("NYGG-Asia"), (which together with the Individual Defendants are the "Defendants"), for breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of 6D Global and its predecessor, and unjust enrichment for his complaint against Individual Defendants, NYGG, and NYGG-Asia, and alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Individual Defendants, United States Securities and Exchange Commission ("SEC") filings, the United States Department of Justice filings, and in particular, the Indictment of Benjamin Tianbing Wei  a/k/a/ Benjamin Wey ("Wey") in this Court, the pleadings filed in this Court by the SEC against Defendant Wey and others, and the action filed in this Court by Discover Growth Fund against Defendant Wey and others, wire and press releases published by and regarding 6D Global, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by 6D Global's directors, officers and/or controlling stockholders who, from June 16, 2014

through the present (the "Relevant Period"), breached their fiduciary duties to 6D Global, formally known as CleanTech Innovations, Inc., ("CleanTech") by: a) permitting Defendant Wey to engage in a scheme to manipulate the price and trading volume of 6D Global's stock by using undisclosed nominee accounts to purchase and sell the stock; b) failing to maintain for the Company adequate internal and financial controls; and c) making false and misleading statements by failing to disclose to the investing public that: i) Defendant Wey, in effect, controlled all of the Company's stock; ii) Defendant Wey was engaged in a scheme to manipulate the price and trading of 6D Global's stock; and iii) the Company lacked adequate internal and financial controls.

2.      6D Global is a digital business solutions company serving the worldwide digital marketing and technology needs of enterprise-class organizations.  6D Global's services include web analytics, marketing automation, mobile applications, business intelligence, marketing cloud, and IT infrastructure-staffing solutions.

3.      Between about 2008 and 2015, at least, Defendant Wey operated and controlled an extensive criminal conspiracy that employed numerous associates, including affiliates such as compliant public companies and their respective officers and directors.

4.      Defendant Wey managed and owned a New York-based financial consulting firm, NYGG.  Defendant Wey also operated and owned a China-based investment-banking firm, NYGG-Asia.  Defendant Wey repeatedly and publicly claimed that NYGG-Asia was entirely independent of both him and NYGG.

5.      Quite to the contrary, Defendant Wey caused Chinese companies seeking U.S. stock market-listing to retain NYGG-Asia (the "NYGG Clients").  Defendant Wey assisted NYGG Clients in arranging for auditing, investment banking, legal and other professional services to

prepare for and obtain a public listing in the United States.  In the process, Defendant Wey secretly acquired large blocks of NYGG Clients' stock through nominee companies (the "Nominees").

6.      Because Defendant Wey's shares accounted for the majority of NYGG Clients' free-trading stock, Defendant Wey was able to manipulate trading in NYGG Clients' stock, pushing up trading prices.  He then sold his shares at artificially inflated prices.  After Defendant Wey sold his stock, NYGG Clients' stock price quickly collapsed.

7.      As set forth in more detail, below, Defendant Wey also controlled NYGG Clients' day-to-day operations.  Defendant Wey caused NYGG Clients to pay NYGG, his New York-based investment advisory and consulting firm, and Defendant Wey's Nominees – for services rendered when no services were, in fact, rendered.

8.      Defendant Wey reaped more  than $70 million from his scheme, and caused hundreds of millions of dollars in damages to investors in all his affiliated companies, and in particular, 6D Global.  As a result of his corporate malfeasance and other criminal conduct, the DOJ indicted Defendant Wey and an associate, and the SEC has sued him along with several additional associates.

9.      With CleanTech, a supplier of physical equipment used in wind turbines in China, Defendant Wey and certain investors personally known to him were left holding the bag.  Days after approving CleanTech's listing, the NASDAQ discovered CleanTech had been concealing material information about NYGG's involvement in its affairs.

10.     The NASDAQ swiftly delisted CleanTech's stock – *after* Defendant Wey had acquired his shares, but *before* he could sell them.

11.     Through  two  years  of  litigation,  dominated  by  Defendant  Wey,  CleanTech

persuaded the SEC to reverse the NASDAQ delisting.

12.     Defendant Wey and CleanTech were able to accomplish the delisting by making numerous false statements to the NASDAQ, the SEC, and the courts.  Chiefly, in the campaign to relist, Defendant Wey and CleanTech persistently stated that NYGG and NYGG-Asia were distinct entities, with Defendant Wey having no interest in NYGG-Asia.  This statement was false: NYGG-Asia's purported boss Roger Li was Defendant Wey's sister's domestic partner, and he reported to Defendant Wey himself.  Defendant Wey, in truth, owned all of NYGG-Asia.

13.     Although Defendant Wey's campaign to reverse CleanTech's delisting ultimately succeeded in 2013, his victory was pyrrhic.  CleanTech, which after the campaign had no public market for its stock, was left, indebted to NYGG-Asia for $16 million.

14.     Defendant Wey determined to make a fresh start.

15.     In June of 2014, Defendant Wey caused CleanTech to agree to "acquire" Six Dimensions, Inc. ("Six Dimensions"), a small private U.S. company that purportedly provides IT services.

16.     The acquisition of Six Dimensions was a complicated transaction.  Its critical terms were that: (a) CleanTech "sold" its operations to its Chinese officers and directors, who, in return, cancelled their personally-held CleanTech shares; (b) CleanTech "acquired" Six Dimensions in exchange for CleanTech stock; and (c) NYGG-Asia converted its CleanTech debt into 6D Global stock (the transaction which included these terms and others is the "6D Global Acquisition").  NYGG-Asia was left holding about 46% of 6D Global's stock, while Six Dimension's former shareholders held about 50%.

17.     SEC rules require companies to disclose persons who beneficially hold more than

5% of their stock.  However, if 6D Global disclosed to investors that Defendant Wey beneficially held 45% of its stock, the Company would be confessing to repeated misrepresentations to the NASDAQ to the contrary, that Defendant Wey did not own and/or control NYGG-Asia.

18.     The NASDAQ would delist 6D Global if it ever discovered that CleanTech had secured reversal of the NASDAQ's delisting decision by lying on the record and to the SEC. Moreover, by this time, Defendant Wey had become notorious.  Defendant Wey had judgment entered against him in a well-publicized sexual harassment trial that ended with an $18 million verdict against Defendant Wey,[1] and a defamation action filed by a FINRA judge who previously ruled against Defendant Wey's associates, thereby becoming the subject of years' worth of slanderous articles appearing in Wey-controlled media.[2]

19.     The Individual Defendants thus continued to misleadingly omit that NYGG-Asia's shares were ultimately owned by Defendant Wey.

20.     Defendant Wey also personally oversaw much of 6D Global's business. Defendant Wey interviewed all candidates for leadership position.  Defendant Wey selected 6D Global's auditor.   Defendant Wey also selected 6D Global's acquisition targets, and he took the lead in negotiating the financing and other agreements related thereto.

21.     6D Global's CEO and Chairman of the Board, Defendant Kang, later privately admitted that, "basically, I work for [Wey]."

22.     The Individual Defendants did not disclose that Defendant Wey was 6D Global's unofficial CEO, either, misleadingly claiming that 6D Global's business was managed by its Board

---

[1] *See Bouveng v. NYG Capital LLC*, No. 14 CIV. 5474 PGG, 2015 WL 3503947 (S.D.N.Y. June 2, 2015).

[2] *See Brummer v. Wey*, 153583/2015 (N.Y. Sup. Ct.).

of Directors and the Company's officers.  Defendant Wey was not an officer of the Company, but Defendant Wey was the ultimate control person of 6D Global.

23.     On September 10, 2015, the Department of Justice ("DOJ") and SEC announced, respectively, the criminal indictment of and a civil lawsuit against Defendant Wey. The DOJ and SEC releases disclosed, among other things, that Defendant Wey's claim to NASDAQ and the SEC that he did not own NYGG-Asia had been a brazen falsity.  Thus, the DOJ and SEC releases revealed that the Individual Defendants' statements made during the Relevant Period materially omitted Defendant Wey's status as beneficial owner of NYGG-Asia's 6D Global shares.

24.     That same day, shocked to discover that Defendant Wey had secured reversal through lies, the NASDAQ halted trading in 6D Global's stock.

25.     Soon after the September 10 trading halt, an institutional investor which had invested $10 million in 6D Global just a month before, Discover Growth Fund ("Discover"), sued to get its money back (the "Discover Litigation").[1]  The institutional investor, Discover, claimed it had not known about Defendant Wey's involvement, and Discover sought an order of attachment.  To bolster their arguments to the contrary, 6D Global filed declarations under penalty of perjury on behalf of Defendants Kang and Szynkowski, claiming that Defendant Wey was not, and had never been, a shareholder of 6D Global.  The Individual Defendants thereby denied knowledge that NYGG-Asia's shares were actually beneficially owned by Defendant Wey.

26.     Defendants Kang's and Szynkowski's statements in the Discover Litigation were knowingly false.  Discovery unearthed a recording of Defendant Kang, in which he candidly admits to another 6D Global executive that "Benjamin Wey" is "a shareholder" of 6D Global, and

---

[1] *See Discover Growth Fund v. 6D Global Technologies, Inc.*, 15-cv-7618-PKC (S.D.N.Y.).

as such, "he's got influence" over it.

27.     Beyond misconduct in the Discover Litigation, instances of the Individual Defendants' conduct evidence conscious misbehavior.  For example, Defendant Kang instituted a Company rule prohibiting other 6D Global employees from referencing Defendant Wey in email; any reference should refer instead to Defendant Wey by code name.

28.     On November 20, 2015, the NASDAQ delisted 6D Global's stock, citing, among other things, Defendant Wey's improper influence over 6D Global's management.  6D Global promptly appealed.  On January 21, 2016, the Company appeared before a NASDAQ Hearings Panel.

29.     Moreover, during an audit of 6D Global's 2015 financial statements, 6D Global's auditor BDO USA LLP ("BDO") conducted investigative procedures to determine whether Defendant Wey's influence over 6D Global violated its internal controls. In conducting these procedures, BDO determined that Defendants Wey and Kang had disobeyed the Board's explicit instructions and issued stock options to NYGG employees in violation of company rules.

30.     BDO also determined that Defendant Kang had repeatedly lied to 6D Global's Board, and in connection with an internal investigation, about Defendant Wey.

31.     BDO advised 6D Global that the auditor could no longer rely on Defendant Kang's representations.  BDO recommended that Defendant Kang resign; if Defendant Kang did not resign, the auditor would have to step down from the Company's retention.

32.     The Chair of the Company's Audit Committee, Defendant Hartung, moved in accordance with the auditor's demand.  However, despite BDO's findings, 6D Global refused to terminate Defendant Kang.

33.     On March 17, 2016, as advised, BDO sent 6D Global a letter offering its resignation.  The news of BDO's resignation was announced in a Form 8-K filed with the SEC on March 23, 2016.

34.     On March 24, 2016, the NASDAQ Hearings Panel denied 6D Global's appeal of its delisting.

35.     Trading in 6D Global's stock opened over the counter on March 29, 2016. Over the next four trading days, 6D Global's stock price fell from its halt price of $2.90 per share to $0.21 per share, or almost 93%.

36.     Today, the Company stock trades at $0.15 per shares.

37.     The Individual Defendants' breaches of fiduciary duty have subjected the Company, the Company's Chief Executive Officer and Chairman, the Company's Chief Financial Officer, and the Company's Directors to a securities fraud class action in this Court and to a private action brought by a 6D Global institutional investor in a private offering, have subjected its controlling shareholder to criminal charges in this Court, have subjected its controlling shareholders to a complaint filed in this Court by the SEC, have caused NASDAQ's halting and then delisting of Company stock, have caused the need to undertake internal investigations, subjected the Company to losses due to the unjust enrichment of Individual Defendants who benefitted from their illegal stock manipulation scheme and/or who were improperly over-compensated by the Company, including through bonuses and other compensation connected to the Individual Defendants' scheme of intentional and/or reckless misconduct, and will cost the Company going forward many millions of dollars.

38.     The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

39.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants who are the Company's current Directors, Officers, and/or controlling stockholders, and/or the Directors and Officers of the predecessor company, all of which acted under the direction of Defendant Wey -- to whom they were beholden, of the substantial likelihood of their liability in this derivative action, in the federal securities law class action and in the private action brought by a 6D Global institutional investor in a private offering, of their not being disinterested and/or independent Directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

40.     This Court has over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction of the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

41.     Additionally, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff is a citizen of a different state than the Individual Defendants and 6D Global, and the amount in controversy exceeds $75,000 exclusive of interest and costs. Plaintiff is a citizen of Nevada and no defendant is a citizen of that state.

42.     The Court has personal jurisdiction over each of the Individual Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

43.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Individual Defendants either resides or maintains executive offices in this District, and the Individual Defendants have received substantial compensation and/or profits in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

44.     Plaintiff is a current shareholder of shares of 6D Global.  Plaintiff has continuously held 6D Global common stock at all relevant times.  Plaintiff is a citizen of Nevada.

### Nominal Defendant 6D Global

45.     Nominal Defendant 6D Global is a Delaware corporation with principal executive offices located in this District at 17 State Street, Suite 2550, New York, N.Y. 10004.  6D Global is a citizen of New York and Delaware.

46.     6D Global is the successor entity of CleanTech, which was a Nevada corporation. During CleanTech's years of operation, it designed, manufactured, tested and sold structural towers for on-land and off shore wind turbines. Clean Tech became a publicly-traded company that traded on NASDAQ under the ticker symbol "CTEK" through a reverse merger with shell company Everton Capital Corporation ("Everton"), prior to its merger into 6D Global.

47.     On June 16, 2014, CleanTech filed a Form 8-K with the SEC announcing that on June 13, 2014 it had entered into a merger agreement with Six Dimensions, Inc. ("Six Dimensions"), a Nevada corporation formerly known as Initial Koncepts, Inc.  Six Dimensions became the wholly-owned subsidiary of CleanTech.  After the merger, CleanTech converted into a Delaware corporation and changed its name to 6D Global Technologies, Inc. ("6D Global").

**Defendant NYGG-Asia**

48.     Defendant NYGG (Asia), Ltd. ("NYGG-Asia") is a subsidiary of Defendant NYGG and is located in Beijing, China.

49.     According to the Company's 2015 proxy statement filed with the SEC on April 30, 2015 on Form 14A (the "2015 Proxy Statement"), "On September 29, 2014, in connection with the Exchange, NYGG (Asia) Ltd. ("NYGG Asia"), CleanTech's largest creditor, pursuant to a Debt Conversion Agreement ("Debt Conversion Agreement"), converted all of CleanTech's indebtedness to NYGG Asia, in the aggregate approximate amount of $16,000,000, in exchange for the issuance of 35,149,883 shares of Common Stock to NYGG Asia and the cancellation of CleanTech's indebtedness to NYGG Asia."

50.     According to the Company's 2015 Proxy Statement, as of April 20, 2015, Defendant NYGG-Asia held 44.9% of 6D Global's outstanding shares. Additionally, Defendant NYGG-Asia actively exerted control over the Company.  Thus, Defendant NYGG-Asia was a controlling shareholder of the Company.

51.     The Company admitted in its annual reported for the year ending December 31, 2014 that it filed with the SEC on March 30, 2015 ("2014 10-K") that NYGG-Asia was its controlling shareholder in stating, "NYGG (Asia), Ltd. holds, in the aggregate, approximately

45.0% of the outstanding shares of our common stock for the year ended March 19, 2015.  As a result, NYGG (Asia) has the ability to substantially influence and, in some cases, may effectively control the outcome of corporate actions requiring stockholder approval, including the election of directors.  This concentration of ownership may also have the effect of delaying or preventing a change in control of 6D Global, even if such a change in control would benefit other investors."

**Defendant NYGG**

52.     Defendant NYGG is a Delaware corporation headquartered in New York, New York and has an additional office is in Beijing, China. 6D Global is a citizen of New York and Delaware. During the relevant period, Defendant NYGG offered consulting services, among other things, to China-based operating companies that endeavored to raise funds in the U.S. capital markets.

53.     Through Defendant NYGG-Asia, NYGG, which actively exerted control over NYGG-Asia and the Company, was a controlling shareholder of the Company.

**Defendant Wey**

54.     Defendant Wey is the founder and President of Defendant NYGG and oversaw the operations of Defendant NYGG-Asia during the Relevant Period. Defendant Wey was indicted by the United States Attorney for the Southern District of New York on September 8, 2015, for stock manipulation and the massing of undisclosed beneficial ownership of more than five percent of the stock of 6D Global, among other companies, and on September 10, 2015 was placed under arrest.  Defendant Wey is a citizen of New York.

55.     Through Defendant NYGG, and, in turn, through Defendant NYGG-Asia, Defendant Wey, who actively exerted control over NYGG, NYGG-Asia, and the Company, was a controlling shareholder of the Company.

56.     The services Defendants Wey and NYGG provided to NYGG's clients included handpicking accountants, auditors, directors, and attorneys for the companies; finding shell companies for and facilitating reverse mergers; and advising NYGG's clients regarding financing transactions.

57.     In addition to these advertised and disclosed services, Defendant Wey and NYGG, with the involvement of Defendant Wei's sister, Tianyi Wei, his wife, Michaela Wey, and others engaged in deceptive conduct to obtain and profit from undisclosed, controlling ownership interests in NYGG's clients and increase the value of NYGG's clients' securities, thereby increasing the value of the significant holdings of those securities by Defendant Wey and his wife and sister.

**Defendant Kang**

58.     Defendant Tejune Kang ("Kang") served as the Chief Executive Officer of Six Dimensions, the predecessor company to 6D Global, since the company's founding in 2004.  He was appointed Chairman of the Board of Directors and Chief Executive Officer of 6D Global in September 2014.

59.     According to the Company's 2015 Proxy Statement, as of April 20, 2015, Defendant Kang beneficially owned 23,250,561 shares of the Company's issued and outstanding common stock.  This accounts for 29.7% of the outstanding common stock of the company.  Given

that, as of the close of business on September 10, 2015, one share of common stock traded for $2.90, Defendant Kang's stock was worth $67,426,626.90.

60.     In 2015, Defendant Kang, acting on behalf of the Company, entered into an unwritten agreement with Defendant Wey for Defendant Wey to act as a "consultant" for the Company and use his contacts to connect the Company with potential investors.

61.     In August 2015, Defendant Kang borrowed $100,000 from the wife of Defendant Wey to purchase additional 6D Global stock. The term of the loan from Defendant Wey's wife expired on December 3, 2015 and it incurred interest at the rate of 4%.

62.     The Company's 2015 Proxy Statement stated the following about Defendant Kang:

Mr. Kang has served as the Chief Executive Officer of Six Dimensions, the predecessor company to 6D Global, since the company's founding in 2004, and was appointed chairman of the Board of Directors of 6D Global in September 2014. Before founding Six Dimensions, Mr. Kang was a principal of Kang Management Group, a commercial real estate developer in Nevada, until 2009 when it was closed down due to the global financial crisis that negatively affected the real estate markets in the West Coast. In early 2010, Mr. Kang filed a bankruptcy petition under Chapter 7 of Title 11 of the United States Code in connection with his personal guarantee of land projects and the inability to refinance related indebtedness. Since then, Mr. Kang has devoted his efforts to growing Six Dimensions. Prior to Kang Management Group, Mr. Kang was an engineer for five years with PeopleSoft (now Oracle Corporation). While at PeopleSoft, Mr. Kang managed Human Resources, Financial, Supply Chain, and Enterprise Performance Management software implementations for Fortune 500 companies including Boeing, Apple, AT&T, HP. Mr. Kang is an active member of Inc. Business Owners Council (IBOC), Vistage, Entrepreneurs' Organization (EO), Alliance of CEOs, National Association of Asian American Professionals (NAAAP), Massachusetts Institute of Technology's Key Executive Program and UBS Elevating Entrepreneur's Small Business Mentoring Program. Mr. Kang graduated from The University of California, Davis with a Bachelor of Science degree in Managerial Economics.

63.     Upon information and belief, Defendant Kang is a citizen of California.

**Defendant Szynkowski**

64.     Defendant Mark Szynkowski ("Szynkowski") has served as the Chief Financial Officer of 6D Global since December 2014.

- 15 -

65.     The Company's 2015 Proxy Statement stated the following about Defendant Szynkowski:

Prior to joining the Company, from December 2005 to July 2014, Mr. Szynkowski was Vice President of Finance for Epiq Systems, a provider of integrated technology products and services for the legal profession. Prior to his tenure at Epiq Systems, Mr. Szynkowski served as Chief Financial Officer and Controller for multiple high-growth organizations and began his career with Ernst & Young. Mr. Szynkowski graduated from Alfred University with a Bachelor degree in Accounting.

66.     Upon information and belief, Defendant Szynkowski is a citizen of New York

**Defendant Hartung**

67.     Defendant Adam Hartung ("Hartung") served as a member of the Board of Directors from September 2014 and  as Chairperson of the Audit Committee and a member of the Compensation and Governance and Nominating Committees – all until his resignation on April 16, 2016.

68.     The Company's 2015 Proxy Statement stated the following about Defendant Hartung:

Mr. Hartung has served as the CEO and Managing Partner of Spark Partners, a strategy and transformation consultancy, since 2004. In 2010, Mr. Hartung became the founding CEO of Soparfilm Energy, a corporation that invests in oil and gas exploration. Additionally, Mr. Hartung has written columns for Forbes.com and CIO Magazine, and has been a contributing editor for the International Journal of Innovation Science since its founding in 2008. Mr. Hartung is the Chairperson of our Audit Committee and a member of our Compensation and Governance and Nominating Committees. Mr. Hartung received a Master in Business Administration degree from Harvard Business School.

69.     Upon information and belief, Defendant Hartung is a citizen of Illinois.

**Defendant Kaufman**

70.     Defendant Davis S. Kaufman ("Kaufman") has served as a member of the Board of Directors since September 2014 and is Chairperson of the Governance and Nominating Committee

and a member of the Audit and Compensation Committees.  On September 30, 2015, Defendant

Kaufman gave written notice to the Company of his resignation from his position as a member of

the Board of Directors of the Company.

71.     The Company's 2015 Proxy Statement stated the following about Defendant

Kaufman:

Mr. Kaufman is currently an Executive Consultant and Partner at FIN Strategy Advisers. Mr.
Kaufman was Senior Vice President and Chief Information Officer at ARAMARK Corporation
from 2005 to 2013. Prior to this role, Mr. Kaufman served as the Vice President, Global Supply
Chain and Quality Information Technology of Schering-Plough Corporation. Earlier, Mr.
Kaufman had a 17 year career with PepsiCo Inc. Mr. Kaufman has served as a member of several
advisory boards, including the Oracle CIO Advisory Board, Sprint CIO Advisory Board, Temple
Fox School of Business MIS Advisory Board, and Villanova School of Business MIS Advisory
Board. Mr. Kaufman is the Chairperson of our Governance and Nominating Committee and a
member of our Audit and Compensation Committees. Mr. Kaufman received a Bachelor of
Science degree in Computer Science from New York University.

72.     Upon information and belief, Defendant Kaufman is a citizen of Pennsylvania.

**Defendant McEwen**

73.     Defendant Terry McEwen ("McEwen") served as a member of the Board of

Directors of CleanTech Innovations, Inc. ("CleanTech") and Chairman of the Audit Committee

and member of Nominating and Compensation Committees since September 2013. On October 5,

2015, Defendant McEwen gave written notice to the Company of his resignation from his position

as a member of the Board.

74.     Defendant McEwen was interim Chief Executive Officer and Chairman of the

Board from June 11, 2014 until September 2014.

75.     According to the Company's 2015 Proxy Statement, as of July 14, 2014 Defendant

McEwen owned 5,076,468 shares of CleanTech stock, which amounted to 61.0 % of the total share

- 17 -

of the CleanTech's issued and outstanding common stock.  His beneficial ownership was ultimately terminated as part of the merger that formed the Company.

76.     The Company's 2015 Proxy Statement stated the following about Defendant McEwen:

Mr. McEwen is the Business Administrator for the City of Trenton, NJ. Prior to this role, he served as a Managing Partner of Preservation Capital Services, LLC. From May 2006 to May 2010, Mr. McEwen served as the Director of Banking for the State of New Jersey Department of Banking and Insurance, a Governor-appointed position that required confirmation by the Senate of the State of New Jersey. Mr. McEwen is a 1980 graduate of the University of Pittsburgh, Pittsburgh, PA, where he was awarded a Bachelor of Science in Business Administration, with a minor in economics and psychology, and received a Master in Business Administration from Rider University in 1998.

77.     Upon information and belief, Defendant McEwen is a citizen of New York.

**Defendant Saxena**

78.     Defendant Anubhav Saxena ("Saxena") served as a member of the Board of Directors since September 2014 and served as the Chairperson of Compensation Committee and a member of the Audit and Governance and Nominating Committees. On September 30, 2015, Defendant Saxena gave written notice to the Company of his resignation from his position as a member of the Board.

79.     The Company's 2015 Proxy Statement stated the following about Defendant Saxena:

Mr. Saxena is president of the Global Managed Services division of Information Services Group (ISG), a NASDAQ listed company (symbol: III), where he also manages the Global Research and Data Services business. Before joining ISG, Mr. Saxena held a series of senior executive positions with HCL Technologies. Mr. Saxena earlier worked with Wipro Ltd. He began his career with Fujitsu ICIM Ltd. A founding member of the G2000 IT Client Executive Councils, Mr. Saxena has been a presenter at the World Economic Forum and a recipient of a number of CXO awards. Mr. Saxena is the Chairperson of our Compensation Committee and he is a member of our Audit and Governance and Nominating Committees. Mr. Saxena earned a Bachelor of Engineering (Electronics) degree from the University of Pune, India.

80.     Upon information and belief, Defendant Saxena is a citizen of California.

**Defendant Chrzaszcz**

81.     Defendant Piotr Chrzaszcz ("Chrzaszcz") has served as a member of the Board of Directors since October 24, 2015 to fill the vacancy created by the resignation of David Kaufman, and currently serves as a member of the Board's Audit Committee and Compensation Committee and as Chairperson of the Board's Governance and Nominating Committee.

82.     The Company's 2015 8-K Statement stated the following about Defendant Chrzaszcz:

Mr. Chrzaszcz is currently an active investor trading his own portfolio. Mr. Chrzaszcz served as the CEO of Commercial Masterminds Inc., a commercial real estate investment and advisory firm from 2007-2012 and holds the advanced real estate investor designation, Certified Commercial Investment Member (CCIM). Mr. Chrzaszcz was an active leader in the CCIM community and a guest lecturer for the UC Berkeley Extension, Personal Financial Planning Program discussing due diligence in commercial real estate. Mr. Chrzaszcz is an Air Force veteran and holds a Bachelor of Science in Aerospace Engineering from Boston University.

83.     Upon information and belief, Defendant Chrzaszcz is a citizen of California.

**Defendant Bannout**

84.     Defendant Michael Bannout ("Bannout") has served as a member of the Board of Directors since October 24, 2015 to fill the vacancy created by the resignation of Defendant Saxena and currently serves as a member of the Board's Audit Committee and Governance and Nominating Committee and as Chairperson of the Board's Compensation Committee.

85.     The Company's 2015 8-K Statement stated the following about Defendant Bannout:

For the past 25 years, Mr. Bannout has been the CEO and President of M. London Group, Inc., a privately owned men's and women's fashion accessories and apparel company, which he started in New York City as a small cut and sew manufacturing company and built into a multi-million

dollar enterprise with world-wide distribution. Mr. Bannout attended Brooklyn College in Brooklyn, NY.

86.    Upon information and belief, Defendant Bannout is a citizen of New York.

## RELEVANT NON-PARTY

87.    Seref Dogan Erbek, a/k/a Dogan Erbek ("Erbek") is a resident of Switzerland and was employed by a Geneva-based financial services firm. During the Relevant Period, Erbek assisted the Wey family to conceal, control, and structure their holdings in 6D Global to evade securities reporting requirements.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

88.    By reason of their positions as officers, directors, fiduciaries and/or controlling stockholders of 6D Global and because of their ability to control the business and corporate affairs of 6D Global, the Individual Defendants owed 6D Global and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage 6D Global in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of 6D Global and its shareholders so as to benefit all shareholders equally.

89.    Each director and officer of the Company owes to 6D Global and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

90.    The Individual Defendants, because of their positions of control and authority as directors, officers and/or controlling stockholders of 6D Global, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

91.     To discharge their duties, the officers, directors and/or controlling stockholders of 6D Global were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

92.     Each Defendant, by virtue of his, her, or its position as a director, officer, and/or controlling stockholder owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations to 6D Global, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers, directors and/or controlling shareholders of the Company has been ratified by the remaining Individual Defendants who collectively comprised 6D Global's Board at all relevant times.

93.     As senior executive officers, directors and/or controlling stockholders of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the NASDAQ, the Individual Defendants had a duty: a) to prevent Defendant Wey from engaging in a scheme to manipulate the price and trading volume of 6D Global's stock by using nominee accounts to purchase and sell the stock; b) to maintain for the Company adequate internal and financial controls; and c) to prevent the Company from making false and misleading statements by failing to disclose to the investing public: i) that Defendant Wey, in effect, controlled all of the Company's stock;  ii) that Defendant

Wey was engaged in a scheme to manipulate the price and trading of 6D Global's stock; and iii) that the Company lacked adequate internal and financial controls.

94.     To discharge their duties, the officers, directors and/or controlling stockholders of 6D Global were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers, directors and/or controlling shareholders of 6D Global were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to the 6D Global's own Code of Ethics and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how 6D Global conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of 6D Global and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that 6D Global's operations would comply with all laws and 6D

Global's financial statements filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

95.     Each of the Individual Defendants further owed to 6D Global and the shareholders the duty of loyalty requiring that each favor 6D Global's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

96.     At all times relevant hereto, the Individual Defendants were the agents of each other and of 6D Global and were at all times acting within the course and scope of such agency.

97.     Because of their advisory, executive, managerial, and directorial positions with 6D Global, each of the Individual Defendants had access to adverse, non-public information about the Company.

98.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by 6D Global.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

99.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

100.    The purpose and effect of the conspiracy, common enterprise and/or common course of conduct was, among other things, to: (i) to engage in, facilitate, conceal, and/or fail to stop Defendant Wey's scheme to manipulate the price and trading volume of 6D Global's stock by using undisclosed nominee accounts to purchase and sell the stock; (ii) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; (iii) to conceal adverse information concerning the Company's directors and officers and their failure to maintain adequate internal and financial controls; and (iv) to fail to maintain adequate internal and financial controls.

101.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by, among other things, causing the Company to purposefully, recklessly or negligently fail to maintain effective accounting and internal control policies and procedures, and fail to prevent Defendant Wey's stock manipulation scheme.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was

- 24 -

a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

102.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

103.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of 6D Global, and was at all times acting within the course and scope of such agency.

## **CODE OF ETHICS**

104.    Pursuant to the Company's Code of Ethics (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

105.    The Code of Ethics provides, under a section titled "Avoid Conflicts of Interest," that:

We must avoid any relationship or activity that might impair, or even appear to impair, our ability to make objective and fair decisions when performing our jobs. At times, we may be faced with situations where the business actions we take on behalf of the Company may conflict with our own personal or family interests because the course of action that is best for us personally may not also be the best course of action for the Company. We owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises. We must never use the Company's property or information for personal gain or personally take for ourselves any opportunity that is discovered through our position with the Company.

Here are some other ways in which conflicts of interest could arise:

- Being employed (you or a close family member) by, or acting as a consultant to, competitor or potential competitor, supplier or contractor, regardless of the nature of the employment, while you are employed by the Company.

- Hiring or supervising family members or closely related persons.
- Serving as a board member for an outside commercial company or organization.
- Owning or having a substantial interest in a competitor, supplier or contractor.
- Having a personal interest, financial interest or potential gain in any transaction of the Company.
- Placing company business with a firm owned or controlled by an employee of the Company or his or her family.
- Accepting gifts, discounts, favors or services from a customer/potential customer, competitor or supplier, unless equally available to employees.

Determining whether a conflict of interest exists is not always easy to do. Employees with a conflict of interest question should seek advice from management. Before engaging in any activity, transaction or relationship that might give rise to a conflict of interest, employees must seek review from their managers or Human Resources. Directors and executive officers must seek determinations and prior authorizations or approvals of potential conflicts exclusively from the Audit Committee.

Situations may occur where the Company transacts business with a party that is directly involved with the company or related to and employee of the company. A related party transaction must be disclosed to the Company's Chief Financial Officer to determine whether or not it is material to the company. In the event the related party transaction is determined to be material, it must be reviewed and approved in writing by the Audit Committee in advance of the consummation of such related party transaction. Significant related party transactions, including those involving the Company's directors or executive officers, must be reviewed and approved in writing in advance by the Board of Directors.

106.    The Code of Ethics provides, under a section titled "Protect Confidential and

Proprietary Information," that:

Integral to the Company's business success is our protection of confidential company information, as well as nonpublic information entrusted to us by employees, customers and other business partners. Confidential and proprietary information includes such things as pricing and financial data, customer names/addresses or nonpublic information about other companies, including current or potential supplier and vendors. We will not disclose confidential and nonpublic information without a valid business purpose and proper authorization.

We will not selectively disclose (whether in one-on-one or small discussions, meetings, presentations, proposals or otherwise) any material nonpublic information with respect to the Company, its securities, business operations, plans, financial condition, results of operations or any development plan. We should be particularly vigilant when making presentations or proposals to customers to ensure that our presentations do not contain material nonpublic information.

107.    The Code of Ethics provides, under a section titled "Uphold the Law," that:

The Company's commitment to integrity begins with complying with laws, rules and regulations where we do business. Further, each of us must have an understanding of company policies, rules and regulations that apply to our specific roles. If we are unsure of whether a contemplated action is permitted by law or the Company's policies, we should seek the advice of the [resource expert.] We are responsible for preventing violations of law and for speaking up if we see possible violations. Consequently, in conducting business, we shall:

a. Strictly Adhere to All Antitrust Laws. We are dedicated to ethical, fair and vigorous competition, and as such, officers, directors and employees must strictly adhere to all antitrust laws in the United States and wherever we may do business. We will sell services based on their merit, superior quality, functionality and competitive pricing. We will make independent pricing and marketing decisions and will not improperly cooperate or coordinate our activities with our competitors. We will not offer or solicit improper payments or gratuities in connection with the purchase of goods or services for the Company or the sales of its products or services, nor will we engage or assist in unlawful boycotts of particular customers.

b. Strictly Comply With All Securities Laws. In our role as a publicly traded company, we must always be alert to, and comply with, the securities laws and regulations of the United States, including those relating to the trading of securities of the Company while in receipt of "insider" information, as more fully described in the Company's Policy Statement on Insider Trading.

c. Respect the Property Rights of Others. It is important that we respect the property rights of others. We will not acquire or seek to acquire improper means of a competitor's trade secrets or other proprietary or confidential information. We will not engage in unauthorized use, copying, distribution or alteration of software or other intellectual property.

d. Be Timely and Accurate In All Public Reports. We will make certain that all disclosures made in financial reports and public documents are full, fair, accurate, timely and understandable. This obligation applies to all employees, including all finance employees, with any responsibility for the preparation for such reports, including drafting, reviewing and signing or certifying the information contained therein. No business goal of any kind is ever an excuse for misrepresenting facts or falsifying records.

Employees should inform executive management and the Human Resources department if they learn that information in any filing or public communication was untrue or misleading at the time it was made or if subsequent information would affect a similar future filing or public communication.

108.    In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' scheme to manipulate the price and

trading volume of 6D Global's stock by using undisclosed nominee accounts to purchase and sell the stock, their scheme to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment, and their scheme to conceal adverse information concerning the Company and failure to maintain adequate internal and financial controls.  In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, protect corporate assets, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

**Background**

**Defendant Wey embarks on career of regulatory violations.**

109.    After more than a decade of securities laws violations and other increasingly brazen misconduct, Defendant Wey has increasingly become infamous in the eyes of public company investors, financial journalists, and the public at large.

110.    Most recently, Defendant Wey's name was unearthed in connection with the infamous Panama Papers.  According to the report, Defendant Wey has been utilizing offshore companies set up by the law firm at the heart of the scandal to facilitate Defendant Wey's stock manipulations, as alleged herein.

111.    As set forth in one recent article,[1]

Bharara who as US attorney general for the southern district of New York has led several crusades against criminal wrongdoing in the financial sector, is already investigating

---

[1] See "Panama Papers:  US launches criminal inquiry into tax avoidance claims," Cht2Engage Admin, Apr. 20, 2016, at https://chat2engage.com/panama-papers-us-launches-criminal-inquiry-tax-avoidance-claims/.

several of the more than 200 US citizens named in the papers.

Among them is Wall Street financier Benjamin Wey, who has been charged with securities fraud, wire fraud, conspiracy and money laundering for using family members to help him amass ownership of large blocks of stock in companies through so-called reverse merger transactions between Chinese companies and US shell companies. He made tens of millions of dollars of illegal profit by manipulating the companies stock prices, according to the indictment. The Panama Papers leak shows that Mossack Fonseca helped set up the offshore companies used in the stock manipulation.

Ben Wey fashioned himself a master of industry, but as alleged, he was merely a master of manipulation, Bharara said when he announced the indictment against Wey [on] September 15, 2015.

112.    Defendant Wey began his career in Oklahoma. He graduated from Oklahoma Baptist University in 1992 with a degree in finance. He completed an MBA in 1999 at the University of Central Oklahoma. Defendant Wey started his first investment advisory and brokerage firm in Oklahoma while studying for an MBA.

113.    In 2002, Defendant Wey founded an Oklahoma-based firm that he called Benchmark Global Capital Group, and was a director, majority shareholder, and CEO. He was fired for cause within six months – namely, trading on insider information and misappropriating company funds.

114.    In 2002, the NASD, FINRA's forerunner, suspended and fined Defendant Wey.

115.    In 2005, The Oklahoma Department of Securities ("OKDS") censured Defendant Wey for separate offenses. The OKDS charged Defendant Wey with a disclosure violation, advising a retired 68 year-old woman to invest her life savings in shares of a penny stock without disclosing his role as the paid promoter. Defendant Wey violated retiree instructions by selling the stock, then repurchasing it for her account shortly after the sale, without authorization. The retiree lost more than 75% of her life savings. Defendant Wey agreed with the state never again

to operate a brokerage or investment advisory business in Oklahoma.

116.   In 2005, Defendant Wey left Oklahoma and his advisory business under a cloud.

117.   Soon thereafter, Defendant Wey hit upon the strategy he would repeatedly employ throughout the next decade, and that was to: (1) covertly acquire large stock interests in U.S-listed shell companies; (2) cause the companies to list on major U.S. exchanges, artificially inflate trading prices through stock manipulation; and (3) sell his shares at a profit, all the while supplementing income by causing Chinese companies to pay him investment-banking fees.

118.   Defendant Wey's scheme required that he exercise control over the companies. Defendant Wey's scheme also required that he and the companies conceal his involvement from the public.

**Defendant Wey's scheme to acquire controlling ownership.**

119.   Defendant Wey caused NYGG-Asia to help NYGG Clients list in the United States through reverse mergers.[1]  Thus, for Defendant Wey, a reverse merger is merely the private company's listing on a public market.

120.   First, Defendant Wey would locate public shells in the U.S. for NYGG Clients. Through a variety of Nominees, Defendant Wey would then acquire the public shells' shares before the reverse mergers so that when the reverse mergers closed, Defendant Wey would hold substantially all of NYGG Clients' shares not held by the former private company's shareholders.  While the former private company's shareholders would hold the majority of the public company's shares, Defendant Wey and the Nominees always controlled more than 5% of

---

[1] In a reverse merger, a private company lists on a major exchange without undertaking an IPO.  Instead, the private company is "acquired" by a defunct public shell, but in return, receives the majority – but not all – of the defunct public shell's shares.  After the reverse merger, the private company is a subsidiary of the public company, but the private company's former shareholders own the majority of the public company's shares.

the new public company's shares.

121.    To completely control public trading in the new public company's shares, Defendant Wey then caused the private company's shareholders to enter into lock-up agreements, restricting them from trading their shares. Defendant Wey pursued the scheme working side-by-side with two attorneys to whom he referred the Chinese private companies for this purpose, Robert Newman ("Newman") and William Uchimoto ("Uchimoto").

122.    Defendant Wey did not disclose his holdings to the public markets. Defendant Wey jumped through considerable hoops to avoid disclosing his name to the public as a shareholder in these companies.

123.    For example, the Chinese operating company that would become CleanTech retained Newman to represent it in its reverse merger. Newman, taking direction from Defendant Wey, not the Chinese operating company, located a promising public shell, Everton Capital Corporation ("Everton"). Newman was also retained by Everton.

124.    Defendant Wey, through his Nominees, bought substantially all of Everton's shares. Concurrently with Defendant Wey's acquisition of Everton shares, Newman instructed Everton's transfer agents to issue 5,000,000 new Everton shares to a person Newman represented was Everton's CEO, President, CFO, Treasurer, and Secretary. However, all communications between Newman and Everton's purported CEO took place through Defendant Wey. As a result of the issuance to the new purported CEO, Defendant Wey and his Nominees technically held only 9.11% of Everton's shares.

125.    Newman then presented Everton to CleanTech. As part of the reverse merger, Everton's purported CEO agreed to cancel all his shares for nominal consideration. The only

Everton shareholders to receive CleanTech shares were Defendant Wey and the Nominees. Following the reverse merger and its elaborate lead-in, Defendant Wey and the Nominees beneficially owned more than 5% of CleanTech's shares.

126.   Newman did not obtain a conflicts waiver from either Everton or the Chinese operating company.  The absence of arm's-length representation on Newman's part was not disclosed to investors.

**Defendant Wey causes NYGG Clients to be listed on major exchanges.**

127.   Public shells do not trade on liquid markets like the NASDAQ or the New York Stock Exchange but instead trade over-the-counter ("OTC").  The OTC market does not provide sufficient liquidity to allow Defendant Wey to sell his shares.  After the reverse merger, Defendant Wey would therefore cause NYGG Clients to list themselves on major exchanges, including the NASDAQ.

128.   At the time of many of NYGG Clients' listings, the NASDAQ required that listing applicants show that the company had at least 300 shareholders who each held a minimum of 100 shares of common stock (the "300 Shareholder Requirement").  The purpose of the 300 Shareholder Requirement was to demonstrate that many different investors had an interest in buying and selling the applicant's stock.  Persons who receive shares directly from the applicant or affiliates do not count towards the 300 Shareholder Requirement.  Thus, to create the illusion that NYGG Clients had the requisite trading interest, Defendant Wey gave shares to friends, family members, and business associates.   Defendant Wey's associates falsely told the NASDAQ that their shares had not been provided by the NYGG Clients' affiliates.

129.   To list on major exchanges, Defendant Wey also used wash and matched trades

- 32 -

to simulate interest in, and manipulate prices of, NYGG Clients' stock.

130.    CleanTech completed its reverse merger in July 2010.  Its first trade as a newly-public company was a trade of 1,000 shares at $5.10/share, or about 70% above the price of a recent offering.  Defendant Wey touted the 70% increase to prospective investors. In fact, the trade was a wash trade; Defendant Wey's sister Tianyi Wei was both the buyer and the seller.

131.    Using the trading interest fraudulently simulated by Defendant Wey, NYGG Clients would then apply for, and obtain, listings on major trading exchanges.

**Defendant Wey sells his and the Nominees' shares.**

132.    Defendant Wey controlled the public market for NYGG Clients' shares to sell his own and the Nominees' shares at inflated prices.

133.    To maximize profits from selling the shares, Defendant Wey continued to manipulate the trading price of NYGG Clients' shares.  For example, in a February 2011 email, Defendant Wey wrote to his broker, Seref Dogan Erbek ("Erbek"):

> [Erbek], Cleantech just traded at $4.50 per share.  Please make sure the trader buys the stock at $5 per share, stay at $5 per share bid price, not less.  Please make sure this happens right away.

134.    That same day, Erbek purchased two tranches of CleanTech shares at $4.86 and $4.93 per share, respectively.

135.    After pumping an NYGG Client's stock price, Defendant Wey would liquidate the Nominee's stock, then arrange for the proceeds to be transferred to him.  Between October 12 and October 30, 2009, for example, Defendant Wey placed orders to sell huge numbers of shares of an NYGG Client, Deer Consumer Products, Inc. ("Deer"), held by a Nominee, Strong Growth Capital, Ltd. ("Strong Growth"), generating proceeds of $4.4 million, $3.5 million of

which quickly transferred to a bank account held by Tianyi Wei, Defendant Wey's sister.

136.     On December 10, 2009, Tiani Wei transferred $3.3 million to Defendant Wey's wife, Michaela Wey.  Michaela Wey reported the $3.3 million as a gift from a foreign person in tax filings.  Defendant Wey and Michaela Wey obtained at least $19 million of such "gifts" from Tianyi Wei alone.  These "gifts" from Tianyi Wei represent a mere fraction of the total proceeds from Defendant Wey's fraudulent scheme.  It is estimated that total proceeds from the scheme exceeded $70 million.

**Defendant Wey causes NYGG Clients to pay investment-banking fees.**

137.     Public representations to the contrary, Defendant Wey and NYGG were significantly involved with NYGG Clients' day-to-day operations.  For example, in 2011, the NASDAQ asked two NYGG Clients, SmartHeat, Inc. ("SmartHeat") and Deer to disclose all relationships between each of them and Defendant Wey and NYGG, among others. Defendant Wey's and NYGG's activities included: (1) the conducting of company financial modeling; (2) the selection of lawyers and auditors; (3) the review of SEC drafts and filings; (4) the identification and recommendation of certain individuals to serve as directors, advising them on handling pending litigation, and discussing non-public information with company officers.  But, both SmartHeat and Deer falsely claimed that Defendant Wey's role was limited to the introduction of underwriters and that Defendant Wey was a mere business acquaintance of the officers.  During the Relevant Period, 6D Global would continue this practice of omitting to disclose material facts about Defendant Wey's control.

138.     Defendant Wey also caused NYGG Clients to hire the Nominees to provide investment banking services.  However, while NYGG Clients paid the Nominees about $11

million, the Nominees provided no such services.

139.     Two NYGG Clients, SmartHeat and Deer, hired a Nominee to provide consulting services in connection with secondary offerings.  SmartHeat paid $3.9 million to Defendant Wey's Nominee, 6.3% of the total raised, and Deer then paid the Nominee $3.8 million, or 6% of the total raised in the offering.  Neither SmartHeat nor Deer disclosed that the Nominee was affiliated with Defendant Wey.  Asked by the underwriter whether the Nominee had any affiliation with Defendant Wey, both Defendant Wey and the Nominee falsely claimed the underwriter there was no such affiliation.

140.     Defendant Wey also caused Deer to announce a share repurchase program.  Pursuant to the share repurchase program, Deer bought 798,300 shares for $6.9 million.  Deer represented in its SEC filings that it had made open-market purchases.  In fact, every repurchased Deer share belonged to Defendant Wey or his Nominees.

141.     Defendant Wey and NYGG Clients also caused the removal of company officials and agents that challenged Defendant Wey.  For example, Defendant Wey told an attorney representing an NYGG Client, AgFeed, Inc. ("AgFeed"), that one of Defendant Wey's Nominees would receive a $300,000 finder's fee for a transaction.  When the AgFeed attorney demanded that Defendant Wey certify he was not affiliated with the nominee, Defendant Wey signed a false certification attesting to no affiliation, then caused the firing of the attorney.  AgFeed replaced the attorney with Uchimoto, another of Defendant Wey's co-conspirators.

**The NASDAQ discovers Defendant Wey's scheme and delists CleanTech.**

142.     On August 28, 2010, Barron's published an article titled "Beware This Chinese Export."  Among other things, the Barron's article called attention to NYGG's claims that 15%

of the Chinese companies on the NASDAQ were clients of NYGG. The article also reported on Defendant Wey's relationship with Deer.  Though Deer had not disclosed any relationship, Defendant Wey's Chinese website showed him flying with Deer's management on a private jet the night prior to the pricing of a $75 million offering.  The article also revealed that CleanTech was an NYGG client.

143.    CleanTech applied to have its stock listed on the NASDAQ.  On September 1, 2010, the NASDAQ emailed CleanTech's counsel, demanding an explanation for its relationships with Defendant Wey.

144.    The next day, on September 2, 2010, CleanTech responded, falsely downplaying Defendant Wey's role, claiming that:

> (a)  NYGG was compensated by NYGG-Asia, not CleanTech.  In fact, NYGG and NYGG-Asia were alter-egos.

> (b)  NYGG-Asia and NYGG were separately owned and operated.  In fact, Defendant Wey owned and operated both NYGG-Asia and NYGG.

> (c)  Defendant Wey was compensated by NYGG, not CleanTech.  In fact, CleanTech compensated Wey through the Nominees both by direct payments for investment banking services and with shares.

> (d)  Defendant Wey's work was limited to the introduction to financial and professional service providers.  In fact, as set forth above, Wey dominated CleanTech.

145.    On October 29, 2010, the NASDAQ propounded document and information requests to CleanTech.  NASDAQ requested, among other things, a detailed written narrative describing all due diligence work performed by NYGG and NYGG-Asia.

146.    CleanTech responded by continuing to misrepresent that Defendant Wey and NYGG-Asia's work was limited to introducing CleanTech to financial and professional service

providers.  Based on CleanTech's misrepresentations, NASDAQ granted CleanTech's listing request.

147.    On December 10, 2010, CleanTech's stock was listed on the NASDAQ.

148.    CleanTech also had not disclosed to the NASDAQ that it had hired NYGG-Asia to conduct a private placement of CleanTech stock.  The private placement was pending during CleanTech's listing application.

149.    As reported in a Form 8-K filed with the SEC on December 16, 2010, on December 13, 2010, CleanTech completed a private placement, selling 2,500,000 Units at $4.00 each, for total proceeds of $10 million (the "December Financing").  Each Unit consisted of one share of stock and one warrant to purchase 67.5% of one share of stock at $4.00 per share.  The closing price of CleanTech's stock on December 15, 2010 was $8.40 per share.

150.    On December 23, 2010, CleanTech filed a registration statement with the SEC for 4,187,500 shares underlying the Units, as well as 300,000 shares underlying warrants issued to NYGG-Asia as compensation for its role as the placement agent (the "December Registration").  NYGG-Asia also received cash compensation, and made a $10 million loan. In addition, Strong Growth, which bought one quarter of the Units for $2.5 million, was a known associate of NYGG-Asia.

151.    When the NASDAQ discovered that CleanTech had engaged in the private placement without disclosing it in response to the document and information requests, the NASDAQ acted swiftly to delist CleanTech's stock.

152.    The NASDAQ, however, did not know that Defendant Wey owned and controlled NYGG-Asia.   For the next two years, Defendant Wey and CleanTech would

repeatedly and falsely represent to the NASDAQ, the SEC, and this Court that NYGG-Asia and NYGG were separately-owned and operated. It was not until September 10, 2015 that the NASDAQ realized the falsity of those representations, as then the DOJ and the SEC issued press releases in connection with their respective investigations into Defendant Wey and his various financial dealings.

**CleanTech and Defendant Wey repeatedly lie to the NASDAQ and to investors to overturn delisting.**

153.    CleanTech appealed the delisting. Defendant Wey, and not CleanTech, dominated the delisting appeal.

154.    In the delisting appeals hearings, CleanTech falsely told the NASDAQ that 75% of the $10 million December Financing came from independent agents not affiliated with either NYGG or NYGG-Asia. In fact, the other three purchasers in the December 13, 2010 private placements – HuaHua Limited, Roosen Commercial Corp., and Wolf Enterprises, Ltd. – were all Defendant Wey Nominees. While CleanTech disclosed that Strong Growth was an NYGG affiliate, it specifically claimed that Defendant Wey had no beneficial ownership in it.

155.    Defendant Wey also directly made false statements to the NADSAQ and the SEC in the CleanTech delisting appeal. In June 2011, Defendant Wey submitted a letter to the NASDAQ falsely representing that:

> (a) "Neither I nor [NYGG] has any beneficial ownership of the securities issued in the [December 2010] financing." In fact, Defendant Wey's Nominees accounted for substantially the entire financing.

> (b) NYGG and NYGG-Asia were "separately owned and operated." In fact, Defendant Wey owned and operated both NYGG and NYGG Asia.

> (c) NYGG-Asia's office was managed by Ming (Roger) Li. Wey deliberately failed to disclose that Li was Tianyi Wei's domestic partner, and that Li

reported directly to Defendant Wey.

(d) Defendant Wey did not receive any fees or other revenues from NYGG-Asia. In fact, Defendant Wey and his Nominees received substantially all of NYGG-Asia's income.

(e) NYGG-Asia identified three other funds willing to participate in the December Financing. In fact, the three other funds were Defendant Wey Nominees.

156.    CleanTech then sued the NASDAQ.  *See CleanTech Innovations, Inc. v. NASDAQ Stock Market, LLC*, 11-cv-9358-KBF (S.D.N.Y., amended complaint filed Jan. 5, 2012) ("CleanTech Am. Cplt").  In its lawsuit, CleanTech alleged that it had suffered crippling damages from the NASDAQ's delisting.  CleanTech's Amended Complaint falsely represented that CleanTech was not subject to delisting, because:

NASDAQ staff, headed by Mr. Emen, had been given uncontradicted evidence that [Wey]: (1) did not control or own stock in CleanTech; and (2) did not receive any of the compensation of [NYGG-Asia] for financings it arranged in China.

CleanTech Am. Cplt. at ¶ 14.

157.    The statement was false because (1) Defendant Wey beneficially owned more than 5% of CleanTech's stock through the Nominees, and (2) Defendant Wey wholly owned NYGG-Asia, and in that capacity, received substantially all of the compensation paid to NYGG-Asia.

158.    While CleanTech was represented by the law firm of Fensterstock & Partners LLP (F&P), it was Defendant Wey who instigated and controlled the litigation.  Defendant Wey demonstrated his dominance of the litigation as follows:

(a) According to a complaint filed by F&P against CleanTech for nonpayment of legal fees, before being retained, F&P met with Wey at NYGG's offices.

(b) NYGG, not CleanTech, paid the attorney's retainer.

(c) Defendant Wey, not CleanTech, handled public relations for the lawsuit, including introducing CleanTech's attorney to reporters.

(d) NYGG appeared at hearings. CleanTech also appeared at certain hearings, through Arnold Staloff, an outside director.  Notably, Staloff is one of Wey's co-conspirators.  Staloff is also a director on the board of three NYGG Clients: Deer, AgFeed, and SmartHeat.

(e) NYGG was copied on confidential client communications.

(f)  According to CleanTech's lawyers, Wey "derive[d] benefits from and involv[ed] himself in the litigation," including by selecting defendants and advising on legal theories.

**The 6D Global Acquisition.**

159.    Without the NASDAQ listing, CleanTech was unable to sell shares to finance operations.   CleanTech instead funded operations through loans from Defendant Wey.   As alleged above, to conceal his involvement in CleanTech's operations, Defendant Wey caused the loans to be made by NYGG-Asia, a separate entity, as represented by both CleanTech and Defendant Wey.

160.    CleanTech incurred substantial losses.  By early 2014, CleanTech owed NYGG-Asia approximately $16 million.  Defendant Wey was left without prospects of either selling his CleanTech stock or being repaid.

161.    Beginning early 2014, at Defendant Wey's urging, CleanTech began to explore a strategic combination.  Defendant Wey separately searched for potential acquirers or merger candidates for CleanTech.

162.    In March 2014, a mutual acquaintance introduced Six Dimensions, Inc. ("Six Dimensions"), to Uchimoto, Defendant Wey's co-conspirator and habitual attorney. Six Dimensions is an American IT company without business in common with CleanTech (which

manufactures products used in wind turbines in China).  Defendant Wey, Six Dimensions, and CleanTech commenced discussions regarding a prospective business combination between Six Dimensions and CleanTech.

163.    On April 8, 2014, CleanTech, Six Dimensions, and NYGG-Asia held a meeting. Uchimoto represented CleanTech.  Defendant Wey represented NYGG-Asia, along with NYGG's general counsel James Baxter and outside counsel.  NYGG-Asia personnel did not attend the meeting.

164.    Six Dimensions expressed interest in a transaction on condition that CleanTech become a shell by repaying its debt and divesting its entire operations.  Following the divestiture, CleanTech would "acquire" Six Dimensions, and in return award CleanTech shares to Six Dimension shareholders.

165.    NYGG demanded that CleanTech proceed with the transaction, which CleanTech did.  The terms of the transaction (the "6D Global Acquisition") included:

> (a)  The total capitalization of 6D Global would be 77,575,442 shares.
>
> (b)  CleanTech's operating subsidiaries would be returned to CleanTech's officers and directors.  In exchange, CleanTech's officers and directors would cancel all of their personally-held CleanTech stock.  The only remaining CleanTech stock purportedly would be held by public investors.  CleanTech's officers and directors would likewise resign from their positions.
>
> (c)  NYGG would exchange its debt for $16 million of 6D Global common stock, or 35,149,883 shares.
>
> (d)  CleanTech would acquire all of Six Dimension's issued and outstanding stock, in exchange for 38,664,871 shares of CleanTech common stock.
>
> (e)  CleanTech would raise at least $3 million in a private placement. CleanTech ultimately raised $5.6 million in gross proceeds, issuing 2,709,484 shares (the "Private Placement").

(f) CleanTech would change its name to 6D Global Technologies, Inc., and convert from a Nevada corporation to a Delaware corporation.

166.    The 6D Global Acquisition closed on September 29, 2014.

167.    Following the 6D Global Acquisition, and including the Private Placement,

6D Global's capitalization was as follows:

|  | Number of shares | Percentage of total 6D Global shares |
|---|---|---|
| NYGG-Asia | 35,629,883 | 45.9% |
| Former Six Dimension Shareholders | 38,664,871 | 49.8% |
| Private Placement Purchasers (other than NYGG-Asia) | 2,229,484 | 2.9% |
| Former CleanTech Shareholders | 1,051,204 | 1.4% |
|  |  |  |
| Total | 77,575,442 | 100% |

**The Private Placement.**

168.    The Private Placement closed in two separate transactions: (1) on September 29, 2014, CleanTech sold 2,201,031 of its shares at $2.07 per share for gross proceeds of $4.6 million; and (2) on November 21, 2014, CleanTech sold an additional 508,453 of its shares at $2.07 per share for gross proceeds of $1.1 million.

169.    The Private Placement was conducted through a Confidential Subscription Agreement dated June 17, 2014.  The Confidential Subscription Agreement represented that:

The [purchaser] should carefully consider the Risk Factors contained in CleanTech's most recent annual report on Form 10-K, as updated or supplemented by subsequent quarterly reports on Form 10-Q and current reports on Form 8-K to the extent filed, each of which are incorporated herein by reference, as the same may be updated from time to time by future filings under the Securities Exchange Act of 1934, as amended, before making an investment decision.

**6D Global must list on the NASDAQ to complete the 6D Global Acquisition.**

170.    By June 20, 2014, the NASDAQ once again informed CleanTech that it was not in compliance with NASDAQ Listing Rules.  The NASDAQ informed CleanTech that it would be delisted if the Company continued to be in noncompliance.

171.    On August 4, 2014, in response to CleanTech's failure to address the issue, the NASDAQ notified CleanTech that it continued to be in violation of certain of the Listing Rules, and as such issued a determination to delist CleanTech's common stock.  Pursuant to NASDAQ rules, the delisting was stayed pending CleanTech's appeal.

172.    CleanTech's continued listing on the NASDAQ was a condition precedent to Six Dimension's obligation to complete the 6D Global Acquisition.

173.    On September 4, 2014, the NASDAQ held the hearing on 6D Global's appeal.

174.    On December 4, 2014, the NASDAQ sent a letter approving 6D Global's listing.

175.    On December 12, 2014, 6D Global's stock began trading on the NASDAQ under ticker SIXD.

176.    Had 6D Global revealed that Defendant Wey's beneficial ownership of NYGG-Asia's shares, it would have held to light Defendant Wey and CleanTech's false representations that served as the basis for overturning its earlier determination to delist the Company on the exchange.

177.    Should the NASDAQ ever discover that Defendant Wey had obtained a reversal of the NASDAQ's delisting determination by lying to the NASDAQ, the SEC, and the DOJ, the NASDAQ would likely delist CleanTech's stock.  Therefore, Defendant Wey's status as a beneficial shareholder of NYGG-Asia's 6D Global shares is material to investors.

**Defendant Wey controls 6D Global's operations on day-to-day basis.**

178.    Throughout the Relevant Period, Defendant Wey continued to control 6D Global's day-to-day business operations, both through his own personal involvement and through staff at NYGG.  According to Matthew Sullivan ("Sullivan"),[1] Defendant Wey was involved in 6D Global's operations on almost a daily basis.  Also according to Sullivan, Defendant Wey's daily involvement included the following:

(a) Financing.  According to Mr. Sullivan, Wey had primary responsibility for securing 6D Global's financing.

(b) Capital markets. According to a December 10, 2014 email from Defendant Kang to Mr. Sullivan:

Keep in mind that [CleanTech] is a 3-4 year disaster that was going on for them and we literally came in this year and cleaned sht up and went public w/ an American company.  True alignment in that sense where [Benjamin Wey] has the capital markets expertise and we are here to grow the company. Need to round out other roles as you know, but that's what we are doing.

(c) Auditor selection.  Wey demanded that 6D Global change its auditor to BDO USA LLP.  Notably, Wey had referred NYGG Clients to Goldman Kurland Mohidin LLP ("GKM").  GKM is a member of the BDO Seidman alliance. 6D Global officials, including Defendant Kang and Sullivan, objected to hiring BDO because of their relatively high fees. 6D Global officials nonetheless ultimately acquiesced to Wey's demand, hiring BDO in October 2014.

(d) Internal employee matters.  Sullivan acquired 500,000 6D Global shares in September 2014, 100,000 of which vested in March 2015.  Defendant Wey and 6D Global demanded that Sullivan refrain from selling his 6D Global shares to the public.  Sullivan began the process of removing restrictive legends from his stock, but in or around June 2015, Wey personally called Sullivan to warn him not to submit any paperwork to remove restrictive legends.  Wey requested that Sullivan sell his shares to Wey's friends instead. Wey was also regularly involved in other 6D Global internal employee

---

[1] Sullivan joined 6D in 2010 when staffed with Defendant Kang and a bookkeeper.  Initially hired as 6D Global's national technical recruiter, Sullivan later became executive vice president with lead roles in several of its acquisitions. In the proxy statement filed with the SEC on September 4, 2014, Sullivan was designated as 6D Global's only executive officer aside from Defendant Kang.  On July 14, 2015, Sullivan resigned to pursue opportunities in the not-for-profit sector.

matters.   For example, Defendant Wey attended 6D Global's corporate retreat in Florida.

(e) Selection of personnel.   In Fall 2014, 6D Global searched for a CFO.   Wey personally interviewed all the candidates, and signed off on 6D Global's choice, Defendant Szynkowski.   In general, Defendant Wey personally interviewed the candidates for all leadership positions.

(f) Internal company policy.   In or around May/June 2015, Defendant Wey instructed Defendant Kang to create and implement an aggressive document destruction policy.   Pursuant to Defendant Wey's instructions, 6D Global enacted a policy calling for all emails to be destroyed within 90 days.

(g) Disclosures.   Defendant Wey reviewed 6D Global's SEC filings before they were filed and provided instructions.   For example, Defendant Wey instructed 6D Global that it need not seek Defendant Szynkowski's former employer's approval before mentioning the employer in SEC filings.   Sullivan, who attended conference calls concerning preparation of 6D Global's 10-Ks and 10-Qs, recalls that Defendant Wey participated in the calls as well.

(h) Operations.   Defendant Wey managed numerous operational matters for 6D Global.   Wey was intimately involved in various internal 6D Global matters, such that 6D Global rescheduled a December 2014 marketing call when Wey said he could not attend.   Pursuant to Wey's orders, Sullivan and Defendant Kang also traveled to Washington D.C. to meet with the NASDAQ to plead for 6D Global's listing at the September 4, 2014 hearing.

(i) Controlling 6D Global's litigation.   Defendant Wey selected 6D Global's counsel. Until September 2015, 6D Global was represented in litigation matters by John Bostany.   Bostany is Defendant Wey's attorney, having previously represented NYGG Client Deer in a highly-publicized lawsuit against a short seller, *Deer Consumer Products, Inc. v. Little Group*, No. 650923/2011 (Sup. Ct. N.Y. Ct.).   In fact, Bostany's offices are located in the same building as NYGG, the Trump Tower, at 40 Wall Street.   6D Global kept Wey abreast of confidential litigation developments.   For example, 6D Global's attorneys immediately informed Wey of all new developments in 6D Global's attempt to list on the NASDAQ.   6D Global also copied Wey on litigation communications with its attorneys.   Defendant Wey also provided directions to 6D Global's attorneys.   For example, on February 27, 2015, Wey emailed 6D Global's attorney to instruct him in preparing a court filing:

From: Benjamin Wey ®
Sent: Friday, February 27, 2015 1:05 P.M.
To: John P. Bostany

Cc: Tejune Kang; Han Dang; Mark Szynkowski; Charen Kim
Subject: Re: SIX D Order to Show Cause

John,

This is a simple solution. You can make a statement/affidavit that based on your conversation with the compliance officer of the brokerage firm where the shares in Bei Lu's name are held, they can be sold right away, at any time, unless there is court intervention. This is the basis to go back to the judge and ask for a freeze order at a minimum, to prevent to [sic] shares from being sold and proceeds leaving the U.S. and back to China. You are an officer of the court and you can do this easily. Call my office should you have more questions.

Ben

(j)  Physical location. Defendant Wey visited 6D Global's offices every few weeks.  Similarly, Wey's attorney, Newman, repeatedly visited 6D Global's offices.  Sullivan recalls seeing Newman at 6D Global's offices at least three times.  Defendant Kang also regularly visited NYGG's offices.

(k)  Material non-public information.  Defendant Wey was regularly provided with material non-public information, as described herein.

179.    In response to BDO's inquiry in connection with BDO's audit of 6D Global's 2015 financial statements, Defendant Kang estimated that Defendant Wey had provided about 180 hours of advisory services between October 2014 and September 2015.

180.    Defendants Wey and Kang also regularly bypassed 6D Global's internal controls. For example, in accordance with 6D Global's 2015 Omnibus Incentive Plan, approved as set out in a Proxy Statement on Schedule 14C, dated February 5, 2015, the Company does not permit stock option awards to non-employees.  Yet in July 2015, in violation of the 2015 Omnibus Incentive Plan, 6D Global granted stock options to James Baxter, NYGG's general counsel, and Warren Raiti, another NYGG employee.  6D Global was forced to rescind the stock options after the Indictment.

- 46 -

**Control of 6D Global's acquisitions.**

181.    Defendant Wey and NYGG took personal control over 6D Global's acquisitions throughout the Relevant Period.

182.    Defendant Wey dictated 6D Global's overall acquisition strategy, directing 6D Global to maximize the percentage of stock issued and minimize the cash portion of the consideration paid for acquisitions.  Defendant Wey also required that 6D Global offer stock that could only be resold usually until after two years.

183.    Defendant Wey and NYGG drafted the form definitive acquisition agreement used in 6D Global's acquisitions.

184.    At Defendant Wey's direction, 6D Global's strategy focused on acquiring companies to attract large investors.  As of March 31, 2015, 6D Global had about $2.67 million in cash, and had incurred a net loss in Q1 2015 of $0.53 million.  According to emails and conversations between Sullivan and Defendant Kang, 6D Global sought out large companies with revenues of at least $10 million with marquee blue chip customers.  6D Global engaged in acquisition discussions with Bridgeline Digital, Inc., a public company with a FY 2014 net loss of ($6.2 million) on revenues of $23.7 million.

185.    According to Sullivan, who oversaw 6D Global's acquisition strategy, the Bridgeline deal did not make operational sense.  Rather, the purpose of the acquisitions was to attract institutional investors like Discover by acquiring businesses with marquee customers and high revenues.  Defendant Wey's focus on securing financing for 6D Global thus dictated 6D Global's acquisition strategy.

186.    Defendant Wey also managed 6D Global's individual acquisitions.

- 47 -

187.    In many cases, Defendant Wey initially brought the acquisition target to 6D Global.  For example, in or around December 2014, Defendant Wey asked 6D Global to look into acquiring Whiteboard Animation Studio.  Defendant Wey contemporaneously disclosed to Defendant Kang and Sullivan that Whiteboard Animation Studio's owner Steve Day ("Day") was related to Wey by marriage.  In a December 2 email describing to Sullivan the potential acquisition, which never actually closed, Defendant Kang stated:

> Here's what I also like about this play.
>
> It aligns interests of [Benjamin Wey] even more w/ our success and growth because this is more than just $ to him as investment.  This becomes also personal since family is related as well for overall growth of 6D Global.

188.    After initial introductions, Defendant Wey personally negotiated certain acquisition terms.  Defendant Wey met with Day over lunch to establish terms of 6D Global's acquisition of Whiteboard.  Even if Defendant Wey did not personally negotiate terms, he gave orders to 6D Global personnel in conducting negotiations.  In December 2014, Defendant Wey ordered Sullivan to go meet Day, and pursuant to Wey's orders, Sullivan met Day at Day's offices, not vice versa.

189.    At Defendant Wey's insistence, in spring and summer of 2015, 6D Global sought to acquire a New York-based digital creative agency owned by Wey's second cousin's husband for approximately one million dollars in stock.  The owner backed out of the deal when he learned more about Defendant Wey's background which, by that time, included a highly-publicized sexual harassment lawsuit.

190.    Defendant Wey and his legal team reviewed all acquisition agreements.  6D Global would ask that Defendant Wey make changes directly to the agreements.  6D Global

then forwarded the agreements, with Defendant Wey's changes, directly to the acquiree.

191.    While finding acquisition prospects was the preoccupation at 6D Global, the Company only closed two acquisitions during the Relevant Period:

> (a) On March 4, 2015, 6D Global closed the Storycode acquisition for $600,000 and 300,000 shares of common stock, coupled with potential earnout shares; and

> (b) On March 20, 2015, 6D Global acquired SwellPath for $300,000 and 300,000 shares of common stock, and up to an additional 300,000 shares and a potential additional $650,000 based on SwellPath's achievement of milestones.

192.    Defendant Wey and his legal team reviewed both the Storycode and SwellPath agreements, making substantial changes to the terms of both.

193.    In violation of SEC rules, 6D did not publicly file the acquisition agreements.

194.    6D Global officers acknowledged that Defendant Wey controlled acquisitions. In a February 18, 2015 email copying Defendant Kang, Sullivan acknowledged to Defendant Wey that "your guidance is critical to our success of [sic] these acquisitions."

**The Individual Defendants admit to Discover that Defendant Wey controls 6D Global.**

195.    6D Global was not profitable and relied on cash infusions to fund its acquisitions. Shortly after the SwellPath and Storycode acquisitions, 6D Global was off, again, searching for large investments and/or cash infusions.

196.    In late July 2015, 6D Global was introduced to Discover, a Cayman Islands-exempted mutual fund managed by Discover Fund Management LLLP from its U.S. Virgin Islands office.

197.    On August 10, 2015, 6D Global and Discover signed a Stock Purchase Agreement (the "SPA"), providing that Discover make a $10 million investment in 6D Global

convertible preferred stock.

198.    In subsequent litigation, Discover's broker declared under penalty of perjury that: (a) Defendants Kang and Szynkowski would refer to NYGG-Asia and Defendant Wey interchangeably as the holder of 45% of 6D Global's stock; (b) the broker spoke to Defendant Wey numerous times in negotiating and closing the SPA; and (c) 6D Global represented that NYGG-Asia's permission was necessary for the transaction. *See* Discover Litigation, Docket No. 23, ¶4.

199.    Shortly after closing the SPA, Defendant Kang arranged to fly to the Virgin Islands to meet with Discover.  Defendant Kang agreed to bring with him a representative from NYGG-Asia, the other large shareholder in 6D Global.    In fact, the representative was Defendant Wey.

200.    According to Discover's Investment Advisor, John Kirkland, Defendant Kang introduced Defendant Wey at the meeting, stating "basically, I work for him."

201.    At the meeting in the Virgin Islands, Defendant Wey stated that: (i) he controlled NYGG-Asia, and through NYGG-Asia, controlled 6D Global as well; (ii) Defendant Wey controlled 6D Global's public trading, and recent price movements had been caused by Wey's manipulation; and (iii) if Discover ever wanted to sell its shares, it should sell them to Defendant Wey or his designees rather than on the public market.

**The securities laws mandate disclosure of beneficial owners in Form 10-Ks and proxy statements.**

202.    Regulation S-K imposes general disclosure obligations applicable to SEC filings made pursuant to the Securities Act and the Exchange Act.  Regulation S-K mandates disclosure if indicated in the form underlying SEC filings. *See* 17 C.F.R. §229.10.

203.    Item 403 of Regulation S-K mandates disclosure of, among other things, the name of any person who or that *beneficially owns* more than 5% of any class of the issuer's securities, as well as the amount of securities owned ("5% Owners").  *See* 17 C.F.R. §229.403.

204.    A "beneficial owner" includes "any person who, directly or indirectly, through any contract, ***arrangement, understanding, relationship, or otherwise*** has or shares (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security."  17 C.F.R. §240.13d-3(a) (emphasis added).  At all times, Defendant Wey held both voting power and investment power over all of NYGG-Asia's 6D Global shares, and accordingly, was a beneficial owner of NYGG-Asia's 6D Global shares.

205.    Item 403 mandates disclosure of 5% Owners in:

(a)  Annual reports on Form 10-K. Instructions to Form 10-K, Item 12.

(b)  Proxy Statements on Schedules 14A or 14C.

**False and misleading statements and omissions of material fact.**

206.    On June 16, 2014, 6D Global issued an 8-K announcing the terms of the 6D Global Acquisition.  Defendant McEwen signed the Form 8-K.  It stated, in relevant part:

On June 11, 2014, in consideration of the Exchange Agreement and the related transactions, **the Registrant's largest creditor, NYGG-Asia Ltd.,** a British Virgin Islands corporation ("NYGG-Asia"), entered into a Forbearance and Waiver Agreement with the Registrant (the "Forbearance Agreement").  Pursuant to the Forbearance Agreement, NYGG-Asia and its affiliates agree to forbear from exercising certain of their respective rights and remedies related to the Registrant's debt obligations to them and certain events of default thereunder.  The forbearance period extends from June 11, 2014 until the first to occur of (i) September 10, 2014, (ii) the transfer of the Controlling Shares to the Registrant in exchange for the transfer of the Subsidiary Interests to the Controlling Shareholders and (iii) the termination of the Exchange Agreement. Upon the

earlier to occur of (i) the occurrence of a forbearance default (which includes any failure by the Registrant to comply with and/or diligently pursue the Exchange Agreement) or (ii) the expiration of the forbearance period, NYGG [Asia]'s agreement to forbear shall immediately terminate and it shall thereafter be entitled to exercise all of its rights and remediates with respect to the Registrant's debt obligations to it.

Further to the Forbearance Agreement, NYGG [Asia] also agrees to unconditionally release each of the China Subsidiaries from all of their debt obligations to it. The terms of NYGG [Asia]'s release and waiver are set forth in a separately-executed Release and Waiver Agreement between NYGG [Asia] and each of the China Subsidiaries (the "Waiver Agreement").

(Emphasis added).

207.    The Company attached the Forbearance Agreement as an exhibit to the Form 8-

K.  The agreement states in pertinent part:

Debt Obligations and the Events of Default, and the execution of this Agreement is a condition precedent to the effectiveness of the Exchange Agreement.

B. The Lender [defined as NYGG-Asia] and/or NYG Capital LLC [i.e., NYGG] have acquired indebtedness of the Borrower previously owed to Fensterstock & Partners LLP and intend to acquire additional indebtedness of the Borrower on or prior to the Distribution Date including, without limitation, amounts that are owed by the Borrower to the law firm of Stradley Ronon (the "Additional Indebtedness", and together with the Prior Loans, the "CTek Indebtedness").

[...]

D. The Borrower has requested that each of the Lender and NYG[G] forbear from exercising certain of their respective rights and remedies with respect to the CTek agreement to forbear shall immediately terminate and it shall thereafter be entitled to exercise all of its rights and remediates with respect to the Registrant's debt obligations to it.

2    Forbearance.

2.1    Subject to the terms and conditions of this Agreement, and provided that no Forbearance Default (as defined below) has occurred, the Lender agrees that during the period commencing on the date of this Agreement and ending on and the first to occur of (i) September 10, 2014, (ii) the Distribution and (iii) the termination of the Exchange Agreement (the "Forbearance Period"), the Lender will not, and will procure that NYG[G] will not, file suit or take any other action to enforce its rights with respect to the Existing Default. This limited forbearance does not extend to any other default or

Events of Default with respect to the CTek Debt Obligations or any other rights and remedies available to the Lender with respect to the Existing Default. Upon the earlier of (a) the occurrence of a Forbearance Default (as defined below) or (b) the expiration of the Forbearance Period, the Lender's agreement to forbear shall automatically be deemed terminated and the Lender shall be entitled to, immediately and without notice, exercise all of its rights and remedies with respect to the CTek Debt Obligations and this Agreement.

**LENDER:**
**NYGG-ASIA LTD.**

By: /s/ Roger Li
Name: Roger Li
Title:  Managing Director

208.	The statements in ¶¶ 206-07 were misleading at the time they were made because they omitted to disclose that NYGG-Asia and NYGG were alter egos and that both were completely controlled by Defendant Wey.

209.	On June 24, 2014 CleanTech filed its Preliminary Information Statement on Schedule 14C (the "First Proxy") with the SEC, relating to the 6D Global Acquisition. Defendant McEwen signed the First Proxy.  The First Proxy repeated the misstatement that NYGG-Asia was issued shares in the 6D Global Acquisition, which was misleading for failing to disclose that Defendant Wey beneficially owned NYGG-Asia's shares.  Moreover, Item 403 of Regulation S-K required that the Company disclose Defendant Wey's beneficial ownership of all NYGG-Asia's shares, which it failed to do.

210.	In addition, the First Proxy included a copy of the bylaws which would govern 6D Global.  The bylaws provided, in pertinent part, as follows:

### ARTICLE III
### BOARD OF DIRECTORS

SECTION 1. Number, Qualification and Term of Office.  The business, property and affairs of the Corporation shall be managed by a Board consisting of not less than three

or more than seven Directors.

## ARTICLE V
## OFFICERS

SECTION 1. Number.  The officers of the Corporation shall be a President, Secretary, and Treasurer, each of which officers shall be elected by the Board of Directors, and such other officers as the Board of Directors may determine, in its discretion, to elect. Any number of offices may be held by the same person.  Any officer may hold such additional title descriptions or qualifiers such as "Chief Executive Officer", "Chief Operating Officer", "Chief Financial Officer", "Senior Vice President", "Executive Vice President" or "Assistant Secretary" or such other title as the Board of Directors shall determine.

211.     The statements in ¶¶ 209-10, above, were misleading for failing to disclose that 6D Global's operations were conducted and controlled by Defendant Wey and his staff at NYGG, rather than 6D Global's officers and Board of Directors.

212.     On July 21, 2014, the SEC sent a letter to the Company referring to Regulation S-K Item 403's requirement that 6d Global disclose Defendant Wey's beneficial ownership in 6D Global securities.  The letter provided, in relevant part:

> As part of your Debt Conversion discussion, please disclose NYGG-Asia Ltd.'s ultimate beneficial ownership of the company's stock following the closing of the Exchange. Your disclosure should cover beneficial ownership of the company's securities that NYGG, directly or indirectly, will have after the closing of the Exchange.  As defined in Exchange Act Rule 13d-3, a beneficial owner of a security includes "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) investment power which includes the power to dispose, or to direct the disposition of such security.

213.     The SEC's letter plainly requested that 6D Global disclose that Defendant Wey's true status as the beneficial owner of NYGG-Asia's 6D Global shares, in that Defendant Wey: (i) would have the sole dispositive power over NYGG-Asia's 6D Global shares; and that Defendant Wey (b) has investment power over NYGG-Asia's 6D Global shares.

214.    On August 4, 2014, the SEC sent another letter commenting on 6D Global's amended proxy statement on Schedule 14C (the "Second Proxy").   In this letter, the SEC demanded that 6D Global further disclose the name of all natural persons with voting and dispositive control over NYGG-Asia's shares.

215.    On August 13, 2014, in response to the July 21 and August 4 SEC letters, 6D Global filed a third amended proxy on Schedule 14C for the 6D Global Acquisition with the SEC (the "Third Proxy"). Defendant McEwen signed the Third Proxy.   Despite the SEC's having twice requested that 6D Global comply with the requirement that 6D Global disclose beneficial ownership of NYGG-Asia's 6D Global shares, the Third Proxy nevertheless failed to disclose that Defendant Wey would beneficially own NYGG-Asia's 6D Global shares.

216.    The Third Proxy also repeated the misstatements set forth in ¶¶ 206-07, 209-10.

217.    On September 4, 2014, 6D Global filed its Definitive Proxy on Schedule 14C relating to the 6D Global Acquisition (the "Definitive Proxy").   Defendant McEwen signed the Definitive Proxy.   The Definitive Proxy persisted in repeating the misleading statements contained in the Third Proxy.

218.    On September 29, 2014, the 6D Global Acquisition closed.   Defendant Wey was required to file a Schedule 13D disclosing his beneficial ownership of 35,629,883 6D Global shares held in the name of NYGG-Asia by October 15, 2014.  Defendant Wey did not file a Schedule 13D.

219.    On October 1, 2014, 6D Global filed a report on Form 8-K announcing the change in control resulting from the 6D Global Acquisition.  Defendant Kang signed the Form 8-K.  Pursuant to the instructions for the Form 8- K, 6D Global was required to report the

"identity of the person(s) who acquired such control [and] the basis of the control, including the percentage of voting securities of the registrant now beneficially owned directly or indirectly by the person(s) who acquired control."  Instructions to Form 8-K, Item 5.01.

220.    Instead, 6D Global only reported that NYGG-Asia beneficially owned the 35,629,883 NYGG-Asia 6D Global shares without disclosing that Defendant Wey was also a beneficial owner.

221.    Attached as Exhibit 3.4 to the Form 8-K filed with the SEC on October 1, 2014 were 6D Global's By-Laws, including the provisions set forth in ¶ 210.

222.    6D Global filed its Form 10-Q for the quarter ended September 31, 2014 on November 12, 2014.  The Form 10-Q was signed by Defendant Kang.  The Form 10-Q stated, in pertinent part:

> *The largest holder of our common stock has significant voting power and may effectively control the outcome of any stockholder vote.*
>
> NYGG (Asia), Ltd. holds, in the aggregate, approximately 46.2% of the outstanding shares of our common stock as of November 10, 2014.  As a result, NYGG (Asia) has the ability to substantially influence and, in some cases, may effectively control the outcome of corporate actions requiring stockholder approval, including the election of directors.  This concentration of ownership may also have the effect of delaying or preventing a change in control of 6D Global, even if such a change in control would benefit other investors.

223.    This statement in ¶ 222 was a misleading statement of material fact for failing to disclose that Defendant Wey, not NYGG-Asia, in fact controlled 6D Global, and that Defendant Wey exercised day-to-day operational control over 6D Global.  Thus, the statement was misleading for failing to disclose not merely that Defendant Wey's affiliates controlled the outcome of 6D Global's corporate actions requiring stockholder approval but also that Defendant Wey even controlled 6D Global's day-to-day operations.

- 56 -

224.    6D Global's stock began trading on the NASDAQ under ticker symbol SIXD on December 12, 2014.

225.    6D Global filed a Proxy Statement on Schedule 14C (the "February Proxy") on February 5, 2015 that related to the adoption of 6D Global's 2015 Omnibus Incentive Plan, pursuant to the written consent of Defendants Kang and NYGG-Asia, which, according to the February Proxy, held a majority of 6D Global's voting shares. The February Proxy was materially misleading because Item 403 of Regulation S-K required the disclosure that Defendant Wey beneficially owned all of NYGG-Asia's shares.

226.    On March 30, 2015, 6D Global filed its annual report on Form 10-K for the year ended December 31, 2014. The Form10-K was signed by Defendants Kang, Szynkowski, and McEwen. In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), Defendants Kang and Szynkowski provided certifications.

227.    The Form 10-K was misleading because Item 403 of Regulation S-K required the disclosure that Defendant Wey beneficially owned all of NYGG-Asia's shares.

228.    The Form 10-K instead stated, in pertinent part:

The largest holder of our common stock has significant voting power and may effectively control the outcome of any stockholder vote.

NYGG-Asia, Ltd. holds, in the aggregate, approximately 46.2% of the outstanding shares of our common stock as of November 10, 2014. As a result, NYGG-Asia has the ability to substantially influence and, in some cases, may effectively control the outcome of corporate actions requiring stockholder approval, including the election of directors. This concentration of ownership may also have the effect of delaying or preventing a change in control of 6D Global, even if such a change in control would benefit other investors.

229.    On April 17, 2015, 6D Global filed with the SEC its preliminary proxy on Schedule 14A (the "2015 Preliminary Proxy"). Defendant Kang signed the 2015 Preliminary

Proxy.

230.    On April 30, 2015, 6D Global filed its definitive proxy on Schedule 14A (the "2015 Proxy Statement," and, together with the 2015 Preliminary Proxy, the "2015 Proxies"). Defendant Kang signed the 2015 Definitive Proxy.

231.    The 2015 Proxies were misleading because Item 403 of Regulation S-K required the 2015 Proxies to disclose that Defendant Wey beneficially owned all of NYGG-Asia's shares.

**The truth emerges.**

232.    The extent of the Individual Defendants' misconduct was revealed in the three actions – in addition to the securities fraud class action -- that were filed against many of the Individual Defendants explaining the ongoing scheme of stock price manipulation, fraud and violations of SEC rules and regulations. These three actions, discussed below, include an indictment, an SEC action, and a private action brought by Discover.

**The DOJ indictment against Defendant Wey and Erbek.**

233.    On September 8, 2015, the United States Attorney for the Southern District of New York filed an indictment against Defendant Wey and Erbek on charges including stock manipulation and fraud. *See United States v. Benjamin Wey, et al.*, 15-crim-611 (the "Indictment"). Defendant Wey was arrested on September 10, 2015, the same day the indictment was unsealed. The Indictment is attached hereto as Exhibit A and incorporated by reference herein.

234.    The Indictment alleges that Defendant Wey and others conspired to defraud the investing public by orchestrating and facilitating Wey's undisclosed amassing of beneficial ownership of more than five percent of the stock of certain publicly traded companies, including

CleanTech, and manipulation of the market price and demand for the stock of those companies in which Defendant Wey had covertly amassed substantial beneficial ownership interests.

235.    During the Relevant Period, Defendant Wey used nominee entities that were owned or otherwise controlled by Defendant Wey, Wey's family member or employees of Defendant NYGG-Asia to obtain substantial portions of shares of U.S. shell companies. One of the shell companies that the nominees obtained a substantial percentage of shares was Everton.

236.    The Indictment further alleges that, although records associated with the offshore nominee entities identify certain of the nominee owners as the sole shareholders, directors, and/or signatories of the nominee entities, in fact, and unknown to the investing public, the nominee entities were actually controlled by Wey. Among other things, Defendant Wey possessed and exercised investment authority over shares of stock held in the names of the nominees; closely tracked the nominees' holdings, including gains and losses on stock positions; and directed other parties to take action in matters pertaining to the nominees, including, for example, the transfer of shares of stock between nominees. In executing the scheme to defraud, Defendant Wey routinely used Erbek to conduct stock trading for accounts held in the names of the nominees.

237.    Further, Defendant Wey caused the nominees to retain control of more than 5% of the shares of CleanTech by virtue of the reverse merger with Everton. In accordance with Section 13(d) of the Exchange Act, Defendant Wey was required to report his beneficial ownership within 10 days of the acquisition of shares in excess of 5% because he had investment authority over the nominees. Defendant Wey, however, intentionally failed to file the requisite reports under Section 13(d).

238.     In fact, to further hide from the investing public the extent to which he owned and exercised control over CleanTech's stock (among others), Defendant Wey purposefully caused the nominees' holdings to be structured in such a way as to ensure that no single one of the nominees held a greater-than-five percent beneficial ownership interest.

239.     As a further part of the conspiracy and scheme to defraud, Defendant Wey caused the share price of CleanTech's stock to be manipulated in various ways. For example, on multiple occasions, Defendant Wey caused two retail brokers located in Manhattan to solicit their customers to buy shares of common stock, often on margin, while those brokers simultaneously actively discouraged the sale of these stocks by their customers, so as to artificially maintain the stock price. Similarly, Defendant Wey explicitly instructed Erbek to maintain the share prices of CleanTech's stock held in certain of the nominees' accounts.

240.     According to the Indictment, on or about February 7, 2011, Defendant Wey sent an email to Erbek stating, "CleanTech just traded at $4.50 per share. Please make sure the trader buys the stock at $5 per share, stay at $5 per share bid price, not less. Please make sure this happens right away." Erbek agreed to do so.

241.     The purpose of Defendants Wey and Erbek's emails was to artificially manipulate the market price and demand of CleanTech common stock.

242.     Additionally, according to the Indictment, Defendant Wey orchestrated certain match trades in CleanTech securities to manipulate the stock price. The Indictment provides the following example: in July 2010, soon after CleanTech was listed at an initial offering price of $3.00 per share, Defendant Wey caused the purchase for a U.S. brokerage account in the name of Defendant Wey's siblings of approximately 1,000 shares of CleanTech stock while also causing a

Singapore brokerage account in the name of one of the nominee entities he controlled to sell the exact same number of shares. The sale and the purchase were done at $5.10 per share which was 70% above the $3.00 initial offering price. After he executed these transactions, Defendant Wey sent emails to prospective investors promoting the apparent 70% increase in CleanTech stock.

243.    Finally, the Indictment alleges that from at least December 2010 through at least December 2011, Defendant Wey willfully and knowingly failed to file with the SEC notice of acquisition of beneficial ownership of CleanTech, which is violation of SEC rules and regulations.

**The SEC Action.**

244.    On September 10, 2015, the SEC filed a complaint in this Court, against Defendant Wey, his wife, his sister, Defendant NYGG, Erbek, and others, for their participation in a scheme to profit from undisclosed controlling ownership interests in several U.S. companies created by reverse mergers, including 6D Global, which were actually controlled by Defendant Wey and Defendant NYGG, and the SEC amended the complaint on November 9, 2015.  *United States Securities and Exchange Commission v. Benjamin Wey, et al.*, 15-cv-07116 (PKC) (the "SEC Action"). The SEC Action is attached hereto as Exhibit B and incorporated by reference herein.

245.    The SEC Action described the fraudulent scheme as follows: Defendant Wey would use nominees controlled by him to take clandestine control of certain U.S. shell companies, including Everton.  After taking control of the shell company, Defendant Wey would arrange one of Defendant NYGG's clients, such as CleanTech, to reverse merge with the shell company that Defendant Wey controlled through his nominees. Following the mergers, Defendant Wey and his family members indirectly held beneficial ownership interest exceeding 5% in the NYGG client.

Defendant Wey then used his control over the NYGG companies such as CleanTech to manipulate the stock price, while misleading the investing public about his control of the companies.

246.    In 2010, NASDAQ delisted CleanTech partly because of Defendant Wey's failure to disclose his involvement in a December 2010 financing in which nominees he controlled received shares of CleanTech. The SEC set aside the delisting decision on July 22, 2013 based on NASDAQ's failure to provide evidence that it had specifically requested all documentation about Defendant Wey's financing transactions.

247.    During CleanTech's appeal of the NASDAQ delisting, Defendant Wey submitted a letter to NASDAQ dated June 30, 2011 in which he made false and misleading statements in order to conceal his financial stake in CleanTech's December 2010 offering. The letter stated that "[n]either I nor NY Global has any beneficial ownership of the securities issued in the financing." This was a false statement because of Benjamin Wey's, Tianyi Wey's, and Michaela Wey's ownership and control of nominees Strong Growth Capital, Ltd., Han Hua, Ltd., and Roosen Commercial Corporation. Benjamin Wey also falsely claimed in the letter that NYGG's Beijing and New York offices were "separately owned and operated."  He also stated that the Beijing office was run by an NYGG employee, who Benjamin Wey failed to disclose was Tianyi Wei's domestic partner. In fact, Benjamin Wey ran both offices, and Tianyi Wei's domestic partner was an NYGG employee who reported to Benjamin Wey. Benjamin Wey also described Han Hua as an "Asian investment fund" when, in fact, it was a nominee that Tianyi Wei owned.

248.    The SEC action charges Defendant Wey and others with numerous violations of the Securities Exchange Act for engaging in the conduct described above.

249.    Through Defendant Wey's and his family members' scheme, they received millions of dollars in illicit profits. The proceeds of sales of the securities and other profits from the scheme were deposited in various nominee brokerage and bank accounts and transferred around the world to mask their sources. Millions of dollars of those funds were then returned to the United States via transfers from accounts that were at least nominally controlled by his sister, Tianyi Wei, to accounts in the name of his wife, Michaela Wey. Defendant Wey and his wife used the proceeds to fund NYGG's operations and their lavish lifestyle.

250.    Some details of their scheme, some of which are set forth also in the Indictment, follow. The market manipulation was aimed at achieving and maintaining a share price above $5.00 for NYGG's client CleanTech. In July 2010, the first trades in Clean Tech securities involved a match trade of 1,000 shares purchased by a certain broker account in the name of Tianyi Wei from a foreign brokerage account maintained in the name of Guo Sheng, a Nominee for which Tianyi Wei was listed as the owner and signatory. The purchase price of $5.10 was 70 percent higher than CleanTech's recent $3.00 offering price; however, nothing had occurred between the offering and this first sale on the secondary market to justify the price increase. Soon thereafter, Benjamin Wey touted the 70-percent increase in an email to potential investors.

251.    Similarly, a February 2011 email recovered during execution of search warrants and sent from Benjamin Wey or someone else at his direction to Erbek revealed an intention to maintain the share price of CleanTech at $5.00. It read, "Dogan, Cleantech just traded at $4.50 per share. Please make sure the trader buys the stock at $5 per share, stay at $5 per share bid price, not less. Please make sure this happens right away." Trading records for the Swiss accounts managed by Erbek show purchases on February 7, 2011, of CleanTech shares in 100 to 198 share tranches

at $4.86 and $4.93. These purchases were part of Benjamin Wey's effort to drive the stock's price upward.

**6D Global stock halted, damaging investors.**

252.    As a result of the unsealing of the Indictment and the filing of the SEC Action, on September 10, 2015, NASDAQ halted trading of 6D Global securities, freezing the stock price at $2.90.

**Additional action filed: the Discover Litigation.**

253.    On September 28, 2015, Discover filed the Discover Litigation -- against Defendants 6D Global, Defendant Wey and the officers and directors of 6D Global in this Court. The Discover Litigation is attached hereto as Exhibit C, and incorporated by reference herein.

254.    The Discover Litigation alleges that on August 10, 2015, Discover entered into a Stock Purchase Agreement ("SPA") with 6D Global in which Discover paid $10,000,000 in exchange for 1,088 convertible preferred shares of 6D Global.

255.    6D Global induced Discover to enter into the SPA by misrepresenting its status as an award-winning digital business, marketing, and technology company and failing to disclose that it was being investigated by the SEC and the Department of Justice, and further failing to disclose the role of Defendant Wey and his nominees in controlling the Company and manipulating its stock price.

256.    It was only after the execution of the SPA, during an August 18, 2015 meeting that 6D Global revealed the status of Defendant Wey as 6D Global's controlling stockholder.

257.    The August 18 meeting was prompted by an e-mail from Defendant Kang to John Kirkland, investment advisor to Discover, in which Kang proposed the meeting and suggested

bringing "a representative from NYGG Asia the other large shareholder in 6D Global", i.e., Defendant Wey.

258.   Discover had never heard of Defendant Wey, and at the August 18th meeting Defendant Wey stated that he controlled Defendant NYGG, and, through Defendant NYGG, he controlled all of 6D Global stock. Defendant Wey continued to say that Defendant Kang worked for him and that there was "no real public float" and basically all free trading shares of 6D Global were controlled by him and his "friends in China."

259.   At the August 18th meeting, Defendant Kang said about his relationship to Defendant Wey: "basically, I work for him."

260.   Discover's complaint seeks both compensatory and punitive damages, as well as rescission of the SPA and return of the $10,000,000 payment for the Company's shares.

**Subsequent events.**

261.   On September 10, 2015, the DOJ and SEC each issued press releases announcing, respectively, the Indictment and the SEC Complaint (the "Press Releases," and collectively with the Indictment and SEC Complaint, the "September 10 Disclosures").

262.   The September 10 Disclosures revealed that: (i) Defendant Wey exercised control over NYGG Clients; (ii) NYGG-Asia was a nominee for Defendant Wey; (iii) Defendant Wey owned and controlled NYGG-Asia; and (iv) Defendant Wey's representations to the NASDAQ in connection with the CleanTech delisting were lies -- that (a) NYGG-Asia and NYGG were separately owned and operated; and (b) NYGG-Asia's offices were run by an employee independent of Defendant Wey.

263.   The September 10 Disclosures therefore confirmed that Defendant Wey and CleanTech had lied to the NASDAQ in CleanTech's delisting proceeding.

264.   On September 15, 2015, aware that the grounds cited by CleanTech and Defendant Wey to secure reversal of the NASDAQ's delisting decision were false, the NASDAQ immediately halted trading in 6D Global's shares.  The halt price was $2.90.

265.   On October 6, 2015, 6D Global filed with the SEC on Form 8-K announcing the departure of certain of the Individual Defendants.  The Form 8-K stated:

> On September 30, 2015, David S. Kaufman, a director of 6D Global Technologies, Inc. (the "Company"), gave written notice to the Company of his resignation from his position as a member of the Board of Directors of the Company (the "Board"). Mr. Kaufman's resignation will be effective on the earlier of Friday, October 30, 2015, or the appointment of his successor. Mr. Kaufman is a director, the Chairman of the Governance and Nominating Committee, and a member of the Audit and Compensation Committees. Mr. Kaufman advised the Board that the reasons for his resignation were not the result of any disagreement with the Company.
>
> On September 30, 2015, Anubhav Saxena, a director of the Company, gave written notice to the Company of his resignation from his position as a member of the Board. Mr. Saxena's resignation will be effective on the earlier of Friday, October 30, 2015, or the appointment of his successor. Mr. Saxena is a director, Chairman of the Compensation Committee, and a member of the Audit and Nominating and Governance Committees. Mr. Saxena advised the Board that the reasons for his resignation were not the result of any disagreement with the Company.
>
> On October 5, 2015, Terry K. McEwen, a director of the Company, gave written notice to the Company of his resignation from his position as a member of the Board. Mr. McEwen's resignation will be effective on the earlier of Thursday, November 5, 2015, or the appointment of his successor. Mr. McEwen advised the Board that the reasons for his resignation were not the result of any disagreement with the Company.

266.   On October 27, 2015, 6D Global filed with the SEC on Form 8-K announcing the departure of certain of the Individual Defendants.  The Form 8-K stated the following, in relevant part:

> Effective as of October 24, 2015, the Board of Directors (the "Board") of 6D Global

Technologies, Inc. (the "Company") elected Piotr (Pete) A. Chrzaszcz as a member of the Board, to fill the vacancy created by the resignation of David Kaufman. Mr. Chrzaszcz will serve as a member of the Board's Audit Committee and Compensation Committee and as chairperson of the Board's Governance and Nominating Committee. The Board has determined that Mr. Chrzaszcz will meet the independence requirements of the NASDAQ Stock Market.

Mr. Chrzaszcz (pronounced Shunz) is currently an active investor trading his own portfolio. Mr. Chrzaszcz served as the CEO of Commercial Masterminds Inc., a commercial real estate investment and advisory firm from 2007-2012 and holds the advanced real estate investor designation, Certified Commercial Investment Member (CCIM). Mr. Chrzaszcz was an active leader in the CCIM community and a guest lecturer for the UC Berkeley Extension, Personal Financial Planning Program discussing due diligence in commercial real estate. Mr. Chrzaszcz is an Air Force veteran and holds a Bachelor of Science in Aerospace Engineering from Boston University.

There are no family relationships between any of the Company's directors or officers and Mr. Chrzaszcz. There are no related party transactions with respect to Mr. Chrzaszcz reportable under Item 404(a) of Regulation S-K.

For his services as a member of the Board and all three committees, Mr. Chrzaszcz will receive $14,500 per quarter and options to purchase 20,000 shares of the Company's common stock per year and is entitled to reimbursement of any fees and expenses in connection with performing his duties as a director. . . .

Effective as of October 27, 2015, the Board elected Michael Bannout as a member of the Board, to fill the vacancy created by the resignation of Anubhav Saxena. Mr. Bannout will serve as a member of the Board's Audit Committee and Governance and Nominating Committee and as chairperson of the Board's Compensation Committee. The Board has determined that Mr. Bannout will meet the independence requirements of the NASDAQ Stock Market.

For the past 25 years, Mr. Bannout has been the CEO and President of M. London Group, Inc., a privately owned men's and women's fashion accessories and apparel company, which he started in New York City as a small cut and sew manufacturing company and built into a multi-million dollar enterprise with world-wide distribution. Mr. Bannout attended Brooklyn College in Brooklyn, NY.

There are no family relationships between any of the Company's directors or officers and Mr. Bannout. There are no related party transactions with respect to Mr. Bannout reportable under Item 404(a) of Regulation S-K.

For his services as a member of the Board and all three committees, Mr. Bannout will receive $14,500 per quarter and options to purchase 20,000 shares of the Company's

- 67 -

common stock per year and is entitled to reimbursement of any fees and expenses in connection with performing his duties as a director.

267.    On November 20, 2015, the NASDAQ delisted 6D Global's stock from trading. 6D Global timely appealed the delisting.  On January 20, 2016, the NASDAQ Hearings Panel reserved decision on 6D Global's appeal.

268.    BDO's audit of 6D Global's 2015 financial statements included investigative procedures designed to assess whether Defendant Wey's control over 6D Global was a material weakness in its internal controls.

269.    In its audit, BDO discovered that Defendant Kang made numerous false exculpatory statements, set forth below.  BDO further discovered instances of Defendants Wey and Kang circumventing Board controls.

270.    On March 15, 2016, BDO sent a letter to the Chair of the Company's Audit Committee, Defendant Hartung, stating that BDO could no longer rely on Defendant Kang's representations.

271.    Accordingly, BDO wrote, if 6D Global did not fire Defendant Kang, BDO would have to resign as 6D Global's auditor.

272.    On March 17, 2016, 6D Global's Board met to discuss BDO's ultimatum. Defendant Kang rejected the request that he resign.  Defendant Hartung then moved to terminate Defendant Kang, but his motion was not seconded and therefore not voted upon.

273.    Defendant Kang remained in office, and BDO resigned later that day.

274.    On March 23, 2016, 6D Global filed with the SEC a Form 8-K in which the Company announced, among other things, that on March 17, 2016,

Adam Hartung, resigned from his position as a member of the Board.  Mr. Hartung's

- 68 -

resignation will be effective on April 16, 2016.  Mr. Hartung is a director, the Chairman of the Audit Committee, and a member of the Governance and Nominating and Compensation Committees.  Mr. Hartung advised the Board that the reason for his resignation was because the Board did not support his decision to terminate Mr. Kang as CEO of the Company[ ], and Mr. Hartung felt he would no longer be an effective member of the Board.

275.    On March 24, 2016, the NASDAQ Hearings Panel denied 6D Global's appeal for relisting.

276.    On March 29, 2016, 6D Global's stock resumed OTC trading, and fell from the halt price of $2.90 per share to close at $1.00.

277.    On April 12, 2016, 6D Global received a letter from the Nasdaq Listing Qualifications Staff that identified two additional bases for delisting:

- The Company did not file its Form 10-K for the fiscal year ended December 31, 2015 by March 30, 2016 and therefore is not in compliance with Listing Rule 5250(c)(1); and

- The Company has not yet paid its 2016 annual fee to Nasdaq and therefore is not in compliance with Listing Rule 5250(f).

278.    On May 20, 2016, 6D Global filed with the SEC a Form 8-K in which the Company set forth the bases for the NASDAQ's delisting of 6D Global and the Company's appeal. The Form 8-K set forth, in relevant part:

> On May 17, 2016, 6D Global Technologies, Inc. (the "Company") received a letter from the Nasdaq Listing Qualifications Staff (the "Nasdaq Staff") stating that the Company's delay in filing its first quarter 2016 Form 10-Q, which was due on May 10, 2016, constitutes an event of non-compliance with Listing Rule 5250(c)(1) and therefore a separate basis for delisting the Company's common stock from The NASDAQ Stock Market LLC ("Nasdaq").

> In prior letters reported by the Company on Forms 8-K filed with the U.S. Securities and Exchange Commission ("SEC") on November 25, 2015, and April 18, 2016, the Nasdaq Staff informed the Company that its common stock was subject to delisting as a result of (1) the Company's delay in filing its 2015 Form 10-K by the deadline of March 30, 2016, (2) the Company's failure to pay its 2016 annual fee to Nasdaq, and (3) the exercise of the Nasdaq Staff's discretionary authority.

The Company is appealing Nasdaq's delisting decision. While its initial appeal to the Nasdaq Hearings Panel (the "Panel") was denied on March 24, 2016, the Company's subsequent appeal of the Panel's decision is currently before the Nasdaq Listing and Hearing Review Council (the "Council"). In support of that appeal, the Company has presented a plan to address each of the Nasdaq Staff's bases for delisting, including:

The engagement of a new independent auditing firm to address the late SEC filings. Working diligently with its new auditors, the Company currently anticipates filing its 2015 Form 10-K by July 15, 2016, and its first quarter Form 10-Q by July 29, 2016. The Company has requested that its common stock remains listed on Nasdaq, though with trading suspended, contingent on the Company making such filings.

A commitment by the Company to pay its 2016 annual Nasdaq fees, concurrent with the resumption of its common stock trading on Nasdaq.

The Company believes it is addressing the issues raised by the Nasdaq Staff and Panel. There can be no assurance, however, that the Council will grant the Company's request for additional time to file its Forms 10-K and 10-Q. In addition, while the Company is working diligently with its auditors, there can be no assurance that the Company will be successful in filing its Forms 10-K and 10-Q by the dates set forth above. Therefore, there can be no assurance that the Company will be successful in its appeal or that its common stock will remain listed on Nasdaq.

279.   As of this filing, 6d Global stock has been trading at $0.15 per share, losing over 92% of its value during the Relevant Period.

## DAMAGES TO 6D GLOBAL

280.   As a direct and proximate result of the Individual Defendants' conduct, 6D Global has lost and expended and will continue to expend many millions of dollars.

281.   Such expenditures include, but are not limited to, legal fees, payments, and fines associated with the federal securities fraud class action lawsuit filed against the Company and its management, the Discover Litigation, the SEC Action, the DOJ Indictment, NASDAQ's halting of trading of Company stock, NASDAQ's delisting of Company stock, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

282.    Such losses include those due to the unjust enrichment of NYGG, the Individual Defendants and Company employees who illicitly received proceeds and fees from the stock manipulation scheme and/or were improperly over-compensated by the Company, including through bonuses and other compensation connected to the Defendants' intentional false and misleading statements and stock manipulation scheme.

283.    As a direct and proximate result of the Individual Defendants' conduct, 6D Global has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

284.    Plaintiff brings this action derivatively and for the benefit of 6D Global to redress injuries suffered, and to be suffered, as a result of the Defendants' breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of 6D Global and unjust enrichment, as well as the aiding and abetting thereof.

285.    6D Global is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

286.    Plaintiff is, and at all relevant times has been, a 6D Global shareholder.  Plaintiff will adequately and fairly represent the interests of 6D Global in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

287.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

288.    A pre-suit demand on the Board of 6D Global is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following four Individual Defendants: Kang, Hartung, Chrzaszcz, and Bannout (collectively, the "Current Directors").  Plaintiff needs only to allege demand futility as to two of the four Current Directors that are on the Board at the time this action was commenced.

289.    Demand is excused as to all of the Current Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme and false and misleading statements and omissions of material fact, which render them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

290.    In complete abdication of their fiduciary duties, the Current Directors either participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price by: A) permitting Defendant Wey to engage in a scheme to manipulate the price and trading volume of 6D Global's stock by using undisclosed nominee accounts to purchase and sell the stock; B) failing to maintain for the Company adequate internal and financial controls; and C) making and/or causing the Company to make false and misleading statements by failing to disclose to the scheme to the investing public, and that the Company lacked adequate internal and financial controls.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the Current Directors breached their fiduciary

duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

291.    Defendant Kang admitted that he works for Defendant Wey, and together they own about 75% of Company stock.  Even without Defendant Kang's huge Company stock interest, the Company admitted in its SEC filings that, "NYGG (Asia), Ltd. [controlled by Defendant Wey] holds, in the aggregate, approximately 45.0% of the outstanding shares of our common stock for the year ended March 19, 2015."  As a result, NYGG (Asia) has the ability to substantially influence and, in some cases, may effectively control the outcome of corporate actions requiring stockholder approval, including the election of directors.  This concentration of ownership may also have the effect of delaying or preventing a change in control of 6D Global, even if such a change in control would benefit other investors."  Together with Defendant Kang's additional 30% stock interest, Defendant Wey owns 3/4 of the Company and fully controls it.

292.    In September 2015, Defendants Wey and Kang caused two of five members of the Board at the time to "resign," and the third resigned in early October 2015.  This active exertion of their control of the Board, together with their majority ownership, demonstrates that the two Current Directors, besides Defendant Kang and Defendant Hartung, appointed to replace those who "resigned," were actually Defendants Wey's and Kang's puppets, who were beholden to them.

293.    Indeed, upon BDO's ultimatum to the Board that it must terminate Defendant Kang or else BDO would resign, the Board refused.   The Board thus protected Defendant Kang in his exploitation of the Company, and caused the resignation of BDO as the Company's auditor, and also resulted in Defendant Hartung's resignation.   This further evidences that Defendants

Chrzaszcz and Bannout were Directors who were completely dominated by and beholden to Defendants Wey and Kang.

294.    Therefore, Defendants Chrzaszcz, and Bannout are not independent or disinterested, but are beholden to Defendants Kang and Wey.

295.    Defendant Kang is not independent or disinterested, but is beholden to Defendant Wey, as he admitted that he works for Defendant Wey, and as he is the CEO of the Company and depends on Defendant Wey for his primary source of income.

296.    Defendant Kang made numerous false statements underplaying Defendant Wey's influence on the 6D Global's Board of Directors.  For example, in July 2015, Defendant Hartung asked Kang to disclose to 6D Global's Board the extent of Defendant Wey's involvement with 6D Global. As Defendant Hartung later reported to BDO, Kang falsely told 6D Global's Board of Directors that Defendant Wey was just a friend and not involved with 6D Global. In fact, Defendant Wey exercised day-to-day operational control over 6D Global.

297.    Moreover, in the Discover Litigation, Defendant Kang submitted a declaration under penalty of perjury denying Defendant Wey's status as a 6D Global shareholder.  Defendant Kang declared:

> As one of CleanTech's primary creditors, NYGG Asia was also involved in the merger and became a significant holder of shares of 6D Global's common stock. At all times after 6D Global began operations, I communicated principally with Defendant Roger Li regarding matters related to NYGG Asia.

298.    Defendant Kang also declared:

> Defendant Wey has never been an officer, director, or shareholder of 6D Global. And I have never known Defendant Wey to be an officer, director, or shareholder of NYGG Asia.

- 74 -

299.    Defendant Kang further declared, ""Indeed, since I first met him in 2014, Defendant Wey has never dictated the operations of 6D Global or its decision-making."

300.    Moreover, as further set out above, Defendant Kang had extensive contacts with Defendant Wey who closely monitored his investment in 6D Global. Defendant Kang's contacts with Li, by contrast, were very limited. In May 2015, more than a year after 6D Global and NYGG-Asia's first meeting, Defendant Kang travelled to China to meet Li and other NYGG-Asia personnel. Kang provided Li and the other NYGG-Asia personnel a 1-2 page dossier presentation to introduce them to 6D Global.

301.    Defendant Kang also told a special investigation team hired by 6D Global's Audit Committee that he did not know who had paid Defendant Wey's expenses to attend the Discover Meeting in the U.S. Virgin Islands. In fact, Kang had paid for Defendant Wey's expenses with his personal credit card. Further, Kang sought and obtained reimbursement from 6D Global in 2015, before he spoke with the investigators.

302.    Additional reasons that demand on Defendant Kang is futile follow.  Defendant Kang, as the Company's Chairman and Chief Executive Officer is thus a non-independent director. He was ultimately responsible for the Company's operations, internal controls, and a number of the false and misleading statements and omissions that were made, including those contained in the SEC filings, all of which he signed.  His large Company stock holding -- 29.7% of the Company's issued and outstanding common stock -- reveals his interest in keeping the Company's stock price as high as possible and his control over the Company.  Moreover, Defendant Kang is beholden to, and controlled by, Defendant Wey: he borrowed money from Defendant Wey's wife; and he "hired" Defendant Wey to act as an allegedly unpaid "consultant" to the Company, during

which time it is possible he imparted material, confidential information about the Company to Defendant Wey.

303.    Defendant Kang is also a defendant in the securities fraud class action lawsuit. Thus, for these reasons, too, Defendant Kang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

304.    Before the Current Directors were appointed together, the Board consisted of the following five Individual Defendants: Kang, Hartung, Kaufman, McEwen and Saxena (the "Former Directors").

305.    The Current Directors and the Former Directors are collectively referred to herein as the Directors.

306.    Alternatively, Plaintiff pleads demand futility due to his alleging that three of the five Former Directors, who were on the Board at the time the stock manipulation scheme took place and the false financial statements were made, breached their fiduciary duties by abandoning the Company when they resigned as Company directors in order to insulate themselves from shareholder derivative claims.  Courts hold that such clever conduct establishes an exception to the requirement to plead that demand on directors who were appointed after wrongdoing occurred is futile.

307.    Indeed, the Former Directors breached their fiduciary duties by, in the wake of public exposure of Defendant Wey's stock manipulation scheme, collectively resigning in order to insulate themselves from shareholder derivative claims.  Instead of endeavoring to recover on behalf of the Company the damages the Company suffered and will suffer from those responsible

for fraud and manipulation, they dropped out and appointed a new board that had no first-hand knowledge of the wrongdoing or of the Company itself. Patently, the Former Directors conspired with the Current Directors by the Former Directors collectively resigning, the result of which, they all expected, would be the receipt of get-home free tickets by the Former Directors.

308.    For the foregoing reasons, demand is excused because Courts do not permit directors who breached their fiduciary duties to defeat demand futility allegations by collectively resigning from and abandoning the company to which they owe allegiance.

309.    The Current and Former Directors, as members of the Board, were and are subject to the Code of Ethics. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Ethics required the Current and Former Directors to also adhere to 6D Global's standards of business conduct. The Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict with our interests or adversely affect the Company's reputation. The Current and Former Directors did not comply with the requirements of the Code of Ethics. The Current and Former Directors violated the Code of Ethics because they participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price. Because the Current and Former Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

310.    The Current and Former Directors also breached their fiduciary duty of loyalty by failing to ensure that the Company had an adequate system of internal controls in place to prevent the misrepresentations made by the Individual Defendants and to prevent the scheme to artificially inflate the Company stock price. Indeed, the Current and Former Directors knowingly or

recklessly disregarded any such controls by causing and facilitating the scheme. Accordingly, the Current and Former Directors breached their fiduciary duties in failing to implement such internal controls and, therefore, face a substantial likelihood of liability, and demand upon them is futile.

311.   The Current and Former Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Current and Former Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Current and Former Directors would be futile.

312.   6D Global has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for 6D Global any part of the damages 6D Global suffered and will continue to suffer thereby. Thus, any demand on the Current Directors would be futile.

313.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Current or Former Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Current Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this

action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

314.    The acts complained of herein constitute violations of fiduciary duties owed by 6D Global's officers, directors and/or controlling shareholders, and these acts are incapable of ratification.

315.    The Current Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of 6D Global.  If there is a directors and officers' liability insurance policy covering the Current Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Current Directors, known as, inter alia, the "insured-versus-insured exclusion."  As a result, if the Current Directors were to sue themselves or certain of the officers of 6D Global, there would be no directors' and officers' insurance protection.  Accordingly, the Current Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Current Directors is futile and, therefore, excused.

316.    If there is no directors' and officers' liability insurance, then the Current Directors will not cause 6D Global to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

317.     Thus, for all of the reasons set forth above, all of the Current Directors, and, if not all of them, certainly at least two of the Current Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Defendants for Breach of Fiduciary Duties

318.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

319.     Each Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of 6D Global's business and affairs.

320.     Each of the Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

321.     The Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.  The Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of 6D Global.

322.     In breach of their fiduciary duties owed to 6D Global, the Defendants willfully participated in misrepresentation of the Company's business operations and prospects, failed to correct the Company's public statements about the Company, and failed to properly oversee 6D Global's business and internal controls, rendering them liable to the Company for breaching their fiduciary duties.

323.     The Defendants had actual or constructive knowledge that that they had caused the Company to improperly misrepresent its business operations and prospects and they failed to

correct the Company's public statements about the Company. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of 6D Global's securities and disguising self-dealing transactions.

324.    The Defendants had actual or constructive knowledge that that they had permitted Defendant Wey to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of 6D Global's securities and engaging in self-dealing transactions.

325.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

326.    As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, 6D Global has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

## SECOND CLAIM

### Against the Defendants for Unjust Enrichment

327.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

328.    By their wrongful acts and the omissions of material fact that they caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment of, 6D Global.

329.    The Defendants either benefitted financially from the improper conduct, including through proceeds or fees received from the stock manipulation scheme, or received bonuses, stock options, or similar compensation from 6D Global that was tied to the performance or artificially inflated valuation of 6D Global, or received compensation that was unjust in light of the Defendants' bad faith conduct.

330.    Plaintiff, as a shareholder and a representative of 6D Global, seeks restitution from the Defendants and seeks an order from this Court disgorging all proceeds, fees, profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 14 of the Securities Exchange Act of 1934

331.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

332.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.   Specifically, the Company's 2015 Proxies

violated §14(a) and Rule 14a-9 because they omitted material information regarding the fact that Defendant Wey beneficially owned NYGG-Asia's Company stock and controlled the Company's day-to-day operations, and included by reference materially false and misleading financial statements.

333.    In the exercise of reasonable care, Individual Defendants should have known that the statements contained in the 2015 Proxies were materially false and misleading.

334.    The misrepresentations and omissions in the 2015 Proxies were material to Company shareholders in voting on the proxy statements. The 2015 Proxies formed an essential link in the accomplishment of the continuation of Defendants' continued violation of their fiduciary duties in connection with the stock manipulation scheme, the making of false and misleading statements, and the failure to institute sufficient controls over financial reporting.

335.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2015 Proxies.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of 6D Global, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Defendants have breached and/or aided and abetted the breach of their fiduciary duties to 6D Global;

(c)    Determining and awarding to 6D Global the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together

with pre-judgment and post-judgment interest thereon;

(d)   Directing 6D Global and the Defendants to take all necessary actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws and to protect 6D Global and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of 6D Global to nominate at least three candidates for election to the board; and

3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding 6D Global restitution from the Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)   Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 2, 2016                         Respectfully submitted,

                                            **THE BROWN LAW FIRM, P.C.**

                                            By:     /s Timothy W. Brown_____

                                            Timothy W. Brown, Esq.
                                            127A Cove Road
                                            Oyster Bay Cove, New York 11771
                                            Telephone: (516) 922-5427
                                            Email: tbrown@thebrownlawfirm.net

                                            *Counsel for Plaintiff*

## VERIFICATION

I, Allan Scott, am a plaintiff in the within action.  I have reviewed the allegations made in this Amended Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 21 day of June, 2016.

Allan Scott