UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x
ALLAN SCOTT, DERIVATIVELY AND ON BEHALF
OF 6D GLOBAL TECHNOLOGIES, INC.,

                    Plaintiff,                        15 CV 09691 (RWS)

v.

BENJAMIN TIANBING WEI A/K/A BENJAMIN WEY,
NEW YORK GLOBAL GROUP, INC., NYGG (ASIA) LTD.,
TEJUNE KANG, MARK SZYNKOWSKI, ADAM
HARTUNG, DAVID S. KAUFMAN, TERRY McEWEN,
ANUBHAV SAXENA, PIOTR CHRZASZCZ and
MICHAEL BANNOUT

                    Defendants,

and

6D GLOBAL TECHNOLOGIES, INC.,

                    Nominal Defendant.
------------------------------------------------------------------------------x

## OBJECTION OF SHAREHOLDER NYGG (ASIA) LTD. TO THE PROPOSED SETTLEMENT OF THE DERIVATIVE ACTION

<u>**TABLE OF CONTENTS**</u>

**PRELIMINARY STATEMENT** ................................................................................. 1

**FACTUAL BACKGROUND** ................................................................................... 5

  A.  NYGG (Asia)'s Investment in 6D Global Technologies, Inc. ............................. 5

  B.  The Now Terminated SEC, DOJ and Discover Actions ...................................... 5

  C.  6D Global's Stock is Delisted .......................................................................... 6

  D.  The Now Terminated Securities Class Action ................................................... 6

  E.  The Instant Shareholder Derivative Action ...................................................... 7

  F.  The Securities Class Action, Discover Action, ................................................. 8

      DOJ Action and SEC Actions are Dismissed ................................................... 8

  G.  The Settlement of the Derivative Action .......................................................... 9

**ARGUMENT** ...................................................................................................... 11

  I.  THE STANDARD FOR APPROVING A DERIVATIVE SETTLEMENT .................. 11

  II.  THE PROPOSED SETTLEMENT IS SUBSTANTIVELY
UNFAIR TO 6D GLOBAL AND ITS SHAREHOLDERS ..................................... 12

    A.  The Proposed Settlement Provides No Benefits ............................................. 12

    B.  Weak Derivative Claims Do Not Justify the Proposed Settlement ................... 15

    C.  The Benefits of Continued Litigation
Outweigh the "Benefits" of the Proposed Settlement ................................... 17

    D.  The Company's Largest Shareholder Opposes the Proposed Settlement ...................... 18

  III.  THE PROPOSED SETTLEMENT IS NOT
ENTITLED TO A PRESUMPTION OF FAIRNESS ............................................ 20

  IV.  PLAINTIFF SHAREHOLDER'S COUNSEL
IS NOT ENTITLED TO A FEE AND EXPENSE AWARD .................................. 20

**CONCLUSION** .................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*In re AOL Time Warner Shareholder Deriv. Litig.*, 2006 WL 2572114
(S.D.N.Y. Sep. 6, 2006)…………………………………………………………11-13

*In re Aqua Dots Prods. Liab. Litig.*, 654 F. 3d 748 (7th Cir. 2011)…………………………16

*City of Detroit v. Grinnell Corp.* 495 F. 2d 448 (2d Cir. 1974)……………………………..12

*In re Fab Universal Corp. Shareholder Deriv. Litig.*, 184 F. Supp.3d 277
(S.D.N.Y. 2015)………………………………………………………………...11-13, 15

*Goldberger v. Integrated Res. Inc.*, 209 F. 3d 43 (2d Cir. 2000)……………………………12

*Kaplan v. Rand*, 193 F.3d 60 (2d Cir. 1999)……………………………………………..20-21

*Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90 (1991)……………………………………...11

*Levy v. General Electric Capital Corp.*, 2001 WL 987873 (S.D.N.Y. Aug. 30, 2001)……...17

*In re MCA*, 598 A.2d 687 (Del. Ch. 1991)…………………………………………………...17

*In re Metropolitan Life Deriv. Litig.*, 935 F. Supp. 286 (S.D.N.Y. 1986)……………………15

*Mills v. Electric Auto Lite Co.* 396 U.S. 375 (1970)…………………………………………13

*In re Pfizer Inc. Shareholder Deriv. Litig.*, 780 F. Supp. 336 (S.D.N.Y. 2011)…………11, 15

*Polar Intern. Brokerage Corp. v. Reeve*, 187 F.R.D. 108 (S.D.N.Y. 1999)…………15, 17, 19

*Puddu v. 6D Global Technologies, Inc.*, 239 F. Supp.3d 694…………………………………8

*Ross v. Bernhard*, 396 U.S. 531 (1970)……………………………………………………....11

*In re SAIC Inc. Deriv. Litig.*, 948 F. Supp.2d 366 (S.D.N.Y. 2013)…………………………11

*In re Subway Footlong Sandwich Marketing and Sales Practices Litig.*,
896 F.3d 551 (7th Cir. 2017)……………………………………………………………16-17

*Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96 (2d Cir. 2005)………………………...20

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982)………………………………………11

**STATUTES**

Federal Rule of Civil Procedure 23.1…………………………………………………………11

NYGG (Asia) Ltd. ("NYGG (Asia)"), the largest individual shareholder of Nominal Defendant 6D Global Technologies, Inc. ("6D Global" or the "Company"), by and through its attorneys, Firestone Law PLLC, objects to the proposed settlement (the "Settlement") of this shareholder derivative action (the "Derivative Action") as follows:

## PRELIMINARY STATEMENT

The proposed Settlement before the Court is unfair and should be rejected.  It would require 6D Global to implement utterly worthless and illusory "corporate governance reforms" which provide no benefits to 6D Global and its shareholders.  Non-pecuniary settlements of derivative actions are permissible only where they provide substantial benefits addressing the internal deficiencies that gave rise to the derivative action.  The reforms proposed here do not even come close to meeting that high standard.

Moreover, for more than two years 6D Global's reputation and goodwill has needlessly suffered from meritless allegations of wrongdoing raised in the Derivative Action and in the actions on which it is entirely based, i.e., the actions which were commenced and then voluntarily dismissed by the government concerning a predecessor company of 6D Global, and the securities class action against 6D Global which was dismissed by this Court.  Requiring 6D Global to institute "corporate governance reforms" in the context of a settlement of the Derivative Action would harm 6D Global and its shareholders by confirming the public's negative and false perception of 6D Global created by the litigation.  By contrast, the shareholders will benefit from litigation of the claims; either the Derivative Action will be dismissed (as NYGG (Asia) believes it should be), thereby restoring the reputation of 6D Global and best positioning it for future growth, or the derivative claims will become stronger and a new settlement with meaningful corporate governance reforms will be negotiated.  Thus, NYGG

1

(Asia), which owns approximately 45% of the of the Company's voting stock, maintains that the potential benefits from litigation far outweigh the proposed Settlement's meaningless "reforms."

This Derivative Action was commenced by Derivative Plaintiff Alan Scott (the "Derivative Plaintiff") in the wake of lawsuits filed by the Department of Justice (the "DOJ") and Securities Exchange Commission (the "SEC") alleging that Benjamin Wey had manipulated the stock price of a predecessor entity to 6D Global named CleanTech Innovations, Inc. ("CleanTech"), as well as a related class action commenced by 6D Global's shareholders alleging securities fraud (the "Securities Class Action") and the delisting of the 6D Global's stock from the NASDAQ.   The Securities Class Action was dismissed by this Court last March, and the DOJ and SEC voluntarily dismissed their charges against Mr. Wey over the summer. The Derivative Action relies entirely on the unproven allegations in those previously filed and now dismissed actions.  No motion practice or discovery took place in the Derivative Action; rather, Derivative Plaintiff agreed to a stay and then sought to settle the action within six months of its filing.

On November 17, 2017, the proposed Settlement of the Derivative Action was presented to this Court for approval.  Pursuant to the proposed Settlement, 6D Global has agreed to implement three cosmetic "corporate governance reforms."

- 6D Global will continue to distribute its existing Code of Ethics (the "Code") to employees and have new employees certify that they have read it.

- 6D Global will institute "training" for employees in its executive offices on "issues relevant to the Company on securities, compliance, insider trading, ethics, and conflict of interest issues" for a period of one year; and

- When 6D Global's stock again becomes publicly traded, it will institute

"education/training" for its directors on "issues relevant to the Company on securities, compliance, Board professionalism, insider trading, ethics and conflict of interest issues" for a five-year period.

The proposed Settlement also provides that Derivative Plaintiff's Counsel may apply for a "Fee and Expense Amount" not greater than $75,000, to be paid by the Company's insurer.

A derivative settlement may not be approved unless it is fair, reasonable and adequate. In reaching that determination, the Court considers the following factors: "'(1) the reasonableness of the benefits achieved by the settlement in light of the potential recovery at trial; (2) the likelihood of success in light of the risks posed by continued litigation; (3) the likely duration and cost of continued litigation; and (4) any shareholder objections to proposed settlement.'" *See infra*, 12.   Where, as here, the proposed settlement is based on non-monetary consideration such as corporate governance reforms, those reforms must confer a "substantial benefit" on the company and "directly address the issues" that gave rise to the derivative action. *See infra*, 12-13.   The proposed Settlement fails these standards, for the following reasons:

**1. <u>The Corporate Governance Reforms Provide No Benefit.</u>** The "reforms" to be implemented under the proposed Settlement provide no benefits to 6D Global and/or do not address the issues that gave rise to the derivative action. The first "reform" simply maintains the same Code that existed at the time of the alleged wrongdoing and continues the existing practice of providing the Code to its employees. The second reform, "training" for employees in the executive office, lasts only a year and does not require that the training be for a minimum number of hours, that it cover any mandatory topics (including those related to the alleged wrongdoing), or that 6D Global certify to the Plaintiff Shareholder that the training has occurred. The third reform, "education/training" of directors, would only come into effect if and when 6D

Global's stock is publicly traded again. As there is assurance that the stock will be publicly traded again, this "reform" may never be implemented and is therefore illusory. *See infra*, 13.

     **2.** **Weak Claims Do Not Justify Approving a Settlement With No Benefits.** The derivative claims at issue here are weak. Nevertheless, they do not justify a proposed Settlement where the benefits to 6D Global are illusory or non-existent. Indeed, courts routinely reject such settlements. As the 7th Circuit recently held in the *Subway* decision discussed below, a settlement that 'seeks only worthless benefits for the class' and 'yields [only] fees for class counsel' is 'no better than a racket' and 'should be dismissed out of hand.'" *See infra*, 15.

     **3.** **The Benefits of Litigation Outweigh the Proposed Settlement.** By agreeing to implement corporate governance reforms – ostensibly to prevent a repetition of the wrongdoing alleged by the Derivative Plaintiff – the negative and false reputation of 6D Global that has been built up by two years of meritless litigation (all of which, except for this matter, was dismissed) will be confirmed. Approval of the proposed Settlement will therefore harm 6D Global's goodwill and prospects for future business at the very time it needs to restore its reputation and build value for its public shareholders. By contrast, real benefits would result from litigation: either the claims will be dismissed and a positive public image of 6D Global will be re-established, or, alternatively, the derivative claims will not be dismissed and a better settlement, with actual value for shareholders, will be negotiated. Thus, the results of litigation are far more preferable than the negative effects of the proposed Settlement. *See infra*, 17

     **4.** **The Company's Largest Shareholder Opposes the Settlement.** NYGG (Asia) is 6D Global's largest shareholder, with a significantly greater financial stake in the continued success of its business and operations than the Derivative Plaintiff. In addition to all of the reasons stated above, NYGG (Asia) does not want 6D Global to enter into a meaningless

settlement agreement that hurts the Company and pays an undeserved fee to the Derivative

Plaintiff's counsel out of 6D Global's insurance policy.  Rather, the parties should proceed with

the litigation and the Defendants should seek dismissal of the derivative claims. *See infra*, 18.

Lastly, it is hornbook law that counsel fees are only appropriate where the settlement

provides a "substantial" benefit to the company.  Here, no benefit whatsoever – let alone

substantial – is achieved.  Accordingly, even if the proposed Settlement is approved, Derivative

Plaintiff's Counsel should not receive a Fee and Expense Amount.  *See infra*, 20.

## **FACTUAL BACKGROUND**

**A.    NYGG (Asia)'s Investment in 6D Global Technologies, Inc.**

NYGG (Asia) became a 6D Global shareholder in September 2014, in connection with

the merger of Six Dimensions, Inc. ("Six Dimensions") and CleanTech.  *See* Relevant pages

from 6D Global Annual Report, attached as Ex. A to the accompanying Declaration of Michael

J. Firestone (the "Firestone Decl.").  Following the merger, Six Dimensions and CleanTech

became 6D Global, a Delaware corporation.  *See id*.  In connection with the merger, NYGG

(Asia) cancelled $16 million worth of CleanTech debt and converted it into 35,149,883 shares of

6D Global common stock.  *See id*.  NYGG (Asia) continues to hold these shares today.  *See*

Firestone Decl., Ex. B.  NYGG (Asia)'s shares constitute approximately 45% of 6D Global's

outstanding shares, making NYGG (Asia) 6D Global's single largest single shareholder.  *See id.*

**B.    The Now Terminated SEC, DOJ and Discover Actions**

On September 8, 2015, the DOJ filed an indictment against Mr. Wey charging that he

failed to disclose his beneficial ownership of more than 5% of CleanTech stock, and that he

engaged in a scheme to manipulate CleanTech's stock price (the "DOJ Action").  *See* Amended

Complaint, Ex A [Docket No. 17-1].  Two days later, the SEC filed a complaint against Mr. Wey

and others (the "SEC Action") alleging securities fraud in connection with CleanTech. *See* Amended Complaint, Ex. B [Docket No. 17-2]. As discussed below, both of these actions were later voluntarily withdrawn by the DOJ and SEC.

On September 28, 2015, Discover Growth Fund ("Discover") commenced an action in this Court (the "Discover Action") against 6D Global, its officers and directors, and Mr. Wey, alleging that they had induced Discover to enter into a stock purchase agreement by failing to disclose Mr. Wey's role at 6D Global and his alleged manipulation of its stock. *See* Amended Complaint, Ex. 3 [Docket Entry 17-3].

## C.     6D Global's Stock is Delisted

On September 15, 2015, in reaction to the DOJ and SEC Actions, the NASDAQ halted trading of 6D Global's securities. *See* Amended Complaint, ¶ 264. On November 20, 2015, the NASDAQ delisted 6D Global's stock from trading. *See id.*, ¶ 267. Although 6D Global appealed its delisting, 6D Global remains delisted and has not provided any timetable for when it anticipates becoming traded on a public exchange again.

## D.     The Now Terminated Securities Class Action

On October 13, 2015, the Securities Class Action lawsuit captioned *Puddu v. 6D Global Technlogies, Inc., et al.*, Civ. No. 15-8061 (RWS), was commenced in this Court against 6D Global, Mr. Wey, NYGG, 6D Global chief executive officer Tejune Kang, and certain other former officers and directors of the Company. The Securities Class Action was purportedly brought on behalf of all purchasers of 6D Global stock between June 16, 2014 and September 10, 2015, and alleged that the Company violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by failing to disclose that Mr. Wey allegedly controlled the Company and that he beneficially owned more than 5% of its stock. *See Puddu*,

Civ. No. 15-8061, Second Amended Complaint [Docket No. 107].  The Securities Class Action was ultimately dismissed.

**E.      The Instant Shareholder Derivative Action**

On December 11, 2015, the Derivative Plaintiff, a purported 6D Global shareholder, commenced a shareholder derivative action on behalf of 6D Global against Mr. Wey, NYGG, NYGG (Asia), and several current and former directors of 6D Global.  *See* Mem. of Law in Support of Plaintiff's Motion to Approve the Settlement ("Plf.'s Mem."), at 3 [Docket No. 33]. NYGG (Asia) was never served with the complaint in the Derivative Action.[1]  The Derivative Plaintiff is represented by the Brown Law Firm, P.C. ("Derivative Plaintiff's Counsel").  *See* Declaration of Timothy Brown, at 2 [Docket No. 32-1].  To date, the Derivative Plaintiff has offered no proof that he is a 6D Global stockholder, nor has he been deposed or produced any documents.

On February 11, 2016, the Derivative Plaintiff agreed to stay the Derivative Action pending the outcome of an anticipated motion to dismiss the Securities Class Action.  [Docket No. 6].  An amended shareholder derivative complaint (the "Amended Complaint" or "Amd. Compl.") was filed on July 5, 2016.  [Docket No. 17].  In the Amended Complaint, the Derivative Plaintiff alleged that pre-suit demand on the board of 6D Global was futile and therefore excused.  *See* Amd. Compl., ¶ 288.  The Amended Complaint mirrors in most respects the Second Amended Complaint (the "Class Action Complaint") filed in the Securities Class Action two months prior to the filing of the Amended Complaint.  *See Puddu*, Civ. No. 15-8061,

---

[1] The docket for this action does not show the issuance of a summons or the filing of an affidavit of service for NYGG (Asia).  By appearing for the purpose of objecting to the proposed Settlement, NYGG (Asia) does not waive (and expressly preserves), any and all arguments it has related to the personal jurisdiction of this Court over NYGG (Asia).

[Docket No. 107]. Indeed, Paragraphs 109-231 and 267-273 of the Amended Complaint virtually duplicate Paragraphs 41-159 and 167-172 of the Class Action Complaint.[2] Additionally, large sections of the Amended Complaint simply repeat the unproven allegations from the SEC, DOJ, and Discover Actions. *See* Amd. Compl., ¶¶ 233-251, 253-260.

The Derivative Plaintiff alleges that the individual defendants breached their fiduciary duties to 6D Global by failing to supervise Mr. Wey (who was not an officer or director of 6D Global), failing to maintain adequate internal and financial controls, and failing to prevent the Company from making allegedly false and misleading statements to the investing public, and that they were unjustly enriched.

**F.    The Securities Class Action, Discover Action,
DOJ Action and SEC Actions are Dismissed**

On March 6, 2017, this Court dismissed the securities class action complaint, finding that the plaintiffs did not allege facts sufficient to show that Mr. Wey beneficially owned more than 5% of 6D Global's stock or that he was in control of the Company. *See Puddu v. 6D Global Technologies, Inc*., 239 F. Supp.3d 694, 704-05 (S.D.N.Y. 2017). The Court also held that plaintiffs had failed to meet the standards for pleading scienter and loss causation. *See id*, at 706-09. The dismissal of the Securities Class Action is presently on appeal to the United States Court of Appeals for the Second Circuit.

On June 22, 2017, the Discover Action was voluntarily dismissed with prejudice. *See* Firestone Decl., Ex. C.

On August 8, 2017, the United States voluntarily dismissed its charges against Wey in the

---

[2] For example, Paragraph 117 of the Amended Complaint alleges as follows: "Soon thereafter, Defendant Wey hit upon the strategy he would repeatedly employ through the next decade . . ." Similarly, Paragraph 46 of the Class Action Complaint alleges as follows: "Soon thereafter, Wey hit upon the strategy he would repeatedly employ in the next decade . . ."

DOJ Action.  *See id*., Ex. D.  One month later, on September 6, 2017, the SEC voluntarily

dismissed its charges against Wey.  *See id*., Ex. E.

## G.     The Settlement of the Derivative Action

Negotiations to settle the Derivative Action began on May 18, 2016 – about six months

after the action was commenced.  *See* Stipulation of Settlement (the "Stipulation"), at 3 [Docket

No. 27]. The parties later took part in a "full-day global mediation" session on March 7, 2017.

*Id*., at 4.  NYGG (Asia) did not participate in any of the settlement negotiations.  *See id*. at 3-4.

On November 15, 2017, the Derivative Plaintiff, 6D Global, and the Individual

Defendants executed the Stipulation.[3]  NYGG (Asia) is not a party to the Settlement.  *See id*., at

24. The settlement does not involve the payment of any money to 6D Global.  Rather, in return

for the Derivative Plaintiff, 6D Global, and all current 6D Global shareholders releasing the

Released Defendant Persons (as that term is defined in the Stipulation) of the derivative claims,

the Company has agreed to implement the following "corporate governance measures".

> 1.     6D Global shall maintain its extant Code of Ethics, 6D Global shall
> continue its practice of having all employees read the Code of Ethics and
> certify that they have read and understand the provisions of the Code of
> Ethics.  All new employees hired on or after January 1, 2016 shall be
> provided a copy of the Code of Ethics and will be required to sign a
> statement confirming that they have read and understand its terms and
> conditions.  The 6D Global Code of Ethics includes, among other things,
> provisions regarding strict compliance with securities laws, accurate
> public reporting and avoidance of conflicts of interest.
>
> 2.     6D Global agrees to require employee training for employees who
> are employed in the Company's executive offices, on issues relevant to the
> Company on securities, compliance, insider trading, ethics, and conflict of
> interest issues, for a period of at least one (1) year following final approval
> of the Settlement.  This employee training may be conducted by 6D
> Global through the use of on-line, in person, or other resources, at 6D

---

[3] The "Individual Defendants" include Defendants Tejune Kang, Mark Szynkowski, Adam
Hartung, David S. Kaufman, Terry McEwen, Anubhav Saxena, Piotr A. Chrzaszcz, and Michael
Bannout.

Global's discretion.

> 3.      Currently, 6D Global's stock is not publicly traded.  Within 12 months of 6D Global's stock becoming publicly traded, 6D Global agrees to require education/training for its Directors (the "Directors") on issues relevant to the Company on securities, compliance, Board professionalism, insider trading, ethics and conflict of interest issues, for at least five (5) years following final approval of the Settlement.  The Director education/training may be conducted by 6D Global through the use of on-line, in-person or other resources such as courses, training and/or learning modules provided by NACD or equivalent, at 6D Global's discretion.

Stipulation, Ex. A.

Pursuant to the proposed Settlement, 6D Global also agreed to direct its insurance carrier to pay Derivative Plaintiff's Counsel up to $75,000 for its fees, expenses and costs (the "Fee and Expense Amount") subject to the Court's approval. *See id.*, at 16-17.  The Shareholder Plaintiff may also apply for Court-approved service award of $1,250 to be funded out of the Fee and Expense Amount.  *See id.*, at 18.

On November 17, 2017, the Derivative Plaintiff requested that the Court preliminarily approve the Settlement and allow notice of the proposed settlement to be provided to the Company's shareholders. [Docket No. 28.]  The Court granted this request on November 21, 2017. [Docket No. 29.] That same day, Law360 published an article concerning the proposed Settlement with the headline "6D Global Settles Suit over PE CEO's Stock Scheming," even though the charges against Mr. Wey had been voluntarily dismissed months earlier.  *See* Firestone Decl., Ex. F.

## ARGUMENT

## I.  THE STANDARD FOR APPROVING A DERIVATIVE SETTLEMENT

Unlike an action a plaintiff brings on his or her own behalf to enforce a personal claim, a shareholder derivative action is brought "'to enforce a *corporate* cause of action." *Kamen v. Kemper Fin. Servs., Inc*., 500 U.S. 90, 95 (1991) (*quoting Ross v. Bernhard*, 396 U.S. 531, 534 (1970) (emphasis in the original). *See also In re SAIC Inc. Deriv. Litig*., 948 F. Supp.2d 366, 375 (S.D.N.Y. 2013) (same).  "Although named a defendant," the corporation "is the real party in interest, the stockholder being at best the nominal plaintiff."  *Ross*, 396 U.S. at 538.

Federal Rule of Civil Procedure 23.1(c) provides that a "derivative action may be settled . . . only with the court's approval."  In considering whether to approve a proposed settlement, the "'central question . . . is whether the compromise is fair, reasonable and adequate.'"  *In re Fab Universal Corp. Shareholder Deriv. Litig*., 148 F. Supp.3d 277, 280 (S.D.N.Y. 2015) (*quoting Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982)).

> [I]n the context of a derivative litigation settled on behalf of the class all shareholders, this requires consideration, in particular, of whether the settlement is the result of arm's-length negotiations in which plaintiffs' counsel has effectively represented the interests of the shareholder class, and whether the substantive terms of the settlement are in the interests of [the company] and its shareholders relative to 'the likely rewards of litigation.'

*In re Pfizer Inc. Shareholder Deriv. Litig*., 780 F. Supp. 336, 340 (S.D.N.Y. 2011) (*citing Weinberger*, 698 F.2d at 73-74).  *See also In re AOL Time Warner Shareholder Deriv. Litig*., 2006 WL 2572114, *2 (S.D.N.Y. Sep. 6, 2006) ("'Before approving the settlement of a derivative action, the Court must be satisfied that the compromise 'fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted.'") (internal citations omitted).  "A court should not engage in mere 'rubber stamp approval' of the settlement, yet it must 'stop short of the detailed and thorough investigation that it would

undertake if it were actually trying the case.'"  *Id.*  (*quoting City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974) *abrogated on other grounds, Goldberger v. Integrated Res. Inc.* 209 F.3d 43 (2d Cir. 2000)).

In determining whether the settlement is substantively fair, the Court considers the following factors: "'(1) the reasonableness of the benefits achieved by the settlement in light of the potential recovery at trial; (2) the likelihood of success in light of the risks posed by continued litigation; (3) the likely duration and cost of continued litigation; and (4) any shareholder objections to proposed settlement.'"  *In re Fab*, 148 F. Supp.3d at 281 (*quoting In re AOL Time Warner*, 2006 WL 2572114, at *3).[4]

In determining whether the settlement is procedurally fair, the Court "must pay close attention to the negotiating process, to ensure that the settlement resulted from 'arms-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests."  *In re Fab*, 148 F. Supp. 3d at 280 (*quoting In re AOL Time Warner*, 2006 WL 2572114, at *3).

## II.   THE PROPOSED SETTLEMENT IS SUBSTANTIVELY UNFAIR TO 6D GLOBAL AND ITS SHAREHOLDERS

### A.   The Proposed Settlement Provides No Benefits

The three "reforms" required under the proposed Settlement provide no substantial benefits and therefore render the proposed Settlement illusory.  It is black letter law that where a derivative action is settled on the basis of corporate reforms, the benefits to the company and its

---

[4]  The Derivative Plaintiff asserts that the proposed Settlement should be evaluated under all of the factors set forth in *City of Detroit v. Grinnell Corp*.  See Plf.'s Mem. at 11.  However, in the context of shareholder derivative litigation, only the *Grinnell* factors listed above "inform the Court's evaluation of whether a settlement is fair, reasonable, and adequate."  *See In re AOL Time Warner*, 2006 WL 2572114, at *3.

shareholders from such reforms must be "substantial."  *See In re AOL Time Warner*, 2006 WL

2572114, at *4 (*citing Mills v. Electric Auto Lite Co.*, 396 U.S. 375, 395 (1970).  "Reforms that

directly address the issues that gave rise to the suit are exactly the type that courts deem to confer

a substantial benefit on the company."  *In re Fab*, 148 F. Supp. 3d at 281.   *See also In re AOL

Time Warner*, 2006 WL 2572114, at *4 (finding corporate governance reforms beneficial where

they "directly address the failure of internal controls that precipitated the instant lawsuits.").

Applying this standard, the Court should find that the "reforms" contemplated by the proposed

Settlement fail to provide substantial benefits, for the following reasons:

First, 6D Global is required to "maintain its extant" Code and to "continue its practice of

having all employees read the Code of Ethics and certify that they have read and understood the

provisions" of the Code.  *See supra*, 9.  In other words, this measure does not entail any changes

to or improvements of current practice.  Rather, it leaves in place the very Code that existed at

the time of the alleged wrongdoing.  This reform plainly does not address any of the issues that

gave rise to the derivative claims or any alleged failure of internal controls.  It therefore cannot

be considered "substantial."

Second, 6D Global is required to provide "training" for its employees in the Company's

executive offices on "issues relevant to the Company on securities, compliance, insider trading,

ethics, and conflict of interest issues, for a period of at least one (1) year following the

Settlement."  *See supra*, 9.   There is no requirement that the training be for a minimum number

of hours, that it cover any mandatory topics, including those that are related to the alleged

wrongdoing, or that the Company certify to the Derivative Plaintiff that the training has

occurred.  There is also no way of knowing whether this would apply to a large or small number

of employees.  Moreover, as 6D Global would only be required to provide training for a single

year, this measure would not apply to any new employee in the executive office who starts one

year and a day from the date of the proposed Settlement's approval.

Third, 6D Global is required to provide "education/training" for its directors "on issues

relevant to the Company on securities, compliance, Board professionalism, insider trading,

ethics, and conflict of interest issues." *See supra*, 10. This requirement is only triggered,

however, within twelve months of 6D Global's stock becoming publicly traded, and it only lasts

for five years following approval of the proposed Settlement.  6D Global has not provided any

indication of when it anticipates that its stock will again be publicly traded.  Indeed, it is possible

that the stock will never be publicly traded again.  Thus, there is no assurance that this reform

will ever go into effect.  Astonishingly, there is no indication from his papers that the Derivative

Plaintiff, cares about, understands, or is even aware of this possibility.  Moreover, the five-year

period is misleading.  The Company is only required to commence the training within a year of

the stock being traded again; thus, if public trading commences three years from approval of the

Settlement, the training would only be required to commence at the end of the fourth year and it

would last a single year.  Lastly, even if the Company is ultimately re-listed, this "reform"

suffers from of the same problems as the employee training: (i) there is no requirement that the

training last a minimum number of hours; (ii) there is no requirement that the training cover any

mandatory topics, including those topics that are related to the alleged wrongdoing; and (iii)

there is no requirement that the Company certify to the Derivative Plaintiff that the training has

occurred.

In short, the corporate governance reforms provide no benefits to the Company and its

shareholders.   Nor do they address the alleged issues that gave rise to the Derivative Action.

Where, as here, shareholders will receive nothing of value from the settlement, the settlement is

patently unfair.  *See Polar Intern. Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 114 (holding

settlement unfair where it provided no value to shareholders).  Indeed, the paucity of the

corporate reforms at issue here stand in stark contrast to the type of robust corporate reforms that

have been approved in past derivative settlements.  *See e.g.*, *In re Fab*, 148 F. Supp. 3d at 280

(company agreed to create an SEC disclosure committee, limit ability of directors to serve on

other company boards and committees, establish educational programs for directors, provide

means for anonymous reporting to audit committee and board, and create position for a

compliance officer if company grew in size); *In re Pfizer*, 780 F. Supp.2d at 338-340 (company

agreed to establish "Regulatory Committee" of five members, one of which would also be a

member of the audit committee and a majority of whom would be independent, and create an

ombudsman program allowing employees to confidentially bring work-related concerns "to the

attention of senior management without fear of reprisal"); *In re Metropolitan Life Deriv. Litig*.,

935 F. Supp. 286, 290 (S.D.N.Y. 1986) (company agreed to create and maintain an independent

Sales Practices Committee of the board to oversee sales practices compliance, and to take sales

practices compliance into account when making promotion and compensation decisions and

awarding performance prizes).

###        B.       Weak Derivative Claims Do Not Justify the Proposed Settlement

Although the Derivative Plaintiff argues that continued litigation would present

difficulties and risks (*see* Plf.'s Mem. at 12-16), those considerations do not justify the approval

of this proposed Settlement, which provides no benefits to 6D Global and its shareholders

The 7th Circuit recently held that a "class action that 'seeks only worthless benefits for

the class' and 'yields [only] fees for class counsel' is 'no better than a racket' and 'should be

dismissed out of hand.'" [5] *In re Subway Footlong Sandwich Marketing and Sales Practices Litig.*, 869 F.3d 551, 553 (7th Cir. 2017).   In that case, a class of consumers sought injunctive relief from the Subway sandwich chain because some of the rolls used in its "foot-long" sandwich were not actually twelve inches long.  Subway agreed to settle in return for undertaking the following: (i) franchisees would "use a tool" to measure sandwich rolls; (ii) corporate quality-control inspectors would measure a sampling of baked bread during each regularly scheduled inspection; (iii) the inspectors would check bread ovens to be sure that they were in proper working order and within operating specification, and (iv) Subway's website and each franchised restaurant would post a notice explaining that "the natural variability in the bread-making process will sometimes result in sandwich rolls that are shorter than the advertised length." *Id.*, at 554.  Class counsel then sought a fee in the amount of $520,000.  *Id.*, at 555. A putative class member objected to the settlement on the grounds that it provided no meaningful benefit to the class and was therefore worthless.  *Id.*   The 7th Circuit reversed the trial court's decision to approve the settlement and class counsel's fee, holding that if the

> class settlement does not provide 'effectual relief' to the class and its 'principal effect' is to 'induce the defendants to pay the class's lawyers enough to make them go away,' then the class representatives have failed in their duty under Rule 23 to 'fairly and adequately protect the interests of the class.'

*Id.* 556, *quoting In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752-53 (7th Cir. 2011).  The Court noted that the "injunctive relief approved by the district judge is utterly worthless" because even after implementation of the settlement, "there's still the same chance that Subway will sell a class member a sandwich that is slightly shorter than advertised."  *In re Subway*, 869 F.3d at

---

[5] The Derivative Plaintiff agrees that the "'role of the court and the criteria considered in evaluating the adequacy and fairness of a derivative settlement are substantially the same as in the class action.'" Plf.'s Prelim. Approval Mem., at 6-7.

556-57.

Here too, the corporate governance measures that 6D Global is agreeing to undertake provide no benefit to the Company or its shareholders.  Where the settlement provides no value to the company and its shareholders, it should not be approved, regardless of other factors which might support the settlement, such as weak claims or the expense of litigation.  *See Levy v. General Electric Capital Corp.*, 2001 WL 987873 at *7 (S.D.N.Y. Aug. 30, 2001) (rejecting settlement of claim for violation of Section 16(b) of Securities Exchange Act where settlement did not "create one dollar of real value" for the Company"); *Polar Intern. Brokerage Corp.*, 187 F.R.D. at 117-118 (rejecting class action settlement where non-pecuniary benefits were of no value even though factors such as the length and expense of litigation and complex legal issues favored settlement); *In re MCA, Inc*. 598 A. 2d 687, 696 (Del. Ch. 1991) (rejecting settlement of class action where value of settlement to shareholders was "illusionary").

   **C.    The Benefits of Continued Litigation
          Outweigh the "Benefits" of the Proposed Settlement**

Requiring 6D Global to institute corporate governance reforms is tantamount to an admission of mismanagement and wrongdoing.[6]  Indeed, the Derivative Plaintiff claims that the reforms are being instituted "to reduce the likelihood that events giving rise to the Derivative Action recur."  Plf.'s Mem. at 6.  Moreover, notwithstanding the fact that none of the claims involving 6D Global or Mr. Wey were ever proven, Law360 publicized the proposed Settlement in the context of a headline claiming that "stock scheming" involving the Company had taken place.  *See supra*, 10.  Thus, it is obvious that the proposed Settlement gives credence to the

---

[6] Although the Stipulation includes a boilerplate denial by 6D Global and the Individual Defendants that they engaged in any wrongdoing (*see* Stipulation, at 5), that language is insufficient to protect the Company from the reputational damage resulting from having to institute corporate "reforms" in the context of a derivative settlement.

wholly false and negative image that has been built up about 6D Global over the last two years of litigation. For a relatively small and new company like 6D Global, this will hinder its ability to attract new business, new investment, and new talent. While the intent of the corporate reforms may be to make 6D Global's investors, partners, and potential employees feel more secure about the way the Company is carrying out its business and operations, their actual effect would be the opposite.

By contrast, continued litigation presents benefits to the Company. If the derivative claims are dismissed, the public will see that the allegations of wrongdoing are un-founded and 6D Global's reputation and good will can be restored. Alternatively – and even though NYGG (Asia) maintains that the derivative claims should be dismissed for failure to make demand upon the board – if the claims are not dismissed, their settlement value will increase and 6D Global may actually benefit from a settlement that imposes real corporate reforms, instead of the ones presented here. Either of these options far outweigh the damage that would be caused to 6D Global if the proposed Settlement is approved. Thus, the benefits of continued litigation far outweigh the non-benefits of the proposed Settlement.

### D.     The Company's Largest Shareholder Opposes the Proposed Settlement

As the Company's largest shareholder, NYGG (Asia) has a significant interest in the outcome of this litigation and in the financial health of 6D Global. Indeed, while the Derivative Plaintiff has not disclosed the extent of his financial interest in the Company, NYGG (Asia) acquired its stock in the Company in return for cancelling $16 million worth of debt owed by 6D Global's predecessor entity, CleanTech. *See supra*, 5.

NYGG (Asia) does not want 6D Global to enter into a meaningless settlement which will permanently tarnish the Company's reputation simply so that the Individual Defendants may be

released from baseless claims, or to preserve the Company's insurance policy.  This is not a trade-off that NYGG (Asia) supports or believes is in 6D Global's best interests.  Nor as a general matter does NYGG (Asia) support settling nuisance derivative claims – particularly ones such as these, where the SEC, DOJ, and Securities Class Action which are the sole basis of the Derivative Action have been dismissed outright, and Derivative Plaintiff's counsel concedes that the chances of success are low.  *See* Plf.'s Mem, 12-16.  In such situations, the shareholders are best served by having the Company and its leadership vindicated, not entering into a meaningless settlement that "provide[s] quick, easy money to plaintiffs' attorneys and nothing to shareholders."  *Polar Intern. Brokerage* Corp., 187 F.R.D. at 120.   Lastly, NYGG (Asia) is most concerned about how best to position 6D Global for future success; for the reasons discussed above, NYGG (Asia) believes that the proposed Settlement would hinder the Company's prospects by harming its goodwill and reputation.  Rather than support the proposed Settlement, NYGG (Asia) maintains (like every one of the settling Defendants, (*see* Stipulation at 5)), that there is no merit to the derivative claims and that the Derivative Action should be dismissed.

Moreover, it should be noted that NYGG (Asia) is also a defendant in the derivative action (although it was never served), and it will be released from all derivative claims if the Settlement is approved.[7] The fact that NYGG (Asia) opposes the Settlement, even though it would be in its personal interest to support it and be released from all derivative claims, should weigh heavily against approval.

---

[7] Section 1.19 of the Stipulation defines "Released Defendant Persons" as "Defendants" in this action.  "Defendants" includes all individuals named as defendants in the action, including NYGG (Asia).  *See* Stipulation, ¶ 1.4.

19

**III.  THE PROPOSED SETTLEMENT IS NOT ENTITLED
        TO A PRESUMPTION OF FAIRNESS**

The Derivative Plaintiff wrongly contends that the proposed Settlement is entitled to a

presumption of fairness.  *See* Plf.'s Mem. at 10.   The presumption of fairness applies only to a

settlement "'reached in arm's-length negotiations between experienced, capable counsel after

meaningful discovery.'"  *Wal-Mart Stores, Inc. v. Visa USA, Inc*., 396 F.3d 96, 116 (2d Cir.

2005) (internal citations omitted) (cited in Plf.'s Mem. at 10).  In *Wal-Mart*, class counsel took or

defended approximately 400 depositions and reviewed more than 5 million pages of documents

over seven years of litigation. *See id*.  Here, where there has been no discovery whatsoever, the

presumption of fairness cannot apply.  *See* Plf.'s Mem. at 16-17 (identifying work undertaken by

Derivative Plaintiff's Counsel, none of which include discovery).

**IV.  PLAINTIFF SHAREHOLDER'S COUNSEL IS NOT
        ENTITLED TO A FEE AND EXPENSE AWARD**

Even if the Court decides to approve the proposed Settlement, it should not grant

Derivative Plaintiff's Counsel a Fee and Expense Amount because the benefits achieved are not

substantial.  "'It is by now . . . well established that an award of counsel fees is only justified

where the derivative action results in a substantial non-monetary benefit to a corporation.'"  *In re*

*Fab*, 148 F. Supp. At 283 (*quoting Kaplan v. Rand*, 193 F. 3d 60, 69 (2d Cir. 1999).  *See also*

Plf.'s Mem. at 19 ("counsel is entitled to adequate compensation for obtaining a 'substantial

benefit' in resolving claims").  Indeed, in *Kaplan*, the Court held that for an attorney to receive a

fee for obtaining a non-monetary settlement,

> The benefit must be something more than technical in its consequences
> and be one that accomplishes a result which corrects or prevents an abuse
> which would be prejudicial to the rights and interests of the corporation or
> affect the enjoyment or protection of an essential right to the stockholder's
> interest.

*Kaplan*, 193 F. 3d at 60.

As discussed above, the corporate governance "reforms" to be implemented under the proposed Settlement are illusory; they provide no benefit to the Company whatsoever.  The Company should not further deplete its D&O insurance policy by paying a single cent to the Derivative Plaintiff's Counsel.  In *Kaplan v. Rand*, 192 F.3d 60, 71 (2d Cir. 1999), the United States Court of Appeal for the Second Circuit denied fees where the corporate governance reforms achieved by derivative plaintiff were "illusory" and did not provide a substantial benefit to "even under the most liberal definition" of that test.[8]  Here too, even if the proposed Settlement is approved, the Court should not approve any award of fees and expenses to Derivative Plaintiff Counsel or a service award to Derivative Plaintiff.

Moreover, notwithstanding the list of "tasks" undertaken by Derivative Plaintiff's Counsel in the course of this litigation (*see* Plf.'s Mem. at 24), it is crystal clear that the Amended Complaint in this action was largely copied from the complaints drafted by other attorneys in the DOJ, SEC, Discover, and Securities Class Actions.  *See supra*, 7-8.  No motion practice or discovery took place.  Rather, most of Derivative Plaintiff's Counsel's time was spent settling this action, but as shown above, the proposed Settlement does not provide 6D Global with any benefits.  Accordingly, the fee application should be denied in its entirety.

---

[8] The "reforms" achieved were (i) the inclusion of statement in the company's annual report that a public document prepared by a company's "Fairness Task Force" was available upon request, and (ii) the inclusion of a non-discrimination statement in all contracts between the company and outside vendors.

## <u>CONCLUSION</u>

For all of the reasons discussed above, the Court should not approve the proposed Settlement. To the extent the Court approves the proposed Settlement, however, it should not grant Derivative Plaintiff's Counsel a Fee and Expense Award or grant a service award to Derivative Plaintiff, and it should grant such other and further relief as the Court deems proper.

Dated: New York, New York
      February 13, 2018

FIRESTONE LAW PLLC

By: <u>/s/ Michael J. Firestone</u>
    Michael J. Firestone

825 Third Ave., Suite 201
New York, NY 10022
Tel: (212) 520-8276
Fax: (212) 954-5295

*Attorney for Objector NYGG (Asia)*