UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
ALAN SCOTT, derivatively and on behalf
of 6D GLOBAL TECHNOLOGIES, INC.,

               Plaintiff,            15 Civ. 9691 (RWS)

  -against-                           OPINION

BENJAMIN TIANBING WEIG A/K/A BENJAMIN
WEY, NEW YORK GLOBAL GROUP, INC.,
NYGG (ASIA) LTD., TEJUNE KANG, MARSK
SZYNKOWSKI, ADAM HARTUNG, DAVID S.
KAUFMAN, TERRY McKEWEN, ANUBHAV
SAXENA, PIOTR CHRZASZCZ, and MICHAEL
BANNOUT

               Defendants.
------------------------------------X



A P P E A R A N C E S:

       Attorneys for Derivative Plaintiff

       THE BROWN LAW FIRM, P.C.
       240 Townsend Square
       Oyster Bay, NY 11771
       By: Timothy W. Brown, Esq.

       Attorneys for Trust Objectors

       PRESS KORAL LLP
       825 Third Avenue, Second Floor
       New York, NY 10022
       By: Matthew J. Press, Esq.

       Attorneys for Objector NYGG (Asia)

       FIRESTONE LAW PLLC
       825 Third Ave., Suite 201
       New York, NY 10022
       By: Michael J. Firestone, Esq.

<u>Attorneys for Former Outside Director Defendants</u>

MANATT, PHELPS & PHILLIPS, LLP
7 Times Square
New York, NY 10036
By: Andrew L. Morrison, Esq.
    Samantha J. Katze, Esq.

<u>Attorneys for Defendant 6D Global Technologies, Inc. and the Individual Defendants</u>

CATAFAGO FINI LLP
350 Fifth Avenue, Suite 7710
New York, NY 10118
By: Tom M. Fini, Esq.

**Sweet, D.J.**

Plaintiff Allan Scott ("Derivative Plaintiff" or "Plaintiff"), derivatively on behalf of 6D Global Technologies, Inc. ("6D Global" or the "Company"), has moved for final approval of the proposed settlement (the "Proposed Settlement" or the "Settlement") and an award of attorneys' fees and reimbursement of expenses. This is a shareholder derivative action (the "Derivative Action") brought on behalf of 6D Global against Benjamin Wey ("Wey"), New York Global Group ("NYGG"), NYGG (Asia) ("NYGG (Asia)"), and several current and former directors of 6D Global on the basis that the individual defendants breached their fiduciary duties to 6D Global by failing to supervise Wey, failing to maintain adequate internal and financial controls, and failing to prevent the Company from making allegedly false and misleading statements to the investing public, and that they were unjustly enriched. This motion for final approval of the Proposed Settlement is brought pursuant to Federal Rule of Civil Procedure 23(e). Plaintiff, 6D Global, and defendants Adam Hartung, David Kaufman, and Anubhav Saxena (collectively, the "Former Outside Director Defendants") agree to the Proposed Settlement, while NYGG (Asia), Capricorn Irrevocable Grantor Trust, Epics Grantor Retained Annuity Trust I, Epics Grantor Retained Annuity Trust II, Epics Grantor

1

Retained Annuity Trust III, Kaskade Grantor Retained Annuity Trust, and The Le Cheval Irrevocable Grantor Trust (collectively, the "Trust Objectors") object.

Based on the facts and conclusions set forth below, the Plaintiff's motion for final approval of the Settlement Agreement is denied.

I. **Facts & Prior Proceedings**

On December 11, 2015, Derivative Plaintiff commenced this derivative action by filing a verified shareholder derivative complaint on behalf of 6D Global against defendants Wey, Tejune Kang ("Kang"), Mark Szynkowski, Adam Hartung, David S. Kaufman, Terry McEwen, Anubhav Saxena, Piotr. A. Chrzaszcz, Michael Bannout, Bei Lv, Dianfu Lv, Arnold Staloff, Shuyuan Liu, Zilt Zhao, Fengjun Sun, and Sheng Ma (collectively, the "Individual Defendants"), and defendants NYGG and NYGG (Asia) for breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of 6D Global and its predecessor, and for unjust enrichment. Derivative Plaintiff largely pleads alleged misconduct by Wey and claims that the Company failed to disclose to the investing public and NASDAQ that Wey allegedly was the beneficial owner of more than 5% of

the Company, through an alleged ownership interest in NYGG (Asia), and allegedly exercised control over its day to day operations. NYGG (Asia) became a 6D Global shareholder in September 2014, in connection with the merger of Six Dimensions, Inc. ("Six Dimensions") and CleanTech. Following the merger, Six Dimensions and CleanTech became 6D Global. NYGG (Asia) holds approximately 45% of 6D Global's outstanding shares, making NYGG (Asia) 6D Global's single largest shareholder.

Meanwhile, and in accordance with these allegations, on September 8, 2015, the U.S. Department of Justice ("DOJ") filed an indictment against Wey charging that he failed to disclose his beneficial ownership of more than 5% of CleanTech stock, and that he engaged in a scheme to manipulate CleanTech's stock price (the "DOJ Action"). On September 10, 2015, the U.S. Securities and Exchange Commission ("SEC") filed a complaint against Wey and others alleging securities fraud in connection with CleanTech (the "SEC Action"). On September 28, 2015, Discover Growth Fund ("Discover") commenced an action in this court against 6D Global, its officers and directors, and Wey, alleging that they had induced Discover to enter into a stock purchase agreement by failing to disclose Wey's role at 6D Global and his alleged manipulation of its stock.

On September 15, 2015, in reaction to the DOJ and SEC Actions, the NASDAQ halted trading of 6D Global's securities. On November 20, 2015, the NASDAQ delisted 6D Global's stock from trading. The Company appealed its delisting, but it remains delisted and has not provided a timetable as to when it anticipates becoming traded on a public exchange again.

On October 13, 2015, the securities class action (the "Securities Class Action") lawsuit captioned *Puddu v. 6D Global Technologies, Inc.*, No. 15 Civ. 8061 (RWS), was commenced against 6D Global, Wey, NYGG, 6D Global's Chief Executive Officer Kang, and certain other former officers and directors of 6D Global. The Securities Class Action was purportedly brought on behalf of all purchasers of 6D Global stock between June 16, 2014 and September 10, 2015, and alleged that the Company violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by failing to disclose that Wey allegedly controlled the Company and that he beneficially owned more than 5% of its stock.

As to the present Derivative Action, on February 11, 2016, the Derivative Plaintiff agreed to stay the action pending the outcome of an anticipated motion to dismiss the Securities Class Action. Derivative Plaintiff filed an Amended Complaint on

July 5, 2016, in which he alleged that pre-suit demand on the board of 6D Global was futile and therefore excused. The Amended Complaint further alleges that the Individual Defendants breached their fiduciary duties to 6D Global by failing to supervise Wey, failing to maintain adequate internal and financial controls, and failing to prevent the Company from making allegedly false and misleading statements to the investing public, and that they were unjustly enriched.

On March 6, 2017, the Securities Class Action complaint was dismissed on the basis that the plaintiffs had not sufficiently alleged that Wey beneficially owned more than 5% of 6D Global's stock or that Wey was in control of the Company. *See Puddu v. 6D Global Techs., Inc.*, 239 F. Supp. 3d 694, 704-05 (S.D.N.Y. 2017). Plaintiffs also failed to meet the standards for pleading scienter and loss causation. *Id.* at 706-09. The dismissal of the Securities Class Action is presently on appeal to the United States Court of Appeals for the Second Circuit. On June 22, 2017, the Discover Action was voluntarily dismissed with prejudice. On August 8, 2017, the DOJ voluntarily dismissed its charges against Wey in the DOJ Action. On September 6, 2017, the SEC voluntarily dismissed its charges against Wey.

Negotiations to settle the present Derivative Action began on May 18, 2016. The parties took part in a "full-day global mediation" session on March 7, 2017. On November 15, 2017, Derivative Plaintiff, 6D Global, and the Individual Defendants executed the stipulation and agreement of settlement (the "Proposed Settlement"), which provides for the following corporate governance measures in exchange of all claims in the original and Amended Complaints being released:

1. 6D Global shall maintain its extant Code of Ethics, 6D Global shall continue its practice of having all employees read the Code of Ethics and certify that they have read and understand the provision of the Code of Ethics. All new employees hired on or after January 1, 2016 shall be provided a copy of the Code of Ethics and will be required to sign a statement confirming that they have read and understand its terms and conditions. The 6D Global Code of Ethics includes among other things, provisions regarding strict compliance with securities laws, accurate public reporting and avoidance of conflicts of interest.

2. 6D Global agrees to require employee training for employees who are employed in the Company's executive offices, on issues relevant to the Company on securities, compliance, insider trading, ethics, and conflict of interest issues, for a period of at least one (1) year following final approval of the Settlement. This employee training may be conducted by 6D Global through the use of on-line, in-person or other resources, at 6D Global's discretion.

3. Currently, 6D Global's stock is not publicly traded. Within 12 months of 6D Global's stock becoming publicly traded, 6D Global agrees to require education/training for its Directors on issues relevant to the Company on securities, compliance, Board professionalism, insider trading, ethics, and conflict of interest issues, for a period of at

6

> least five (5) years following final approval of the Settlement. This Director education/training may be conducted by 6D Global through the use of on-line, in-person or other resources such as courses, training and/or learning modules provided by NACD or equivalent, at 6D Global's discretion.

(Stipulation and Order of Confidentiality ("Proposed Settlement"), Dkt. 27 Ex. A.)

Pursuant to the Proposed Settlement, 6D Global agreed to direct its insurance carrier to pay Derivative Plaintiff's counsel up to $75,000 for its fees, expenses, and costs (the "Fee and Expense Amount"), subject to approval. *See id.* at 16-17. The Derivative Plaintiff may also apply for a Court-approved service award of $1,250 to be funded out of the Fee and Expense Amount. *See id.* at 18.

On November 17, 2017, the Derivative Plaintiff requested preliminary approval of the Settlement and that notice of the Proposed Settlement be provided to the Company's shareholders. Both requests were granted on November 21, 2017. Plaintiff moved for final approval of the Settlement on January 17, 2018. Objections were filed by the Trust Objectors and NYGG (Asia) on February 14, 2018, and Derivative Plaintiff and the Former Outside Director Defendants responded to the objections

on February 21, 2018. The motion was heard and marked fully submitted on February 28, 2018.

II. **Plaintiff's Motion for Final Approval of the Proposed Settlement is Denied**

A derivative cause of action entitles a shareholder to bring "suit to enforce a corporate cause of action against officers, directors, and third parties." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (citing *Ross v. Bernhard*, 396 U.S. 531, 534 (1970) (emphasis omitted)). Under Rule 23.1 of the Federal Rules of Civil Procedure, a "derivative action may be settled . . . only with the court's approval." Fed. R. Civ. P. 23.1(c). In considering a proposed settlement of a class action, "[t]he central question . . . is whether the compromise is fair, reasonable and adequate." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982). Such a determination involves consideration of two types of evidence, *id.* at 74, "in particular, of whether the settlement is the result of arm's-length negotiations in which plaintiffs' counsel has effectively represented the interest of the shareholder class, and whether the substantive terms of the settlement are in the interests of the company and its shareholders relative to the likely rewards of litigation." *In re Fab S'holder Derivative Litig.* ("*In re*

8

*Fab*"), 148 F. Supp. 3d at 280 (alterations omitted) (citing *In re Pfizer Inc. S'holder Derivative Litig.* ("*In re Pfizer*"), 780 F. Supp. 2d 336, 340 (S.D.N.Y. 2011)).

"A court should not engage in mere rubber stamp approval of the settlement, yet it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *In re AOL Time Warner S'holder Derivative Litig.* ("*In re AOL*"), No. 02 Civ. 6302 (SWK), 2006 WL 2572114, at *3 (S.D.N.Y. 1996) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974) (internal quotation marks omitted)). "If the class settlement does not provide effectual relief to the class and its principal effect is to induce the defendants to pay the class's lawyers enough to make them go away, then the class representatives have failed in their duty under Rule 23 to fairly and adequately protect the interests of the class." *In re Subway Footlong Sandwich Marketing and Sales Practice Litig.* ("*In re Subway*"), 869 F.3d 551, 556 (7th Cir. 2017) (quoting Fed. R. Civ. P. 23(a)(4)) (internal citations and quotations omitted).

In assessing the procedural fairness of a settlement, courts "must pay close attention to the negotiating process, to ensure that the settlement resulted from 'arms-length

9

negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests.'" *In re AOL*, 2006 WL 2572114, at *3 (citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)) (internal quotation marks omitted). The parties and objectors do not dispute that the settlement here was entered into by way of arm's-length negotiations by experienced counsel.

In determining whether the substantive terms of a settlement are in the interest of the company and the shareholders, courts are informed by the following *Grinnell* factors: "(1) the reasonableness of the benefits achieved by the settlement in light of the potential recovery at trial; (2) the likelihood of success in light of the risks posed by continued litigation; (3) the likely duration and cost of continued litigation; and (4) any shareholder objections to proposed settlement." *In re Fab*, 148 F. Supp. 3d at 281 (quoting *In re AOL*, 2006 WL 2572115, at *3); *accord City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).

"When considering the benefits achieved by a settlement, courts must keep in mind that 'there is a range of reasonableness with respect to a settlement-a range which

recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *In re AOL*, 2006 WL 2572114, at *4 (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). The benefit conferred via a settlement agreement need not be monetary; rather, "[a] corporation may receive a substantial benefit from a derivative suit . . . regardless of whether the benefit is pecuniary in nature." *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 395 (1970). However, the benefit must be substantial in nature.

Reforms addressing the issues giving rise to the derivative suit "are exactly the type that courts deem to confer a substantial benefit on the company." *In re Fab*, 148 F. Supp. 3d at 281. For instance, in *In re Fab*, a derivative action in which plaintiff alleged directors and officers breached their fiduciary duties by deceptively licensing thousands of kiosks in China to copy illegally pirated copyrighted material on to consumer devices, the court found the settlement conferred a substantial benefit. *Id.* at 280. The company agreed to create an SEC disclosure committee, limit the ability of directors and management to serve on other company boards and committees, establish education programs for directors, change the Board's committee system and functionality, adopt a methodology of

11

anonymous reporting to an Audit Committee and the Board, and in the event the company were to grow to a particular size, create a position for a compliance officer to administer corporate governance and business ethics). Moreover, the court approved the settlement in *In re Pfizer*, 780 F. Supp. 2d at 338-40, a derivative action in which consolidated plaintiffs asserted claims for breach of fiduciary duty, violation of federal proxy rules, and unjust enrichment. The settlement consisted of the company establishing and funding the $75 million cost of a Regulatory Committee charged with the broad mandate of overseeing compliance with the requirements for drug promotion and marketing, evaluating whether the company's compensation policies are aligned with its compliance obligations, and creating an ombudsman program allowing employees to confidentially bring work-related concerns to senior management without fear of reprisal. In *In re Metro. Life Derivative Litig.*, 935 F. Supp. 286, 290 (S.D.N.Y. 1986), where insureds sought to recover for breach of fiduciary duty for failing to supervise sales agents, the court approved a settlement in which the company agreed to create and maintain an independent Sales Practice Committee of the board to oversee sales practice compliance, and to take sales practice compliance into account when making promotion and compensation decisions and awarding performance prizes.

The paucity of the corporate reforms at issue in the present action stand in stark contrast to the type of robust reforms that have been approved in past derivative settlements. Here, the underlying complaint alleges that the Individual Defendants breached their fiduciary duties to the Company by failing to supervise Wey, failing to maintain adequate internal and financial controls, and failing to prevent 6D Global from making allegedly false and misleading statements to the investing public. The three reforms contemplated by the Proposed Settlement fail to provide substantial benefits, and therefore render the Proposed Settlement illusory.

First, 6D Global is required to "maintain its extant Code of Ethics" and to "continue its practice of having all employees read the Code of Ethics." (*See* Proposed Settlement, Ex. A. at 2). The language of this proposed reform demonstrates that it confers no meaningful benefit or any benefit at all on the Company and its shareholders beyond what was already in existence prior to the filing of the complaint and the time of the alleged wrongdoing. Accordingly, this proposed reform does not address any of the issues that gave rise to the derivative claims or any alleged failure of internal controls and is not substantial

13

Second, pursuant to the Proposed Settlement, 6D Global is required to provide "training" for its employees in the Company's executive offices on "issues relevant to the Company on securities, compliance, insider trading, ethics, and conflict of interest issues, for a period of at least one (1) year following the Settlement." (*See id.* at 9.) There is no specified requirement that the training be for a minimum number of hours, that it cover any mandatory topics, or that the Company certify to the Derivative Plaintiff that the training has occurred. Moreover, this measure would not apply to any new employee in the executive office who is hired more than one year from the date of the Proposed Settlement's approval. Due to its lack of specificity and limited duration, this proposed reform cannot be considered substantial.

The third proposed reform provides that 6D Global is required to provide "education/training" for its directors "on issues relevant to the Company on securities, compliance, Board professionalism, insider trading, ethics, and conflict of interest issues." (*See id.* at 10.) The Company is only required to commence the training within a year of the stock being traded again; thus, if public trading commences three years from approval of the Settlement, the training would only be required to commence at the end of the fourth year and it would last a

14

year. Moreover, this measure suffers from many of the same problems as the employee training reform. There is no requirement that the training last a minimum number of hours; cover any mandatory topics; or that the Company certify to the Derivative Plaintiff that the training has occurred.

In sum, the three reforms agreed to in the Proposed Settlement provide no meaningful benefit to the Company, Derivative Plaintiff, or the shareholders, and as such, the *Grinnell* factors weigh in favor of denial of this motion to approve the Proposed Settlement. *See In re Subway*, 869 F.3d at 553 (internal quotation marks omitted) (holding that a "class action that seeks only worthless benefits for the class and yields only fees for class counsel is no better than a racket and should be dismissed out of hand."); *see also Guoliang Ma v. Harmless Harvest, Inc.*, No. 16 Civ. 7102 (JMA) (SIL), 2018 WL 1720740, at *8 (E.D.N.Y. March 31, 2018) (denying final approval of the proposed settlement where "class counsel and named plaintiffs are receiving the totality of the economic benefit with the class essentially receiving meaningless injunctive relief in exchange for a broad release of past and future claims.").

## III. Conclusion

For the foregoing reasons, the Plaintiff's motion to approve the Proposed Settlement is denied.

It is so ordered.

**New York, NY**
**May /7, 2018**

_____
ROBERT W. SWEET
U.S.D.J.