# EXHIBIT 1

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
Alexander P. McBride
Matthew H. Lee
240 Townsend Square
Oyster Bay, New York 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net
        amcbride@thebrownlawfirm.net
        mlee@thebrownlawfirm.net

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLAN SCOTT, DERIVATIVELY AND ON BEHALF OF 6D GLOBAL TECHNOLOGIES INC., | Case No. 1:15-cv-09691-RWS |
| Plaintiff, | **[PROPOSED] SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** |
| v. | **(1) BREACH OF FIDUCIARY DUTY; (2) UNJUST ENRICHMENT; AND (3) VIOLATIONS OF SECTION 14 OF THE SECURITIES EXCHANGE ACT OF 1934** |
| BENJAMIN TIANBING WEI A/K/A/ BENJAMIN WEY, NEW YORK GLOBAL GROUP, INC., NYGG (ASIA), LTD., TEJUNE KANG, MARK SZYNKOWSKI, ADAM HARTUNG, DAVID S. KAUFMAN, TERRY MCEWEN, ANUBHAV SAXENA, PIOTR A. CHRZASZCZ, and MICHAEL BANNOUT, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| And | |
| 6D GLOBAL TECHNOLOGIES INC., | |
| Nominal Defendant. | |

Plaintiff Allan Scott ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant 6D Global Technologies Inc. ("6D Global" or the "Company"), files this [Proposed] Second Amended Verified Shareholder Derivative Complaint against defendants Benjamin Tianbing Wei a/k/a/ Benjamin Wey ("Wey" or "Wei"), Tejune Kang ("Kang"), Mark Szynkowski ("Szynkowski"), Adam Hartung ("Hartung"), David S. Kaufman ("Kaufman"), Terry McEwen ("McEwen"), Anubhav Saxena ("Saxena"), Piotr A. Chrzaszcz ("Chrzaszcz"), and Michael Bannout ("Bannout") (collectively, the "Individual Defendants") and defendants New York Global Group, Inc. ("NYGG") and NYGG (Asia), Ltd. ("NYGG-Asia") (which together with the Individual Defendants are the "Defendants"), for breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of 6D Global and its predecessor, and unjust enrichment for his complaint against Individual Defendants, NYGG, and NYGG-Asia, and alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Individual Defendants, United States Securities and Exchange Commission ("SEC") filings, the United States Department of Justice ("DOJ") filings, and in particular, the Indictment of Benjamin Tianbing Wei a/k/a/ Benjamin Wey ("Wey") in this Court, the pleadings filed in this Court by the SEC against Defendant Wey and others, the action filed by 6D Global against Adam Ware and others, the action filed in this Court by John Cottam against Global Emerging Capital Group and others, the action filed by Daniel A. Larson and Greg W. Nielsen against 6D Global and Defendant Tejune Kang, and the action filed in this Court by Discover Growth Fund against Defendant Wey and others, wire and press releases published by

- 2 -

and regarding 6D Global, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by 6D Global's directors, officers and/or controlling stockholders who, from June 16, 2014 through the present (the "Relevant Period"), breached their fiduciary duties to 6D Global, formally known as CleanTech Innovations, Inc., ("CleanTech") by:  a) permitting Defendant Wey to engage in a scheme to manipulate the price and trading volume of 6D Global's stock by using undisclosed nominee accounts to purchase and sell the stock; b) failing to maintain for the Company adequate internal and financial controls; and c) making false and misleading statements by failing to disclose to the investing public that: i) Defendant Wey, in effect, controlled all of the Company's stock;  ii) Defendant Wey was engaged in a scheme to manipulate the price and trading of 6D Global's stock; and iii) the Company lacked adequate internal and financial controls.

2.      6D Global is a digital business solutions company serving the worldwide digital marketing and technology needs of enterprise-class organizations.  6D Global's services include web analytics, marketing automation, mobile applications, business intelligence, marketing cloud, and IT infrastructure-staffing solutions.

3.       Between about 2008 and 2015, at least, Defendant Wey operated and controlled an extensive criminal conspiracy that employed numerous associates, including affiliates such as compliant public companies and their respective officers and directors.

4.      Defendant Wey managed and owned a New York-based financial consulting firm, NYGG.  Defendant Wey also operated and owned a China-based investment-banking firm, NYGG-Asia.  Defendant Wey repeatedly and publicly claimed that NYGG-Asia was entirely independent of both him and NYGG.

5.      Quite to the contrary, Defendant Wey caused Chinese companies seeking U.S. stock market-listing to retain NYGG-Asia (the "NYGG Clients").  Defendant Wey assisted NYGG Clients in arranging for auditing, investment banking, legal and other professional services to prepare for and obtain a public listing in the United States.  In the process, Defendant Wey secretly acquired large blocks of NYGG Clients' stock through nominee companies (the "Nominees").

6.      Because Defendant Wey's shares accounted for the majority of NYGG Clients' free-trading stock, Defendant Wey was able to manipulate trading in NYGG Clients' stock, pushing up trading prices.  He then sold his shares at artificially inflated prices.  After Defendant Wey sold his stock, NYGG Clients' stock price quickly collapsed.

7.      As set forth in more detail, below, Defendant Wey also controlled NYGG Clients' day-to-day operations.  Defendant Wey caused NYGG Clients to pay NYGG, his New York-based investment advisory and consulting firm, and Defendant Wey's Nominees – for services rendered when no services were, in fact, rendered.

8.      Defendant Wey reaped more  than $70 million from his scheme, and caused hundreds of millions of dollars in damages to investors in all his affiliated companies, and in particular, 6D Global.  As a result of his corporate malfeasance and other criminal conduct, the DOJ indicted Defendant Wey and an associate, and the SEC has sued him along with several additional associates.

9.      With CleanTech, a supplier of physical equipment used in wind turbines in China, Defendant Wey and certain investors personally known to him were left holding the bag.  Days after approving CleanTech's listing, the NASDAQ discovered CleanTech had been concealing material information about NYGG's involvement in its affairs.

10.     The NASDAQ swiftly delisted CleanTech's stock – *after* Defendant Wey had acquired his shares, but *before* he could sell them.

11.     Through two years of litigation, dominated by Defendant Wey, CleanTech persuaded the SEC to reverse the NASDAQ delisting.

12.     Defendant Wey and CleanTech were able to accomplish the delisting by making numerous false statements to the NASDAQ, the SEC, and the courts.  Chiefly, in the campaign to relist, Defendant Wey and CleanTech persistently stated that NYGG and NYGG-Asia were distinct entities, with Defendant Wey having no interest in NYGG-Asia.  This statement was false: NYGG-Asia's purported boss Roger Li was Defendant Wey's sister's domestic partner, and he reported to Defendant Wey himself.  Defendant Wey, in truth, owned all of NYGG-Asia.

13.     Although Defendant Wey's campaign to reverse CleanTech's delisting ultimately succeeded in 2013, his victory was pyrrhic.  CleanTech, which after the campaign had no public market for its stock, was left indebted to NYGG-Asia for $16 million.

14.     Defendant Wey determined to make a fresh start.

15.     In June of 2014, Defendant Wey caused CleanTech to agree to "acquire" Six Dimensions, Inc. ("Six Dimensions"), a small private U.S. company that purportedly provides IT services.

16.     The acquisition of Six Dimensions was a complicated transaction.  Its critical

terms were that: (a) CleanTech "sold" its operations to its Chinese officers and directors, who, in return, cancelled their personally-held CleanTech shares; (b) CleanTech "acquired" Six Dimensions in exchange for CleanTech stock; and (c) NYGG-Asia converted its CleanTech debt into 6D Global stock (the transaction which included these terms and others is the "6D Global Acquisition"). NYGG-Asia was left holding about 46% of 6D Global's stock, while Six Dimension's former shareholders held about 50%.

17.      SEC rules require companies to disclose persons who beneficially hold more than 5% of their stock. However, if 6D Global disclosed to investors that Defendant Wey beneficially held 45% of its stock, the Company would be confessing to repeated misrepresentations to the NASDAQ to the contrary, that Defendant Wey did not own and/or control NYGG-Asia.

18.      The NASDAQ would delist 6D Global if it ever discovered that CleanTech had secured reversal of the NASDAQ's delisting decision by lying on the record and to the SEC. Moreover, by this time, Defendant Wey had become notorious. Defendant Wey had judgment entered against him in a well-publicized sexual harassment trial that ended with an $18 million verdict against Defendant Wey,[1] and a defamation action filed by a FINRA judge who previously ruled against Defendant Wey's associates, thereby becoming the subject of years' worth of slanderous articles appearing in Wey-controlled media.[2]

19.      The Individual Defendants thus continued to misleadingly omit that NYGG-Asia's shares were ultimately owned by Defendant Wey.

20.      Defendant Wey also personally oversaw much of 6D Global's business. Defendant Wey interviewed all candidates for leadership position. Defendant Wey selected 6D

---

[1] *See Bouveng v. NYG Capital LLC*, No. 14 CIV. 5474 PGG, 2015 WL 3503947 (S.D.N.Y. June 2, 2015).
[2] *See Brummer v. Wey*, 153583/2015 (N.Y. Sup. Ct.).

Global's auditor.  Defendant Wey also selected 6D Global's acquisition targets, and he took the lead in negotiating the financing and other agreements related thereto.

21.     6D Global's CEO and Chairman of the Board, Defendant Kang, later privately admitted that, "basically, I work for [Wey]."

22.     The Individual Defendants did not disclose that Defendant Wey was 6D Global's unofficial CEO, either, misleadingly claiming that 6D Global's business was managed by its Board of Directors (or, the "Board") and the Company's officers.  Defendant Wey was not an officer of the Company, but Defendant Wey was the ultimate control person of 6D Global.

23.     On September 10, 2015, the DOJ and SEC announced, respectively, the criminal indictment of and a civil lawsuit against Defendant Wey.[3] The DOJ and SEC releases disclosed, among other things, that Defendant Wey's claim to NASDAQ and the SEC that he did not own NYGG-Asia had been a brazen falsity.  Thus, the DOJ and SEC releases revealed that the Individual Defendants' statements made during the Relevant Period materially omitted Defendant Wey's status as beneficial owner of NYGG-Asia's 6D Global shares.

24.     That same day, shocked to discover that Defendant Wey had secured reversal through lies, the NASDAQ halted trading in 6D Global's stock.

25.     Soon after the September 10 trading halt, on September 28, 2015, an institutional investor which had invested $10 million in 6D Global just a month before, Discover Growth Fund ("Discover"), sued to get its money back (the "Discover Litigation").[4] The institutional investor, Discover, claimed it had not known about Defendant Wey's involvement, and Discover sought an

---

[3] The respective actions initiated by the DOJ and SEC have since been dismissed as a result of the suppression of evidence that was allegedly improperly obtained.
[4] *See Discover Growth Fund v. 6D Global Technologies, Inc.*, 15-cv-7618-PKC (S.D.N.Y.).

order of attachment.  To bolster their arguments to the contrary, 6D Global filed declarations under penalty of perjury on behalf of Defendants Kang and Szynkowski, claiming that Defendant Wey was not, and had never been, a shareholder of 6D Global.  The Individual Defendants thereby denied knowledge that NYGG-Asia's shares were actually beneficially owned by Defendant Wey.

26.     Defendants Kang's and Szynkowski's statements in the Discover Litigation were knowingly false.  Discovery unearthed a recording of Defendant Kang, in which he candidly admits to another 6D Global executive that "Benjamin Wey" is "a shareholder" of 6D Global, and as such, "he's got influence" over it.

27.     Beyond misconduct in the Discover Litigation, instances of the Individual Defendants' conduct evidence conscious misbehavior.  For example, Defendant Kang instituted a Company rule prohibiting other 6D Global employees from referencing Defendant Wey in email; any reference should refer instead to Defendant Wey by code name.

28.     On November 20, 2015, the NASDAQ delisted 6D Global's stock, citing, among other things, Defendant Wey's improper influence over 6D Global's management.  6D Global promptly appealed.  On January 21, 2016, the Company appeared before a NASDAQ Hearings Panel.

29.     Moreover, during an audit of 6D Global's 2015 financial statements, 6D Global's auditor BDO USA LLP ("BDO") conducted investigative procedures to determine whether Defendant Wey's influence over 6D Global violated its internal controls. In conducting these procedures, BDO determined that Defendants Wey and Kang had disobeyed the Board's explicit instructions and issued stock options to NYGG employees in violation of company rules.

30.     BDO also determined that Defendant Kang had repeatedly lied to 6D Global's

Board, and in connection with an internal investigation, about Defendant Wey.

31.     BDO advised 6D Global that the auditor could no longer rely on Defendant Kang's representations.  BDO recommended that Defendant Kang resign; if Defendant Kang did not resign, the auditor would have to step down from the Company's retention.

32.     The Chair of the Company's Audit Committee, Defendant Hartung, moved in accordance with the auditor's demand.  However, despite BDO's findings, 6D Global refused to terminate Defendant Kang.

33.     On March 17, 2016, as advised, BDO sent 6D Global a letter offering its resignation.  The news of BDO's resignation was announced in a Form 8-K filed with the SEC on March 23, 2016.

34.     On March 24, 2016, the NASDAQ Hearings Panel denied 6D Global's appeal of its delisting.

35.     Trading in 6D Global's stock opened over the counter on March 29, 2016.  Over the next four trading days, 6D Global's stock price fell from its halt price of $2.90 per share to $0.21 per share, or almost 93%.

36.     Today, 6D Global's stock trades over the counter at $0.01 per share.

37.     On June 16, 2016, a Company investor named John Cottam ("Cottam") filed an action (the "Cottam Litigation")[5] currently pending in this Court against 6D Global, 6D Acquisitions, Inc., Defendant Kang, a broker/dealer called Global Emerging Capital Group, LLC ("GECG"), GECG's regulatory legal counsel who, upon information and belief, serves as or served as Defendant Wey's personal legal counsel, and a registered investment representative.[6]

---

[5] *See Cottam v. Global Emerging Capital Group, LLC, et al.*, 1:16-cv-04584 (S.D.N.Y.)
[6] Currently, the defendants in the Cottam litigation are 6D Global, 6D Acquisitions, Inc., and 6D Global.

The Cottam Litigation alleges that the defendants at various times made written and oral representations to Cottam to induce him to invest money in a private confidential offering, all while knowing that the representations were false when made and omitting material information.

38.     On November 7, 2016, a Company investor named Adam Ware ("Ware") filed a Third Party Complaint against Defendants Wey, Kang, Syznkowski, 6D Global, NYGG, NYGG-Asia, and former interim Company CEO Terry McEwen, in an action in this Court initially brought by 6D Global and Six Dimensions against Ware and the other equity rights holders of Swellpath, Inc. ("Swellpath") (the "Swellpath Litigation").[7]  Ware's Third Party Complaint alleges fraud, fraudulent inducement, securities fraud, and, in the alternative, breach of contract and negligence for the failure to disclose material facts which induced Ware to sell his stock and goodwill in Swellpath to 6D Global in exchange for sham and fraudulent consideration.

39.     On February 10, 2017, Company shareholders Daniel A. Larson ("Larson") and Greg W. Nielsen ("Nielsen") filed an action against 6D Global and Defendant Kang in the Circuit Court for the Thirteenth Judicial Circuit in and for Hillsborough County, Florida (the "Larson Litigation").[8]  The Larson Litigation alleges negligent misrepresentation and negligence against the Company and Defendant Kang, and unjust enrichment against the Company, arising from Larson and Nielsen's purchase of restricted Company shares in an unregistered, private sale from 6D Global and Kang.

40.     As the above-referenced actions show, Defendants Wey, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena, NYGG, and NYGG-Asia (the "Investment-Related

---

[7] *See 6D Global Technologies, et al. v. Ware, et al.*, 1:16-cv-05625 (S.D.N.Y.).
[8] *See Larson, et al. v. 6D Global Technologies, Inc. et al.*, 17-CA-001313 (Cir. Ct., 13th J. Cir, Florida).

Misconduct Defendants"), who were with and/or controlling owners of the Company when the misconduct underlying the above actions occurred,[9] breached their fiduciary duties by causing and/or allowing the Company to mislead, and/or violate agreements with, Company investors and a former employee, thereby resulting in ensuing litigation and settlements which ultimately damaged 6D Global.

41.     The scheme consisted of, *inter alia*:  (1) breaching an employment contract and securities purchase agreement with a former employee; (2) inducing investors to invest in the Company through private offerings with oral and written misrepresentations known to be false; and (3) improperly restricting the transferability of the securities that were obtained by certain of these investors (collectively, the "Investment-Related Misconduct").

42.     Defendant Kang is especially liable for breaching his fiduciary duties, as at least since February 14, 2018, he was the sole director of the Company.  As the sole director, in breach of his fiduciary duties, Kang has taken control of the Company from shareholders by causing 6D Global to fail to (a) make periodic reports and filings required by the SEC and (b) hold an annual meeting of stockholders since its last Annual Meeting of Stockholders on August 19, 2016, in violation of Delaware law and 6D Global's By-laws.  Defendant Kang has further breached his fiduciary duties by causing the Company to violate its By-laws by having too few directors on the Board, and thus strengthening his control over 6D Global.

43.     The Individual Defendants' breaches of fiduciary duty have subjected the Company, the Company's Chief Executive Officer and Chairman, the Company's Chief Financial

---

[9] The remaining Individual Defendants, Defendants Chrzaszcz and Bannout, are also liable for breaches of their fiduciary duties related to the Investment-Related Misconduct insofar as they failed to cure any misconduct after they were appointed to the Board.

Officer, and the Company's Directors to a securities fraud class action in this Court[10] and to multiple private actions brought by 6D Global investors, have subjected its controlling shareholder to criminal charges in this Court, have subjected its controlling shareholders to a complaint filed in this Court by the SEC, have caused NASDAQ's halting and then delisting of Company stock, have caused the need to undertake internal investigations, subjected the Company to losses due to the unjust enrichment of Individual Defendants who benefitted from their illegal stock manipulation scheme and/or who were improperly over-compensated by the Company, including through bonuses and other compensation connected to the Individual Defendants' scheme of intentional and/or reckless misconduct, and will cost the Company going forward many millions of dollars.

44.     The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

45.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants who are or were the Company's current Directors, Officers, and/or controlling stockholders, and/or the Directors and Officers of the predecessor company, all of which acted under the direction of Defendant Wey -- to whom they were beholden, of the substantial likelihood of their liability in this derivative action, in the related federal securities law class action and in the Cottam Litigation, of their not being disinterested and/or independent Directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

---

[10] On March 6, 2017, the court granted a motion to dismiss the securities fraud class action with prejudice.  The plaintiffs subsequently appealed the dismissal to the Second Circuit Court of Appeals, which appeal is currently pending.

## JURISDICTION AND VENUE

46.     This Court has over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction of the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

47.     Additionally, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff is a citizen of a different state than the Individual Defendants and 6D Global, and the amount in controversy exceeds $75,000 exclusive of interest and costs. Plaintiff is a citizen of Nevada and no defendant is a citizen of that state.

48.     The Court has personal jurisdiction over each of the Individual Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

49.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Individual Defendants either resides or maintains executive offices in this District, and the Individual Defendants have received substantial compensation and/or profits in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

50.    Plaintiff is a current shareholder of shares of 6D Global.  Plaintiff has continuously held 6D Global common stock since August 17, 2015.  Plaintiff is a citizen of Nevada.

**Nominal Defendant 6D Global**

51.    Nominal Defendant 6D Global is a Delaware corporation with principal executive offices located in this District at 17 State Street, Suite 2550, New York, N.Y. 10004.  6D Global is a citizen of New York and Delaware.

52.    6D Global is the successor entity of CleanTech, which was a Nevada corporation. During CleanTech's years of operation, it designed, manufactured, tested and sold structural towers for on-land and off shore wind turbines. Clean Tech became a publicly-traded company that traded on NASDAQ under the ticker symbol "CTEK" through a reverse merger with shell company Everton Capital Corporation ("Everton"), prior to its merger into 6D Global.

53.    On June 16, 2014, CleanTech filed a Form 8-K with the SEC announcing that on June 13, 2014 it had entered into a merger agreement with Six Dimensions, a Nevada corporation formerly known as Initial Koncepts, Inc.  Six Dimensions became the wholly-owned subsidiary of CleanTech.  After the merger, CleanTech converted into a Delaware corporation and changed its name to 6D Global Technologies, Inc..

**Defendant NYGG-Asia**

54.    Defendant NYGG-Asia is a subsidiary of Defendant NYGG and is located in Beijing, China.

55.    According to the Company's 2015 proxy statement filed with the SEC on April 30, 2015 on Form 14A (the "2015 Proxy Statement"), "On September 29, 2014, in connection with the Exchange, NYGG-Asia, CleanTech's largest creditor, pursuant to a Debt Conversion

Agreement ("Debt Conversion Agreement"), converted all of CleanTech's indebtedness to NYGG Asia, in the aggregate approximate amount of $16,000,000, in exchange for the issuance of 35,149,883 shares of Common Stock to NYGG Asia and the cancellation of CleanTech's indebtedness to NYGG Asia."

56.     According to the Company's 2015 Proxy Statement, as of April 20, 2015, Defendant NYGG-Asia held 44.9% of 6D Global's outstanding shares. Additionally, Defendant NYGG-Asia actively exerted control over the Company.  Thus, Defendant NYGG-Asia was a controlling shareholder of the Company.

57.     The Company admitted in its annual reported for the year ending December 31, 2014 that it filed with the SEC on March 30, 2015 ("2014 10-K") that NYGG-Asia was its controlling shareholder in stating, "NYGG (Asia), Ltd. holds, in the aggregate, approximately 45.0% of the outstanding shares of our common stock for the year ended March 19, 2015.  As a result, NYGG (Asia) has the ability to substantially influence and, in some cases, may effectively control the outcome of corporate actions requiring stockholder approval, including the election of directors.  This concentration of ownership may also have the effect of delaying or preventing a change in control of 6D Global, even if such a change in control would benefit other investors."

**Defendant NYGG**

58.     Defendant NYGG is a Delaware corporation headquartered in New York, New York and has an additional office is in Beijing, China. 6D Global is a citizen of New York and Delaware. During the relevant period, Defendant NYGG offered consulting services, among other things, to China-based operating companies that endeavored to raise funds in the U.S. capital markets.

59.     Through Defendant NYGG-Asia, NYGG, which actively exerted control over NYGG-Asia and the Company, was a controlling shareholder of the Company.

**<u>Defendant Wey</u>**

60.     Defendant Wey is the founder and President of Defendant NYGG and oversaw the operations of Defendant NYGG-Asia during the Relevant Period. Defendant Wey was indicted by the United States Attorney for the Southern District of New York on September 8, 2015, for stock manipulation and the massing of undisclosed beneficial ownership of more than five percent of the stock of 6D Global, among other companies, and on September 10, 2015 was placed under arrest.  The charges made against him by the SEC and DOJ have since been dropped.  Defendant Wey is a citizen of New York.

61.     Through Defendant NYGG, and, in turn, through Defendant NYGG-Asia, Defendant Wey, who actively exerted control over NYGG, NYGG-Asia, and the Company, was a controlling shareholder of the Company.

62.     The services Defendants Wey and NYGG provided to NYGG's clients included handpicking accountants, auditors, directors, and attorneys for the companies; finding shell companies for and facilitating reverse mergers; and advising NYGG's clients regarding financing transactions.

63.     In addition to these advertised and disclosed services, Defendant Wey and NYGG, with the involvement of Defendant Wei's sister, Tianyi Wei, his wife, Michaela Wey, and others engaged in deceptive conduct to obtain and profit from undisclosed, controlling ownership interests in NYGG's clients and increase the value of NYGG's clients' securities, thereby

increasing the value of the significant holdings of those securities by Defendant Wey and his wife and sister.

**Defendant Kang**

64.     Defendant Kang served as the Chief Executive Officer of Six Dimensions, the predecessor company to 6D Global, since the company's founding in 2004.  He was appointed Chairman of the Board of Directors and Chief Executive Officer of 6D Global in September 2014. He currently serves as the Company's sole director.

65.     According to the Company's 2015 Proxy Statement, as of April 20, 2015, Defendant Kang beneficially owned 23,250,561 shares of the Company's issued and outstanding common stock.  This accounts for 29.7% of the outstanding common stock of the company.  Given that, as of the close of business on September 10, 2015, one share of common stock traded for $2.90, Defendant Kang's stock was worth $67,426,626.90.

66.     In 2015, Defendant Kang, acting on behalf of the Company, entered into an unwritten agreement with Defendant Wey for Defendant Wey to act as a "consultant" for the Company and use his contacts to connect the Company with potential investors.

67.     In August 2015, Defendant Kang borrowed $100,000 from the wife of Defendant Wey to purchase additional 6D Global stock. The term of the loan from Defendant Wey's wife expired on December 3, 2015 and it incurred interest at the rate of 4%.

68.     The Company's 2015 Proxy Statement stated the following about Defendant Kang:

Mr. Kang has served as the Chief Executive Officer of Six Dimensions, the predecessor company to 6D Global, since the company's founding in 2004, and was appointed chairman of the Board of Directors of 6D Global in September 2014. Before founding Six Dimensions, Mr. Kang was a principal of Kang Management Group, a commercial real estate developer in Nevada, until 2009 when it was closed down due to the global financial crisis that negatively affected the real estate markets in the West Coast. In early 2010, Mr. Kang filed a bankruptcy petition under Chapter 7 of

- 17 -

Title 11 of the United States Code in connection with his personal guarantee of land projects and the inability to refinance related indebtedness. Since then, Mr. Kang has devoted his efforts to growing Six Dimensions. Prior to Kang Management Group, Mr. Kang was an engineer for five years with PeopleSoft (now Oracle Corporation). While at PeopleSoft, Mr. Kang managed Human Resources, Financial, Supply Chain, and Enterprise Performance Management software implementations for Fortune 500 companies including Boeing, Apple, AT&T, HP. Mr. Kang is an active member of Inc. Business Owners Council (IBOC), Vistage, Entrepreneurs' Organization (EO), Alliance of CEOs, National Association of Asian American Professionals (NAAAP), Massachusetts Institute of Technology's Key Executive Program and UBS Elevating Entrepreneur's Small Business Mentoring Program. Mr. Kang graduated from The University of California, Davis with a Bachelor of Science degree in Managerial Economics.

69.     Upon information and belief, Defendant Kang is a citizen of California.

**Defendant Szynkowski**

70.     Defendant Szynkowski served as the Chief Financial Officer of 6D Global from December 2014 to, upon information and belief, December 2017.

71.     The Company's 2015 Proxy Statement stated the following about Defendant Szynkowski:

Prior to joining the Company, from December 2005 to July 2014, Mr. Szynkowski was Vice President of Finance for Epiq Systems, a provider of integrated technology products and services for the legal profession. Prior to his tenure at Epiq Systems, Mr. Szynkowski served as Chief Financial Officer and Controller for multiple high-growth organizations and began his career with Ernst & Young. Mr. Szynkowski graduated from Alfred University with a Bachelor degree in Accounting.

72.     Upon information and belief, Defendant Szynkowski is a citizen of New York

**Defendant Hartung**

73.     Defendant Adam Hartung ("Hartung") served as a member of the Board of Directors from September 2014 and as Chairperson of the Audit Committee and a member of the Compensation and Governance and Nominating Committees – all until his resignation on April 16, 2016.

74.     The Company's 2015 Proxy Statement stated the following about Defendant Hartung:

Mr. Hartung has served as the CEO and Managing Partner of Spark Partners, a strategy and transformation consultancy, since 2004. In 2010, Mr. Hartung became the founding CEO of Soparfilm Energy, a corporation that invests in oil and gas exploration. Additionally, Mr. Hartung has written columns for Forbes.com and CIO Magazine, and has been a contributing editor for the International Journal of Innovation Science since its founding in 2008. Mr. Hartung is the Chairperson of our Audit Committee and a member of our Compensation and Governance and Nominating Committees. Mr. Hartung received a Master in Business Administration degree from Harvard Business School.

75.     Upon information and belief, Defendant Hartung is a citizen of Illinois.

**Defendant Kaufman**

76.     Defendant Davis S. Kaufman ("Kaufman") served as a member of the Board of Directors from September 2014 and was Chairperson of the Governance and Nominating Committee and a member of the Audit and Compensation Committees.  On September 30, 2015, Defendant Kaufman gave written notice to the Company of his resignation from his position as a member of the Board of Directors of the Company.

77.     The Company's 2015 Proxy Statement stated the following about Defendant Kaufman:

Mr. Kaufman is currently an Executive Consultant and Partner at FIN Strategy Advisers. Mr. Kaufman was Senior Vice President and Chief Information Officer at ARAMARK Corporation from 2005 to 2013. Prior to this role, Mr. Kaufman served as the Vice President, Global Supply Chain and Quality Information Technology of Schering-Plough Corporation. Earlier, Mr. Kaufman had a 17 year career with PepsiCo Inc. Mr. Kaufman has served as a member of several advisory boards, including the Oracle CIO Advisory Board, Sprint CIO Advisory Board, Temple Fox School of Business MIS Advisory Board, and Villanova School of Business MIS Advisory Board. Mr. Kaufman is the Chairperson of our Governance and Nominating Committee and a member of our Audit and Compensation Committees. Mr. Kaufman received a Bachelor of Science degree in Computer Science from New York University.

78.     Upon information and belief, Defendant Kaufman is a citizen of Pennsylvania.

**Defendant McEwen**

79.     Defendant Terry McEwen ("McEwen") served as a member of the Board of Directors of CleanTech Innovations, Inc. ("CleanTech") and Chairman of the Audit Committee and member of Nominating and Compensation Committees from September 2013. On October 5, 2015, Defendant McEwen gave written notice to the Company of his resignation from his position as a member of the Board.

80.     Defendant McEwen was interim Chief Executive Officer and Chairman of the Board from June 11, 2014 until September 2014.

81.     According to the Company's 2015 Proxy Statement, as of July 14, 2014 Defendant McEwen owned 5,076,468 shares of CleanTech stock, which amounted to 61.0 % of the total share of the CleanTech's issued and outstanding common stock.  His beneficial ownership was ultimately terminated as part of the merger that formed the Company.

82.     The Company's 2015 Proxy Statement stated the following about Defendant McEwen:

Mr. McEwen is the Business Administrator for the City of Trenton, NJ. Prior to this role, he served as a Managing Partner of Preservation Capital Services, LLC. From May 2006 to May 2010, Mr. McEwen served as the Director of Banking for the State of New Jersey Department of Banking and Insurance, a Governor-appointed position that required confirmation by the Senate of the State of New Jersey. Mr. McEwen is a 1980 graduate of the University of Pittsburgh, Pittsburgh, PA, where he was awarded a Bachelor of Science in Business Administration, with a minor in economics and psychology, and received a Master in Business Administration from Rider University in 1998.

83.     Upon information and belief, Defendant McEwen is a citizen of New York.

**Defendant Saxena**

84.     Defendant Anubhav Saxena ("Saxena") served as a member of the Board of Directors from September 2014 and served as the Chairperson of Compensation Committee and a

member of the Audit and Governance and Nominating Committees. On September 30, 2015, Defendant Saxena gave written notice to the Company of his resignation from his position as a member of the Board.

85.    The Company's 2015 Proxy Statement stated the following about Defendant Saxena:

Mr. Saxena is president of the Global Managed Services division of Information Services Group (ISG), a NASDAQ listed company (symbol: III), where he also manages the Global Research and Data Services business. Before joining ISG, Mr. Saxena held a series of senior executive positions with HCL Technologies. Mr. Saxena earlier worked with Wipro Ltd. He began his career with Fujitsu ICIM Ltd. A founding member of the G2000 IT Client Executive Councils, Mr. Saxena has been a presenter at the World Economic Forum and a recipient of a number of CXO awards. Mr. Saxena is the Chairperson of our Compensation Committee and he is a member of our Audit and Governance and Nominating Committees. Mr. Saxena earned a Bachelor of Engineering (Electronics) degree from the University of Pune, India.

86.    Upon information and belief, Defendant Saxena is a citizen of California.

**Defendant Chrzaszcz**

87.    Defendant Piotr Chrzaszcz ("Chrzaszcz") served as a member of the Board of Directors from October 24, 2015 to fill the vacancy created by the resignation of David Kaufman, and served as a member of the Board's Audit Committee and Compensation Committee and as Chairperson of the Board's Governance and Nominating Committee.  At least by February 14, 2018, he was no longer a member of the Board.

88.    The Company's 2015 8-K Statement stated the following about Defendant Chrzaszcz:

Mr. Chrzaszcz is currently an active investor trading his own portfolio. Mr. Chrzaszcz served as the CEO of Commercial Masterminds Inc., a commercial real estate investment and advisory firm from 2007-2012 and holds the advanced real estate investor designation, Certified Commercial Investment Member (CCIM). Mr. Chrzaszcz was an active leader in the CCIM community and a guest lecturer for the UC Berkeley Extension, Personal Financial Planning Program discussing due

diligence in commercial real estate. Mr. Chrzaszcz is an Air Force veteran and holds a Bachelor of Science in Aerospace Engineering from Boston University.

89.     Upon information and belief, Defendant Chrzaszcz is a citizen of California.

**Defendant Bannout**

90.     Defendant Michael Bannout ("Bannout") has served as a member of the Board of Directors from October 24, 2015 to fill the vacancy created by the resignation of Defendant Saxena and served as a member of the Board's Audit Committee and Governance and Nominating Committee and as Chairperson of the Board's Compensation Committee.  At least by February 14, 2018, he was no longer a member of the Board.

91.     The Company's 2015 8-K Statement stated the following about Defendant Bannout:

For the past 25 years, Mr. Bannout has been the CEO and President of M. London Group, Inc., a privately owned men's and women's fashion accessories and apparel company, which he started in New York City as a small cut and sew manufacturing company and built into a multi-million dollar enterprise with world-wide distribution. Mr. Bannout attended Brooklyn College in Brooklyn, NY.

92.     Upon information and belief, Defendant Bannout is a citizen of New York.

## RELEVANT NON-PARTY

93.     Seref Dogan Erbek, a/k/a Dogan Erbek ("Erbek") is a resident of Switzerland and was employed by a Geneva-based financial services firm. During the Relevant Period, Erbek assisted the Wey family to conceal, control, and structure their holdings in 6D Global to evade securities reporting requirements.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

94.     By reason of their positions as officers, directors, fiduciaries and/or controlling stockholders of 6D Global and because of their ability to control the business and corporate affairs

of 6D Global, the Individual Defendants owed 6D Global and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage 6D Global in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of 6D Global and its shareholders so as to benefit all shareholders equally.

95.    Each director and officer of the Company owes to 6D Global and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

96.    The Individual Defendants, because of their positions of control and authority as directors, officers and/or controlling stockholders of 6D Global, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

97.    To discharge their duties, the officers, directors and/or controlling stockholders of 6D Global were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

98.    Each Defendant, by virtue of his, her, or its position as a director, officer, and/or controlling stockholder owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations to 6D Global, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

- 23 -

The conduct of the Individual Defendants who were also officers, directors and/or controlling shareholders of the Company has been ratified by the remaining Individual Defendants who collectively comprised 6D Global's Board at all relevant times.

99.     As senior executive officers, directors and/or controlling stockholders of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the NASDAQ, the Individual Defendants had a duty: a) to prevent Defendant Wey from engaging in a scheme to manipulate the price and trading volume of 6D Global's stock by using nominee accounts to purchase and sell the stock; b) to maintain for the Company adequate internal and financial controls; and c) to prevent the Company from making false and misleading statements by failing to disclose to the investing public: i) that Defendant Wey, in effect, controlled all of the Company's stock;  ii) that Defendant Wey was engaged in a scheme to manipulate the price and trading of 6D Global's stock; and iii) that the Company lacked adequate internal and financial controls.

100.    To discharge their duties, the officers, directors and/or controlling stockholders of 6D Global were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers, directors and/or controlling shareholders of 6D Global were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to the 6D Global's own Code of Ethics and internal guidelines;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how 6D Global conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of 6D Global and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that 6D Global's operations would comply with all laws and 6D Global's financial statements filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

- 25 -

(i)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

101.    Each of the Individual Defendants further owed to 6D Global and the shareholders the duty of loyalty requiring that each favor 6D Global's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

102.    At all times relevant hereto, the Individual Defendants were the agents of each other and of 6D Global and were at all times acting within the course and scope of such agency.

103.    Because of their advisory, executive, managerial, and directorial positions with 6D Global, each of the Individual Defendants had access to adverse, non-public information about the Company.

104.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by 6D Global.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

105.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

106.    The purpose and effect of the conspiracy, common enterprise and/or common course of conduct was, among other things, to: (i) to engage in, facilitate, conceal, and/or fail to

- 26 -

stop Defendant Wey's scheme to manipulate the price and trading volume of 6D Global's stock by using undisclosed nominee accounts to purchase and sell the stock; (ii) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; (iii) to conceal adverse information concerning the Company's directors and officers and their failure to maintain adequate internal and financial controls; and (iv) to fail to maintain adequate internal and financial controls.

107.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by, among other things, causing the Company to purposefully, recklessly or negligently fail to maintain effective accounting and internal control policies and procedures, and fail to prevent Defendant Wey's stock manipulation scheme.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

108.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

109.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of 6D Global, and was at all times acting within the course and scope of such agency.

## **CODE OF ETHICS**

110.    Pursuant to the Company's Code of Ethics (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

111.    The Code of Ethics provides, under a section titled "Avoid Conflicts of Interest," that:

We must avoid any relationship or activity that might impair, or even appear to impair, our ability to make objective and fair decisions when performing our jobs. At times, we may be faced with situations where the business actions we take on behalf of the Company may conflict with our own personal or family interests because the course of action that is best for us personally may not also be the best course of action for the Company. We owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises. We must never use the Company's property or information for personal gain or personally take for ourselves any opportunity that is discovered through our position with the Company.

Here are some other ways in which conflicts of interest could arise:

- Being employed (you or a close family member) by, or acting as a consultant to, competitor or potential competitor, supplier or contractor, regardless of the nature of the employment, while you are employed by the Company.
- Hiring or supervising family members or closely related persons.
- Serving as a board member for an outside commercial company or organization.
- Owning or having a substantial interest in a competitor, supplier or contractor.
- Having a personal interest, financial interest or potential gain in any transaction of the Company.
- Placing company business with a firm owned or controlled by an employee of the Company or his or her family.
- Accepting gifts, discounts, favors or services from a customer/potential customer, competitor or supplier, unless equally available to employees.

Determining whether a conflict of interest exists is not always easy to do. Employees with a conflict of interest question should seek advice from management. Before engaging in any activity, transaction or relationship that might give rise to a conflict of interest, employees must seek review from their managers or Human Resources. Directors and executive officers must seek determinations and prior authorizations or approvals of potential conflicts exclusively from the Audit Committee.

Situations may occur where the Company transacts business with a party that is directly involved with the company or related to and employee of the company. A related party transaction must be disclosed to the Company's Chief Financial Officer to determine whether or not it is material to the company. In the event the related party transaction is determined to be material, it must be reviewed and approved in writing by the Audit Committee in advance of the consummation of

such related party transaction. Significant related party transactions, including those involving the Company's directors or executive officers, must be reviewed and approved in writing in advance by the Board of Directors.

112.     The Code of Ethics provides, under a section titled "Protect Confidential and

Proprietary Information," that:

Integral to the Company's business success is our protection of confidential company information, as well as nonpublic information entrusted to us by employees, customers and other business partners. Confidential and proprietary information includes such things as pricing and financial data, customer names/addresses or nonpublic information about other companies, including current or potential supplier and vendors. We will not disclose confidential and nonpublic information without a valid business purpose and proper authorization.

We will not selectively disclose (whether in one-on-one or small discussions, meetings, presentations, proposals or otherwise) any material nonpublic information with respect to the Company, its securities, business operations, plans, financial condition, results of operations or any development plan. We should be particularly vigilant when making presentations or proposals to customers to ensure that our presentations do not contain material nonpublic information.

113.     The Code of Ethics provides, under a section titled "Uphold the Law," that:

The Company's commitment to integrity begins with complying with laws, rules and regulations where we do business. Further, each of us must have an understanding of company policies, rules and regulations that apply to our specific roles. If we are unsure of whether a contemplated action is permitted by law or the Company's policies, we should seek the advice of the [resource expert.] We are responsible for preventing violations of law and for speaking up if we see possible violations. Consequently, in conducting business, we shall:

a. Strictly Adhere to All Antitrust Laws. We are dedicated to ethical, fair and vigorous competition, and as such, officers, directors and employees must strictly adhere to all antitrust laws in the United States and wherever we may do business. We will sell services based on their merit, superior quality, functionality and competitive pricing. We will make independent pricing and marketing decisions and will not improperly cooperate or coordinate our activities with our competitors. We will not offer or solicit improper payments or gratuities in connection with the purchase of goods or services for the Company or the sales of its products or services, nor will we engage or assist in unlawful boycotts of particular customers.

b. Strictly Comply With All Securities Laws. In our role as a publicly traded company, we must always be alert to, and comply with, the securities laws and regulations of the United States, including those relating to the trading of securities of the Company while in receipt of "insider" information, as more fully described in the Company's Policy Statement on Insider Trading.

- 29 -

c. <u>Respect the Property Rights of Others.</u> It is important that we respect the property rights of others. We will not acquire or seek to acquire improper means of a competitor's trade secrets or other proprietary or confidential information. We will not engage in unauthorized use, copying, distribution or alteration of software or other intellectual property.

d. <u>Be Timely and Accurate In All Public Reports.</u> We will make certain that all disclosures made in financial reports and public documents are full, fair, accurate, timely and understandable. This obligation applies to all employees, including all finance employees, with any responsibility for the preparation for such reports, including drafting, reviewing and signing or certifying the information contained therein. No business goal of any kind is ever an excuse for misrepresenting facts or falsifying records.

Employees should inform executive management and the Human Resources department if they learn that information in any filing or public communication was untrue or misleading at the time it was made or if subsequent information would affect a similar future filing or public communication.

114.    In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' scheme to manipulate the price and trading volume of 6D Global's stock by using undisclosed nominee accounts to purchase and sell the stock, their scheme to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment, and their scheme to conceal adverse information concerning the Company and failure to maintain adequate internal and financial controls.  In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, protect corporate assets, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

**Defendant Wey embarks on career of regulatory violations.**

115.   After more than a decade of securities laws violations and other increasingly brazen misconduct, Defendant Wey has increasingly become infamous in the eyes of public company investors, financial journalists, and the public at large.

116.   Most recently, Defendant Wey's name was unearthed in connection with the infamous Panama Papers.  According to the report, Defendant Wey has been utilizing offshore companies set up by the law firm at the heart of the scandal to facilitate Defendant Wey's stock manipulations, as alleged herein.

117.   As set forth in one recent article,[11]

> Bharara who as US attorney general for the southern district of New York has led several crusades against criminal wrongdoing in the financial sector, is already investigating several of the more than 200 US citizens named in the papers.
>
> Among them is Wall Street financier Benjamin Wey, who has been charged with securities fraud, wire fraud, conspiracy and money laundering for using family members to help him amass ownership of large blocks of stock in companies through so-called reverse merger transactions between Chinese companies and US shell companies. He made tens of millions of dollars of illegal profit by manipulating the companies stock prices, according to the indictment.  The Panama Papers leak shows that Mossack Fonseca helped set up the offshore companies used in the stock manipulation.
>
> Ben Wey fashioned himself a master of industry, but as alleged, he was merely a master of manipulation, Bharara said when he announced the indictment against Wey [on] September 15, 2015.

118.   Defendant Wey began his career in Oklahoma.  He graduated from Oklahoma Baptist University in 1992 with a degree in finance.  He completed an MBA in 1999 at the University of Central Oklahoma.  Defendant Wey started his first investment advisory and brokerage firm in Oklahoma while studying for an MBA.

---

[11] *See* "Panama Papers:  US launches criminal inquiry into tax avoidance claims," Cht2Engage Admin, Apr. 20, 2016, at https://chat2engage.com/panama-papers-us-launches-criminal-inquiry-tax-avoidance-claims/.

119.    In 2002, Defendant Wey founded an Oklahoma-based firm that he called Benchmark Global Capital Group, and was a director, majority shareholder, and CEO.  He was fired for cause within six months – namely, trading on insider information and misappropriating company funds.

120.    In 2002, the NASD, FINRA's forerunner, suspended and fined Defendant Wey.

121.    In 2005, The Oklahoma Department of Securities ("OKDS") censured Defendant Wey for separate offenses.  The OKDS charged Defendant Wey with a disclosure violation, advising a retired 68 year-old woman to invest her life savings in shares of a penny stock without disclosing his role as the paid promoter.  Defendant Wey violated retiree instructions by selling the stock, then repurchasing it for her account shortly after the sale, without authorization.  The retiree lost more than 75% of her life savings.  Defendant Wey agreed with the state never again to operate a brokerage or investment advisory business in Oklahoma.

122.    In 2005, Defendant Wey left Oklahoma and his advisory business under a cloud.

123.    Soon thereafter, Defendant Wey hit upon the strategy he would repeatedly employ throughout the next decade, and that was to: (1) covertly acquire large stock interests in U.S-listed shell companies; (2) cause the companies to list on major U.S. exchanges, artificially inflate trading prices through stock manipulation; and (3) sell his shares at a profit, all the while supplementing income by causing Chinese companies to pay him investment-banking fees.

124.    Defendant Wey's scheme required that he exercise control over the companies.  Defendant Wey's scheme also required that he and the companies conceal his involvement from the public.

**Defendant Wey's scheme to acquire controlling ownership.**

125.   Defendant Wey caused NYGG-Asia to help NYGG Clients list in the United States through reverse mergers.[12]  Thus, for Defendant Wey, a reverse merger is merely the private company's listing on a public market.

126.   First, Defendant Wey would locate public shells in the U.S. for NYGG Clients. Through a variety of Nominees, Defendant Wey would then acquire the public shells' shares before the reverse mergers so that when the reverse mergers closed, Defendant Wey would hold substantially all of NYGG Clients' shares not held by the former private company's shareholders.  While the former private company's shareholders would hold the majority of the public company's shares, Defendant Wey and the Nominees always controlled more than 5% of the new public company's shares.

127.   To completely control public trading in the new public company's shares, Defendant Wey then caused the private company's shareholders to enter into lock-up agreements, restricting them from trading their shares.  Defendant Wey pursued the scheme working side-by-side with two attorneys to whom he referred the Chinese private companies for this purpose, Robert Newman ("Newman") and William Uchimoto ("Uchimoto").

128.   Defendant Wey did not disclose his holdings to the public markets.  Defendant Wey jumped through considerable hoops to avoid disclosing his name to the public as a shareholder in these companies.

129.   For example, the Chinese operating company that would become CleanTech retained Newman to represent it in its reverse merger. Newman, taking direction from Defendant

---

[12] In a reverse merger, a private company lists on a major exchange without undertaking an IPO.  Instead, the private company is "acquired" by a defunct public shell, but in return, receives the majority – but not all – of the defunct public shell's shares.  After the reverse merger, the private company is a subsidiary of the public company, but the private company's former shareholders own the majority of the public company's shares.

Wey, not the Chinese operating company, located a promising public shell, Everton Capital Corporation ("Everton").  Newman was also retained by Everton.

130.    Defendant Wey, through his Nominees, bought substantially all of Everton's shares.  Concurrently with Defendant Wey's acquisition of Everton shares, Newman instructed Everton's transfer agents to issue 5,000,000 new Everton shares to a person Newman represented was Everton's CEO, President, CFO, Treasurer, and Secretary.  However, all communications between Newman and Everton's purported CEO took place through Defendant Wey.  As a result of the issuance to the new purported CEO, Defendant Wey and his Nominees technically held only 9.11% of Everton's shares.

131.    Newman then presented Everton to CleanTech.  As part of the reverse merger, Everton's purported CEO agreed to cancel all his shares for nominal consideration.  The only Everton shareholders to receive CleanTech shares were Defendant Wey and the Nominees. Following the reverse merger and its  elaborate lead-in, Defendant Wey and the Nominees beneficially owned more than 5% of CleanTech's shares.

132.    Newman did not obtain a conflicts waiver from either Everton or the Chinese operating company.  The absence of arm's-length representation on Newman's part was not disclosed to investors.

**Defendant Wey causes NYGG Clients to be listed on major exchanges.**

133.    Public shells do not trade on liquid markets like the NASDAQ or the New York Stock Exchange but instead trade over-the-counter ("OTC").  The OTC market does not provide sufficient liquidity to allow Defendant Wey to sell his shares.  After the reverse merger, Defendant Wey would therefore cause NYGG Clients to list themselves on major exchanges,

including the NASDAQ.

134.    At the time of many of NYGG Clients' listings, the NASDAQ required that listing applicants show that the company had at least 300 shareholders who each held a minimum of 100 shares of common stock (the "300 Shareholder Requirement").    The purpose of the 300 Shareholder Requirement was to demonstrate that many different investors had an interest in buying and selling the applicant's stock.  Persons who receive shares directly from the applicant or affiliates do not count towards the 300 Shareholder Requirement.  Thus, to create the illusion that NYGG Clients had the requisite trading interest, Defendant Wey gave shares to friends, family members, and business associates.  Defendant Wey's associates falsely told the NASDAQ that their shares had not been provided by the NYGG Clients' affiliates.

135.    To list on major exchanges, Defendant Wey also used wash and matched trades to simulate interest in, and manipulate prices of, NYGG Clients' stock.

136.    CleanTech completed its reverse merger in July 2010.  Its first trade as a newly-public company was a trade of 1,000 shares at $5.10/share, or about 70% above the price of a recent offering.  Defendant Wey touted the 70% increase to prospective investors. In fact, the trade was a wash trade; Defendant Wey's sister Tianyi Wei was both the buyer and the seller.

137.    Using the trading interest fraudulently simulated by Defendant Wey, NYGG Clients would then apply for, and obtain, listings on major trading exchanges.

**Defendant Wey sells his and the Nominees' shares.**

138.    Defendant Wey controlled the public market for NYGG Clients' shares to sell his own and the Nominees' shares at inflated prices.

139.    To maximize profits from selling the shares, Defendant Wey continued to

- 35 -

manipulate the trading price of NYGG Clients' shares.  For example, in a February 2011 email, Defendant Wey wrote to his broker, Seref Dogan Erbek ("Erbek"):

> [Erbek], Cleantech just traded at $4.50 per share.  Please make sure the trader buys the stock at $5 per share, stay at $5 per share bid price, not less.  Please make sure this happens right away.

140.    That same day, Erbek purchased two tranches of CleanTech shares at $4.86 and $4.93 per share, respectively.

141.    After pumping an NYGG Client's stock price, Defendant Wey would liquidate the Nominee's stock, then arrange for the proceeds to be transferred to him.  Between October 12 and October 30, 2009, for example, Defendant Wey placed orders to sell huge numbers of shares of an NYGG Client, Deer Consumer Products, Inc. ("Deer"), held by a Nominee, Strong Growth Capital, Ltd. ("Strong Growth"), generating proceeds of $4.4 million, $3.5 million of which quickly transferred to a bank account held by Tianyi Wei, Defendant Wey's sister.

142.    On December 10, 2009, Tiani Wei transferred $3.3 million to Defendant Wey's wife, Michaela Wey.  Michaela Wey reported the $3.3 million as a gift from a foreign person in tax filings.  Defendant Wey and Michaela Wey obtained at least $19 million of such "gifts" from Tianyi Wei alone.  These "gifts" from Tianyi Wei represent a mere fraction of the total proceeds from Defendant Wey's fraudulent scheme.  It is estimated that total proceeds from the scheme exceeded $70 million.

**Defendant Wey causes NYGG Clients to pay investment-banking fees.**

143.    Public representations to the contrary, Defendant Wey and NYGG were significantly involved with NYGG Clients' day-to-day operations.  For example, in 2011, the NASDAQ asked two NYGG Clients, SmartHeat, Inc. ("SmartHeat") and Deer to disclose all

relationships between each of them and Defendant Wey and NYGG, among others. Defendant Wey's and NYGG's activities included: (1) the conducting of company financial modeling; (2) the selection of lawyers and auditors; (3) the review of SEC drafts and filings; (4) the identification and recommendation of certain individuals to serve as directors, advising them on handling pending litigation, and discussing non-public information with company officers. But, both SmartHeat and Deer falsely claimed that Defendant Wey's role was limited to the introduction of underwriters and that Defendant Wey was a mere business acquaintance of the officers. During the Relevant Period, 6D Global would continue this practice of omitting to disclose material facts about Defendant Wey's control.

144. Defendant Wey also caused NYGG Clients to hire the Nominees to provide investment banking services. However, while NYGG Clients paid the Nominees about $11 million, the Nominees provided no such services.

145. Two NYGG Clients, SmartHeat and Deer, hired a Nominee to provide consulting services in connection with secondary offerings. SmartHeat paid $3.9 million to Defendant Wey's Nominee, 6.3% of the total raised, and Deer then paid the Nominee $3.8 million, or 6% of the total raised in the offering. Neither SmartHeat nor Deer disclosed that the Nominee was affiliated with Defendant Wey. Asked by the underwriter whether the Nominee had any affiliation with Defendant Wey, both Defendant Wey and the Nominee falsely claimed the underwriter there was no such affiliation.

146. Defendant Wey also caused Deer to announce a share repurchase program. Pursuant to the share repurchase program, Deer bought 798,300 shares for $6.9 million. Deer represented in its SEC filings that it had made open-market purchases. In fact, every

repurchased Deer share belonged to Defendant Wey or his Nominees.

147.    Defendant Wey and NYGG Clients also caused the removal of company officials and agents that challenged Defendant Wey.  For example, Defendant Wey told an attorney representing an NYGG Client, AgFeed, Inc. ("AgFeed"), that one of Defendant Wey's Nominees would receive a $300,000 finder's fee for a transaction.  When the AgFeed attorney demanded that Defendant Wey certify he was not affiliated with the nominee, Defendant Wey signed a false certification attesting to no affiliation, then caused the firing of the attorney.  AgFeed replaced the attorney with Uchimoto, another of Defendant Wey's co-conspirators.

**The NASDAQ discovers Defendant Wey's scheme and delists CleanTech.**

148.    On August 28, 2010, Barron's published an article titled "Beware This Chinese Export."  Among other things, the Barron's article called attention to NYGG's claims that 15% of the Chinese companies on the NASDAQ were clients of NYGG. The article also reported on Defendant Wey's relationship with Deer.  Though Deer had not disclosed any relationship, Defendant Wey's Chinese website showed him flying with Deer's management on a private jet the night prior to the pricing of a $75 million offering.  The article also revealed that CleanTech was an NYGG client.

149.    CleanTech applied to have its stock listed on the NASDAQ.  On September 1, 2010, the NASDAQ emailed CleanTech's counsel, demanding an explanation for its relationships with Defendant Wey.

150.    The next day, on September 2, 2010, CleanTech responded, falsely downplaying Defendant Wey's role, claiming that:

> (a)  NYGG was compensated by NYGG-Asia, not CleanTech.  In fact, NYGG and NYGG-Asia were alter-egos.

- 38 -

(b) NYGG-Asia and NYGG were separately owned and operated.  In fact, Defendant Wey owned and operated both NYGG-Asia and NYGG.

(c) Defendant Wey was compensated by NYGG, not CleanTech.  In fact, CleanTech compensated Wey through the Nominees both by direct payments for investment banking services and with shares.

(d) Defendant Wey's work was limited to the introduction to financial and professional service providers.  In fact, as set forth above, Wey dominated CleanTech.

151.   On October 29, 2010, the NASDAQ propounded document and information requests to CleanTech.  NASDAQ requested, among other things, a detailed written narrative describing all due diligence work performed by NYGG and NYGG-Asia.

152.   CleanTech responded by continuing to misrepresent that Defendant Wey and NYGG-Asia's work was limited to introducing CleanTech to financial and professional service providers.  Based on CleanTech's misrepresentations, NASDAQ granted CleanTech's listing request.

153.   On December 10, 2010, CleanTech's stock was listed on the NASDAQ.

154.   CleanTech also had not disclosed to the NASDAQ that it had hired NYGG-Asia to conduct a private placement of CleanTech stock.  The private placement was pending during CleanTech's listing application.

155.   As reported in a Form 8-K filed with the SEC on December 16, 2010, on December 13, 2010, CleanTech completed a private placement, selling 2,500,000 Units at $4.00 each, for total proceeds of $10 million (the "December Financing").  Each Unit consisted of one share of stock and one warrant to purchase 67.5% of one share of stock at $4.00 per share.  The closing price of CleanTech's stock on December 15, 2010 was $8.40 per share.

156.    On December 23, 2010, CleanTech filed a registration statement with the SEC for 4,187,500 shares underlying the Units, as well as 300,000 shares underlying warrants issued to NYGG-Asia as compensation for its role as the placement agent (the "December Registration"). NYGG-Asia also received cash compensation, and made a $10 million loan. In addition, Strong Growth, which bought one quarter of the Units for $2.5 million, was a known associate of NYGG-Asia.

157.    When the NASDAQ discovered that CleanTech had engaged in the private placement without disclosing it in response to the document and information requests, the NASDAQ acted swiftly to delist CleanTech's stock.

158.    The NASDAQ, however, did not know that Defendant Wey owned and controlled NYGG-Asia.  For the next two years, Defendant Wey and CleanTech would repeatedly and falsely represent to the NASDAQ, the SEC, and this Court that NYGG-Asia and NYGG were separately-owned and operated.  It was not until September 10, 2015 that the NASDAQ realized the falsity of those representations, as then the DOJ and the SEC issued press releases in connection with their respective investigations into Defendant Wey and his various financial dealings.

**CleanTech and Defendant Wey repeatedly lie to the NASDAQ and to investors to overturn delisting.**

159.    CleanTech appealed the delisting. Defendant Wey, and not CleanTech, dominated the delisting appeal.

160.    In the delisting appeals hearings, CleanTech falsely told the NASDAQ that 75% of the $10 million December Financing came from independent agents not affiliated with either NYGG or NYGG-Asia.  In fact, the other three purchasers in the December 13, 2010 private

placements – HuaHua Limited, Roosen Commercial Corp., and Wolf Enterprises, Ltd. – were all Defendant Wey Nominees. While CleanTech disclosed that Strong Growth was an NYGG affiliate, it specifically claimed that Defendant Wey had no beneficial ownership in it.

161.  Defendant Wey also directly made false statements to the NADSAQ and the SEC in the CleanTech delisting appeal. In June 2011, Defendant Wey submitted a letter to the NASDAQ falsely representing that:

(a)  "Neither I nor [NYGG] has any beneficial ownership of the securities issued in the [December 2010] financing." In fact, Defendant Wey's Nominees accounted for substantially the entire financing.

(b)  NYGG and NYGG-Asia were "separately owned and operated." In fact, Defendant Wey owned and operated both NYGG and NYGG Asia.

(c)  NYGG-Asia's office was managed by Ming (Roger) Li. Wey deliberately failed to disclose that Li was Tianyi Wei's domestic partner, and that Li reported directly to Defendant Wey.

(d)  Defendant Wey did not receive any fees or other revenues from NYGG-Asia. In fact, Defendant Wey and his Nominees received substantially all of NYGG-Asia's income.

(e)  NYGG-Asia identified three other funds willing to participate in the December Financing. In fact, the three other funds were Defendant Wey Nominees.

162.  CleanTech then sued the NASDAQ. *See CleanTech Innovations, Inc. v. NASDAQ Stock Market, LLC*, 11-cv-9358-KBF (S.D.N.Y., amended complaint filed Jan. 5, 2012) ("CleanTech Am. Cplt"). In its lawsuit, CleanTech alleged that it had suffered crippling damages from the NASDAQ's delisting. CleanTech's Amended Complaint falsely represented that CleanTech was not subject to delisting, because:

NASDAQ staff, headed by Mr. Emen, had been given uncontradicted evidence that [Wey]: (1) did not control or own stock in CleanTech; and (2) did not receive any of the compensation of [NYGG-Asia] for financings it arranged in China.

- 41 -

CleanTech Am. Cplt. at ¶ 14.

163.    The statement was false because (1) Defendant Wey beneficially owned more than 5% of CleanTech's stock through the Nominees, and (2) Defendant Wey wholly owned NYGG-Asia, and in that capacity, received substantially all of the compensation paid to NYGG-Asia.

164.    While CleanTech was represented by the law firm of Fensterstock & Partners LLP (F&P), it was Defendant Wey who instigated and controlled the litigation.   Defendant Wey demonstrated his dominance of the litigation as follows:

>    (a)  According to a complaint filed by F&P against CleanTech for nonpayment of legal fees, before being retained, F&P met with Wey at NYGG's offices.

>    (b)  NYGG, not CleanTech, paid the attorney's retainer.

>    (c)  Defendant Wey, not CleanTech, handled public relations for the lawsuit, including introducing CleanTech's attorney to reporters.

>    (d)  NYGG appeared at hearings. CleanTech also appeared at certain hearings, through Arnold Staloff, an outside director.  Notably, Staloff is one of Wey's co-conspirators.  Staloff is also a director on the board of three NYGG Clients: Deer, AgFeed, and SmartHeat.

>    (e)  NYGG was copied on confidential client communications.

>    (f)  According to CleanTech's lawyers, Wey "derive[d] benefits from and involv[ed] himself in the litigation," including by selecting defendants and advising on legal theories.

**The 6D Global Acquisition.**

165.    Without the NASDAQ listing, CleanTech was unable to sell shares to finance operations.  CleanTech instead funded operations through loans from Defendant Wey.  As alleged above, to conceal his involvement in CleanTech's operations, Defendant Wey caused the loans to be made by NYGG-Asia, a separate entity, as represented by both CleanTech and Defendant Wey.

166.    CleanTech incurred substantial losses.  By early 2014, CleanTech owed NYGG-Asia approximately $16 million.  Defendant Wey was left without prospects of either selling his CleanTech stock or being repaid.

167.    Beginning early 2014, at Defendant Wey's urging, CleanTech began to explore a strategic combination.  Defendant Wey separately searched for potential acquirers or merger candidates for CleanTech.

168.    In March 2014, a mutual acquaintance introduced Six Dimensions, Inc. ("Six Dimensions"), to Uchimoto, Defendant Wey's co-conspirator and habitual attorney.  Six Dimensions is an American IT company without business in common with CleanTech (which manufactures products used in wind turbines in China).  Defendant Wey, Six Dimensions, and CleanTech commenced discussions regarding a prospective business combination between Six Dimensions and CleanTech.

169.    On April 8, 2014, CleanTech, Six Dimensions, and NYGG-Asia held a meeting.  Uchimoto represented CleanTech.  Defendant Wey represented NYGG-Asia, along with NYGG's general counsel James Baxter and outside counsel.  NYGG-Asia personnel did not attend the meeting.

170.    Six Dimensions expressed interest in a transaction on condition that CleanTech become a shell by repaying its debt and divesting its entire operations.  Following the divestiture, CleanTech would "acquire" Six Dimensions, and in return award CleanTech shares to Six Dimension shareholders.

171.    NYGG demanded that CleanTech proceed with the transaction, which CleanTech did.  The terms of the transaction (the "6D Global Acquisition") included:

(a)  The total capitalization of 6D Global would be 77,575,442 shares.

(b)  CleanTech's operating subsidiaries would be returned to CleanTech's officers and directors.  In exchange, CleanTech's officers and directors would cancel all of their personally-held CleanTech stock.  The only remaining CleanTech stock purportedly would be held by public investors.  CleanTech's officers and directors would likewise resign from their positions.

(c)  NYGG would exchange its debt for $16 million of 6D Global common stock, or 35,149,883 shares.

(d)  CleanTech would acquire all of Six Dimension's issued and outstanding stock, in exchange for 38,664,871 shares of CleanTech common stock.

(e)  CleanTech would raise at least $3 million in a private placement. CleanTech ultimately raised $5.6 million in gross proceeds, issuing 2,709,484 shares (the "Private Placement").

(f)  CleanTech would change its name to 6D Global Technologies, Inc., and convert from a Nevada corporation to a Delaware corporation.

172.    The 6D Global Acquisition closed on September 29, 2014.

173.    Following the 6D Global Acquisition, and including the Private Placement, 6D

Global's capitalization was as follows:

| | Number of shares | Percentage of total 6D Global shares |
|---|---|---|
| NYGG-Asia | 35,629,883 | 45.9% |
| Former Six Dimension Shareholders | 38,664,871 | 49.8% |
| Private Placement Purchasers (other than NYGG-Asia) | 2,229,484 | 2.9% |
| Former CleanTech Shareholders | 1,051,204 | 1.4% |
| | | |
| Total | 77,575,442 | 100% |

**The Private Placement.**

174.    The Private Placement closed in two separate transactions: (1) on September 29, 2014, CleanTech sold 2,201,031 of its shares at $2.07 per share for gross proceeds of $4.6 million; and (2) on November 21, 2014, CleanTech sold an additional 508,453 of its shares at $2.07 per share for gross proceeds of $1.1 million.

175.    The Private Placement was conducted through a Confidential Subscription Agreement dated June 17, 2014.  The Confidential Subscription Agreement represented that:

> The [purchaser] should carefully consider the Risk Factors contained in CleanTech's most recent annual report on Form 10-K, as updated or supplemented by subsequent quarterly reports on Form 10-Q and current reports on Form 8-K to the extent filed, each of which are incorporated herein by reference, as the same may be updated from time to time by future filings under the Securities Exchange Act of 1934, as amended, before making an investment decision.

**6D Global must list on the NASDAQ to complete the 6D Global Acquisition.**

176.    By June 20, 2014, the NASDAQ once again informed CleanTech that it was not in compliance with NASDAQ Listing Rules.  The NASDAQ informed CleanTech that it would be delisted if the Company continued to be in noncompliance.

177.    On August 4, 2014, in response to CleanTech's failure to address the issue, the NASDAQ notified CleanTech that it continued to be in violation of certain of the Listing Rules, and as such issued a determination to delist CleanTech's common stock.  Pursuant to NASDAQ rules, the delisting was stayed pending CleanTech's appeal.

178.    CleanTech's continued listing on the NASDAQ was a condition precedent to Six Dimension's obligation to complete the 6D Global Acquisition.

179.    On September 4, 2014, the NASDAQ held the hearing on 6D Global's appeal.

180.    On December 4, 2014, the NASDAQ sent a letter approving 6D Global's listing.

181.    On December 12, 2014, 6D Global's stock began trading on the NASDAQ under

- 45 -

ticker SIXD.

182.    Had 6D Global revealed that Defendant Wey's beneficial ownership of NYGG-Asia's shares, it would have held to light Defendant Wey and CleanTech's false representations that served as the basis for overturning its earlier determination to delist the Company on the exchange.

183.    Should the NASDAQ ever discover that Defendant Wey had obtained a reversal of the NASDAQ's delisting determination by lying to the NASDAQ, the SEC, and the DOJ, the NASDAQ would likely delist CleanTech's stock.  Therefore, Defendant Wey's status as a beneficial shareholder of NYGG-Asia's 6D Global shares is material to investors.

**Defendant Wey controls 6D Global's operations on day-to-day basis.**

184.    Throughout the Relevant Period, Defendant Wey continued to control 6D Global's day-to-day business operations, both through his own personal involvement and through staff at NYGG.  According to Matthew Sullivan ("Sullivan"),[13] Defendant Wey was involved in 6D Global's operations on almost a daily basis.  Also according to Sullivan, Defendant Wey's daily involvement included the following:

> (a) Financing.  According to Mr. Sullivan, Wey had primary responsibility for securing 6D Global's financing.
>
> (b) Capital markets. According to a December 10, 2014 email from Defendant Kang to Mr. Sullivan:
>
> Keep in mind that [CleanTech] is a 3-4 year disaster that was going on for them and we literally came in this year and cleaned sht up and went public w/ an American company.  True alignment in that sense where [Benjamin Wey]

---

[13] Sullivan joined 6D in 2010 when staffed with Defendant Kang and a bookkeeper.  Initially hired as 6D Global's national technical recruiter, Sullivan later became executive vice president with lead roles in several of its acquisitions. In the proxy statement filed with the SEC on September 4, 2014, Sullivan was designated as 6D Global's only executive officer aside from Defendant Kang.  On July 14, 2015, Sullivan resigned to pursue opportunities in the not-for-profit sector.

has the capital markets expertise and we are here to grow the company. Need to round out other roles as you know, but that's what we are doing.

(c) Auditor selection.  Wey demanded that 6D Global change its auditor to BDO USA LLP.  Notably, Wey had referred NYGG Clients to Goldman Kurland Mohidin LLP ("GKM").  GKM is a member of the BDO Seidman alliance. 6D Global officials, including Defendant Kang and Sullivan, objected to hiring BDO because of their relatively high fees. 6D Global officials nonetheless ultimately acquiesced to Wey's demand, hiring BDO in October 2014.

(d) Internal employee matters.  Sullivan acquired 500,000 6D Global shares in September 2014, 100,000 of which vested in March 2015.  Defendant Wey and 6D Global demanded that Sullivan refrain from selling his 6D Global shares to the public.  Sullivan began the process of removing restrictive legends from his stock, but in or around June 2015, Wey personally called Sullivan to warn him not to submit any paperwork to remove restrictive legends.  Wey requested that Sullivan sell his shares to Wey's friends instead. Wey was also regularly involved in other 6D Global internal employee matters.  For example, Defendant Wey attended 6D Global's corporate retreat in Florida.

(e) Selection of personnel.  In Fall 2014, 6D Global searched for a CFO.  Wey personally interviewed all the candidates, and signed off on 6D Global's choice, Defendant Szynkowski.   In general, Defendant Wey personally interviewed the candidates for all leadership positions.

(f) Internal company policy.  In or around May/June 2015, Defendant Wey instructed Defendant Kang to create and implement an aggressive document destruction policy.  Pursuant to Defendant Wey's instructions, 6D Global enacted a policy calling for all emails to be destroyed within 90 days.

(g) Disclosures.  Defendant Wey reviewed 6D Global's SEC filings before they were filed and provided instructions.  For example, Defendant Wey instructed 6D Global that it need not seek Defendant Szynkowski's former employer's approval before mentioning the employer in SEC filings.  Sullivan, who attended conference calls concerning preparation of 6D Global's 10-Ks and 10-Qs, recalls that Defendant Wey participated in the calls as well.

(h) Operations.  Defendant Wey managed numerous operational matters for 6D Global.  Wey was intimately involved in various internal 6D Global matters, such that 6D Global rescheduled a December 2014 marketing call when Wey said he could not attend.  Pursuant to Wey's orders, Sullivan and Defendant Kang also traveled to Washington D.C. to meet with the NASDAQ to plead for 6D Global's listing at the September 4, 2014 hearing.

(i) Controlling 6D Global's litigation.   Defendant Wey selected 6D Global's counsel. Until September 2015, 6D Global was represented in litigation matters by John Bostany.   Bostany is Defendant Wey's attorney, having previously represented NYGG Client Deer in a highly-publicized lawsuit against a short seller, *Deer Consumer Products, Inc. v. Little Group*, No. 650923/2011 (Sup. Ct. N.Y. Ct.).   In fact, Bostany's offices are located in the same building as NYGG, the Trump Tower, at 40 Wall Street.  6D Global kept Wey abreast of confidential litigation developments.   For example, 6D Global's attorneys immediately informed Wey of all new developments in 6D Global's attempt to list on the NASDAQ.   6D Global also copied Wey on litigation communications with its attorneys.   Defendant Wey also provided directions to 6D Global's attorneys.  For example, on February 27, 2015, Wey emailed 6D Global's attorney to instruct him in preparing a court filing:

From: Benjamin Wey ®
Sent: Friday, February 27, 2015 1:05 P.M.
To: John P. Bostany
Cc: Tejune Kang; Han Dang; Mark Szynkowski; Charen Kim
Subject: Re: SIX D Order to Show Cause

John,

This is a simple solution. You can make a statement/affidavit that based on your conversation with the compliance officer of the brokerage firm where the shares in Bei Lu's name are held, they can be sold right away, at any time, unless there is court intervention. This is the basis to go back to the judge and ask for a freeze order at a minimum, to prevent to [sic] shares from being sold and proceeds leaving the U.S. and back to China. You are an officer of the court and you can do this easily. Call my office should you have more questions.

Ben

(j) Physical location. Defendant Wey visited 6D Global's offices every few weeks.  Similarly, Wey's attorney, Newman, repeatedly visited 6D Global's offices.  Sullivan recalls seeing Newman at 6D Global's offices at least three times.  Defendant Kang also regularly visited NYGG's offices.

(k) Material non-public information.  Defendant Wey was regularly provided with material non-public information, as described herein.

185.   In response to BDO's inquiry in connection with BDO's audit of 6D Global's

2015 financial statements, Defendant Kang estimated that Defendant Wey had provided about 180 hours of advisory services between October 2014 and September 2015.

186.     Defendants Wey and Kang also regularly bypassed 6D Global's internal controls. For example, in accordance with 6D Global's 2015 Omnibus Incentive Plan, approved as set out in a Proxy Statement on Schedule 14C, dated February 5, 2015, the Company does not permit stock option awards to non-employees.  Yet in July 2015, in violation of the 2015 Omnibus Incentive Plan, 6D Global granted stock options to James Baxter, NYGG's general counsel, and Warren Raiti, another NYGG employee.  6D Global was forced to rescind the stock options after the Indictment.

**Control of 6D Global's acquisitions.**

187.     Defendant Wey and NYGG took personal control over 6D Global's acquisitions throughout the Relevant Period.

188.     Defendant Wey dictated 6D Global's overall acquisition strategy, directing 6D Global to maximize the percentage of stock issued and minimize the cash portion of the consideration paid for acquisitions.  Defendant Wey also required that 6D Global offer stock that could only be resold usually until after two years.

189.     Defendant Wey and NYGG drafted the form definitive acquisition agreement used in 6D Global's acquisitions.

190.     At Defendant Wey's direction, 6D Global's strategy focused on acquiring companies to attract large investors.  As of March 31, 2015, 6D Global had about $2.67 million in cash, and had incurred a net loss in Q1 2015 of $0.53 million.  According to emails and conversations between Sullivan and Defendant Kang, 6D Global sought out large companies with

- 49 -

revenues of at least $10 million with marquee blue chip customers.  6D Global engaged in acquisition discussions with Bridgeline Digital, Inc., a public company with a FY 2014 net loss of ($6.2 million) on revenues of $23.7 million.

191.    According to Sullivan, who oversaw 6D Global's acquisition strategy, the Bridgeline deal did not make operational sense.  Rather, the purpose of the acquisitions was to attract institutional investors like Discover by acquiring businesses with marquee customers and high revenues.  Defendant Wey's focus on securing financing for 6D Global thus dictated 6D Global's acquisition strategy.

192.    Defendant Wey also managed 6D Global's individual acquisitions.

193.    In many cases, Defendant Wey initially brought the acquisition target to 6D Global.  For example, in or around December 2014, Defendant Wey asked 6D Global to look into acquiring Whiteboard Animation Studio.  Defendant Wey contemporaneously disclosed to Defendant Kang and Sullivan that Whiteboard Animation Studio's owner Steve Day ("Day") was related to Wey by marriage.  In a December 2 email describing to Sullivan the potential acquisition, which never actually closed, Defendant Kang stated:

Here's what I also like about this play.

It aligns interests of [Benjamin Wey] even more w/ our success and growth because this is more than just $ to him as investment.  This becomes also personal since family is related as well for overall growth of 6D Global.

194.    After initial introductions, Defendant Wey personally negotiated certain acquisition terms.  Defendant Wey met with Day over lunch to establish terms of 6D Global's acquisition of Whiteboard.  Even if Defendant Wey did not personally negotiate terms, he gave orders to 6D Global personnel in conducting negotiations.  In December 2014, Defendant Wey

ordered Sullivan to go meet Day, and pursuant to Wey's orders, Sullivan met Day at Day's offices, not vice versa.

195.    At Defendant Wey's insistence, in spring and summer of 2015, 6D Global sought to acquire a New York-based digital creative agency owned by Wey's second cousin's husband for approximately one million dollars in stock.  The owner backed out of the deal when he learned more about Defendant Wey's background which, by that time, included a highly-publicized sexual harassment lawsuit.

196.    Defendant Wey and his legal team reviewed all acquisition agreements.  6D Global would ask that Defendant Wey make changes directly to the agreements.  6D Global then forwarded the agreements, with Defendant Wey's changes, directly to the acquiree.

197.    While finding acquisition prospects was the preoccupation at 6D Global, the Company only closed two acquisitions during the Relevant Period:

> (a) On March 4, 2015, 6D Global closed the Storycode acquisition for $600,000 and 300,000 shares of common stock, coupled with potential earnout shares; and

> (b) On March 20, 2015, 6D Global acquired SwellPath for $300,000 and 300,000 shares of common stock, and up to an additional 300,000 shares and a potential additional $650,000 based on SwellPath's achievement of milestones.

198.    Defendant Wey and his legal team reviewed both the Storycode and SwellPath agreements, making substantial changes to the terms of both.

199.    In violation of SEC rules, 6D did not publicly file the acquisition agreements.

200.    6D Global officers acknowledged that Defendant Wey controlled acquisitions.  In a February 18, 2015 email copying Defendant Kang, Sullivan acknowledged to Defendant Wey that "your guidance is critical to our success of [sic] these acquisitions."

**The Individual Defendants admit to Discover that Defendant Wey controls 6D Global.**

201. 6D Global was not profitable and relied on cash infusions to fund its acquisitions. Shortly after the SwellPath and Storycode acquisitions, 6D Global was off, again, searching for large investments and/or cash infusions.

202. In late July 2015, 6D Global was introduced to Discover, a Cayman Islands-exempted mutual fund managed by Discover Fund Management LLLP from its U.S. Virgin Islands office.

203. On August 10, 2015, 6D Global and Discover signed a Stock Purchase Agreement (the "SPA"), providing that Discover make a $10 million investment in 6D Global convertible preferred stock.

204. In subsequent litigation, Discover's broker declared under penalty of perjury that: (a) Defendants Kang and Szynkowski would refer to NYGG-Asia and Defendant Wey interchangeably as the holder of 45% of 6D Global's stock; (b) the broker spoke to Defendant Wey numerous times in negotiating and closing the SPA; and (c) 6D Global represented that NYGG-Asia's permission was necessary for the transaction. *See* Discover Litigation, Docket No. 23, ¶4.

205. Shortly after closing the SPA, Defendant Kang arranged to fly to the Virgin Islands to meet with Discover. Defendant Kang agreed to bring with him a representative from NYGG-Asia, the other large shareholder in 6D Global. In fact, the representative was Defendant Wey.

206. According to Discover's Investment Advisor, John Kirkland, Defendant Kang introduced Defendant Wey at the meeting, stating "basically, I work for him."

207.    At the meeting in the Virgin Islands, Defendant Wey stated that: (i) he controlled NYGG-Asia, and through NYGG-Asia, controlled 6D Global as well; (ii) Defendant Wey controlled 6D Global's public trading, and recent price movements had been caused by Wey's manipulation; and (iii) if Discover ever wanted to sell its shares, it should sell them to Defendant Wey or his designees rather than on the public market.

**The securities laws mandate disclosure of beneficial owners in Form 10-Ks and proxy statements.**

208.    Regulation S-K imposes general disclosure obligations applicable to SEC filings made pursuant to the Securities Act and the Exchange Act.  Regulation S-K mandates disclosure if indicated in the form underlying SEC filings.  *See* 17 C.F.R. §229.10.

209.    Item 403 of Regulation S-K mandates disclosure of, among other things, the name of any person who or that *beneficially owns* more than 5% of any class of the issuer's securities, as well as the amount of securities owned ("5% Owners").  *See* 17 C.F.R. §229.403.

210.    A "beneficial owner" includes "any person who, directly or indirectly, through any contract, ***arrangement, understanding, relationship, or otherwise*** has or shares (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security."  17 C.F.R. §240.13d-3(a) (emphasis added).  At all times, Defendant Wey held both voting power and investment power over all of NYGG-Asia's 6D Global shares, and accordingly, was a beneficial owner of NYGG-Asia's 6D Global shares.

211.    Item 403 mandates disclosure of 5% Owners in:

(a) Annual reports on Form 10-K. Instructions to Form 10-K, Item 12.

- 53 -

(b) Proxy Statements on Schedules 14A or 14C.

**Defendant Kang has taken control of the Company from shareholders and has caused the Company to deprive shareholders of their fundamental rights.**

212.    Article III, Section 1 of 6D Global's By-laws state: "The business, property and affairs of the Corporation shall be managed by a Board consisting of not less than three or more than seven Directors."  In violation of the Company's By-laws, since at latest February 14, 2018, the Company only has one director, Defendant Kang, who has control over how many directors are currently on the Board.  To maintain control of the Company, Kang has prevented additional members from serving on the Board.

213.    Defendant Kang, by way of his control over the Company, has also caused the Company to fail to apprise shareholders of material Company information.  As a company that has registered securities under the Securities Act of 1933, 6D Global is subject to the reporting obligations of Section 15(d) of the Exchange Act, which include making annual and periodic reports on Forms 10-K and 10-Q, respectively.  The Company has not filed its required periodic reports since its Form 10-K for the fiscal quarter and year ended December 31, 2015, which was filed with the SEC on July 11, 2016.  The Company is thus delinquent in filing its periodic reports for all of 2016, 2017 and, thus far, the first half of 2018.

214.    Moreover, 6D Global's By-laws require that the Company hold an annual meeting of the shareholders and that "if the election of directors shall not be held on the day designated herein for any annual meeting of the shareholders, or at any adjournment thereof, the Board shall cause the election to be held at a special meeting of the shareholders as soon thereafter as may be convenient."  Notably, there is no "day designated herein" in the Company's By-laws.

215.    Delaware Code Title 8. Corporations § 211. Meetings of stockholders, states that,

- 54 -

"[u]nless directors are elected by written consent in lieu of an annual meeting as permitted by this subsection, an annual meeting of stockholders shall be held for the election of directors on a date and at a time designated by or in the manner provided in the bylaws."  Although the Company's By-laws do not specifically designate a date therein, they make clear that the Company is to hold an "annual" meeting.  The Code also provides that if no date for an annual meeting has been designated for a period of 13 months after "the latest to occur of the organization of the corporation, its last annual meeting or the last action by written consent to elect directors in lieu of an annual meeting, the Court of Chancery may summarily order a meeting to be held upon the application of any stockholder or director."

216.    The Company last held an Annual Meeting of Stockholders on August 19, 2016, and thus its following Annual Meeting of Stockholders should have been held by September 20, 2017, where the Company was required to hold an election of directors.

217.    Defendant Kang breached his fiduciary duty to hold an Annual Meeting of Stockholders during which there would be an election of the directors to the Board, because Kang seeks to remain the sole director against the will and the best interests of the Company's stockholders.  Kang's actions have deprived the Company of the benefit of a diverse and uninterested Board and of the opportunity to elect directors.  In effect, Defendant Kang has usurped the power of 6D Global shareholders by depriving them of their fundamental rights to control the Company.

**False and misleading statements and omissions of material fact.**

218.    On June 16, 2014, 6D Global issued an 8-K announcing the terms of the 6D Global Acquisition.  Defendant McEwen signed the Form 8-K.  It stated, in relevant part:

On June 11, 2014, in consideration of the Exchange Agreement and the related transactions, **the Registrant's largest creditor, NYGG-Asia Ltd.**, a British Virgin Islands corporation ("NYGG-Asia"), entered into a Forbearance and Waiver Agreement with the Registrant (the "Forbearance Agreement"). Pursuant to the Forbearance Agreement, NYGG-Asia and its affiliates agree to forbear from exercising certain of their respective rights and remedies related to the Registrant's debt obligations to them and certain events of default thereunder. The forbearance period extends from June 11, 2014 until the first to occur of (i) September 10, 2014, (ii) the transfer of the Controlling Shares to the Registrant in exchange for the transfer of the Subsidiary Interests to the Controlling Shareholders and (iii) the termination of the Exchange Agreement. Upon the earlier to occur of (i) the occurrence of a forbearance default (which includes any failure by the Registrant to comply with and/or diligently pursue the Exchange Agreement) or (ii) the expiration of the forbearance period, NYGG [Asia]'s agreement to forbear shall immediately terminate and it shall thereafter be entitled to exercise all of its rights and remediates with respect to the Registrant's debt obligations to it.

Further to the Forbearance Agreement, NYGG [Asia] also agrees to unconditionally release each of the China Subsidiaries from all of their debt obligations to it. The terms of NYGG [Asia]'s release and waiver are set forth in a separately-executed Release and Waiver Agreement between NYGG [Asia] and each of the China Subsidiaries (the "Waiver Agreement").

(Emphasis added).

219. The Company attached the Forbearance Agreement as an exhibit to the Form 8-

K. The agreement states in pertinent part:

Debt Obligations and the Events of Default, and the execution of this Agreement is a condition precedent to the effectiveness of the Exchange Agreement.

B. The Lender [defined as NYGG-Asia] and/or NYG Capital LLC [i.e., NYGG] have acquired indebtedness of the Borrower previously owed to Fensterstock & Partners LLP and intend to acquire additional indebtedness of the Borrower on or prior to the Distribution Date including, without limitation, amounts that are owed by the Borrower to the law firm of Stradley Ronon (the "Additional Indebtedness", and together with the Prior Loans, the "CTek Indebtedness").

[...]

D. The Borrower has requested that each of the Lender and NYG[G] forbear from exercising certain of their respective rights and remedies with respect to the CTek agreement to forbear shall immediately terminate and it shall thereafter be entitled to exercise all of its rights and remediates with respect to the Registrant's debt obligations to it.

- 56 -

2      Forbearance.

2.1     Subject to the terms and conditions of this Agreement, and provided that no Forbearance Default (as defined below) has occurred, the Lender agrees that during the period commencing on the date of this Agreement and ending on and the first to occur of (i) September 10, 2014, (ii) the Distribution and (iii) the termination of the Exchange Agreement (the "Forbearance Period"), the Lender will not, and will procure that NYG[G] will not, file suit or take any other action to enforce its rights with respect to the Existing Default. This limited forbearance does not extend to any other default or Events of Default with respect to the CTek Debt Obligations or any other rights and remedies available to the Lender with respect to the Existing Default. Upon the earlier of (a) the occurrence of a Forbearance Default (as defined below) or (b) the expiration of the Forbearance Period, the Lender's agreement to forbear shall automatically be deemed terminated and the Lender shall be entitled to, immediately and without notice, exercise all of its rights and remedies with respect to the CTek Debt Obligations and this Agreement.

**LENDER:**
**NYGG-ASIA LTD.**

By:  /s/ Roger Li
Name: Roger Li
Title:  Managing Director

220.    The statements in ¶¶ 218-19 were misleading at the time they were made because they omitted to disclose that NYGG-Asia and NYGG were alter egos and that both were completely controlled by Defendant Wey.

221.    On June 24, 2014 CleanTech filed its Preliminary Information Statement on Schedule 14C (the "First Proxy") with the SEC, relating to the 6D Global Acquisition. Defendant McEwen signed the First Proxy.  The First Proxy repeated the misstatement that NYGG-Asia was issued shares in the 6D Global Acquisition, which was misleading for failing to disclose that Defendant Wey beneficially owned NYGG-Asia's shares.  Moreover, Item 403 of Regulation S-K required that the Company disclose Defendant Wey's beneficial ownership of all NYGG-Asia's shares, which it failed to do.

222.    In addition, the First Proxy included a copy of the bylaws which would govern 6D

Global.  The bylaws provided, in pertinent part, as follows:

**ARTICLE III**
**BOARD OF DIRECTORS**

<u>SECTION 1. Number, Qualification and Term of Office</u>.  The business, property and affairs of the Corporation shall be managed by a Board consisting of not less than three or more than seven Directors.

**ARTICLE V**
**OFFICERS**

<u>SECTION 1</u>. <u>Number</u>.  The officers of the Corporation shall be a President, Secretary, and Treasurer, each of which officers shall be elected by the Board of Directors, and such other officers as the Board of Directors may determine, in its discretion, to elect. Any number of offices may be held by the same person.  Any officer may hold such additional title descriptions or qualifiers such as "Chief Executive Officer", "Chief Operating Officer", "Chief Financial Officer", "Senior Vice President", "Executive Vice President" or "Assistant Secretary" or such other title as the Board of Directors shall determine.

223.    The statements in ¶¶ 221-22, above, were misleading for failing to disclose that

6D Global's operations were conducted and controlled by Defendant Wey and his staff at NYGG,

rather than 6D Global's officers and Board of Directors.

224.    On July 21, 2014, the SEC sent a letter to the Company referring to Regulation S-

K Item 403's requirement that 6d Global disclose Defendant Wey's beneficial ownership in 6D

Global securities.  The letter provided, in relevant part:

As part of your Debt Conversion discussion, please disclose NYGG-Asia Ltd.'s ultimate beneficial ownership of the company's stock following the closing of the Exchange. Your disclosure should cover beneficial ownership of the company's securities that NYGG, directly or indirectly, will have after the closing of the Exchange.  As defined in Exchange Act Rule 13d-3, a beneficial owner of a security includes "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) investment power which includes the power to dispose, or to direct the disposition of such security.

- 58 -

225.    The SEC's letter plainly requested that 6D Global disclose that Defendant Wey's true status as the beneficial owner of NYGG-Asia's 6D Global shares, in that Defendant Wey: (i) would have the sole dispositive power over NYGG-Asia's 6D Global shares; and that Defendant Wey (b) has investment power over NYGG-Asia's 6D Global shares.

226.    On August 4, 2014, the SEC sent another letter commenting on 6D Global's amended proxy statement on Schedule 14C (the "Second Proxy").  In this letter, the SEC demanded that 6D Global further disclose the name of all natural persons with voting and dispositive control over NYGG-Asia's shares.

227.    On August 13, 2014, in response to the July 21 and August 4 SEC letters, 6D Global filed a third amended proxy on Schedule 14C for the 6D Global Acquisition with the SEC (the "Third Proxy"). Defendant McEwen signed the Third Proxy.  Despite the SEC's having twice requested that 6D Global comply with the requirement that 6D Global disclose beneficial ownership of NYGG-Asia's 6D Global shares, the Third Proxy nevertheless failed to disclose that Defendant Wey would beneficially own NYGG-Asia's 6D Global shares.

228.    The Third Proxy also repeated the misstatements set forth in ¶¶ 218-19, 221-22.

229.    On September 4, 2014, 6D Global filed its Definitive Proxy on Schedule 14C relating to the 6D Global Acquisition (the "Definitive Proxy").  Defendant McEwen signed the Definitive Proxy.  The Definitive Proxy persisted in repeating the misleading statements contained in the Third Proxy.

230.    On September 29, 2014, the 6D Global Acquisition closed.  Defendant Wey was required to file a Schedule 13D disclosing his beneficial ownership of 35,629,883 6D Global shares held in the name of NYGG-Asia by October 15, 2014.  Defendant Wey did not file a

Schedule 13D.

231.     On October 1, 2014, 6D Global filed a report on Form 8-K announcing the change in control resulting from the 6D Global Acquisition.  Defendant Kang signed the Form 8-K. Pursuant to the instructions for the Form 8- K, 6D Global was required to report the "identity of the person(s) who acquired such control [and] the basis of the control, including the percentage of voting securities of the registrant now beneficially owned directly or indirectly by the person(s) who acquired control."  Instructions to Form 8-K, Item 5.01.

232.     Instead, 6D Global only reported that NYGG-Asia beneficially owned the 35,629,883 NYGG-Asia 6D Global shares without disclosing that Defendant Wey was also a beneficial owner.

233.     Attached as Exhibit 3.4 to the Form 8-K filed with the SEC on October 1, 2014 were 6D Global's By-Laws, including the provisions set forth in ¶ 222.

234.     6D Global filed its Form 10-Q for the quarter ended September  31,  2014 on November 12, 2014.  The Form 10-Q was signed  by  Defendant  Kang.  The Form 10-Q stated, in pertinent part:

> *The largest holder of our common stock has significant voting power and may effectively control the outcome of any stockholder vote.*
>
> NYGG (Asia), Ltd. holds, in the aggregate, approximately 46.2% of the outstanding shares of our common stock as of November 10, 2014.  As a result, NYGG (Asia) has the ability to substantially influence and, in some cases, may effectively control the outcome of corporate actions requiring stockholder approval, including the election of directors.  This concentration of ownership may also have the effect of delaying or preventing a change in control of 6D Global, even if such a change in control would benefit other investors.

235.     This statement in ¶ 234 was a misleading statement of material fact for failing to disclose that Defendant Wey, not NYGG-Asia, in fact controlled 6D Global, and that Defendant

Wey exercised day-to-day operational control over 6D Global.  Thus, the statement was misleading for failing to disclose not merely that Defendant Wey's affiliates controlled the outcome of 6D Global's corporate actions requiring stockholder approval but also that Defendant Wey even controlled 6D Global's day-to-day operations.

236.    6D Global's stock began trading on the NASDAQ under ticker symbol SIXD on December 12, 2014.

237.    6D Global filed a Proxy Statement on Schedule 14C (the "February Proxy") on February 5, 2015 that related to the adoption of 6D Global's 2015 Omnibus Incentive Plan, pursuant to the written consent of Defendants Kang and NYGG-Asia, which, according to the February Proxy, held a majority of 6D Global's voting shares. The February Proxy was materially misleading because Item 403 of Regulation S-K required the disclosure that Defendant Wey beneficially owned all of NYGG-Asia's shares.

238.    On March 30, 2015, 6D Global filed its annual report on Form 10-K for the year ended December 31, 2014.  The Form10-K was signed by Defendants Kang, Szynkowski, and McEwen.  In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), Defendants Kang and Szynkowski provided certifications.

239.    The Form 10-K was misleading because Item 403 of Regulation S-K required the disclosure that Defendant Wey beneficially owned all of NYGG-Asia's shares.

240.    The Form 10-K instead stated, in pertinent part:

The largest holder of our common stock has significant voting power and may effectively control the outcome of any stockholder vote.

NYGG-Asia, Ltd. holds, in the aggregate, approximately 46.2% of the outstanding shares of our common stock as of November 10, 2014. As a result, NYGG-Asia has the ability to substantially influence and, in some cases, may effectively control the outcome of

corporate actions requiring stockholder approval, including the election of directors. This concentration of ownership may also have the effect of delaying or preventing a change in control of 6D Global, even if such a change in control would benefit other investors.

241.    On April 17, 2015, 6D Global filed with the SEC its preliminary proxy on Schedule 14A (the "2015 Preliminary Proxy").  Defendant Kang signed the 2015 Preliminary Proxy.

242.    On April 30, 2015, 6D Global filed its definitive proxy on Schedule 14A (the "2015 Proxy Statement," and, together with the 2015 Preliminary Proxy, the "2015 Proxies"). Defendant Kang signed the 2015 Definitive Proxy.

243.    The 2015 Proxies were misleading because Item 403 of Regulation S-K required the 2015 Proxies to disclose that Defendant Wey beneficially owned all of NYGG-Asia's shares.

**The truth emerges.**

244.    The extent of the Individual Defendants' misconduct was revealed in the three actions – in addition to the securities fraud class action -- that were filed against many of the Individual Defendants explaining the ongoing scheme of stock price manipulation, fraud and violations of SEC rules and regulations. These three actions, discussed below, include an indictment, an SEC action, and a private action brought by Discover.

**The DOJ indictment against Defendant Wey and Erbek.**

245.    On September 8, 2015, the United States Attorney for the Southern District of New York filed an indictment against Defendant Wey and Erbek on charges including stock manipulation and fraud. *See United States v. Benjamin Wey, et al.*, 15-crim-611 (the "Indictment"). Defendant Wey was arrested on September 10, 2015, the same day the indictment was unsealed. The Indictment is attached hereto as Exhibit A and incorporated by reference herein.

246.    The Indictment alleges that Defendant Wey and others conspired to defraud the investing public by orchestrating and facilitating Wey's undisclosed amassing of beneficial ownership of more than five percent of the stock of certain publicly traded companies, including CleanTech, and manipulation of the market price and demand for the stock of those companies in which Defendant Wey had covertly amassed substantial beneficial ownership interests.

247.    During the Relevant Period, Defendant Wey used nominee entities that were owned or otherwise controlled by Defendant Wey, Wey's family member or employees of Defendant NYGG-Asia to obtain substantial portions of shares of U.S. shell companies. One of the shell companies that the nominees obtained a substantial percentage of shares was Everton.

248.    The Indictment further alleges that, although records associated with the offshore nominee entities identify certain of the nominee owners as the sole shareholders, directors, and/or signatories of the nominee entities, in fact, and unknown to the investing public, the nominee entities were actually controlled by Wey. Among other things, Defendant Wey possessed and exercised investment authority over shares of stock held in the names of the nominees; closely tracked the nominees' holdings, including gains and losses on stock positions; and directed other parties to take action in matters pertaining to the nominees, including, for example, the transfer of shares of stock between nominees. In executing the scheme to defraud, Defendant Wey routinely used Erbek to conduct stock trading for accounts held in the names of the nominees.

249.    Further, Defendant Wey caused the nominees to retain control of more than 5% of the shares of CleanTech by virtue of the reverse merger with Everton. In accordance with Section 13(d) of the Exchange Act, Defendant Wey was required to report his beneficial ownership within 10 days of the acquisition of shares in excess of 5% because he had investment authority over the

nominees. Defendant Wey, however, intentionally failed to file the requisite reports under Section 13(d).

250.     In fact, to further hide from the investing public the extent to which he owned and exercised control over CleanTech's stock (among others), Defendant Wey purposefully caused the nominees' holdings to be structured in such a way as to ensure that no single one of the nominees held a greater-than-five percent beneficial ownership interest.

251.     As a further part of the conspiracy and scheme to defraud, Defendant Wey caused the share price of CleanTech's stock to be manipulated in various ways. For example, on multiple occasions, Defendant Wey caused two retail brokers located in Manhattan to solicit their customers to buy shares of common stock, often on margin, while those brokers simultaneously actively discouraged the sale of these stocks by their customers, so as to artificially maintain the stock price. Similarly, Defendant Wey explicitly instructed Erbek to maintain the share prices of CleanTech's stock held in certain of the nominees' accounts.

252.     According to the Indictment, on or about February 7, 2011, Defendant Wey sent an email to Erbek stating, "CleanTech just traded at $4.50 per share. Please make sure the trader buys the stock at $5 per share, stay at $5 per share bid price, not less. Please make sure this happens right away." Erbek agreed to do so.

253.     The purpose of Defendants Wey and Erbek's emails was to artificially manipulate the market price and demand of CleanTech common stock.

254.     Additionally, according to the Indictment, Defendant Wey orchestrated certain match trades in CleanTech securities to manipulate the stock price. The Indictment provides the following example: in July 2010, soon after CleanTech was listed at an initial offering price of

$3.00 per share, Defendant Wey caused the purchase for a U.S. brokerage account in the name of Defendant Wey's siblings of approximately 1,000 shares of CleanTech stock while also causing a Singapore brokerage account in the name of one of the nominee entities he controlled to sell the exact same number of shares. The sale and the purchase were done at $5.10 per share which was 70% above the $3.00 initial offering price. After he executed these transactions, Defendant Wey sent emails to prospective investors promoting the apparent 70% increase in CleanTech stock.

255.    Finally, the Indictment alleges that from at least December 2010 through at least December 2011, Defendant Wey willfully and knowingly failed to file with the SEC notice of acquisition of beneficial ownership of CleanTech, which is violation of SEC rules and regulations.

**The SEC Action.**

256.    On September 10, 2015, the SEC filed a complaint in this Court, against Defendant Wey, his wife, his sister, Defendant NYGG, Erbek, and others, for their participation in a scheme to profit from undisclosed controlling ownership interests in several U.S. companies created by reverse mergers, including 6D Global, which were actually controlled by Defendant Wey and Defendant NYGG, and the SEC amended the complaint on November 9, 2015. *United States Securities and Exchange Commission v. Benjamin Wey, et al.*, 15-cv-07116 (PKC) (the "SEC Action"). The SEC Action is attached hereto as Exhibit B and incorporated by reference herein.

257.    The SEC Action described the fraudulent scheme as follows: Defendant Wey would use nominees controlled by him to take clandestine control of certain U.S. shell companies, including Everton.  After taking control of the shell company, Defendant Wey would arrange one of Defendant NYGG's clients, such as CleanTech, to reverse merge with the shell company that Defendant Wey controlled through his nominees. Following the mergers, Defendant Wey and his

family members indirectly held beneficial ownership interest exceeding 5% in the NYGG client. Defendant Wey then used his control over the NYGG companies such as CleanTech to manipulate the stock price, while misleading the investing public about his control of the companies.

258.     In 2010, NASDAQ delisted CleanTech partly because of Defendant Wey's failure to disclose his involvement in a December 2010 financing in which nominees he controlled received shares of CleanTech. The SEC set aside the delisting decision on July 22, 2013 based on NASDAQ's failure to provide evidence that it had specifically requested all documentation about Defendant Wey's financing transactions.

259.     During CleanTech's appeal of the NASDAQ delisting, Defendant Wey submitted a letter to NASDAQ dated June 30, 2011 in which he made false and misleading statements in order to conceal his financial stake in CleanTech's December 2010 offering. The letter stated that "[n]either I nor NY Global has any beneficial ownership of the securities issued in the financing." This was a false statement because of Benjamin Wey's, Tianyi Wey's, and Michaela Wey's ownership and control of nominees Strong Growth Capital, Ltd., Han Hua, Ltd., and Roosen Commercial Corporation. Benjamin Wey also falsely claimed in the letter that NYGG's Beijing and New York offices were "separately owned and operated."  He also stated that the Beijing office was run by an NYGG employee, who Benjamin Wey failed to disclose was Tianyi Wei's domestic partner. In fact, Benjamin Wey ran both offices, and Tianyi Wei's domestic partner was an NYGG employee who reported to Benjamin Wey. Benjamin Wey also described Han Hua as an "Asian investment fund" when, in fact, it was a nominee that Tianyi Wei owned.

260.     The SEC action charges Defendant Wey and others with numerous violations of the Securities Exchange Act for engaging in the conduct described above.

261.    Through Defendant Wey's and his family members' scheme, they received millions of dollars in illicit profits. The proceeds of sales of the securities and other profits from the scheme were deposited in various nominee brokerage and bank accounts and transferred around the world to mask their sources. Millions of dollars of those funds were then returned to the United States via transfers from accounts that were at least nominally controlled by his sister, Tianyi Wei, to accounts in the name of his wife, Michaela Wey. Defendant Wey and his wife used the proceeds to fund NYGG's operations and their lavish lifestyle.

262.    Some details of their scheme, some of which are set forth also in the Indictment, follow. The market manipulation was aimed at achieving and maintaining a share price above $5.00 for NYGG's client CleanTech. In July 2010, the first trades in Clean Tech securities involved a match trade of 1,000 shares purchased by a certain broker account in the name of Tianyi Wei from a foreign brokerage account maintained in the name of Guo Sheng, a Nominee for which Tianyi Wei was listed as the owner and signatory. The purchase price of $5.10 was 70 percent higher than CleanTech's recent $3.00 offering price; however, nothing had occurred between the offering and this first sale on the secondary market to justify the price increase. Soon thereafter, Benjamin Wey touted the 70-percent increase in an email to potential investors.

263.    Similarly, a February 2011 email recovered during execution of search warrants and sent from Benjamin Wey or someone else at his direction to Erbek revealed an intention to maintain the share price of CleanTech at $5.00. It read, "Dogan, Cleantech just traded at $4.50 per share. Please make sure the trader buys the stock at $5 per share, stay at $5 per share bid price, not less. Please make sure this happens right away." Trading records for the Swiss accounts managed by Erbek show purchases on February 7, 2011, of CleanTech shares in 100 to 198 share tranches

at $4.86 and $4.93. These purchases were part of Benjamin Wey's effort to drive the stock's price upward.

**6D Global stock halted, damaging investors.**

264.     As a result of the unsealing of the Indictment and the filing of the SEC Action, on September 10, 2015, NASDAQ halted trading of 6D Global securities, freezing the stock price at $2.90.  Today, 6D Global's stock trades over the counter at a price per share of $0.01.

**The Investment-Related Misconduct Defendants engaged in and/or caused the Company to engage in the Investment-Related Misconduct.**

265.     The Investment-Related Misconduct Defendants caused and/or allowed the Company to engage in a scheme consisting of, *inter alia*: (1) breaching an employment contract and securities purchase agreement with a former employee; (2) inducing investors with oral and written misrepresentations known to be false to invest in the Company in a private confidential offering; and (3) improperly restricting the transferability of the securities that were obtained by certain of these investors.

266.     As discussed in further detail herein, the Investment-Related Misconduct Defendants fraudulently induced, or allowed the Company to induce, investors into investing substantial consideration in 6D Global in exchange for Company shares which would become worthless after the Company was delisted from the NASDAQ because the Company had improperly imposed restrictions on the free marketability and transferability of such purchased stock.

267.     These investors were fraudulently induced into investing in the Company because the Investment-Related Misconduct Defendants knew and purposely omitted material adverse facts in direct communications with the investors and/or in the Company's investment related

filings and documents, including that: (1) those defendants were engaged in a stock manipulation scheme and related party transactions; (2) there was an ongoing SEC and DOJ investigation into their misconduct; and (3) the statements the Investment-Related Misconduct Defendants made both publicly and privately to induce investors to enter into securities purchase agreements and invest in the Company omitted the fact that Defendant Wey controlled 6D Global.

268.   Through their scheme, the Investment-Related Misconduct Defendants sought to unjustly enrich themselves and to prevent investors from disposing of their 6D Global shares so that they could unlawfully control the market.  To that effect, they made and/or caused the Company to make the false and misleading statements discussed herein to create fraudulent, unlawful, and arbitrary obstacles for investors to remove the restrictions on their stock, and with the intent of making it as difficult as possible for investors to remove the restrictions on their 6D Global shares to prevent them from selling them.

269.   When these material facts came to light, the Company's stock price experienced a sharp downward spiral, ultimately culminating with its delisting from the NASDAQ, cratering the worth of the investors' investments and in some instances rendering them essentially worthless.

**Additional action filed: the Discover Litigation.**

270.   On September 28, 2015, Discover filed the Discover Litigation -- against Defendants 6D Global, Defendant Wey and the officers and directors of 6D Global in this Court. The complaint in the Discover Litigation is attached hereto as Exhibit C, and incorporated by reference herein.

271.    The Discover Litigation alleges that on August 10, 2015, Discover entered into a Stock Purchase Agreement (the "Discover SPA") with 6D Global in which Discover paid $10,000,000 in exchange for 1,088 convertible preferred shares of 6D Global.

272.    6D Global induced Discover to enter into the Discover SPA by misrepresenting its status as an award-winning digital business, marketing, and technology company and failing to disclose that it was being investigated by the SEC and the Department of Justice, and further failing to disclose the role of Defendant Wey and his nominees in controlling the Company and manipulating its stock price.

273.    It was only after the execution of the Discover SPA, during an August 18, 2015 meeting that 6D Global revealed the status of Defendant Wey as 6D Global's controlling stockholder.

274.    The August 18 meeting was prompted by an e-mail from Defendant Kang to John Kirkland, investment advisor to Discover, in which Kang proposed the meeting and suggested bringing "a representative from NYGG Asia the other large shareholder in 6D Global", i.e., Defendant Wey.

275.    Discover had never heard of Defendant Wey, and at the August 18th meeting Defendant Wey stated that he controlled Defendant NYGG, and, through Defendant NYGG, he controlled all of 6D Global stock. Defendant Wey continued to say that Defendant Kang worked for him and that there was "no real public float" and basically all free trading shares of 6D Global were controlled by him and his "friends in China."

276.    At the August 18th meeting, Defendant Kang said about his relationship to Defendant Wey: "basically, I work for him."

277.   Discover's complaint seeks both compensatory and punitive damages, as well as rescission of the Discover SPA and return of the $10,000,000 payment for the Company's shares.

278.   The Company incurred damages as a result of costs related to the Discover Litigation, which was voluntarily dismissed with prejudice against 6D Global, Hartung, Kang, Kaufman, McEwen, Saxena, and Synkwoski on June 22, 2017, and voluntarily dismissed without prejudice against Erbek, NYGG, NYGG-Asia, Wey, Michaela Wei (Wey), and Tianyi Wei on March 9, 2018.

**Subsequent events.**

279.   On September 10, 2015, the DOJ and SEC each issued press releases announcing, respectively, the Indictment and the SEC Complaint (the "Press Releases," and collectively with the Indictment and SEC Complaint, the "September 10 Disclosures").

280.   The September 10 Disclosures revealed that: (i) Defendant Wey exercised control over NYGG Clients; (ii) NYGG-Asia was a nominee for Defendant Wey; (iii) Defendant Wey owned and controlled NYGG-Asia; and (iv) Defendant Wey's representations to the NASDAQ in connection with the CleanTech delisting were lies -- that (a) NYGG-Asia and NYGG were separately owned and operated; and (b) NYGG-Asia's offices were run by an employee independent of Defendant Wey.

281.   The September 10 Disclosures therefore confirmed that Defendant Wey and CleanTech had lied to the NASDAQ in CleanTech's delisting proceeding.

282.   On September 15, 2015, aware that the grounds cited by CleanTech and Defendant Wey to secure reversal of the NASDAQ's delisting decision were false, the NASDAQ immediately halted trading in 6D Global's shares.  The halt price was $2.90.

283.    On October 6, 2015, 6D Global filed with the SEC on Form 8-K announcing the

departure of certain of the Individual Defendants.  The Form 8-K stated:

> On September 30, 2015, David S. Kaufman, a director of 6D Global Technologies, Inc.
> (the "Company"), gave written notice to the Company of his resignation from his position
> as a member of the Board of Directors of the Company (the "Board"). Mr. Kaufman's
> resignation will be effective on the earlier of Friday, October 30, 2015, or the appointment
> of his successor. Mr. Kaufman is a director, the Chairman of the Governance and
> Nominating Committee, and a member of the Audit and Compensation Committees. Mr.
> Kaufman advised the Board that the reasons for his resignation were not the result of any
> disagreement with the Company.
>
> On September 30, 2015, Anubhav Saxena, a director of the Company, gave written notice
> to the Company of his resignation from his position as a member of the Board. Mr.
> Saxena's resignation will be effective on the earlier of Friday, October 30, 2015, or the
> appointment of his successor. Mr. Saxena is a director, Chairman of the Compensation
> Committee, and a member of the Audit and Nominating and Governance Committees. Mr.
> Saxena advised the Board that the reasons for his resignation were not the result of any
> disagreement with the Company.
>
> On October 5, 2015, Terry K. McEwen, a director of the Company, gave written notice to
> the Company of his resignation from his position as a member of the Board. Mr. McEwen's
> resignation will be effective on the earlier of Thursday, November 5, 2015, or the
> appointment of his successor. Mr. McEwen advised the Board that the reasons for his
> resignation were not the result of any disagreement with the Company.

284.    On October 27, 2015, 6D Global filed with the SEC on Form 8-K announcing the

departure of certain of the Individual Defendants.  The Form 8-K stated the following, in relevant

part:

> Effective as of October 24, 2015, the Board of Directors (the "Board") of 6D Global
> Technologies, Inc. (the "Company") elected Piotr (Pete) A. Chrzaszcz as a member of the
> Board, to fill the vacancy created by the resignation of David Kaufman. Mr. Chrzaszcz
> will serve as a member of the Board's Audit Committee and Compensation Committee and
> as chairperson of the Board's Governance and Nominating Committee. The Board has
> determined that Mr. Chrzaszcz will meet the independence requirements of the NASDAQ
> Stock Market.
>
> Mr. Chrzaszcz (pronounced Shunz) is currently an active investor trading his own
> portfolio. Mr. Chrzaszcz served as the CEO of Commercial Masterminds Inc., a
> commercial real estate investment and advisory firm from 2007-2012 and holds the

advanced real estate investor designation, Certified Commercial Investment Member (CCIM). Mr. Chrzaszcz was an active leader in the CCIM community and a guest lecturer for the UC Berkeley Extension, Personal Financial Planning Program discussing due diligence in commercial real estate. Mr. Chrzaszcz is an Air Force veteran and holds a Bachelor of Science in Aerospace Engineering from Boston University.

There are no family relationships between any of the Company's directors or officers and Mr. Chrzaszcz. There are no related party transactions with respect to Mr. Chrzaszcz reportable under Item 404(a) of Regulation S-K.

For his services as a member of the Board and all three committees, Mr. Chrzaszcz will receive $14,500 per quarter and options to purchase 20,000 shares of the Company's common stock per year and is entitled to reimbursement of any fees and expenses in connection with performing his duties as a director. . . .

Effective as of October 27, 2015, the Board elected Michael Bannout as a member of the Board, to fill the vacancy created by the resignation of Anubhav Saxena.  Mr. Bannout will serve as a member of the Board's Audit Committee and Governance and Nominating Committee and as chairperson of the Board's Compensation Committee. The Board has determined that Mr. Bannout will meet the independence requirements of the NASDAQ Stock Market.

For the past 25 years, Mr. Bannout has been the CEO and President of M. London Group, Inc., a privately owned men's and women's fashion accessories and apparel company, which he started in New York City as a small cut and sew manufacturing company and built into a multi-million dollar enterprise with world-wide distribution. Mr. Bannout attended Brooklyn College in Brooklyn, NY.

There are no family relationships between any of the Company's directors or officers and Mr. Bannout. There are no related party transactions with respect to Mr. Bannout reportable under Item 404(a) of Regulation S-K.

For his services as a member of the Board and all three committees, Mr. Bannout will receive $14,500 per quarter and options to purchase 20,000 shares of the Company's common stock per year and is entitled to reimbursement of any fees and expenses in connection with performing his duties as a director.

285.    On November 20, 2015, the NASDAQ delisted 6D Global's stock from trading.

6D Global timely appealed the delisting.  On January 20, 2016, the NASDAQ Hearings Panel

reserved decision on 6D Global's appeal.

286.     BDO's audit of 6D Global's 2015 financial statements included investigative procedures designed to assess whether Defendant Wey's control over 6D Global was a material weakness in its internal controls.

287.     In its audit, BDO discovered that Defendant Kang made numerous false exculpatory statements, set forth below.  BDO further discovered instances of Defendants Wey and Kang circumventing Board controls.

288.     On March 15, 2016, BDO sent a letter to the Chair of the Company's Audit Committee, Defendant Hartung, stating that BDO could no longer rely on Defendant Kang's representations.

289.     Accordingly, BDO wrote, if 6D Global did not fire Defendant Kang, BDO would have to resign as 6D Global's auditor.

290.     On March 17, 2016, 6D Global's Board met to discuss BDO's ultimatum. Defendant Kang rejected the request that he resign.  Defendant Hartung then moved to terminate Defendant Kang, but his motion was not seconded and therefore not voted upon.

291.     Defendant Kang remained in office, and BDO resigned later that day.

292.     On March 23, 2016, 6D Global filed with the SEC a Form 8-K in which the Company announced, among other things, that on March 17, 2016,

> Adam Hartung, resigned from his position as a member of the Board.  Mr. Hartung's resignation will be effective on April 16, 2016.  Mr. Hartung is a director, the Chairman of the Audit Committee, and a member of the Governance and Nominating and Compensation Committees.  Mr. Hartung advised the Board that the reason for his resignation was because the Board did not support his decision to terminate Mr. Kang as CEO of the Company[ ], and Mr. Hartung felt he would no longer be an effective member of the Board.

293.   On March 24, 2016, the NASDAQ Hearings Panel denied 6D Global's appeal for relisting.

294.   On March 29, 2016, 6D Global's stock resumed OTC trading, and fell from the halt price of $2.90 per share to close at $1.00.

295.   On April 12, 2016, 6D Global received a letter from the Nasdaq Listing Qualifications Staff that identified two additional bases for delisting:

- The Company did not file its Form 10-K for the fiscal year ended December 31, 2015 by March 30, 2016 and therefore is not in compliance with Listing Rule 5250(c)(1); and

- The Company has not yet paid its 2016 annual fee to Nasdaq and therefore is not in compliance with Listing Rule 5250(f).

296.   On May 20, 2016, 6D Global filed with the SEC a Form 8-K in which the Company set forth the bases for the NASDAQ's delisting of 6D Global and the Company's appeal. The Form 8-K set forth, in relevant part:

On May 17, 2016, 6D Global Technologies, Inc. (the "Company") received a letter from the Nasdaq Listing Qualifications Staff (the "Nasdaq Staff") stating that the Company's delay in filing its first quarter 2016 Form 10-Q, which was due on May 10, 2016, constitutes an event of non-compliance with Listing Rule 5250(c)(1) and therefore a separate basis for delisting the Company's common stock from The NASDAQ Stock Market LLC ("Nasdaq").

In prior letters reported by the Company on Forms 8-K filed with the U.S. Securities and Exchange Commission ("SEC") on November 25, 2015, and April 18, 2016, the Nasdaq Staff informed the Company that its common stock was subject to delisting as a result of (1) the Company's delay in filing its 2015 Form 10-K by the deadline of March 30, 2016, (2) the Company's failure to pay its 2016 annual fee to Nasdaq, and (3) the exercise of the Nasdaq Staff's discretionary authority.

The Company is appealing Nasdaq's delisting decision. While its initial appeal to the Nasdaq Hearings Panel (the "Panel") was denied on March 24, 2016, the Company's subsequent appeal of the Panel's decision is currently before the Nasdaq Listing and Hearing Review Council (the "Council"). In support of that appeal, the Company has presented a plan to address each of the Nasdaq Staff's bases for delisting, including:

The engagement of a new independent auditing firm to address the late SEC filings. Working diligently with its new auditors, the Company currently anticipates filing its 2015 Form 10-K by July 15, 2016, and its first quarter Form 10-Q by July 29, 2016. The Company has requested that its common stock remains listed on Nasdaq, though with trading suspended, contingent on the Company making such filings.

A commitment by the Company to pay its 2016 annual Nasdaq fees, concurrent with the resumption of its common stock trading on Nasdaq.

The Company believes it is addressing the issues raised by the Nasdaq Staff and Panel. There can be no assurance, however, that the Council will grant the Company's request for additional time to file its Forms 10-K and 10-Q. In addition, while the Company is working diligently with its auditors, there can be no assurance that the Company will be successful in filing its Forms 10-K and 10-Q by the dates set forth above. Therefore, there can be no assurance that the Company will be successful in its appeal or that its common stock will remain listed on Nasdaq.

### Additional action filed: the Swellpath Litigation

297.   On November 7, 2016, Ware filed a Third Party Complaint against Defendants Wey, Kang, Syznkowski, 6D Global, NYGG, NYGG-Asia, and former interim Company CEO Terry McEwen (the "Swellpath Defendants") in the Swellpath Litigation. The Third Party Complaint in the Swellpath Litigation is attached hereto as Exhibit D, and incorporated by reference herein.

298.   Ware's Third Party Complaint alleges fraud, fraudulent inducement, securities fraud, and in the alternative, breach of contract and negligence for the failure to disclose material facts which induced Ware to sell his stock and goodwill in Swellpath to 6D global in exchange for sham and fraudulent consideration.

299.   The Investment-Related Misconduct Defendants caused the Company to engage in the misconduct, and to the extent any did not directly engage in the misconduct themselves, they facilitated and/or permitted the remaining Swellpath Defendants' engagement in the misconduct.

- 76 -

300.     Swellpath was founded and co-owned by Ware and a colleague, and they, along with 6D Global, Swellpath, and its equity rights holders entered into a Securities Purchase Agreement dated March 19, 2015 whereby 6D Global acquired Swellpath (the "Swellpath SPA").

301.     Additionally, Ware and Six Dimensions entered into an employment agreement on or about March 18, 2015 wherein Ware and Six Dimensions agreed that Ware would serve as Vice President—Swellpath.

302.     Ware and 6D Global also entered into a Goodwill Purchase Agreement on or about March 20, 2015 wherein 6D Global agreed to purchase Ware's goodwill in Swellpath, as defined in the agreement as certain intellectual property, know-how, close business relationships, goodwill, trade secrets, processes, methods, research records, and knowledge and other information related thereto, owned by Ware.

303.     Pursuant to the Swellpath SPA, Ware gave 6D Global 2,940,000 shares in Swellpath and goodwill in exchange for 240,000 restricted shares of 6D Global and $240,000. The value of Ware's shares and goodwill in Swellpath was mutually agreed by the parties to be $1.68 million.  The value of the 6D Global shares issued to Ware was $1.86 million based on 6D Global's closing stock price of $7.75 per share on the closing date, March 20, 2015.  The restriction on the stock given to Ware was that it could not be sold before one year of him being issued them.

304.     After 6D Global's stock was delisted from the NASDAQ, the consideration paid to Ware became almost worthless.

305.     The Swellpath Defendants specifically failed to disclose to Ware that:  (1) they

were engaged in a stock manipulation scheme and related party transactions; (2) there was an ongoing SEC and DOJ investigation into their misconduct; and (3) the statements the Swellpath Defendants made both publicly and privately to Ware to induce him to enter into the Swellpath SPA omitted the fact that Wey controlled 6D Global.

306.    Ware reasonably relied upon the public filings issued by the Company, which had failed to disclose the above materially adverse facts in agreeing to sell his interest in Swellpath to 6D Global.

307.    The Swellpath Defendants additionally caused the Company to breach the Swellpath SPA by failing to properly disclose these material adverse facts to Ware, thus violating provisions requiring GD Global to promptly notify Ware of certain events, including any fact, circumstance, event or action the existence, occurrence or taking of which (1) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (as defined in the Swellpath SPA) or (2) has resulted in, or could be expected to result in, the failure of any of the conditions set forth [in the Swellpath SPA] to be satisfied, including any matter thereafter arising or discovered that, if existing or known at the date of the Swellpath SPA and the closing that would be required to be disclosed pursuant to the SPA, including any actions commenced, or threatened against, relating to or involving or otherwise effecting the Company, the securities involved in the Swellpath SPA, or Swellpath.

308.    To induce Ware to enter into the Swellpath SPA and the Goodwill Purchase Agreement, The Swellpath Defendants also made the same omissions in reports filed pursuant to the Exchange Act (including under Section 13, 15(d) and under sections (a) or (c) of Section 14) that Ware relied upon, making the reports false and misleading.  Moreover, the Swellpath

SPA falsely stated that the reports "complied in all material respects with the requirements of the Exchange Act and the rules and regulations thereunder when filed."

309.    The Swellpath Defendants engaged in, and the Investment-Related Misconduct Defendants permitted, this misconduct to unjustly enrich the Company with Swellpath common stock and Ware's goodwill and employment.

310.    The Swellpath Defendants also caused Ware to be terminated in violation of his employment contract with Six Dimensions, purporting to terminate him as a result of a "failure to make a good faith attempt to perform employee's duties . . . ."  Ware purportedly was terminated because he "was not on track to meet the Q2 Quota by June 30, 2016," but received notice of his termination on June 29, 2016, before the Q2 Quota deadline.

311.    Ware's Third Party Complaint seeks at least $10,000,000 in compensatory damages for each cause of action and at least $10,000,000 in punitive damages.

312.    On April 6, 2017, counsel for Ware informed the court in the Swellpath Litigation that the parties had fully executed a Settlement Agreement, which has not been made public.

313.    The Company was damaged as a result of settling the legal claims in the Swellpath Litigation, which in turn arose due to the misconduct engaged in by the Investment-Related Misconduct Defendants.

**Additional action filed: the Cottam Litigation**

314.    On June 16, 2016, Cottam filed the Cottam Litigation, currently pending in this Court, against 6D Global, 6D Acquisitions, Inc.,[14] Defendant Kang, GECG, GECG's regulatory

---

[14] 6D Acquisitions, Inc. ("6D Acquisitions") was a special purpose vehicle formed for the purpose of investing in a reorganized company that followed a share exchange between CleanTech and Six Dimensions.  Pursuant to the Subscription Agreement, the share exchange would consist of CleanTech issuing approximately 50% of its

legal counsel who, upon information and belief, serves as or served as Defendant Wey's personal legal counsel, and a registered investment representative.[15]   The complaint in the Cottam Litigation is attached hereto as Exhibit E, and incorporated by reference herein.

315.   The Cottam Litigation alleges that the Cottam Defendants at various times made written and oral representations to Cottam to induce him to invest money in 6D Global in a private confidential offering in late 2014, all while knowing that the representations were false when made and omitted material information.

316.   The Investment-Related Misconduct Defendants caused the Company to engage in the misconduct, and to the extent any did not directly engage in the misconduct themselves, they facilitated and/or permitted the remaining Cottam Defendants' engagement in the misconduct.

317.   In the Subscription Agreement that Cottam entered into (the "Subscription Agreement"), signed by Defendant Kang on behalf of 6D Acquisitions and for the ultimate benefit of 6D Global, there was an explicit representation that "[t]here are no material misstatements or omissions in this Subscription Agreement or any information provided in the Offering materials."

318.   Through the offering, relying on the terms of the Subscription Agreement, Cottam purchased 58 units for $870,000, which represented 2,900,000 shares of 6D Acquisitions common stock.   Per the terms of the Subscription Agreement, for every one share of 6D

---

outstanding common stock to the shareholders of Six Dimensions in exchange for all of Six Dimensions' outstanding stock, the net result of which was to render Six Dimensions a wholly-owned subsidiary of CleanTech (the "Share Exchange").   The resulting reorganized company would be 6D Global.   6D Acquisitions dissolved on or around October 22, 2014.

[15] Currently, the defendants in the Cottam litigation are 6D Global, 6D Acquisitions, and Defendant Kang (the "Cottam Defendants").

Acquisitions stock purchased through the Offering, Cottam would receive one share of 6D Global stock.

319.    Cottam, however, did not receive the correct number of shares, only receiving a total of 420,290 6D Global shares.  By failing to issue Cottam the shares he was due, the Cottam Defendants breached their contract with Cottam.

320.    The Cottam Defendants failed to inform Cottam prior to his investment that he would be receiving 2,479,710 fewer shares than the Subscription Agreement clearly stated he was to receive.

321.    In reliance on the explicit language in the Subscription Agreement, Cottam believed that he owned 2,900,000 shares of Company stock after the Share Exchange.  Cottam did not become aware that he had fewer shares until about April 2015, when he attempted to sell his shares.

322.    The proffered explanation for the reduction in shares received by Cottam was that two reverse stock splits of CleanTech stock caused his shares to be reduced proportionately.  The first reverse stock split was a 1-3 split occurring on July 14, 2014.  The Subscription Agreement, which Cottam received in September 2014, failed to disclose that this reverse stock split had even occurred.  The second reverse stock split was a 1-2.3 split occurring on September 25, 2014, after Cottam had signed the Subscription Agreement.

323.    However, pursuant to the unambiguous terms of the Subscription Agreement, the number of 6D Global shares that Cottam was to receive was not predicated on the amount of shares of CleanTech stock, and thus any reverse stock splits of CleanTech stock should not have impacted how many 6D Global shares Cottam was to receive.  The Subscription Agreement in

fact stated that the offering price of the units to be obtained by Cottam was unrelated to the "value, assets or other objective criteria of value" of CleanTech.

324.    The Cottam Defendants failed to amend to Subscription Agreement so as to correct the false and misleading statements and omissions contained therein or to notify a substantial investor in the Company's private offering of the false and misleading statements and omissions contained therein, including regarding the reverse stock splits.

325.    In connection with the offering, the Cottam Defendants also failed to disclose to the Cottam that: (1) the share exchange was a reverse merger and would involve the use of a shell corporation; (2) CleanTech would continue its operations through its subsidiary Six Dimensions; and (3) CleanTech was not a shell company.

326.    The Cottam Defendants made misstatements related to these omissions in the Subscription Agreement and in public filings by CleanTech, including stating in CleanTech's Information Statement filed with the SEC on September 4, 2014 that the transaction between Six Dimensions and CleanTech "will not be a 'reverse merger.'"

327.    The truth, however, was that prior to Cottam's investment, the Cottam Defendants knew of and planned for a reverse merger between CleanTech and Six Dimensions, using CleanTech as a shell corporation.  The Cottam Defendants purposely failed to disclose this plan to Cottam in order to induce him into investing in the Company.

328.    As of June 14, 2014, CleanTech had divested all of its assets and operations and functioned solely as a shell corporation, which was not disclosed to Cottam nor in any of CleanTech's SEC filings.

329.    It was only two months after the Company received Cottam's investment funds

that the truth regarding the Share Exchange came to light.  In 6D Global's Form 10-Q filed with the SEC on November 12, 2014, the Company described the Share Exchange as follows:

> The Exchange is being treated as a reverse recapitalization effected by a share exchange for financial accounting and reporting purposes since substantially all of CleanTech's operations were disposed of prior to the consummation of the transaction.   Six Dimensions is treated as the accounting acquirer as its stockholders control the Company after the Exchange Agreement, even though CleanTech was the legal acquirer.  As a result, the assets and liabilities and the historical operations that are reflected in these financial statements are those of Six Dimensions as if six Dimensions had always been the reporting company and, on he date of the Exchange Agreement, changed its name and reorganized its capital stock.  Since CleanTech had no operations upon the Exchange Agreement taking place, the transaction was treated as a reverse recapitalization for accounting purposes and no goodwill or other intangible assets were recorded by the Company as a result of the Exchange Agreement.  Historical common stock amounts and additional paid-in capital have been retroactively adjusted using the exchange ratio of approximately 1.3 shares of CleanTech Common Stock for reach one common share of Six Dimensions.[ ]

330.   The Cottam Defendants additionally made false and misleading statements and omissions concerning share restrictions on the shares Cottam was to receive and placed improper restrictions on his ability to sell those shares.

331.   After initially learning how many shares of 6D Global he actually received as a result of his investment, Cottam sought to liquidate his shares.  On the day he obtained his shares, September 29, 2014, shares of 6D Global were trading at approximately $8.30 per share.  When Cottam tried to sell his shares, however, he was notified for the first time that he could not sell his stock because they were restricted.

332.   The Cottam Defendants failed to disclose to Cottam that the stock he was to receive would be restricted.  Moreover, the Subscription Agreement did not disclose that there would be restrictions on his stock.

333.   Cottam attempted to sell his 6D Global shares toward the end of March 2015, six

months after receiving his stock, when they were trading between $8 to $9 per share, and he was notified that they were still restricted. Cottam was eventually given a list of requirements by 6D Global to be fulfilled to have the restrictions on his shares removed. A representative of the Company stated that a reason for the imposition of the obstacles to remove the restrictions on his stock was because the Company had previously been a shell corporation—a fact that was misrepresented in the Company's SEC filings.

334. The Cottam Defendants sought to prevent investors, including Cottam, from disposing of their 6D Global shares so that they could unlawfully control the market. To that effect, they caused the Company to create fraudulent, unlawful, and arbitrary obstacles for investors such as Cottam to overcome to have restrictions on their stock removed with the intent of making it as difficult as possible for investors to remove the restrictions on their 6D Global shares to prevent them from selling them.

335. Cottam, from April 2015 through August 2015, sought to have the restrictions on his stock removed so he could liquidate his Company stock, but each time he attempted to gather information from the Company regarding the required process, Cottam was given misleading and constantly changing requirements. In multiple instances, despite gathering and presenting to the Company what it indicated to him would be needed to have the restriction on his stock removed, the Company notified Cottam that he had to perform additional and previously undisclosed tasks. For example, Cottam was told that to remove the restriction on his stock he was required to obtain a sell order, despite that this was not a requirement provided for on the written list of requirements that the Company initially provided to him.

336. Finally, in August 2015, the restrictions on Cottam's shares were removed, but

by that time, the Company's share price was trading at approximately $2 per share.  Cottam

eventually sold his 6D Global shares that month for approximately $940,000 at approximately

$2.24 per share.

337.    The Cottam Defendants additionally made false and misleading statements and

omissions regarding Defendant Wey's involvement in the misconduct.  Cottam, having been a

victim in a previous Wey-orchestrated scam, sought to avoid investing in any transaction

involving Wey, and sought assurances to that effect.

338.    However, the Subscription Agreement and, as noted throughout this Complaint,

the Company's relevant SEC filings and public statements failed to disclose Wey's involvement

or his control and ownership of any of the relevant entities, including that Wey was the owner

of NYGG-Asia, which was to receive nearly 50% of the shares of 6D Global following the Share

Exchange.

339.    The Cottam Litigation seeks actual, compensatory and punitive damages as a

result of damages Cottam sustained from the defendants' misconduct in addition to an award of

reasonable attorney's fees and the costs of the action.

**Additional action filed: the Larson Litigation**

340.    On February 10, 2017, Company shareholders Larson and Nielsen filed the

Larson Litigation.  The complaint in the Larson Litigation is attached hereto as Exhibit F, and

incorporated by reference herein.

341.    The Larson Litigation alleges negligent misrepresentation and negligence

against the Company and Defendant Kang and unjust enrichment against the Company arising

from Larson and Nielsen's purchase of restricted Company shares in an unregistered, private

sale from 6D Global and Kang.

342.    The Investment-Related Misconduct Defendants caused the Company to engage in the misconduct, and to the extent any did not directly engage in the misconduct themselves, they facilitated and/or permitted Defendant Kang's misconduct.

343.    In the context of such a sale, the SEC requires that the certificate or other evidence of ownership of the securities must include a disclosure that is prominently displayed stating the restrictions on transferability which attaches to those securities, referred to as a "restrictive legend."  It is in the issuer's sole discretion whether the restrictive legend is removed.

344.    Larson and Nielsen purchased hundreds of thousands of dollars worth of Company stock as a result of being repeatedly informed that the restrictions and the restrictive legends on the transferability of the securities purchased would be removed six months after the date of purchase, resulting in the shares being freely marketable and tradeable.

345.    Larson and Nielsen relied on these false and misleading representations in deciding to invest in the Company, and would not have purchased the securities if not for such representations.  Larson and Nielsen moreover expressed to the Company and Defendant Kang, both repeatedly prior to purchasing their shares and during the purported six month holding period, that they intended to sell their Company shares as soon as possible after the end of the six month restriction period.  The Company and Defendant Kang led Larson and Nielsen to believe that they would easily meet their [objectives].

346.    At the end of the six month holding period, however, the Company and Defendant Kang failed to allow the restrictive legends on the securities purchased by Larson

- 86 -

and Nielsen to be removed, instead choosing to negligently delay the removal of such restrictions by, *inter alia*, changing the legend removal requirements Larson and Nielsen were required to meet, and preventing them from obtaining freely tradeable securities prior to 6D Global's trading halt and ultimate delisting by the NASDAQ.

347.    Larson was solicited by Defendant Wey on September 24, 2014 and was provided information by Wey about a "friends and family" private placement offering of 6D Global securities.  Larson was explicitly informed by Wey that the restricted holding period of the offered shares was just six months, and that after such period Larson would freely be able to sell and/or transfer the securities he obtained on the open market.

348.    Additionally, Defendant Wey represented that the six month holding period was shorter than the 12 month holding period that restricted other investors' ability to sell Company shares, and this representation was an inducement relied upon by Larson in deciding to invest in the offering.

349.    The Company and Defendant Kang were aware of the misrepresentations made by Wey on the Company's behalf.  In fact, the Company and/or Defendant Kang directed, approved, and ratified such representations regarding the purported six month holding period.

350.    Relying on the misrepresentations made to him, Larson executed a Subscription Agreement (the "Larson Subscription Agreement") drafted by and/or with the consent and approval of the Company and Kang, which provided information regarding the offering.

351.    The Larson Subscription Agreement expressly stated that the information contained therein was "not intended to be exhaustive and [was] provided only as a guide to assist the Subscriber in making an independent investigation of the Company . . . [and that] the

Offering materials do not contain all of the information that would normally be contained in a prospectus used in a public offering, or in an offering memorandum typically used in a private offering."

352.    The Larson Subscription Agreement also expressly contemplated that material information about the securities at issue would be provided to Larson outside of and apart from the Subscription Agreement itself.  As stated in the Larson Subscription Agreement:

> The Subscriber acknowledges having had the opportunity to ask questions of the Company concerning the Company's business and activities and prospects, the nits and the terms and conditions of this Offering, 6DT's planned operations and prospects, and obtained such additional information and reviewed such documents as the subscriber deemed necessary.

353.    Thus, Larson reasonably relied on the oral misrepresentations made to him that induced him to enter the Larson Subscription Agreement.

354.    The Larson Subscription Agreement moreover did not contain language refuting the representations expressly made to Larson, i.e., that the restricted holding period of the offered securities bought by him was just six months, and that this six month holding period was shorter than the 12-month holding period restricting other investors from selling 6D Global shares.

355.    Relying on Wey's representations regarding the six month holding period applicable to the stock being offered to him, on September 29, 2014, Larson purchased 101,450 shares Company stock at a price per share of $2.07—approximately a $210,000 total investment.

356.    Larson subsequently met personally with Defendants Wey and Kang on November 8 and 9, 2014, after Wey contacted him in Florida.  Defendants Wey and Kang repeatedly stated to Larson in person that: (1) they were actively soliciting buyers in Florida; (2) Larson should purchase additional Company shares; (3) the restricted holding period was only six

months for the Company shares Larson purchased; and (4) Larson should invite his "Florida friends and family" to invest in the Company.

357.    Larson stated to Defendants Kang and Wey during these meetings that he intended to sell his shares as soon as their six month holding period ended, and that he intended to dispose of them prior to the expiration of the longer restricted holding periods applicable to other Company investors.  Defendant Kang, notably, expressly encouraged Larson to sell enough shares at the end of the purported six month holding period to recoup, at minimum, his initial investment while letting "profits ride" with the remainder of his Company holdings.

358.    Defendant Kang called Larson twice in Florida in the following days, soliciting him to, *inter alia*, again encourage more "friends and family" to purchase Company stock in the offering.

359.    On November 10, 2014, Nielsen contacted Defendant Kang to discuss a possible investment in the Company.  While they spoke, Defendant Kang directly asked Nielsen a question regarding his investment time horizon, to which Nielsen expressly responded that it was his intention to sell the majority of the 6D Global stock he obtained immediately after the end of the six month holding period for those securities.  During their conversation, Defendant Kang never told Nielsen that the restriction holding period on the stock obtained would be over six months, nor did Defendant Kang advise of any foreseeable delay in the restrictions being removed.

360.    Nielsen received a Subscription Agreement (the "Nielsen Subscription Agreement") and Investor Questionnaire on November 13, 2014, which he reviewed and executed on the same day.  The Nielsen Subscription Agreement was identical to the Larson Subscription Agreement, containing the same false and misleading representations and omissions discussed

above.

361.   Relying on the false and misleading representations made to him, particularly the assurances that the shares he would be issued would be subject to just a six month restricted holding period, on November 14, 2014 Nielsen purchased 96,618 shares of Company stock for $2.07 per share—a total investment of approximately $200,000.

362.   On November 21, 2014, the Nielsen Subscription Agreement appears to have been executed by Defendant Kang, with the terms therein "Agreed to and Accepted" by Kang.

363.   As of the filing of the Larson Litigation, Larson had yet to receive any documentation indicating that the Larson Subscription Agreement was either formally executed or accepted by 6D Global prior to or contemporaneously with his purchase.

364.   In early 2015, after Larson and Nielsen purchased their shares from the Company, but before the expiration of their respective six month restricted holding periods, the Company and Kang negligently and improperly started altering the processes and rules required to remove the restrictive legends on Larson's and Nielsen's securities.  The Company's and Defendant Kang's misconduct prevented Larson and Nielsen from trading or transferring their Company shares freely six months after the dates of their respective purchase.

365.   On April 23, 2015, Larson and Nielsen made a formal request to the Company to confirm that in May 2015 (six months after their purchase) all restrictions on the free transferability of their shares purchased would be removed so that the securities would be freely tradeable on the open secondary market.  The same day, Defendant Kang's Executive Assistant provided Larson and Nielsen with a checklist to be met in order to remove the restrictive legends from the securities certificates they obtained from the Company, which included the unreasonable

requirements of: (1) a Rule 144 Seller's Representation Letter; (2) a legal opinion issued by an approved law firm in the U.S. that included a statement (a) attesting that the individual is not a licensed securities broker and is acting on the selling shareholder's on behalf, not on the behalf of others, (b) from the law firm attesting that it will take full responsibility and will accept full liabilities for the accuracy of its legal opinion, it has verified the identity of the selling shareholder, and that the selling shareholder is not in possession of any non-public information and is not an affiliate of the Company, and (c) from both the selling shareholder and the law firm specifically indemnifying and holding harmless the Company, its affiliates, respective controlling persons, directors, officers, agents, and employees of any of the foregoing, from any and all claims that are related or arise out of the removal of the restrictive legend from the stockholder's certificate; and (3) a certified copy of a valid government-issued identification.

366.    The checklist also noted that "[a]fter all documentation is received, gathered and verified by the Company's Corporate Secretary, the Company will correspond with its legal counsel for final approval.  The Company will make efforts to correspond with its stock transfer agent to remove the restrictive legend."

367.    However, as detailed below, the Company and Defendant Kang repeatedly changed the requirements that Larson and Nielsen had to meet to remove the restrictive legends from their securities.  In doing so, the Company and Defendant Kang modified the substance and spirit of the agreement that was the fundamental precept of Larson's and Nielsen's decision to invest in 6D Global.  The Company and Defendant Kang engaged in this misconduct for the purpose of preventing Larson and Nielsen from selling their shares immediately after the end of the six month holding period that was acknowledged and promised to them, and which was the

foundation of Larson's and Nielsen's decisions to invest in the Company.

368.    Beginning in May 2015, Larson and Nielsen and their retained counsel repeatedly attempted to satisfy the requirements presented by 6D Global and repeatedly requested to the Company and Defendant Kang that the restrictions be removed on their shares.  In response, the Company and Defendant Kang did not act in good faith and remove the restrictive legends, instead choosing to make it impossible for Larson and Nielsen to meet the changing requirements.

369.    On May 29, 2015, Larson's and Nielsen's counsel provided all the required and requested documents to comply with the Company's policies concerning removal of the restrictive legends from Larson's and Nielsen's stock certificates.  On the same day, the price per share of Company stock closed at $8.68.

370.    The Company and Defendant Kang, however, wrongfully refused to remove the restrictive legends from the stock certificates and continued to impose additional, changing, and unreasonable requirements that Larson and Nielsen repeatedly and unsuccessfully attempted to meet.  6D Global and Kang eventually and unilaterally imposed a one year holding period, twice as a long as the six month holding period that formed the fundamental basis for Larson's and Nielsen's decision to invest.

371.    On June 8, 2015, Larson's and Nielsen's counsel provided the Company with the revised documents and legal opinion requested.  In June 9, 2015, Defendant Kang's Executive Assistant notified counsel for Larson and Nielsen that "Legal [h]as approved [the removal of all restrictions pertaining to Larson's and Nielsen's investment].  Please send originals and all other requirements from corporate policy to the address below my signature."

372.    Subsequently, despite expressly representing that 6D Global's legal department

had approved the removal of the restrictive legends, the Company withdrew the approval, and improperly imposed additional requirements that were unreasonable and impossible for any investor to satisfy.

373.   Larson and Nielsen nonetheless attempted to meet the Company's requirements, and on June 18, 2015, Defendant Kang's Executive Assistant acknowledged receipt of Larson's and Nielsen's required documents and stated that she would be "passing on to legal for review" and that she "will keep [them] posted on status." This delay tactic continued for several weeks.

374.   On July 9, 2015, the restrictions on Larson's and Nielsen's securities should have been removed, and on that day the price per share of Company stock was trading at an intraday high of $19.41.

375.   Defendant Kang's Executive Assistant emailed counsel for Larson and Nielsen on July 20, 2015, and stated, "Yes, it is approved. In order for me to move forward, I will need a copy of the stock certificate. Also, we will also need a seller's representation letter from your broker as well as a sale order before I can instruct the transfer agent to remove the restrictive legend."

376.   Larson and Nielsen again provided all the requested and required documents and information, and again, despite satisfying 6D Global's requirements, the Company and Kang improperly and unlawfully refused to remove the restrictive legends on Larson's and Nielsen's stock certificates.

377.   On August 4, 2015, Larson and Nielsen expressed and communicated their frustration concerning the Company's refusal to remove the restrictions and the Company's constantly changing requirements to Defendant Kang.

378.    On August 12, 2015, after repeatedly asking for explanations regarding removal of the restrictive legends, 6D global notified Larson and Nielsen that attorney Michael Pastor was "approved" by 6D Global to remove the restrictive legends from their stock certificates. However, Pastor was not able to remove the restrictive legends and 6D Global moreover refused to provide Larson and Nielsen with information regarding any instance where restrictive legends had successfully and timely been removed from 6D Global securities certificates.

379.    By September 10, 2015, the NASDAQ had halted the trading of Company stock, holding the price per share of Company stock at $2.90.  On or about December 19, 2016, the Company's stock was delisted from the NASDAQ.  The Company's common stock is currently essentially worthless, trading on over the counter at $0.01 per share.  Thus, Larson's and Nielsen's investment in the Company has been rendered essentially worthless as a result of the Company's and Defendant Kang's actions.  Moreover, Larson and Nielsen were improperly deprived of the opportunity to realize a profit from their investment, as would have been the case had the restrictions on their stock been removed six months after purchase, as had been represented to them.

380.    The Larson Litigation requests that Larson's and Nielsen's purchases of Company stock be rescinded and all related proceeds received by the Company be returned to them, in addition to compensatory damages.  The Company has been damaged as a result of the misconduct alleged in the Larson Action, including costs related to litigating and resolving the action, which was jointly dismissed by all parties with prejudice on July 7, 2017.[16]

---

[16] Although there is no sign of settlement on the Larson Litigation docket, upon information and belief, Plaintiff assumes it was settled.

## DAMAGES TO 6D GLOBAL

381.    As a direct and proximate result of the Individual Defendants' conduct, 6D Global has lost and expended and will continue to expend many millions of dollars.

382.    Such expenditures include, but are not limited to, legal fees, payments, and fines associated with the federal securities fraud class action lawsuit filed against the Company and its management, the Discover Litigation, the Swellpath Litigation, the Cottam Litigation, the Larson Litigation, the SEC Action, the DOJ Indictment, NASDAQ's halting of trading of Company stock, NASDAQ's delisting of Company stock, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

383.    Such losses include those due to the unjust enrichment of NYGG, the Individual Defendants and Company employees who illicitly received proceeds and fees from the stock manipulation scheme and/or were improperly over-compensated by the Company, including through bonuses and other compensation connected to the Defendants' intentional false and misleading statements and stock manipulation scheme.

384.    As a direct and proximate result of the Individual Defendants' conduct, 6D Global has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

385.    Plaintiff brings this action derivatively and for the benefit of 6D Global to redress injuries suffered, and to be suffered, as a result of the Defendants' breaches of their fiduciary duties

as directors, officers, and/or controlling shareholders of 6D Global and unjust enrichment, as well as the aiding and abetting thereof.

386.    6D Global is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

387.    Plaintiff is, and at all relevant times has been, a 6D Global shareholder.  Plaintiff will adequately and fairly represent the interests of 6D Global in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

388.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

389.    Demand futility is examined with respect to the membership of the Board at the time the amended complaint is filed unless the asserted terms are "validly in litigation" at the time of the original complaint.  *Braddock v. Zimmerman*, 906, 776, 778-79 (Del. 2006).

390.    Many of the claims that are complained of herein, which are essential to Plaintiff's instant derivative action, are being made for the first time in this Complaint, and were never made in any of the complaints that Plaintiff previously filed.  These new claims are not new legal theories by which Plaintiff can achieve the same, or even similar, relief to that which Plaintiff sought by making the claims in any of the complaints previously filed.  Moreover, these new claims are not based on allegations that were made in any of the complaints that Plaintiff previously filed.

391.     As to the claims alleged in Plaintiff's prior amended complaint filed on July 5, 2016, those claims were "validly in litigation," and demand futility is to be examined with respect to the membership of the Board at the time of filing of this action.

**Demand upon the Board at the time of filing of this action is futile.**

392.     At the time of filing of this action, the Board consisted of the following four Individual Defendants: Kang, Hartung, Chrzaszcz, and Bannout (collectively, the "Initial Directors").  A pre-suit demand on the Initial Directors is futile and, therefore, excused.  Plaintiff needs only to allege demand futility as to two of the four Initial Directors that are on the Board at the time this action was commenced.

393.     Demand is excused as to all of the Initial Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme and false and misleading statements and omissions of material fact, which render them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

394.     In complete abdication of their fiduciary duties, the Initial Directors either participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price by: A) permitting Defendant Wey to engage in a scheme to manipulate the price and trading volume of 6D Global's stock by using undisclosed nominee accounts to purchase and sell the stock; B) failing to maintain for the Company adequate internal and financial controls; and C) making and/or causing the Company to make false and misleading statements by failing to disclose to the scheme to the investing public, and that the Company lacked adequate internal and financial controls.  The fraudulent scheme was intended to make the Company appear more profitable and

attractive to investors.  As a result of the foregoing, the Initial Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

395.    Defendant Kang admitted that he works for Defendant Wey, and together they own about 75% of Company stock.  Even without Defendant Kang's huge Company stock interest, the Company admitted in its SEC filings that, "NYGG (Asia), Ltd. [controlled by Defendant Wey] holds, in the aggregate, approximately 45.0% of the outstanding shares of our common stock for the year ended March 19, 2015."   As a result, NYGG (Asia) has the ability to substantially influence and, in some cases, may effectively control the outcome of corporate actions requiring stockholder approval, including the election of directors.  This concentration of ownership may also have the effect of delaying or preventing a change in control of 6D Global, even if such a change in control would benefit other investors."  Together with Defendant Kang's additional 30% stock interest, Defendant Wey owns 3/4 of the Company and fully controls it.

396.    In September 2015, Defendants Wey and Kang caused two of five members of the Board at the time to "resign," and the third resigned in early October 2015.  This active exertion of their control of the Board, together with their majority ownership, demonstrates that the two Initial Directors, besides Defendant Kang and Defendant Hartung, appointed to replace those who "resigned," were actually Defendants Wey's and Kang's puppets, who were beholden to them.

397.    Indeed, upon BDO's ultimatum to the Board that it must terminate Defendant Kang or else BDO would resign, the Board refused.   The Board thus protected Defendant Kang in his exploitation of the Company, and caused the resignation of BDO as the Company's auditor, and also resulted in Defendant Hartung's resignation.   This further evidences that Defendants

Chrzaszcz and Bannout were Directors who were completely dominated by and beholden to Defendants Wey and Kang.

398.    Therefore, Defendants Chrzaszcz, and Bannout are not independent or disinterested, but are beholden to Defendants Kang and Wey.

399.    Moreover, Defendants Kang and Hartung face a substantial likelihood of liability for their engagement in the Investment-Related Misconduct, and Defendants Chrzaszcz and Bannout also face a substantial likelihood of liability for failing to cure the Investment-Related Misconduct to the extent that it was still occurring when they were appointed to the Board.

400.    Defendant Kang is not independent or disinterested, but is beholden to Defendant Wey, as he admitted that he works for Defendant Wey, and as he is the CEO of the Company and depends on Defendant Wey for his primary source of income.

401.    Defendant Kang made numerous false statements underplaying Defendant Wey's influence on the 6D Global's Board of Directors.  For example, in July 2015, Defendant Hartung asked Kang to disclose to 6D Global's Board the extent of Defendant Wey's involvement with 6D Global. As Defendant Hartung later reported to BDO, Kang falsely told 6D Global's Board of Directors that Defendant Wey was just a friend and not involved with 6D Global. In fact, Defendant Wey exercised day-to-day operational control over 6D Global.

402.    Moreover, in the Discover Litigation, Defendant Kang submitted a declaration under penalty of perjury denying Defendant Wey's status as a 6D Global shareholder.  Defendant Kang declared:

> As one of CleanTech's primary creditors, NYGG Asia was also involved in the merger and became a significant holder of shares of 6D Global's common stock. At all times after 6D Global began operations, I communicated principally with Defendant Roger Li regarding matters related to NYGG Asia.

403.     Defendant Kang also declared:

Defendant Wey has never been an officer, director, or shareholder of 6D Global. And I have never known Defendant Wey to be an officer, director, or shareholder of NYGG Asia.

404.     Defendant Kang further declared, "Indeed, since I first met him in 2014, Defendant Wey has never dictated the operations of 6D Global or its decision-making."

405.     Moreover, as further set out above, Defendant Kang had extensive contacts with Defendant Wey who closely monitored his investment in 6D Global. Defendant Kang's contacts with Li, by contrast, were very limited. In May 2015, more than a year after 6D Global and NYGG-Asia's first meeting, Defendant Kang travelled to China to meet Li and other NYGG-Asia personnel. Kang provided Li and the other NYGG-Asia personnel a 1-2 page dossier presentation to introduce them to 6D Global.

406.     Defendant Kang also told a special investigation team hired by 6D Global's Audit Committee that he did not know who had paid Defendant Wey's expenses to attend the Discover Meeting in the U.S. Virgin Islands. In fact, Kang had paid for Defendant Wey's expenses with his personal credit card. Further, Kang sought and obtained reimbursement from 6D Global in 2015, before he spoke with the investigators.

407.     Additional reasons that demand on Defendant Kang is futile follow.  Defendant Kang, as the Company's Chairman and Chief Executive Officer is thus a non-independent director. He was ultimately responsible for the Company's operations, internal controls, and a number of the false and misleading statements and omissions that were made, including those contained in the SEC filings, all of which he signed.  His large Company stock holding -- 29.7% of the Company's issued and outstanding common stock -- reveals his interest in keeping the Company's

stock price as high as possible and his control over the Company.  Moreover, Defendant Kang is beholden to, and controlled by, Defendant Wey: he borrowed money from Defendant Wey's wife; and he "hired" Defendant Wey to act as an allegedly unpaid "consultant" to the Company, during which time it is possible he imparted material, confidential information about the Company to Defendant Wey.

408.    Defendant Kang is also a defendant in the securities fraud class action lawsuit and the Cottam Litigation.  Thus, for these reasons, too, Defendant Kang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

409.    Before the Initial Directors were appointed together, the Board consisted of the following five Individual Defendants: Kang, Hartung, Kaufman, McEwen and Saxena (the "Former Directors").

410.    The Initial Directors and the Former Directors are collectively referred to herein as the Directors.

411.    Alternatively, Plaintiff pleads demand futility due to his alleging that three of the five Former Directors, who were on the Board at the time the stock manipulation scheme took place and the false financial statements were made, breached their fiduciary duties by abandoning the Company when they resigned as Company directors in order to insulate themselves from shareholder derivative claims.  Courts hold that such clever conduct establishes an exception to the requirement to plead that demand on directors who were appointed after wrongdoing occurred is futile.

412.     Indeed, the Former Directors breached their fiduciary duties by, in the wake of public exposure of Defendant Wey's stock manipulation scheme, collectively resigning in order to insulate themselves from shareholder derivative claims.  Instead of endeavoring to recover on behalf of the Company the damages the Company suffered and will suffer from those responsible for fraud and manipulation, they dropped out and appointed a new board that had no first-hand knowledge of the wrongdoing or of the Company itself.  Patently, the Former Directors conspired with the Initial Directors by the Former Directors collectively resigning, the result of which, they all expected, would be the receipt of get-home free tickets by the Former Directors.

413.     For the foregoing reasons, demand is excused because Courts do not permit directors who breached their fiduciary duties to defeat demand futility allegations by collectively resigning from and abandoning the company to which they owe allegiance.

**Demand upon the Board at the time of the filing of this Complaint is also futile.**

414.     As to the new claims alleged in in this Second Amended Complaint that are not "validly in litigation," demand futility should be analyzed with respect to the membership of the Board on the date Plaintiff filed this Complaint.  Additionally, to the extent demand is not found to be futile as to the Board at the time of filing of this action, demand futility should be assessed as to the current Board as to all claims alleged in this Second Amended Complaint.  As of the time of filing of this Complaint, the sole member on the Board is Defendant Kang.

415.     As to why demand is futile and thus excused as to Defendant Kang, Plaintiff incorporates by reference and realleges the allegations set forth above in ¶¶ 394-408, as though fully set forth herein.

416.     The Directors, as members of the Board, were and are subject to the Code of Ethics. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics required the Directors to also adhere to 6D Global's standards of business conduct.  The Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict with our interests or adversely affect the Company's reputation.  The Directors did not comply with the requirements of the Code of Ethics.  The Directors violated the Code of Ethics because they participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price.  Because The Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

417.     The Directors also breached their fiduciary duty of loyalty by failing to ensure that the Company had an adequate system of internal controls in place to prevent the misrepresentations made by the Individual Defendants and to prevent the scheme to artificially inflate the Company stock price.  Indeed, The Directors knowingly or recklessly disregarded any such controls by causing and facilitating the scheme.  Accordingly, The Directors breached their fiduciary duties in failing to implement such internal controls and, therefore, face a substantial likelihood of liability, and demand upon them is futile.

418.     The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded The Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on The Directors would be futile.

419.    6D Global has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Initial Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for 6D Global any part of the damages 6D Global suffered and will continue to suffer thereby.  Thus, any demand on the Initial Directors would be futile.

420.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Current or Former Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Initial Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

421.    The acts complained of herein constitute violations of fiduciary duties owed by 6D Global's officers, directors and/or controlling shareholders, and these acts are incapable of ratification.

422.    The Initial Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of 6D Global.  If there is a directors and officers' liability insurance policy covering the Initial Directors, it may contain provisions that eliminate

coverage for any action brought directly by the Company against the Initial Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Initial Directors were to sue themselves or certain of the officers of 6D Global, there would be no directors' and officers' insurance protection. Accordingly, the Initial Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Initial Directors is futile and, therefore, excused.

423.    If there is no directors' and officers' liability insurance, then the Initial Directors will not cause 6D Global to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

424.    Thus, for all of the reasons set forth above, all of the Initial Directors, and, if not all of them, certainly at least two of the Initial Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Defendants for Breach of Fiduciary Duties

425.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

426.    Each Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of 6D Global's business and affairs.

427.    Each of the Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

- 105 -

428.     The Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.   The Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of 6D Global.

429.     In breach of their fiduciary duties owed to 6D Global, the Defendants willfully participated in misrepresentation of the Company's business operations and prospects, failed to correct the Company's public statements about the Company, and failed to properly oversee 6D Global's business and internal controls, rendering them liable to the Company for breaching their fiduciary duties.

430.     In further breach of their fiduciary duties owed to 6D Global, the Investment-Related Misconduct Defendants engaged in and/or allowed the Company to engage in the Investment-Related Misconduct.

431.     Defendant Kang further breached his fiduciary duties to the Company.   As 6D Global's sole director, he has taken control of the Company from its shareholders.   Kang has also caused 6D Global to fail to make periodic reports and filings required by the SEC and to fail to hold an annual meeting of stockholders, in violation of Delaware law and 6D Global's By-laws. Defendant Kang has further caused the Company to violate its By-laws by having too few directors on the Board, and thus strengthening Kang's control over 6D Global.

432.     The Defendants had actual or constructive knowledge that that they had caused the Company to improperly misrepresent its business operations and prospects and they failed to correct the Company's public statements about the Company.   The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with

reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of 6D Global's securities and disguising self-dealing transactions.

433.    The Defendants had actual or constructive knowledge that that they had permitted Defendant Wey to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of 6D Global's securities and engaging in self-dealing transactions.

434.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

435.    As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, 6D Global has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Defendants are liable to the Company.

## SECOND CLAIM

### Against the Defendants for Unjust Enrichment

436.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

- 107 -

437.     By their wrongful acts and the omissions of material fact that they caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment of, 6D Global.

438.     The Defendants either benefitted financially from the improper conduct, including through proceeds or fees received from the stock manipulation scheme, or received bonuses, stock options, or similar compensation from 6D Global that was tied to the performance or artificially inflated valuation of 6D Global, or received compensation that was unjust in light of the Defendants' bad faith conduct.

439.     Plaintiff, as a shareholder and a representative of 6D Global, seeks restitution from the Defendants and seeks an order from this Court disgorging all proceeds, fees, profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 14 of the Securities Exchange Act of 1934

440.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

441.     Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.   Specifically, the Company's 2015 Proxies violated §14(a) and Rule 14a-9 because they omitted material information regarding the fact that Defendant Wey beneficially owned NYGG-Asia's Company stock and controlled the Company's

day-to-day operations, and included by reference materially false and misleading financial statements.

442.    In the exercise of reasonable care, Individual Defendants should have known that the statements contained in the 2015 Proxies were materially false and misleading.

443.    The misrepresentations and omissions in the 2015 Proxies were material to Company shareholders in voting on the proxy statements. The 2015 Proxies formed an essential link in the accomplishment of the continuation of Defendants' continued violation of their fiduciary duties in connection with the stock manipulation scheme, the making of false and misleading statements, and the failure to institute sufficient controls over financial reporting.

444.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2015 Proxies.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of 6D Global, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Defendants have breached and/or aided and abetted the breach of their fiduciary duties to 6D Global;

(c)    Determining and awarding to 6D Global the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing 6D Global and the Defendants to take all necessary actions to reform

and improve the Company's corporate governance and internal procedures to comply with applicable laws and to protect 6D Global and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of 6D Global to nominate at least three candidates for election to the board; and

3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding 6D Global restitution from the Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: July 24, 2018                    Respectfully submitted,

                                        **THE BROWN LAW FIRM, P.C.**

                                        By:  _/s Timothy W. Brown_
                                        Timothy W. Brown, Esq.
                                        Alexander P. McBride, Esq.
                                        Matthew H. Lee, Esq.
                                        240 Townsend Square
                                        Oyster Bay, New York 11771
                                        Telephone: (516) 922-5427
                                        Email: tbrown@thebrownlawfirm.net
                                              apmcbride@thebrownlawfirm.net
                                              mlee@thebrownlawfirm.net

                                        _Counsel for Plaintiff_

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

   - v. -                           :

BENJAMIN WEY,                      :
   a/k/a "Benjamin Wei,"
   a/k/a "Tianbing Wei," and  :
SEREF DOGAN ERBEK,
   a/k/a "Dogan Erbek,"         :

        Defendants.          :

- - - - - - - - - - - - - - - - x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9|8|15
```

__INDICTMENT__

15 Cr.

**15 CRIM 611**

JUDGE NATHAN

## COUNT ONE
### (Conspiracy to Commit Securities Fraud and Wire Fraud)

The Grand Jury charges:

### Relevant Persons and Entities

1.    At all times relevant to this Indictment, New York Global Group, Inc. ("NYGG") was a Delaware corporation doing business in New York, New York.  In conjunction with a New York Global Group entity located in Beijing, China ("NYGG-Asia"), NYGG offered consulting services, among other things, to China-based operating companies that wished to raise funds in the U.S. capital markets.

2.    At all times relevant to this Indictment, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant, was the founder and President of NYGG and oversaw the operations of NYGG-Asia.

3.   At all times relevant to this Indictment, SEREF DOGAN ERBEK, a/k/a "Dogan Erbek," the defendant, was a resident of Switzerland and was employed by a Geneva-based financial services firm.

4.   At certain times relevant to this Indictment, SmartHeat, Inc. ("SmartHeat") was a China-based manufacturer of heat exchangers used in the industrial and residential markets in China to reduce the need for coal.  At various times, SmartHeat's common stock was traded on the Nasdaq Stock Market LLC ("Nasdaq") under the ticker symbol "HEAT."

5.   At certain times relevant to this Indictment, Deer Consumer Products, Inc. ("Deer") was a China-based manufacturer and seller of small kitchen appliances for the domestic Chinese market and export markets.  At various times, Deer's common stock was traded on the Nasdaq under the ticker symbol "DEER."

6.   At certain times relevant to this Indictment, CleanTech Innovations, Inc. ("CleanTech") was a China-based manufacturer of windmills.  At various times, CleanTech's common stock was traded on the Nasdaq under the ticker symbol "CTEK."

<u>Overview of the Conspiracy</u>

7.   From at least in or about 2007 through at least in or about 2011, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," and SEREF DOGAN ERBEK, a/k/a "Dogan Erbek," the defendants, and others known and unknown, conspired to defraud

the investing public by orchestrating and facilitating (1) WEY's undisclosed amassing of beneficial ownership of more than five percent of the stock of certain publicly traded companies; and (2) manipulation of the market price and demand for the stock of those companies in which WEY had covertly amassed substantial beneficial ownership interests.

Use of Nominees to Acquire Substantial
Ownership Interests in Shell Companies

8.   In furtherance of the conspiracy and scheme to defraud, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant, caused certain entities (the "Nominee Entities") that were owned or otherwise associated with a sibling of WEY ("Wey's Sibling"),[1] certain other members of WEY's extended family, and employees of NYGG-Asia (collectively, the "Nominee Owners" and, together with the Nominee Entities, the "Nominees") to obtain a substantial portion of the shares of certain U.S. shell companies (the "Shell Companies") that were trading on the National Association of Securities Dealers' Over-the-Counter Bulletin Board, a regulated quotation service that displays real-time quotes, last-sale prices, and volume information for certain over-the-counter securities.  For example, between in or about 2007 and in or about 2010, WEY caused certain of the Nominees to obtain substantial portions of

---

[1] At all times relevant to this Indictment, Wey's Sibling resided in China and was employed as a manager of NYGG-Asia.

shares of the following three Shell Companies:   Pacific Goldrim Resources, Inc.; Tag Events Corp.; and Everton Capital Corp.

9.   Although records associated with the Nominee Entities, all of which were incorporated offshore, identify certain of the Nominee Owners as the sole shareholders, directors, and/or signatories of the Nominee Entities, in truth and in fact, and unbeknownst to the investing public, the Nominee Entities were actually controlled by BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant.   Among other things, WEY possessed and exercised investment authority over shares of stock held in the names of the Nominees; closely tracked the Nominees' holdings, including gains and losses on stock positions; and directed other parties to take action in matters pertaining to the Nominees, including, for example, the transfer of shares of stock between Nominees.   In executing the scheme to defraud, WEY routinely directed SEREF DOGAN ERBEK, a/k/a "Dogan Erbek," the defendant, who well knew of WEY's control over the Nominees, to conduct stock trading for accounts held in the names of the Nominees.

## The Reverse Merger Transactions

10.   As a further part of the conspiracy and scheme to defraud, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant, through NYGG-Asia, identified various Chinese operating companies (the "Operating Companies") desirous

4

of raising capital in the U.S. markets, and offered NYGG's
services in advising and facilitating reverse merger
transactions for the purpose of gaining access to those capital
markets.  WEY intentionally caused the Operating Companies to
merge with particular Shell Companies of which WEY, through the
Nominees, held significant ownership stakes.

11.  The management of each Operating Company gained
ownership of a majority of the outstanding shares of the newly
formed publicly traded company.  However, management's holdings
in these new companies (the "Issuers") typically were subject to
lock-up agreements which precluded disposition of management's
stock for a period of years.

12.  Among the Issuers born of the above-described reverse
merger transactions were SmartHeat, Deer, and CleanTech.

### Undisclosed Beneficial Ownership of More Than Five Percent of the Issuers' Stock

13.  As a further part of the conspiracy and scheme to
defraud, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing
Wei," the defendant, caused the Nominees to retain undisclosed
control of more than five percent of the shares of each of the
Issuers -- shares originally of the Shell Companies that, by
virtue of the reverse merger transactions, became shares of the
Issuers.  Because, as noted, the Issuers' management typically
entered into lockup agreements preventing disposition of their

own interests in the Issuers, WEY -- through the Nominees -- at various points effectively controlled a substantial portion of a given Issuer's public stock float.  Because WEY, among other things, exercised investment authority over the shares of the Issuers held in the names of the Nominees, WEY was required under Section 13(d) of the Securities Exchange Act of 1934 ("Section 13(d)") and Securities and Exchange Commission Regulation 13D ("Regulation 13D") promulgated thereunder to report his beneficial ownership within 10 days of the acquisition of shares in excess of five percent.

14.  As a further part of the conspiracy and scheme to defraud, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant, intentionally failed to file the requisite reports under Section 13(d) and Regulation 13D, even though he was well aware of this reporting requirement.  In fact, to further obscure from the investing public the extent to which he owned and exercised control over Issuers' stock, and with the assistance of SEREF DOGAN ERBEK, a/k/a "Dogan Erbek," the defendant, WEY purposefully caused the Nominees' holdings to be structured in such a way as to ensure that no single one of the Nominees held a greater-than-five percent beneficial ownership interest in any of the Issuers.  For example, on or about July 21, 2010, WEY sent an email to ERBEK, instructing ERBEK to allocate shares among the Nominees so that no one Nominee

6

possessed more than five percent of the outstanding shares of
Deer stock.   In another email sent by WEY to ERBEK on or about
September 20, 2010, WEY further exhibited his awareness of and
intent to avoid his obligations under Section 13(d) and
Regulation 13D by explaining that, "Under SEC filing
requirements, any individual or entity owning more than five
percent of a company's total outstanding shares must file SEC
13D or 13G forms."

<u>Deception to Gain Listing of Issuers on the Nasdaq</u>

15.   At or about the time that the Issuers emerged from the
above-described reverse merger transactions, their common stock,
like the stock of the Shell Companies that preceded them, traded
only in over-the-counter markets and in low volumes.   The
Issuers' stock could not be sold in significant quantities in
the open market until a liquid market developed and the shares
traded on an exchange.   To address this problem, and in
furtherance of the conspiracy and scheme to defraud, BENJAMIN
WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant,
caused the Issuers' management to apply for listings on the
Nasdaq, which would have the effect of increasing market
interest and liquidity in the Issuers' securities.

16.   As BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing
Wei," the defendant, well knew, to secure a listing on the
Nasdaq, an issuer had to meet a series of listing standards

designed to ensure, among other things, that there would be sufficient public float, investor base, and trading interest to provide the depth and liquidity necessary to promote fair and orderly markets in each of the Issuers. Among other things, Nasdaq required an issuer to have at least 300 "round-lot" shareholders, defined as shareholders owning at least 100 shares of common stock each.

17.   To satisfy the Nasdaq's round-lot shareholder requirement, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant, deceptively caused shares of some of the Issuers to be transferred from certain of the Nominees to dozens of WEY's friends, employees, and business associates and/or their family members as gifts or unsolicited bonuses in increments of 100 or more, thereby artificially inflating the number of shareholders in each of the Issuers. In certain instances, round-lot share holdings were issued in the names of individuals who never actually received the share certificates and had no idea they owned such shares. The Nasdaq repeatedly informed attorneys for the Issuers, with whom WEY was in frequent contact about the 300 round-lot shareholder requirement, that gifted shares could not contribute to the minimum shareholder requirement for listing on its exchange because such shares did not establish "sufficient public float, investor base, and trading interest" in the company.

Nevertheless, through the deceptive device of stock giveaways to friends, employees, and business associates (and/or their family members), WEY was able to create the appearance of a bona fide shareholder base in the newly formed Issuers. The ruse was in each instance successful. Nasdaq approved the listings of the subject Issuers.

Manipulation of Issuers' Stock Prices

18. As a further part of the conspiracy and scheme to defraud, both before and after an Issuer became listed on Nasdaq, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," and SEREF DOGAN ERBEK, a/k/a "Dogan Erbek," the defendants, and others known and unknown, caused the share price of its stock to be manipulated in various ways. For example, on multiple occasions, WEY caused two retail brokers located in Manhattan to solicit their customers to buy shares of common stock of the Issuers, often on margin, while those brokers simultaneously actively discouraged the sale of these stocks by their customers, so as to artificially maintain the stock price of each Issuer. Similarly, WEY explicitly instructed ERBEK to maintain the share prices of at least two Issuers' stock held in certain of the Nominees' accounts. For example, on or about February 7, 2011, WEY sent an email to ERBEK stating, "Cleantech just traded at $4.50 per share. Please make sure the trader buys the stock at $5 per share, stay at $5 per share bid price,

9

not less.  Please make sure this happens right away." ERBEK

agreed to do so, but cautioned WEY, "Obviously, we need to be

careful to give such orders/make such comments.  I may explain

it over the phone; please call me if you have time."

19.  In addition, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a

"Tianbing Wei," the defendant, orchestrated certain match trades

in the securities of the Issuers, for the purpose of

manipulating the prices of those stocks.  For example, in or

about early July 2010, shortly after CleanTech was listed at an

initial offering price of $3.00 per share, WEY caused the

purchase for a U.S. brokerage account in the name of Wey's

Sibling of approximately 1,000 shares of CleanTech stock, while

also causing a Singapore brokerage account in the name of one of

the Nominee Entities to sell the exact same number of shares.

Both the sale and the purchase were done at a price of $5.10 per

share -- 70% above the $3.00 initial offering price.  After this

match trade had been executed, WEY used email to tout to

prospective investors the apparent 70% increase in CleanTech's

stock price.

20.  At the same time that BENJAMIN WEY, a/k/a "Benjamin

Wei," a/k/a "Tianbing Wei," and SEREF DOGAN ERBEK, a/k/a "Dogan

Erbek," the defendants, were causing the share prices of the

Issuers' stock to be manipulated in the ways described above,

WEY caused shares held in the name of Wey's Sibling and other

Nominees at brokerage accounts in the United States and overseas to be sold, thereby generating millions of dollars in proceeds at artificially inflated prices.

### Reaping and Laundering Profits from the Scheme

21.   In furtherance of the conspiracy and scheme to defraud, from in or about 2007 through in or about 2011, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant, caused millions of dollars' worth of the Issuers' stock and cash generated from sales of that stock to be transferred from accounts located in the United States in the name of Wey's Sibling and certain of the other Nominees to accounts located overseas, including in Switzerland and Hong Kong.

22.   After the proceeds were moved through these overseas accounts held in the names of Wey's Sibling and certain of the other Nominees, millions of dollars were repatriated to the United States for the benefit of BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant.  For example, more than $20 million in cash was transferred from a Hong Kong account in the name of Wey's Sibling to bank accounts in the United States that WEY and/or WEY's wife controlled.  WEY and his wife used that money to purchase, among other things, an apartment at the Ritz-Carlton Hotel in the Battery Park neighborhood of New York, New York.  These transfers of funds

11

were generally reported on tax returns under WEY's wife's name

as untaxable "gifts" from a foreign person.

### Statutory Allegations

23.   From at least in or about 2007 through at least in or

about 2011, in the Southern District of New York and elsewhere,

BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," and

DOGAN ERBEK, the defendants, and others known and unknown,

willfully and knowingly did combine, conspire, confederate, and

agree together and with each other to commit offenses against

the United States, namely, (a) fraud in connection with the

purchase and sale of securities, in violation of Title 15,

United States Code, Sections 78j(b) and 78ff, and Title 17, Code

of Federal Regulations, Section 240.10b-5; and (b) wire fraud,

in violation of Title 18, United States Code, Section 1343.

### Objects of the Conspiracy

### Securities Fraud

24.   It was a part and an object of the conspiracy that

BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," and

SEREF DOGAN ERBEK, a/k/a "Dogan Erbek," the defendants, and

others known and unknown, willfully and knowingly, directly and

indirectly, by use of the means and instrumentalities of

interstate commerce, the mails, and the facilities of national

securities exchanges, would and did use and employ manipulative

and deceptive devices and contrivances in connection with the

purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

## Wire Fraud

25. It was further a part and an object of the conspiracy that BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," and SEREF DOGAN ERBEK, a/k/a "Dogan Erbek," the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

<u>Overt Acts</u>

26.   In furtherance of the conspiracy and to effect the illegal objects thereof, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," and SEREF DOGAN ERBEK, a/k/a "Dogan Erbek," the defendants, and others known and unknown, caused the following overt acts, among others, to be committed in the Southern District of New York and elsewhere:

a.   On or about February 7, 2011, WEY sent an email from New York, New York to ERBEK in Switzerland for the purpose of causing the market price and demand for the common stock of CleanTech to be manipulated artificially.

b.   On or about February 7, 2011, ERBEK sent an email from Switzerland to WEY in New York, New York, advising WEY that ERBEK was working to ensure that the common stock of CleanTech would be traded at an artificially manipulated price.

(Title 18, United States Code, Section 371.)

<u>COUNT TWO</u>
(Securities Fraud)

The Grand Jury further charges:

27.   The allegations contained in paragraphs 1 through 22 and 26 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

28.   From at least in or about 2007 through at least in or about 2011, in the Southern District of New York and elsewhere,

14

BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," and SEREF DOGAN ERBEK, a/k/a "Dogan Erbek," the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances, in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, WEY, with the assistance of ERBEK and others, secretly amassed and concealed a beneficial ownership interest in excess of five percent of the common stock of each of SmartHeat, Deer, and CleanTech, and manipulated and caused to be manipulated the market price and demand for the common stock of those public companies.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

15

## COUNT THREE
### (Securities Fraud)

The Grand Jury further charges:

29.   The allegations contained in paragraphs 1 through 22
and 26 above are hereby repeated, re-alleged, and incorporated
by reference as if fully set forth herein.

30.   From at least in or about 2007 through at least in or
about 2011, in the Southern District of New York and elsewhere,
BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," and
SEREF DOGAN ERBEK, a/k/a "Dogan Erbek," the defendants,
knowingly and intentionally executed a scheme and artifice to
(a) defraud persons in connection with securities of an issuer
with a class of securities registered under Section 12 of the
Securities Exchange Act of 1934 and that was required to file
reports under section 15(d) of the Securities Exchange Act of
1934, to wit, the common stock of SmartHeat, Deer, and
CleanTech; and (b) obtain, by means of false and fraudulent
pretenses, representations, and promises, money and property in
connection with the purchase and sale of securities of an issuer
with a class of securities registered under Section 12 of the
Securities Exchange Act of 1934 and that was required to file
reports under section 15(d) of the Securities Exchange Act of

16

1934, to wit, the common stock of SmartHeat, Deer, and CleanTech.

(Title 18, United States Code, Sections 1348 and 2.)

### COUNT FOUR
### (Wire Fraud)

The Grand Jury further charges:

31.   The allegations contained in paragraphs 1 through 22 and 26 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

32.   From at least in or about 2007 through at least in or about 2011, in the Southern District of New York and elsewhere, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," and DOGAN ERBEK, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, WEY and ERBEK sent certain email communications between New York, New York and, among other places, Switzerland, in furtherance of a scheme

to manipulate the market price and demand for the common stock

of SmartHeat, Deer, and CleanTech.

(Title 18, United States Code, Sections 1343 and 2.)

### COUNT FIVE
(Failure to Disclose Ownership in
Excess of Five Percent of Deer Stock)

The Grand Jury further charges:

33.   The allegations contained in paragraphs 1 through 22

and 26 above are hereby repeated, re-alleged, and incorporated

by reference as if fully set forth herein.

34.   From at least in or about April 2009 through at least

on or about September 20, 2010, in the Southern District of New

York and elsewhere, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a

"Tianbing Wei," the defendant, a person who acquired directly

and indirectly the beneficial ownership of an equity security of

a class which was registered pursuant to Section 78l of Title 15

of the United States Code, and was directly and indirectly the

beneficial owner of more than five per centum of such class, to

wit, common stock of Deer, willfully and knowingly failed,

within 10 days after such acquisition, to file with the U.S.

Securities and Exchange Commission ("SEC") a statement

containing any of the information set forth in Title 15, United

States Code, Section 78m(d)(1)(A) through (E), and such

additional information as the SEC by rules and regulations

prescribed as necessary and appropriate in the public interest

18

and for the protection of investors, to wit, WEY intentionally failed to disclose his beneficial ownership interest in excess of five percent of Deer common stock.

(Title 15, United States Code, Sections 78m(d) & 78ff; Title 18, United States Code, Section 2; Title 17, Code of Federal Regulations, Section 240.13d-1.)

## COUNT SIX
### (Failure to Disclose Ownership in Excess of Five Percent of CleanTech Stock)

The Grand Jury further charges:

35.   The allegations contained in paragraphs 1 through 22 and 26 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

36.   From at least in or about December 2010 through at least in or about December 2011, in the Southern District of New York and elsewhere, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant, a person who acquired directly and indirectly the beneficial ownership of an equity security of a class which was registered pursuant to Section 78l of Title 15 of the United States Code, and was directly and indirectly the beneficial owner of more than five per centum of such class, to wit, common stock of CleanTech, willfully and knowingly failed, within 10 days after such acquisition, to file with the U.S. Securities and Exchange Commission ("SEC") a statement containing any of the information set forth in Title 15, United States Code, Section 78m(d)(1)(A) through (E), and such

19

additional information as the SEC by rules and regulations
prescribed as necessary and appropriate in the public interest
and for the protection of investors, to wit, WEY intentionally
failed to disclose his beneficial ownership interest in excess
of five percent of CleanTech common stock.

(Title 15, United States Code, Sections 78m(d) & 78ff; Title 18,
   United States Code, Section 2; Title 17, Code of Federal
                 Regulations, Section 240.13d-1.)

### COUNT SEVEN
### (Money Laundering)

The Grand Jury further charges:

37.   The allegations contained in paragraphs 1 through 22
and 26 above are hereby repeated, re-alleged, and incorporated
by reference as if fully set forth herein.

38.   From at least in or about 2007 through at least on or
about June 8, 2011, in the Southern District of New York and
elsewhere, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing
Wei," the defendant, knowing that the property involved in a
financial transaction represented the proceeds of some form of
unlawful activity, knowingly conducted and attempted to conduct
such a financial transaction, affecting interstate commerce,
which in fact involved the proceeds of specified unlawful
activity, to wit, fraud in the sale of securities and wire
fraud, knowing that the transaction was designed in whole and in
part to conceal and disguise the nature, the location, the

source, the ownership, and the control of the proceeds of
specified unlawful activity, to wit, WEY moved, or caused to be
moved, millions of dollars from the sale of shares of SmartHeat,
Deer, and CleanTech stock through various accounts located in
the United States and overseas before repatriating that money to
the United States, in order to conceal that those funds were
obtained in connection with his fraud on the investing public.

(Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.)

## COUNT EIGHT
### (Money Laundering)

The Grand Jury further charges:

39.  The allegations contained in paragraphs 1 through 22
and 26 above are hereby repeated, re-alleged, and incorporated
by reference as if fully set forth herein.

40.  From at least in or about 2007 through at least on or
about September 23, 2011, in the Southern District of New York
and elsewhere, BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a
"Tianbing Wei," the defendant, knowingly transported,
transmitted, and transferred, and attempted to transport,
transmit, and transfer monetary instruments and funds from a
place in the United States to and through a place outside the
United States and to a place in the United States from and
through a place outside the United States, with the intent to
promote the carrying on of specified unlawful activity, that is,

21

offenses involving fraud in the sale of securities and wire
fraud; to wit, WEY transferred, and caused to be transferred,
via international wire payments initiated outside of the United
States, millions of dollars from the sale of shares of
SmartHeat, Deer, and CleanTech stock to accounts in the United
States, including into the operating accounts of NYGG, in order
to promote the carrying on of the securities and wire fraud
schemes alleged in Counts One through Four of this Indictment.
(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

## FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH FOUR

41. As the result of committing one or more of the
offenses alleged in Counts One through Four of this Indictment,
BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," and
SEREF DOGAN ERBEK, a/k/a "Dogan Erbek," the defendants, shall
forfeit to the United States pursuant to Title 18, United States
Code, Section 981(a)(1)(C) and Title 28, United States Code,
Section 2461, all property, real and personal, that constitutes
or is derived from proceeds traceable to the commission of the
above offenses, including, but not limited to, a sum of United
States currency, representing the amount of proceeds obtained as
a result of the charged offenses.

## FORFEITURE ALLEGATION AS TO COUNTS SEVEN AND EIGHT

42. As the result of committing the money laundering
offenses charged in Counts Seven and Eight of this Indictment,

22

BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1) any property, real and personal, involved in such offenses, and any property traceable to such property, including but not limited to a sum in United States currency that in aggregate is property which was involved in the money laundering offenses charged in Counts Seven and Eight of the Indictment or is traceable to such property.

<u>Substitute Assets Provision</u>

43.  If any of the above-described forfeitable property, as a result of any act or omission of BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," and SEREF DOGAN ERBEK, a/k/a "Dogan Erbek," the defendants,

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the court;

      d.    has been substantially diminished in value; or

      e.    has been comingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any

23

other property of WEY and ERBEK, up to the value of the

forfeitable property described above.

    (Title 15, United States Code, Sections 78j(b), 78ff;
Title 18, United States Code, Sections 981, 982 and 1956;
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461; and
Title 17, Code of Federal Regulations, Section 240.10b-5.)


_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

24

Form No. USA-33s-274 (Ed. 9-25-58)

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

BENJAMIN WEY,
a/k/a "Benjamin Wei,"
a/k/a "Tianbing Wei," and
SEREF DOGAN ERBEK,
a/k/a "Dogan Erbek,"

Defendants.

---

INDICTMENT

15 Cr.

(15 U.S.C. §§ 78m(d), 78j(b) & 78ff;
17 C.F.R. §§ 240.10b-5 & 240.13d-1;
18 U.S.C. §§ 2, 371, 1343,
1348 & 1956)

PREET BHARARA
United States Attorney

A TRUE BILL

_Yolanda Ocasio_
Foreperson

---

9/8/15 - Filed Sealed Indictment
cc  AW's issued
J Maas
USM2

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                              **Plaintiff,**

v.

BENJAMIN WEY,
NEW YORK GLOBAL GROUP,
TIANYI WEI,
MICHAELA WEY,
ROBERT NEWMAN,
WILLIAM UCHIMOTO, and
SEREF DOGAN ERBEK,

                             **Defendants,**

and

ADVANTAGE CONSULTANTS, LTD.,
YORK CAPITAL MANAGEMENT, LTD.,
FOUR TONG INVESTMENTS, LTD.,
STRONG GROWTH CAPITAL, LTD.,
MEDIAN ASSETS INVESTMENTS, LTD., and
HAN HUA, LTD.,

                         **Relief Defendants.**

</td><td>

Civil Action No. 15-7116 (PKC)
ECF CASE
(Jury Trial Demanded)

</td></tr>
</table>

## AMENDED COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission"), alleges for its Complaint as follows:

## SUMMARY OF ALLEGATIONS

1. This case arises out of Defendants' multi-million dollar, cross-border fraudulent scheme to obtain and profit from undisclosed, controlling ownership interests in several China-based companies that were clients of Defendant Benjamin Wey and his company, Defendant

New York Global Group ("NYGG").  Those companies include Deer Consumer Products, Inc., CleanTech Innovations, Inc., and SmartHeat, Inc. (collectively the "NYGG Clients").

2.      Benjamin Wey and NYGG recruited the NYGG Clients by offering to assist them in becoming United States issuers through mergers with publicly-traded, domestic shell companies.  Unbeknownst to the NYGG Clients and the investing public, however, from 2005 to at least July 2015 (the "Relevant Period"), Defendants were engaged in a fraudulent scheme that allowed Benjamin Wey, his sister, Defendant Tianyi Wei, and his wife, Defendant Michaela Wey, to secretly take and profit from control of the NYGG Clients using a network of foreign nominees.

3.      Benjamin Wey, with the involvement of the other Defendants, directed all aspects of the fraudulent scheme, the first step of which involved using nominees controlled by him, his sister, and/or his wife to obtain clandestine control of a shell company.  After secretly acquiring control of the shell company, Benjamin Wey—working closely with attorney Defendant Robert Newman—arranged for one of the NYGG Clients to reverse merge with the shell company Benjamin Wey and some of his family members directly or indirectly owned.  Neither Benjamin Wey nor Newman, who was ostensibly serving as counsel for the NYGG Clients, disclosed that Benjamin Wey, Tianyi Wei, and Michaela Wey ultimately owned and controlled those shell companies.  Following the mergers, Benjamin Wey, Tianyi Wei, and Michaela Wey directly or indirectly held beneficial ownership interests exceeding five percent in the NYGG Clients.  They divided the shares representing those interests among nominees they controlled and deposited the shares in numerous brokerage accounts around the world to evade the reporting requirements of the federal securities laws.

2

4.      Concealing his family's beneficial ownership of the shells and of the NYGG Clients also allowed Benjamin Wey, with the assistance of Newman and NYGG, to convince the management of the NYGG Clients to enter into "lock-up" agreements that prevented the officers and directors of the NYGG Clients from trading their shares, typically for over three years. Because the management of the NYGG Clients held most of the shares that were not owned and controlled by Benjamin Wey, Tianyi Wei, and Michaela Wey, the lock-up agreements had the effect of giving Benjamin Wey, Tianyi Wei, and Michaela Wey control over the vast majority of the NYGG Clients' publicly-traded shares.  This control allowed Benjamin Wey, with the assistance of his Swiss broker, Defendant Seref Dogan Erbek, and others to manipulate the market for those securities and profit from the scheme.

5.      Throughout the Relevant Period, Benjamin Wey and others working with him, including Newman and another attorney, Defendant William Uchimoto, misled underwriters, NASDAQ, and others by presenting a false version of their activities and involvement with NYGG Clients and nominees.

6.      Uchimoto, for example, facilitated the scheme and helped to maximize its profits by assisting Benjamin Wey in fraudulently obtaining or maintaining listings for the NYGG Clients on the NASDAQ.  At the time the NYGG Clients sought listings, the NASDAQ required applicants to have a minimum of 300 shareholders who each owned 100 shares or more, *i.e.*, "round-lot shareholders."  To meet this requirement, Benjamin Wey, with the assistance of Uchimoto and others, fraudulently inflated the shareholder base of the NYGG Clients by causing nominees that Benjamin Wey and his family members controlled to distribute shares of the NYGG Clients, at no cost, to dozens of their friends, family members, employees, and business associates, including Uchimoto and Newman, in round-lot increments of 100 to 300 shares.

3

Some shares were never delivered to the round-lot shareholders, and some were transferred back to nominees, again at no cost, once the NASDAQ listing was obtained. Other round-lot shareholders were never even aware that shares had been temporarily transferred into their names.

7. Similarly, Benjamin Wey, with the assistance of Erbek and others, used control over the NYGG Clients to manipulate their share price.

8. Then, with the assistance of Newman, who represented the NYGG Clients but was actually controlled by Benjamin Wey and NYGG, Benjamin Wey again made material misstatements and omissions to NASDAQ about the nature of his affiliation with certain nominees and NYGG Clients.

9. Newman also participated in the scheme by causing filings to be made with the Commission that he knew or was reckless in not knowing contained false statements and fraudulently misled an investment bank that underwrote offerings for some of the NYGG Clients.

10. Through this scheme, Benjamin Wey, Tianyi Wei, and Michaela Wey received millions of dollars in illicit profits. The proceeds of sales of the securities and other profits from the scheme were deposited in various nominee brokerage and bank accounts and transferred around the world to mask their sources. Millions of dollars of those funds were then returned to the United States via transfers from accounts that were at least nominally controlled by Tianyi Wei to accounts in the name of Benjamin Wey's wife, Michaela Wey. Benjamin and Michaela Wey used the proceeds to fund NYGG's operations and their lavish lifestyle.

11. Uchimoto and Newman received fees as a result of Benjamin Wey directing the NYGG Clients to retain them to provide legal services.

4

12.     By this conduct, Benjamin Wey, Tianyi Wei, Robert Newman, William Uchimoto, and NYGG violated, and Tianyi Wei, Michaela Wey, Robert Newman, William Uchimoto, and Seref Dogan Erbek aided and abetted others' violations of, the antifraud and disclosure provisions of the federal securities laws.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and 28 U.S.C. § 1331.

14.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within this judicial district.

15.     In connection with the transactions, acts, practices, and courses of business alleged in this Complaint, Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange.

## DEFENDANTS

16.     **Benjamin Wey** (also known as Benjamin Wei and Tianbing Wei), born in 1971, was, at all times relevant to this action, the founder and principal of NYGG.  Benjamin Wey exercised ultimate decision-making authority and control over NYGG.  He was an associated person of registered broker-dealers from 1999 to 2002.  During the Commission's investigation that led to this action, Benjamin Wey invoked his Fifth Amendment privilege against self-

incrimination, refusing to answer questions substantively during sworn testimony or produce documents responsive to the Commission's investigative subpoena. He resides in New York, New York.

17. **New York Global Group ("NYGG")** is a Delaware corporation headquartered in New York, New York, with a second office located in Beijing, China.

18. Benjamin Wey established NYGG to guide Chinese companies through the processes of raising capital in U.S. markets and going public, often through reverse mergers with publicly-traded shell companies. The services Benjamin Wey and NYGG provided to the NYGG Clients included handpicking accountants, auditors, directors, and attorneys for the companies; finding shell companies for and facilitating reverse mergers; and advising the NYGG Clients regarding financing transactions.

19. In addition to these advertised and disclosed services, Benjamin Wey and NYGG, with the involvement of Tianyi Wei, Michaela Wey, Newman, and Uchimoto, engaged in deceptive conduct to obtain and profit from undisclosed, controlling ownership interests in the NYGG Clients and increase the value of the NYGG Clients' securities, thereby increasing the value of the significant holdings of those securities by Benjamin Wey, Tianyi Wei, and Michaela Wey.

20. **Tianyi Wei** (also known as Sarah Wei), born in 1970, is Benjamin Wey's sister and an employee and manager of NYGG's office in Beijing, China. Tianyi Wei resides in China.

21. Tianyi Wei participated in the scheme by, among other things, acting as a nominee for holdings in the NYGG Clients and serving as an officer or shareholder of several of the off-shore nominees used to mask her beneficial ownership of the NYGG Clients, along with

that of Benjamin Wey. Accounts in the names of Tianyi Wei and nominees for which she was listed as a controlling person engaged in manipulative trading in shares of Deer and CleanTech. Tianyi Wei received profits from the illicit trading; and she transferred millions of dollars of those illegal profits to nominee accounts around the world in furtherance of the scheme and to the United States for the enrichment of Benjamin Wey and Michaela Wey.

22. **Michaela Wey**, born in 1975, is Benjamin Wey's wife and an attorney licensed to practice in New York. During the Commission's investigation that led to this action, Michaela Wey invoked her Fifth Amendment privilege against self-incrimination, refusing to answer questions substantively during sworn testimony or produce documents responsive to the Commission's investigative subpoena. She resides in New York, New York.

23. Michaela Wey held trading authority over Swiss brokerage accounts in the names of her family members and other nominees who held warrants or large positions in the shares of the NYGG Clients. The Swiss broker for these accounts, Erbek, was contacted by a cellular telephone registered to Michaela Wey. Michaela Wey also engaged in deceptive conduct to conceal the scheme, including knowingly failing to file required public filings that would have disclosed her greater-than-five-percent ownership of the NYGG Clients. In addition, she received the proceeds of the fraud into her personal account and claimed the proceeds—many millions of dollars—as untaxable gifts from a foreign person on her personal tax returns.

24. **Robert Newman**, born in 1953, is an attorney licensed to practice in New York. He resides in Irvington, New York.

25. Benjamin Wey directed the NYGG Clients to hire Newman as their corporate counsel. In that role, among other things, Newman knowingly or recklessly took actions that deceived others about Benjamin Wey's and Tianyi Wei's association with the nominees and the

NYGG Clients. Although Newman knew that Benjamin Wey was a corporate insider of the NYGG Clients, he made filings with the Commission and sent letters to NASDAQ that were materially false and misleading concerning Benjamin Wey's relationships with those clients and the nominees.

26. **William Uchimoto**, born in 1955, is an attorney licensed to practice in Pennsylvania, where he resides.

27. Uchimoto was retained by two NYGG Clients, SmartHeat and Deer, to assist them in obtaining listings on the NASDAQ. During the Relevant Period, among other things, Uchimoto engaged in deceptive conduct to create the appearance that SmartHeat had met NASDAQ's minimum shareholder requirements for listing.

28. **Seref Dogan Erbek,** born in 1962, was, at all relevant times, an employee of a firm based in Geneva, Switzerland that provided "financial and fiduciary services" for several nominees controlled by Benjamin Wey, Tianyi Wei, and Michaela Wey.

29. In furtherance of the fraudulent scheme, Erbek was instrumental in executing manipulative trades in Deer and CleanTech. Among other things, he also knowingly assisted Benjamin Wey, Tianyi Wei, and Michaela Wey in structuring their holdings in the NYGG Clients to evade securities reporting requirements and concealing their control of the NYGG Clients.

## THE NOMINEES

30. The network of corporate and individual nominees employed by Benjamin Wey, Tianyi Wei, and Michaela Wey is described in detail below and includes the following entities and individuals: Advantage Consultants, Ltd.; York Capital Management, Ltd.; Four Tong Investments, Ltd.; Strong Growth Capital, Ltd.; Median Assets Investments, Ltd.; Han Hua, Ltd.;

Guo Sheng, Ltd.; Futmon Holding, Ltd.; Bicornio Real Estate SA; Roosen Commercial Corporation; Wolf Enterprises, Ltd.; Harlesden Assets, Ltd.; Finchley International Investments, Ltd.; Michaela Wey's father; Michaela Wey's mother; Michaela Wey's sister; and Tianyi Wei's then-minor child (collectively the "Nominees").

**Relief Defendant Nominees**

31.     **Advantage Consultants, Ltd. ("ACL")** is a limited liability corporation incorporated in the British Virgin Islands. From at least August 2007 until at least November 2008, Tianyi Wei was the director, sole owner, and signatory for at least one bank account in the name of ACL and ACL's corporate actions. An electronic copy of an unsigned letter dated in 2009 from Tianyi Wei to Erbek, recovered during the execution of judicially-authorized search warrants at the offices of NYGG and Benjamin Wey's and Michaela Wey's residence (the "Search Warrants"), granted Benjamin Wey trading authority over at least one account in the name of ACL administered by Erbek. Records of ACL's account holdings, including a spreadsheet that tracked ACL's and other Nominees' holdings of the NYGG Clients, were also recovered during the execution of the Search Warrants. ACL received over $4 million as a result of the fraudulent conduct alleged herein.

32.     **York Capital Management, Ltd. ("York Capital")** is a limited liability corporation incorporated in the British Virgin Islands. According to incorporation documents, Tianyi Wei was its sole owner and signatory during the Relevant Period. Benjamin Wey exercised trading authority over York Capital's domestic brokerage account during the Relevant Period. An electronic version of an unsigned letter dated in 2009 from Tianyi Wei to Erbek, recovered during the execution of the Search Warrants, granted Benjamin Wey trading authority over at least one account in the name of York Capital administered by Erbek. A spreadsheet that

tracked York Capital's and other Nominees' holdings of the NYGG Clients was also recovered during the execution of the Search Warrants. York Capital received over $15 million as a result of the fraudulent conduct alleged herein.

33.    **Four Tong Investments, Ltd. ("Four Tong")** is a limited liability corporation incorporated in the Turks and Caicos Islands.  According to incorporation and bank account opening documents, Tianyi Wei was the sole owner, director, and signatory for Four Tong during the Relevant Period.  Four Tong received over $4 million as a result of the fraudulent conduct alleged herein.

34.    **Strong Growth Capital, Ltd. ("Strong Growth")** is a limited liability corporation incorporated in the British Virgin Islands.  According to incorporation documents, an entity owned by Tianyi Wei was the owner of Strong Growth during the Relevant Period.  An electronic copy of an unsigned letter dated in 2009 from Tianyi Wei to Erbek, recovered during the execution of the Search Warrants, granted Benjamin Wey trading authority over at least one account in the name of Strong Growth administered by Erbek.  A spreadsheet that tracked Strong Growth's and other Nominees' holdings of the NYGG Clients was also recovered during the execution of the Search Warrants.  Strong Growth received over $30 million as a result of the fraudulent conduct alleged herein.

35.    **Median Assets Investments, Ltd. ("Median")** is a limited liability corporation incorporated in the British Virgin Islands.  According to incorporation documents, Tianyi Wei's domestic partner, who was a high-level employee of the Beijing office of NYGG, was Median's sole owner; and Tianyi Wei possessed signature authority for its bank account.  Median received nearly $2 million as a result of the fraudulent conduct alleged herein.

36.     **Han Hua, Ltd. ("Han Hua")** is a limited liability corporation incorporated in the British Virgin Islands.  According to transfer agent records and account opening documents, Tianyi Wei was the beneficial owner and signatory for the entity's corporate actions and at least one account in its name.  Han Hua received equities worth over $5 million as a result of the fraudulent conduct alleged herein.

**Other Nominee Entities**

37.     **Guo Sheng, Ltd. ("Guo Sheng")** is a limited liability corporation incorporated in the Bahamas.  According to brokerage account records, transfer agent records and corporate resolutions, Tianyi Wei was Guo Sheng's owner and sole signing officer.

38.     **Futmon Holding, Ltd. ("Futmon")** is a limited liability corporation incorporated in the British Virgin Islands.  During the Relevant Period, Futmon maintained at least one brokerage account that was controlled by Benjamin Wey and administered on his behalf by Erbek.  An unsigned letter dated in 2009 from Tianyi Wei to Erbek, recovered during the execution of the Search Warrants, granted Benjamin Wey trading authority over at least one account in the name of Futmon administered by Erbek.  A spreadsheet that tracked Futmon's and other Nominees' holdings of the NYGG Clients was also recovered during the execution of the Search Warrants.

39.     **Bicornio Real Estate S.A. ("Bicornio")** is incorporated in the British Virgin Islands.  A letter to Erbek dated October 14, 2008, recovered during the execution of the Search Warrants, granted Michaela Wey authority over at least one account in the name of Bicornio administered by Erbek.  A spreadsheet that tracked Bicornio's and other Nominees' holdings of the NYGG Clients was also recovered during the execution of the Search Warrants.

40.    **Roosen Commercial Corp. ("Roosen")** is incorporated in the British Virgin Islands.  A letter to Erbek dated October 14, 2008, recovered during the execution of the Search Warrants granted Michaela Wey authority over at least one account in the name of Roosen administered by Erbek.  A spreadsheet that tracked Roosen's and other Nominees' holdings of the NYGG Clients was also recovered during the execution of the Search Warrants.

41.    **Wolf Enterprises, Ltd.  ("Wolf")** is a limited liability company incorporated in the British Virgin Islands.  During the Relevant Period, Wolf maintained at least one brokerage account that was controlled by Benjamin Wey and administered on his behalf by Erbek.  A spreadsheet that tracked Wolf's and other Nominees' holdings of the NYGG Clients was recovered during the execution of the Search Warrants.

42.    **Harlesden Assets, Ltd. ("Harlesden")** is a limited liability company incorporated in the United Kingdom.  A corporate resolution dated December 2005 listed Tianyi Wei as the chairman and CEO of Harlesden.

43.    **Finchley International Investments, Ltd. ("Finchley")** is a limited liability corporation incorporated in the British Virgin Islands.  A corporate resolution dated September 2006 listed Tianyi Wei as the chairman of Finchley.

## THE NYGG CLIENTS

44.    **SmartHeat, Inc. ("SmartHeat")**, a China-based manufacturer of heating panel technology, became a publicly-traded, U.S. issuer through an NYGG-facilitated reverse merger with a shell company, Pacific Goldrim Resources, Inc., on April 14, 2008.  The shares of Pacific Goldrim Resources, Inc. became registered pursuant to Section 12 of the Exchange Act on January 30, 2008.  At various times, SmartHeat traded on the NASDAQ under the ticker symbol, "HEAT."

45.     **Deer Consumer Products, Inc. ("Deer")**, a China-based manufacturer of kitchen appliances, became a publicly-traded, U.S. issuer through an NYGG-facilitated reverse merger with a shell company, Tag Events Corporation, on September 3, 2008. The shares of Tag Events Corporation became registered pursuant to Section 12 of the Exchange Act on April 29, 2009. At various times, Deer traded on the NASDAQ under the ticker symbol, "DEER."

46.     **CleanTech Innovations, Inc. ("CleanTech")**, a China-based manufacturer of windmills, became a publicly-traded, U.S. issuer through an NYGG-facilitated reverse merger with a shell company, Everton Capital Corporation, on July 2, 2010. The shares of Everton Capital Corporation became registered pursuant to Section 12 of the Exchange Act on December 2, 2008. At various times, CleanTech traded on the NASDAQ under the ticker symbol, "CTEK." NASDAQ delisted CleanTech in December 2010—soon after it was originally listed—for its failure to disclose a financing deal that occurred just before its listing, and in which Benjamin Wey played a significant role. The Commission set aside the decision to delist on July 22, 2013, based on NASDAQ's failure to provide evidence that it had specifically requested all documentation about Benjamin Wey-related financing transactions. In late 2014, CleanTech merged with a small American technology company and became 6D Global Technologies Inc., which is currently traded on the NASDAQ under the ticker symbol, "SIXD."

### DEFENDANTS' DECEPTIVE CONDUCT
### TO CONCEAL AND PROFIT FROM CONTROL OF THE NYGG CLIENTS

47.     To execute their fraudulent scheme, Defendants used several forms of deceptive conduct and devices, including setting up and exercising control over a network of foreign Nominees; using Nominees to gain undisclosed control of shell companies and the NYGG Clients that engaged in reverse merger transactions with the shells; making materially misleading statements and omissions in connection with financing transactions and applications for

NASDAQ listings; engaging in stock giveaways to create the illusion of a shareholder base for certain of the NYGG Clients; manipulating the market for the securities of certain of the NYGG Clients; and structuring the securities holdings of the Nominees and intentionally failing to file required Commission filings to avoid disclosure of beneficial ownership.

**Creating and Controlling a Network of Nominees**

48.     Benjamin Wey, Tianyi Wei, and Michaela Wey utilized a network of foreign Nominees to secretly obtain control over the NYGG Clients.  In addition to using the Nominees that were corporate entities, Benjamin Wey caused the NYGG Clients to issue shares in the names of NYGG employees and his, Tianyi Wei's, and Michaela Wey's relatives.  Those shares were then deposited into accounts controlled by Benjamin Wey, Tianyi Wei, and Michaela Wey.

49.     Although Tianyi Wei and others ostensibly controlled the securities holdings and bank and brokerage accounts of the Nominees, Benjamin Wey and Michaela Wey, directly or through the actions of others:  (1) exercised investment authority over the shares issued to the Nominees; (2) closely tracked the Nominees' stock holdings; (3) directed others in matters pertaining to the Nominees; and (4) personally enriched themselves with fees paid to the Nominees and proceeds from the sale of shares held in accounts in the names of Tianyi Wei and the Nominees.

50.     On or about July 3, 2007, Benjamin Wey, with the assistance of Tianyi Wei, opened an account at a brokerage firm located in the United States ("Broker 1") in Tianyi Wei's name.  The account held shares of the NYGG Clients.  During 2007 through 2009, most of the online trading in the Broker 1 account did not originate from China, where Tianyi Wei lived and worked.  Instead, the trading came from an IP address at NYGG's office in New York, where Benjamin Wey worked and was principal.

14

51.     In or about March 2008, Benjamin Wey, with the assistance of Tianyi Wei, opened another account at another brokerage firm located in the United States ("Broker 2") in the name of Tianyi Wei. From in or about April 2008 through in or about July 2010, Benjamin Wey called Broker 2 by telephone to place all trade orders for shares of the NYGG Clients in the account. In or about October 2008, Tianyi Wei signed a written grant of authority allowing Benjamin Wey to trade in the account. All conversations with Broker 2 about the disposition of shares or funds in the account were with Benjamin Wey, not Tianyi Wei.

52.     In July 2010, Benjamin Wey transferred the entire contents of the Broker 2 account to a new account he opened at a brokerage firm located in the United States ("Broker 3") in the name of Tianyi Wei. During 2010, Benjamin Wey traded heavily in the shares of Deer in the Broker 3 account. Again, all conversations with Broker 3 about the disposition of shares or funds in the account were with Benjamin Wey, not Tianyi Wei.

53.     From 2007 through 2009, Benjamin Wey opened, and traded in, additional accounts at a brokerage firm located in New Jersey ("Broker 4"). He opened these accounts in the names of Michaela Wey's sister and two other Nominees, Strong Growth and York Capital. As with the brokerage accounts opened in his sister Tianyi Wei's name, Benjamin Wey directed the trading in the accounts through telephone calls to Broker 4's trading desk.

54.     Beginning in at least 2009, Benjamin Wey, Tianyi Wei, and Michaela Wey hired and paid Erbek to open and maintain brokerage accounts in Switzerland in the names of various Nominees (the "Swiss Accounts"). The Swiss Accounts held shares of the NYGG Clients.

55.     During execution of the Search Warrants, spreadsheets entitled "Portfolio" were found. These spreadsheets tracked holdings in Swiss brokerage accounts of shares of the NYGG Clients, including accounts in the names of ACL, York Capital, Strong Growth, Futmon,

Bicornio, Roosen, Wolf, Michaela Wey's sister and father, and Tianyi Wei. The spreadsheets reflected holdings worth approximately $118 million.

56. On numerous occasions during at least 2010 and 2011, emails containing instructions for trading in NYGG Clients' stocks and the allocation of assets among brokerage accounts held by some of the Nominees, including ACL, Strong Growth, Futmon, and Roosen, were sent by Benjamin Wey or someone else at his direction and recovered during execution of the Search Warrants. In addition, during this same period, numerous telephone calls were placed to Erbek's firm from cell phones registered in the names of Benjamin Wey and Michaela Wey.

57. Account numbers, wire transfer instructions, data regarding stock holdings, and additional information regarding foreign bank accounts in the names of Tianyi Wei and various Nominees, including ACL, York Capital, Strong Growth, and Four Tong, were also recovered during execution of the Search Warrants.

58. From 2008 through 2012—either directly or through Newman or an NYGG employee—Benjamin Wey repeatedly directed the NYGG Clients' transfer agent to transfer shares to and from various Nominees. On various occasions, Benjamin Wey also instructed the transfer agent, either directly or through Newman, to send share certificates in the names of some of the Nominees to Benjamin Wey for him to distribute among the Nominees rather than sending them to the Nominees' addresses of record. Benjamin Wey also gave shares of Deer and SmartHeat held by Tianyi Wei, her then-minor child, and Wolf to friends and business associates as gifts or bonuses. As described in detail in paragraphs 82 through 90 below, Wey's gifting of shares inflated the shareholder counts of Deer and SmartHeat; shareholder counts that he, with the help of others as discussed herein, fraudulently used to facilitate applications by Deer and SmartHeat for listings on the NASDAQ.

59.     Benjamin Wey also profited from the Nominees' holdings by causing the NYGG Clients to pay approximately $11 million in fees to some of the Nominees, including ACL, Four Tong, Strong Growth, and Median, without disclosing his relationship to these entities.  These fees were purportedly for services related to private placements and secondary offerings, though it does not appear that they actually provided any meaningful services.  Moreover, as explained below in paragraphs 111 through 114, Benjamin Wey, Tianyi Wei, and Michaela Wey received even larger profits from sales of shares of the NYGG Clients by the Nominees' brokerage accounts.

**Using Nominees to Obtain Secret Control of the NYGG Clients**

60.     As discussed above, the NYGG Clients were Chinese companies that engaged NYGG to help them obtain access to the U.S. equity markets.  Benjamin Wey, NYGG employees, and Newman helped them accomplish this by arranging reverse mergers between NYGG's clients and U.S. shell companies.  As part of the fraudulent scheme, Benjamin Wey, acting in concert with Tianyi Wei and Newman, obtained secret control of the shell companies and later the publicly-traded shares of each company that emerged from the reverse merger. Wey did this by:  (1) locating publicly-traded shell companies; (2) clandestinely purchasing the shell companies by arranging ownership in the names of certain individuals affiliated with Benjamin Wey, NYGG, and Tianyi Wei; and (3) arranging transfers of shares from the shell companies' original shareholders to Nominees controlled by Benjamin Wey, Tianyi Wei, and Michaela Wey.  After Benjamin Wey, Tianyi Wei, and Michaela Wey obtained significant interests in the shell companies, Benjamin Wey, employees at NYGG working at his direction, and Newman facilitated reverse mergers between the shell companies and the NYGG Clients.

61.     As a result of the reverse mergers, the management of the Chinese operating companies that had retained NYGG and reverse merged with an NYGG-provided shell company received a majority of the shares of the newly-formed NYGG Clients.

62.     However, by virtue of their ownership interests in the shell companies, the Nominees also received large amounts of the publicly-traded shares of the newly-formed public companies as a result of the mergers. Through their control of the Nominees, Benjamin Wey, Tianyi Wei, and Michaela Wey retained undisclosed control of more than ten percent of the shares of the NYGG Clients that emerged from the reverse mergers.

63.     To cement control over trading in the market for the NYGG Clients' shares, Benjamin Wey, with the assistance of Newman (who purportedly represented the NYGG Clients) and others, convinced the management of the NYGG Clients to enter into three-year lock-up agreements that prevented the companies' officers and directors from selling their shares. Benjamin Wey represented to the NYGG Clients' management that the lock-ups were necessary to instill confidence in the investing public. Once the companies' management signed the lock-up agreements, Benjamin Wey, Tianyi Wei, and Michaela Wey, through the Nominees they controlled, held the vast majority of the NYGG Clients' freely-trading shares. This domination of the shares of the NYGG Clients available for trading allowed Benjamin Wey, Tianyi Wei, and Michaela Wey, with the assistance of Erbek and Newman, to manipulate the market for those issuers.

64.     The events surrounding the reverse merger that resulted in the creation of CleanTech is an example of this aspect of the fraudulent scheme. The Chinese operating company that became CleanTech retained NYGG to assist it in the process of going public in the United States.

65. At Benjamin Wey's direction, Newman, who was hired to represent the Chinese operating company, located a publicly-traded shell company, Everton Capital Corporation ("Everton") for the purpose of a reverse merger. Newman negotiated the purchase price of Everton with its owners. Benjamin Wey then approved the purchase price. Funds for the purchase were then wired into Newman's attorney trust account from a bank account maintained in the name of Four Tong. In or about April 2009, Newman completed the purchase of Everton by transferring funds from his trust account to accounts for the benefit of Everton's shareholders.

66. Concurrently, Newman instructed the shell company's transfer agent to transfer 5,000,000 shares of Everton from its original President to a person purported to be Everton's new CEO, President, CFO, Treasurer, and Secretary. According to a Form 8-K Everton filed with the Commission in July 2010, the purported CEO was a 29-year-old "independent business consultant" from China who had purchased 90.89 percent of Everton's outstanding common stock. Nominees controlled by Benjamin Wey, Tianyi Wei, and Michaela Wey held most of the remaining 9.11 percent of the shares. Although he represented Everton, Newman never met the purported CEO and received his biographical information for Commission filings from Benjamin Wey. All communications between Newman and the purported CEO were either conducted through Benjamin Wey or via an email address Benjamin Wey provided to Newman.

67. In connection with the reverse merger, the purported CEO later signed an agreement to have the Everton shares in his name cancelled in exchange for a just a fraction of a penny per share, well below their actual value. The remaining shareholders in the shell company—almost exclusively Nominees—retained their shares of Everton and, as a result, they became beneficial owners of more than ten percent of the shares of CleanTech following the merger.

68. During the CleanTech reverse merger, Newman provided legal representation for both the shell company, Everton, and the Chinese operating company without receiving a waiver of conflicts from either party. Newman's dual representation also was not disclosed in the July 2, 2010 Form 8-K filed with the Commission or in the merger agreement that was filed as an exhibit to the Form 8-K.

**Material Misstatements and Omissions to Conceal Control of the Nominees and, thereby, the NYGG Clients**

69. In furtherance of the scheme, Benjamin Wey and Newman attempted to conceal Benjamin Wey's relationship with the various Nominees and the NYGG Clients through material misrepresentations and omissions of material facts necessary to make the statements not misleading.

70. One example of this involved another NYGG client, AgFeed Inc. ("AgFeed") that had become a publicly-traded, U.S. issuer through an NYGG-facilitated reverse merger between two Chinese animal husbandry companies and a shell company on October 31, 2006. Benjamin Wey informed an attorney for AgFeed ("AgFeed Attorney") that Four Tong was to receive $300,000 as a "finder's fee" for a transaction. The AgFeed Attorney advised that if Benjamin Wey—as a consultant to the company and an insider—received fees, then those fees had to be publicly disclosed in Commission filings. Benjamin Wey falsely denied to the AgFeed Attorney that he was affiliated with Four Tong in any way. At the insistence of the AgFeed Attorney, Benjamin Wey also signed a certification wherein he falsely represented that he had no affiliation with Four Tong.

71. Shortly after he was asked to sign the certification, Benjamin Wey attempted to terminate the AgFeed Attorney's representation. The AgFeed Attorney protested that only AgFeed's management had the authority to fire him. Soon thereafter, the AgFeed Attorney

received an email from AgFeed management firing him. Uchimoto was then hired by AgFeed to replace the AgFeed Attorney.

72.     Benjamin Wey similarly failed to disclose his conflicts of interest in April 2009, when he persuaded SmartHeat to hire ACL to provide strategic business consulting services for SmartHeat. SmartHeat agreed to pay ACL $3.9 million in connection with the November 2009 public offering of SmartHeat's stock in the United States.

73.     The primary underwriter for the SmartHeat offering asked what, if any, affiliation Benjamin Wey had to ACL, in an effort to determine how to properly disclose the fee to ACL in SmartHeat's offering materials. In addition, the primary underwriter asked ACL to execute a certification representing, among other things, that ACL was comprised solely of non-U.S. persons (the "Certification") because of restrictions on foreign broker dealers soliciting U.S. investors. The primary underwriter also pressed both Benjamin Wey and Newman for information about the identities of ACL's owners.

74.     Benjamin Wey falsely told the primary underwriter that neither he nor NYGG had any affiliation with ACL. Benjamin Wey did not disclose that Tianyi Wei, who was his sister and an NYGG manager in Beijing, had served as the sole director and owner of ACL.

75.     Newman, who also knew that Benjamin Wey was affiliated with ACL, also misled the primary underwriter by directing its employee to contact a person in China who Benjamin Wey claimed was ACL's CFO. The purported CFO of ACL falsely denied that ACL had any contacts in the United States, but later failed to respond to the primary underwriter's request that he execute the Certification affirming this representation.

76.     Eventually Benjamin Wey directed the primary underwriter to Erbek as a contact person for ACL. Erbek then directed the primary underwriter to a Bahamian consulting

21

company that Erbek identified as ACL's sole director. At the primary underwriter's request, Erbek procured signatures from the Bahamian consulting company on the Certification.

77.     Benjamin Wey and Newman continued to knowingly misrepresent and conceal Benjamin Wey's affiliation with ACL in connection with a December 2009 capital financing for Deer. In connection with that financing, Deer paid ACL fees of $3,795,765. For this transaction, Deer used the same primary underwriter that SmartHeat had used for its November 2009 public financing, discussed above. The primary underwriter conducted similar due diligence relating to ACL's role in the Deer offering as it did in connection with the SmartHeat offering. As part of that due diligence, the primary underwriter had ACL execute a certification that repeated the representations made in the SmartHeat offering Certification, including that ACL was comprised solely of non-U.S. persons.

78.     Benjamin Wey's misrepresentations, aided by Newman, caused the offering documents for the Deer and SmartHeat public offerings to be materially misleading by failing to disclose Benjamin Wey's affiliation with ACL. Had the primary underwriter known that it had been misled regarding Benjamin Wey's affiliation with ACL, it would not have agreed to underwrite the deals.

79.     Newman continued to assist Benjamin Wey in concealing Benjamin Wey's true role in the fraudulent scheme. For instance, in 2011, Newman misled NASDAQ about Benjamin Wey's relationship with Deer and SmartHeat. Early that year, NASDAQ sent letters to Newman, as counsel for Deer and SmartHeat, asking the companies to disclose "any and all relationships, past or present, between the Compan[ies]" and Benjamin Wey, Tianyi Wei, NYGG, Strong Growth, and others. After discussing with Benjamin Wey how to respond, Newman signed and sent letters to NASDAQ that failed to disclose that Benjamin Wey

controlled substantial holdings of Deer and SmartHeat through the Nominees, including Strong Growth. Instead, Newman described a limited relationship that included introducing underwriters to Deer and SmartHeat and being acquainted with officers or directors of Deer and SmartHeat.

80. At the time he wrote the letters to NASDAQ, Newman knowingly or recklessly misled NASDAQ about Benjamin Wey's ownership interest in Deer and SmartHeat. Beyond the limited relationship Newman described to NASDAQ, Newman also knew that Benjamin Wey and NYGG had significantly more involvement with Deer and SmartHeat, including conducting financial modeling, choosing their lawyers and accountants, reviewing drafts of their Commission filings, identifying and recommending individuals to serve as their directors, advising as to pending litigation, and discussing non-public information with a company officer.

81. Benjamin Wey also personally misled NASDAQ, knowing that his statements were misleading. In late 2010, NASDAQ delisted CleanTech based in part on CleanTech's failure to disclose Benjamin Wey's involvement in a December 2010 financing in which Strong Growth, Han Hua, and Roosen received shares of CleanTech. During CleanTech's appeal of NASDAQ's delisting determination, Benjamin Wey submitted a letter to NASDAQ, dated June 30, 2011, in which he made false and misleading statements in order to conceal his financial stake in CleanTech's December 2010 offering. For example, Benjamin Wey wrote, "[n]either I nor NY Global has any beneficial ownership of the securities issued in the financing." This was a false statement because of Benjamin Wey's, Tianyi Wei's, and Michaela Wey's ownership and control of Strong Growth, Han Hua, and Roosen. Benjamin Wey also falsely claimed in the letter that NYGG's Beijing and New York offices were "separately owned and operated." He also stated that the Beijing office was run by an NYGG employee, who Benjamin Wey failed to

disclose was Tianyi Wei's domestic partner. In fact, Benjamin Wey ran both offices, and Tianyi

Wei's domestic partner was an NYGG employee who reported to Benjamin Wey. Benjamin

Wey also described Han Hua as an "Asian investment fund" when, in fact, it was a Nominee that

Tianyi Wei owned.

**Misrepresentations and Other Deceptive Conduct to Obtain NASDAQ Listings for Deer and SmartHeat**

82.     After the reverse mergers, securities of the NYGG Clients traded in the over-the-

counter markets and in very low volumes. Accordingly, they could not be sold in significant

quantities until a more liquid market developed. If a company is able to obtain a listing on the

NASDAQ, its investor interest and liquidity generally increase significantly. Thus, to maximize

profits from the scheme, Benjamin Wey, with the assistance of Uchimoto, fraudulently obtained

listings for Deer and SmartHeat on the NASDAQ.

83.     In 2008 and 2009, when SmartHeat and Deer, respectively, sought to be listed on

the NASDAQ, that exchange's Rule 4310(c)(6) required an applicant to have at least 300

"round-lot shareholders," defined as shareholders owning at least 100 shares of common stock.

At the time of their applications, neither SmartHeat nor Deer had a sufficient number of round-

lot shareholders to qualify for a listing on the NASDAQ. Benjamin Wey, with the assistance of

Tianyi Wei and Uchimoto, therefore artificially inflated the number of shareholders for Deer and

SmartHeat by gifting shares in round-lot increments to dozens of Benjamin Wey's friends,

family members, business associates, and others (the "Gifted Shareholders").

84.     In furtherance of the scheme, Benjamin Wey directed the transfer agent for Deer

and SmartHeat to transfer shares held by Tianyi Wei, her then-minor child, and Nominee Wolf to

the Gifted Shareholders in increments of 100 to 300 shares. Through this deceptive conduct,

Benjamin Wey was able to create the illusion that Deer and SmartHeat possessed the requisite shareholder base for listing on the NASDAQ.

85.     For many of the Gifted Shareholders, the shares arrived unexpectedly and with an accompanying letter or card from Benjamin Wey stating that the shares were a gift or bonus.  In other instances, Benjamin Wey told the Gifted Shareholders about the shares in person.  In some instances, the Gifted Shareholders never received the shares and did not know they owned shares of Deer or SmartHeat.   One example involved an acquaintance of Benjamin Wey and the acquaintance's wife.  According to stock certificates and powers of attorney purportedly signed by them, Benjamin Wey's acquaintance and his wife each held 100 shares of Deer, which they subsequently transferred to Tianyi Wei.  However, neither the acquaintance nor his wife knew that they ever owned shares of Deer, and they believed that the signatures on the stock certificates and powers of attorney were forged.

86.     Uchimoto's attorney billing invoices from 2008 and 2009 reflect his extensive communications with Benjamin Wey regarding the shareholder count for SmartHeat's application to become listed on the NASDAQ.  In addition, Uchimoto and his wife were among the recipients of round-lot shares from Benjamin Wey.  Newman also received Deer shares as a round-lot shareholder.

87.     In connection with their NASDAQ listing applications, SmartHeat and Deer reported to NASDAQ that they had more than 300 round-lot shareholders in September 2008 and June 2009, respectively.   NASDAQ staff, however, evaluated the applications to determine whether the companies had sufficient investor bases and trading interest to provide the liquidity necessary to promote fair and orderly markets.  NASDAQ generally does not count gifted shares toward the minimum shareholder requirement because they do not establish necessary trading

interest. Accordingly, to ascertain the trading interest of numerous shareholders with "round-lots" – many with exactly 100 shares – NASDAQ asked Uchimoto, as SmartHeat's and Deer's listing counsel, about the circumstances by which those shareholders received shares.

88. In responding to NASDAQ's questions, Uchimoto made misleading statements including that, "my spouse and I, among others, own 100 shares each, which were gifted to us by a social friend in China who is a shareholder and is not an affiliate of the Company." Uchimoto subsequently told NASDAQ that Tianyi Wei was the one "who gifted the shares." Uchimoto, however, later admitted that he had briefly met Tianyi Wei one time in an airport, thus making his statement to NASDAQ that the shares came from Tianyi Wei on the basis of a social relationship misleading. Uchimoto later claimed that the social friend he referred to in his initial statement to NASDAQ was Benjamin Wey; but in that case, his statement to NASDAQ was still false, as Benjamin Wey was at all relevant times "an affiliate of the Company."

89. NASDAQ informed Uchimoto that it did not count gifted shares toward its minimum shareholder requirement. Uchimoto then proposed to Benjamin Wey a plan to have the previously-gifted shares deposited into brokerage accounts (a process which is sometimes referred to as "putting shares in street name"). The result of putting the round-lot shares in street name was that those shares were then aggregated, and it was no longer evident in the records NASDAQ used to verify whether its minimum shareholder requirements were met that many of the shareholders held only 100 share lots. This had the effect of disguising the holdings of individual Gifted Shareholders.

90. Uchimoto then informed NASDAQ that his clients had satisfied the round-lot shareholder requirement without counting the Gifted Shareholders, when, in fact, the Gifted Shareholders were still included in the shareholder count to meet NASDAQ's requirement. The

26

ruse worked, and NASDAQ approved the listings of SmartHeat and Deer on January 29, 2009, and July 16, 2009, respectively.

**Manipulating the Market for Deer and CleanTech Securities**

91.  As part of the fraudulent scheme to illegally profit from his control of the NYGG Clients, Benjamin Wey, with the assistance of Erbek, Newman, Tianyi Wei, and Michaela Wey, manipulated the market for the securities of Deer and CleanTech.

92.  In the summer of 2010, Benjamin Wey, with the assistance of Newman, Tianyi Wei, and Michaela Wey, manipulated the price of Deer stock in connection with a stock repurchase program. This manipulation allowed Benjamin Wey and Tianyi Wei to profit by liquidating significant positions in Deer held by Tianyi Wei and a Nominee that she and Benjamin Wey controlled while the stock repurchase plan orchestrated by Benjamin Wey supported the share price.

93.  Deer initiated the repurchase program upon Benjamin Wey's recommendation and his assurance that the company would not have to spend any money to fund it. Funding for the stock repurchase program ostensibly came from the exercise of warrants held by various Nominees that entitled them to purchase Deer stock. These Nominees included ACL, Strong Growth, Bicornio, Roosen, Futmon, and Wolf. Benjamin Wey, however, used the Nominees interchangeably, and in fact, the funds to purchase the Deer shares pursuant to those Nominees' exercise of warrants were provided only by Strong Growth and Tianyi Wei.

94.  To effectuate the stock repurchase program, Benjamin Wey instructed Newman to open a brokerage account in Deer's name to enable Benjamin Wey and Newman to execute the market repurchases. Newman opened the account and held trading authority over it.

95.     The funds provided by Strong Growth and Tianyi Wei were transferred to Newman's trust account, and Newman then transferred those proceeds to the brokerage account he controlled to use for repurchase of Deer's stock.    Newman knew that Tianyi Wei was Benjamin Wey's sister and an employee of NYGG and that Benjamin Wey and NYGG "advised" Deer, but Newman did not question why Tianyi Wei was involved in funding Deer's stock repurchase program.

96.     Pursuant to Deer's stock repurchase program, in June 2010, Deer's brokerage account expended $6,951,478 for nineteen repurchases of Deer stock.  This exact amount was transferred from the Strong Growth and Tianyi Wei accounts through the Newman trust account and into the brokerage account Newman established at Benjamin Wey's direction to fund the stock repurchase.

97.     During this period, as Deer was repurchasing its own shares in the market, foreign brokerage accounts in the names of Strong Growth and Tianyi Wei sold at least 640,000 shares of Deer for over $5.5 million in proceeds.  The average daily closing price for Deer was $8.75 in June 2010, the month during which the company was repurchasing its shares.  In contrast, the daily average for May 2010 was $8.33, and the daily average for July 2010 was $7.93.  The result of the stock repurchase scheme was that while Tianyi Wei and Strong Growth, a Nominee controlled by Benjamin Wey and Tianyi Wei, were selling hundreds of thousands of shares of Deer stock, the stock repurchase plan recommended by Benjamin Wey and funded by Tianyi Wei and Strong Growth using warrants owned by Nominees helped to maintain Deer's share price.

98.     Benjamin Wey arranged for the shares purchased pursuant to the warrant exercise to be divided and distributed among Nominees in amounts that did not match the number of

28

warrants that each Nominee possessed or exercised. On or about July 28, 2010, pursuant to Benjamin Wey's instructions, Newman requested issuance of 1,000,000 shares to Strong Growth; 400,000 to ACL; and 351,610 to Guo Sheng. Both Strong Growth and ACL received more shares than they were entitled to receive based on their possession and exercise of warrants, and Guo Sheng received shares even though it held no warrants at all. Those shares were actually from the exercise of warrants owned by Bicornio and Roosen, two Nominees for which Michaela Wey exercised investment authority. The interchangeability of these Nominees — which were supposedly independent and distinct investors — for purposes of exercising warrants and issuing shares, demonstrates that Benjamin Wey and his associates controlled all of them and treated them as parts of a whole.

99.     Another example of market manipulation was aimed at achieving and maintaining a share price above $5.00 for NYGG Client, CleanTech. In July 2010, the first trades in CleanTech securities involved a match trade of 1,000 shares purchased by a Broker 2 account in the name of Tianyi Wei from a foreign brokerage account maintained in the name of Guo Sheng, a Nominee for which Tianyi Wei was listed as the owner and signatory. The purchase price of $5.10 was 70 percent higher than CleanTech's recent $3.00 offering price; however, nothing had occurred between the offering and this first sale on the secondary market to justify the price increase. Soon thereafter, Benjamin Wey touted the 70-percent increase in an email to potential investors.

100.    Similarly, a February 2011 email recovered during execution of the Search Warrants and sent from Benjamin Wey or someone else at his direction to Erbek revealed an intention to maintain the share price of CleanTech at $5.00. It read, "Dogan, Cleantech just traded at $4.50 per share. Please make sure the trader buys the stock at $5 per share, stay at $5

per share bid price, not less. Please make sure this happens right away." Trading records for the Swiss accounts managed by Erbek show purchases on February 7, 2011, of CleanTech shares in 100 to 198 share tranches at $4.86 and $4.93. These purchases were part of Benjamin Wey's effort to drive the stock's price upward.

101. Another example of market manipulation of the NYGG Issuers involving Benjamin Wey occurred from on or about October 14, 2010, through on or about November 10, 2010, when the Swiss Accounts held in the names of some of the Nominees acted in concert to maintain the price for Deer above $11.00 per share. Maintaining Deer's share price above $11.00 was significant because, on December 10, 2009, Deer conducted a public offering of 6,000,000 shares at a stock price of $11.00 per share. In an October 14, 2010 email to the primary underwriter for the offering, Benjamin Wey touted the quality of the companies he advised, including Deer, which he noted was "trading at $11.40 last trade, above the offering price of $11 in December 2009." At the time, Benjamin Wey and NYGG were trying to secure an underwriter for a financing for CleanTech.

102. During that time, those Nominee accounts sold at least 1,167,590 shares of Deer for a profit at prices between $11.40 and $12.00. On eight occasions, however, when the price of Deer dropped to $11.00, the account temporarily reversed course and purchased large amounts of Deer shares. These purchases constituted a significant amount of the day's volume of trading in the stock. These trades appear to have been aimed at and had the effect of supporting the share price of Deer at $11.00.

**Using Nominees to Avoid Required Public Disclosure of Control of the NYGG Clients**

103. Beneficial owners of greater than five percent of a securities issuer's outstanding shares are legally required to report their total securities holdings for that issuer on Schedules

13D or 13G filed with the SEC. Beneficial owners of greater than ten percent of an issuer's outstanding shares are required to report all trading of that issuer's securities, regardless of the size of the trade, by filing Forms 3, 4, or 5 with the Commission. These filing requirements apply both to any single investor (whether an individual and entity) and to two or more investors acting as a group for the purpose of acquiring, holding, or disposing of securities of an issuer.

104. Benjamin Wey, Tianyi Wei, and Michaela Wey, with the assistance of Erbek, structured the Nominees' holdings in an effort to ensure that no one entity or individual ever held a greater-than-five-percent beneficial ownership interest in any NYGG Client to avoid triggering the beneficial ownership disclosure requirements. Specifically, on or about July 21, 2010, an email sent from Benjamin Wey or someone else at his direction to Erbek directed Erbek to:

> allocate on your end [in the Swiss accounts Erbek managed]:
> 1) Strong[Growth]: 1,000,000 shares. 2) A[CL]: 400,000 shares.
> 3) Y[ork Capital]: 351,610 shares. Since five percent limit at each
> account is 1.6 million . . . the above will be fine.

Another email sent by Benjamin Wey or someone else at his direction to Erbek on or about September 20, 2010, explained that, "Under SEC filing requirements, any individual or entity owning more than 5% of a company's total outstanding shares must file SEC 13D or 13G forms."

105. By virtue of their control over the Nominees, Benjamin Wey, Michaela Wey, and Tianyi Wei, at various times throughout the Relevant Period, individually and collectively held more than five percent of the public equity of the NYGG Clients.

106. Benjamin Wey possessed investment authority over all the Nominees at various times during the Relevant Period. Tianyi Wei, by virtue of her and her minor-child's holdings and her position as sole shareholder, officer, and director of many of the Nominee entities, held beneficial ownership of more than five percent of the shares of the NYGG Clients at various

31

times during the Relevant Period. Michaela Wey, by virtue of her control over shares held by accounts in the names of her family members and at least two Nominees, Bicornio and Roosen, held beneficial ownership of more than five percent of the shares of Deer and SmartHeat at various times during the Relevant Period.

107. Benjamin Wey, Tianyi Wei, Michaela Wey, and the Nominees they controlled were also sufficiently interrelated that they constituted a group for the purposes of the filing requirements of Exchange Act Section 13(d) and Regulation 13D-G thereunder. Nonetheless, Benjamin Wey, Michaela Wey, and Tianyi Wei repeatedly failed to file the required Schedules 13D or 13G.

108. Only twice did Benjamin Wey instruct Newman to file Schedules 13D, and both times, the filings were materially false. A February 2010 schedule for Futmon, filed by Newman, failed to correctly state that Benjamin Wey and Tianyi Wei were beneficial owners of the shares of Deer described in the disclosure. A September 2010 schedule that reported Tianyi Wei as possessing sole voting and dispositive powers over the shares of Deer was materially false and misleading because it did not include shares of Deer held by Nominee entities for which she was sole shareholder, officer, or director.

109. At times during the Relevant Period, Benjamin Wey and Tianyi Wei possessed greater than ten percent beneficial ownership of the NYGG Clients. Neither Benjamin Wey nor Tianyi Wei filed the forms required by Section 16(a) of the Securities Act to initially disclose their ten percent beneficial ownership or to report their trading of shares of the NYGG Clients.

110. The repeated failures to file required public disclosures of beneficial ownership were a knowing or reckless part of the fraudulent scheme. Benjamin Wey, Tianyi Wei, and Michaela Wey knew or were reckless in not knowing their obligations under the federal

securities laws as beneficial owners of greater than five percent of the outstanding shares of the NYGG Clients. Likewise, Benjamin Wey and Tianyi Wei knew or were reckless in not knowing their obligations as greater than ten percent of the outstanding shares of the NYGG Clients to report their holdings and any changes in those holdings on Forms 3, 4 and 5, public documents filed with the Commission. Benjamin Wey, Tianyi Wei, and Newman also knew or were reckless in not knowing that the two Schedule 13D filings Newman made at Benjamin Wey's direction for Futmon and Tianyi Wei were materially false. Benjamin Wey, Tianyi Wei, Michaela Wey, and Newman also knew or were reckless in not knowing that the investing public routinely used such disclosures to, among other things, gauge the sentiment of public companies' insiders and large shareholders about those companies' financial condition and prospects, thereby relying on them in making investment decisions.

**Profiting from Hidden Control of the NYGG Clients**

111.    Benjamin Wey and his associates profited from their scheme in numerous ways. For instance, Benjamin Wey, Tianyi Wei, and Michaela Wey profited from the scheme by their receipt of millions of dollars in fees paid to some of the Nominees by the NYGG Clients and profits from sales of shares of the NYGG Clients. Nominees obtained undisclosed fees and additional shares of the NYGG Clients in connection with private placements and other financings facilitated by Benjamin Wey and NYGG. In total, the NYGG Clients paid fees totaling at least $11,312,074 to ACL, Strong Growth, Four Tong, and Median Assets, for services purportedly related to private placements and secondary offerings. There is no evidence that these Nominees provided any services to the NYGG Clients. Benjamin and Michaela Wey used the fees paid to these Nominees to, among other things, fund the operations of NYGG's New York office.

33

112.    Benjamin Wey, Tianyi Wei, and Michaela Wey also illegally profited from their control of the Nominees through the sales of shares of the NYGG Clients in the Nominees' brokerage accounts.  After sending the sales proceeds to foreign bank accounts in the names of various Nominees to mask their origin, Benjamin Wey or Michaela Wey would direct Tianyi Wei to transfer at least a portion of the money back to the United States.  Michaela Wey falsely described these massive transfers of cash as "gifts from a foreign person" in her tax filings.  In fact, the money was illegal profits from the fraudulent scheme, not gifts from Benjamin Wey's sister.

113.    For example, from on or about October 12 through on or about October 30, 2009, Benjamin Wey called Broker 4 and placed orders to sell 354,902 shares of Deer stock from the Strong Growth brokerage account; the sale generated proceeds of $4,413,679.  On or about November 24, 2009, Benjamin Wey caused $4,413,830 to be wired from the Strong Growth account at Broker 4 to a bank account in Hong Kong in the name of Strong Growth.  On or about December 8, 2009, $3,500,000 was transferred from Strong Growth's Hong Kong bank account to another Hong Kong bank account in the name of Tianyi Wei.  Soon thereafter, on or about December 10, 2009, Michaela Wey received in her personal checking account $3,300,000 from the Tianyi Wei Hong Kong account.

114.    The $3.3 million transfer was one of several multi-million dollar "gifts" made to Michaela Wey that were used to fund large real estate purchases and remodel those properties, among other things.  Moreover, approximately $3 million in transfers from accounts in the name of Tianyi Wei to accounts held for the Ben Wey Family Trust were used to buy whole life insurance for Benjamin Wey's and Michaela Wey's family members.  In all, Benjamin Wey and Michaela Wey obtained tens of millions of dollars in profits from the fraudulent scheme, of

which at least $19 million was sent from Tianyi Wei to Michaela Wey's personal account as "gifts." Tianyi Wei retained large portions of the proceeds as well.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act
### (Against Defendants Benjamin Wey, NYGG, Tianyi Wei, Newman, and Uchimoto for Violations of Rule 10b-5(a) and(c) and Against Defendants Benjamin Wey, NYGG, Newman, and Uchimoto for Violations of Rule 10b-5(b))

115.     Paragraphs 1 through 114 are realleged and incorporated herein by reference.

116.     Through the conduct described above, Benjamin Wey, Tianyi Wei, Newman, Uchimoto, and NYGG violated Section 10(b) of the Exchange Act [15 U.S.C § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

117.     Benjamin Wey, Tianyi Wei, Newman, Uchimoto, and NYGG, in connection with the purchase or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit.

118.     By reason of the forgoing, Benjamin Wey, NYGG, Tianyi Wei, Newman, and Uchimoto have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Violations of Section 20(e) of the Exchange Act:**
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against Defendant Tianyi Wei)**

119.   Paragraphs 1 through 114 are realleged and incorporated herein by reference.

120.   Through the conduct described above, Benjamin Wey and NYGG, in connection with the purchase or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

121.   Tianyi Wei knowingly or recklessly provided substantial assistance to Benjamin Wey and NYGG in their violations of Section 10(b) of the Exchange Act and Rule 10b-5. Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Tianyi Wei is deemed to be in violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent as Benjamin Wey and NYGG, and unless enjoined, will again aid and abet violations of those provisions.

## THIRD CLAIM FOR RELIEF

**Violations of Section 20(e) of the Exchange Act:**
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against Defendants Michaela Wey, Newman, Uchimoto, and Erbek)**

122.   Paragraphs 1 through 114 are realleged and incorporated herein by reference

123.   Through the conduct described above, Benjamin Wey, NYGG, and Tianyi Wei, in connection with the purchase or sale of any security by use of the means or instrumentalities of

36

interstate commerce, the mails, or any facility of any national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

124.    Michaela Wey, Newman, Uchimoto, and Erbek knowingly or recklessly provided substantial assistance to Benjamin Wey, NYGG, and Tianyi Wei in their violations of Section 10(b) of the Exchange Act and Rule 10b-5.

125.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Michaela Wey, Newman, Uchimoto, and Erbek are deemed to be in violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent as Benjamin Wey, NYGG, and Tianyi Wei, and unless enjoined, will again aid and abet violations of those provisions.

**FOURTH CLAIM FOR RELIEF**

**Violations of Section 20(a) of the Exchange Act: Controlling Person Liability for NYGG's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Against Defendant Benjamin Wey)**

126.    Paragraphs 1 through 114 are realleged and incorporated by reference herein.

127.    Through the conduct described above, NYGG, in connection with the purchase or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit in

violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

128.    When NYGG violated Section 10(b) of the Exchange Act and Rule 10b-5, Benjamin Wey directly or indirectly controlled NYGG.  Benjamin Wey was therefore a "controlling person" within the meaning of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] with regard to NYGG.

129.    As alleged above, Benjamin Wey was a culpable participant in, and directly or indirectly induced the acts constituting, NYGG's violations of the Exchange Act, and did not act in good faith.

130.    By reason of the foregoing, Benjamin Wey is jointly and severally liable with and to the same extent as NYGG for its violations of Section 10(b) of the Exchange Act and Rule 10b-5 and, unless enjoined, will again act as a "controlling person" in connection with such violations.

### FIFTH CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act**
**(Against Defendants Benjamin Wey, NYGG, Tianyi Wei, Newman, and Uchimoto for**
**Violations of 17(a)(1) and(3) and Against Defendants Benjamin Wey, NYGG, Newman,**
**and Uchimoto for Violations of 17(a)(2))**

131.    Paragraphs 1 through 114 are realleged and incorporated herein by reference.

132.    Through the conduct described above, Benjamin Wey, NYGG, Tianyi Wei, Newman, and Uchimoto, directly or indirectly, in the offer or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, (a) knowingly or recklessly employed a device, scheme, or artifice to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact or omissions of material fact necessary to make the statements

not misleading; and (c) knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit on the purchaser.

133. By reason of the foregoing, Benjamin Wey, NYGG, Tianyi Wei, Newman, and Uchimoto have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SIXTH CLAIM FOR RELIEF

### Violations of Section 15(b) of the Securities Act:
### Aiding and Abetting Violations of Section 17(a) of the Securities Act
### (Against Defendant Tianyi Wei)

134. Paragraphs 1 through 114 are realleged and incorporated herein by reference.

135. Through the conduct described above, Benjamin Wey and NYGG, directly or indirectly, in the offer or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, (a) knowingly or recklessly employed a device, scheme, or artifice to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact or omissions of material fact necessary to make the statements not misleading; and (c) knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit on the purchaser in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

136. Tianyi Wei knowingly or recklessly provided substantial assistance to Benjamin Wey and NYGG in their violations of Section 17(a) of the Securities Act.

137. Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Tianyi Wei is deemed to be in violation of Section 17(a) of the Exchange Act to the same extent as Benjamin Wey and NYGG, and unless enjoined, will again aid and abet violations of that provision.

## SEVENTH CLAIM FOR RELIEF

**Violations of Section 15(b) of the Securities Act:**
**Aiding and Abetting Violations of Section 17(a) of the Securities Act**
**(Against Defendants Michaela Wey, Newman, Uchimoto, and Erbek)**

138.     Paragraphs 1 through 114 are realleged and incorporated herein by reference.

139.     Through the conduct described above, Benjamin Wey, NYGG, and Tianyi Wei, directly or indirectly, in the offer or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, (a) knowingly or recklessly employed a device, scheme, or artifice to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact or omissions of material fact necessary to make the statements not misleading; and (c) knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit on the purchaser in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

140.     Michaela Wey, Newman, Uchimoto, and Erbek knowingly or recklessly provided substantial assistance to Benjamin Wey, NYGG, and Tianyi Wei in their violations of Section 17(a) of the Securities Act.

141.     Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Michaela Wey, Newman, Uchimoto, and Erbek are deemed to be in violation of Section 17(a) of the Exchange Act to the same extent as Benjamin Wey, NYGG, and Tianyi Wei, and unless enjoined, will again aid and abet violations of that provision.

## EIGHTH CLAIM FOR RELIEF

### Violations of Section 13(d) of the Exchange Act and Rule 13d-1 thereunder
### (Against Defendants Benjamin Wey, Tianyi Wei, and Michaela Wey)

142.　Paragraphs 1 through 114 are realleged and incorporated herein by reference.

143.　Pursuant to Section 13(d) of the Exchange Act and Regulation 13D-G thereunder, persons who directly or indirectly acquire beneficial ownership of more than 5 percent of the outstanding shares of a class of voting equity securities registered under Section 12 of the Exchange Act are required to file a Schedule 13D or, in limited circumstances, a Schedule 13G. These filing requirements apply both to individuals and to two or more persons who act as a group for the purpose of acquiring, holding, or disposing of securities of an issuer.

144.　Benjamin Wey acquired and held beneficial ownership of more than five percent of shares in Deer from on or about April 29, 2009, to on or about September 20, 2010; SmartHeat, from January 30, 2008, to on or about May 27, 2009; and CleanTech on or about March 22, 2010, to on or about April 15, 2010, and from on or about December 13, 2010, until at least July 27, 2015.

145.　Tianyi Wey acquired and held beneficial ownership of more than five percent of shares in Deer from on or about April 29, 2009, to on or about April 13, 2010, and from on or about May 18, 2010, to on or about September 14, 2010; SmartHeat, from on or about January 30, 2008, to on or about May 19, 2009; and CleanTech from on or about March 22, 2010, to on or about April 15, 2010, from on or about December 13, 2010, to on or about September 28, 2014, and from on or about October 7, 2014, to on or about July 27, 2015.

146.　Michaela Wey was a beneficial owner of more than five percent of shares in Deer, from on or about May 28, 2009, to on or about June 9, 2009, and from on or about September 25, 2009, to on or about October 1, 2009, and from on or about October 5, 2009, to on or about

October 7, 2009; and SmartHeat, from on or about January 30, 2008, to on or about April 13, 2008.

147.     Benjamin Wey, Tianyi, Wei, and Michaela Wey and the Nominees they controlled were sufficiently interrelated that they constituted a group for the purposes of Exchange Act Section 13(d) and the Regulation 13D-G filing requirements.

148.     Accordingly, Benjamin Wey, Tianyi Wei, and Michaela Wey were each under an obligation to file with the Commission true and accurate reports with respect to their ownership of the securities of the NYGG Clients, including those held by the Nominees they controlled, pursuant to Exchange Act Section 13(d) and Rule 13d-1 thereunder, and failed to do so.

149.     By reason of the foregoing, Benjamin Wey, Tianyi Wei, and Michaela Wey violated, and, unless enjoined and restrained will continue to violate, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

## NINTH CLAIM FOR RELIEF

**Violations of 20(e) of the Exchange Act:
Aiding and Abetting Violations of Section 13(d)
of the Exchange Act and Rule 13d-1 thereunder
(Against Defendant Tianyi Wei)**

150.     Paragraphs 1 through 114 are realleged and incorporated herein by reference.

151.     Through the conduct described above, Benjamin Wey violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

152.     Tianyi Wei knowingly or recklessly provided substantial assistance to Benjamin Wey in his violations of Section 13(d) of the Exchange Act and Rule 13d-1.

153.     Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Tianyi Wei is deemed to be in violation of Section 13(d) of the Exchange Act and Rule 13d-1 thereunder to the

same extent as Benjamin Wey, and unless enjoined, will again aid and abet violations of those provisions.

## TENTH CLAIM FOR RELIEF

**Violations of 20(e) of the Exchange Act:**
**Aiding and Abetting Violations of Section 13(d)**
**of the Exchange Act and Rule 13d-1 thereunder**
**(Against Defendant Michaela Wey, Newman, and Erbek)**

154.    Paragraphs 1 through 114 are realleged and incorporated herein by reference.

155.    Through the conduct described above, Benjamin Wey and Tianyi Wei violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

156.    Michaela Wey, Newman, and Erbek knowingly or recklessly provided substantial assistance to Benjamin Wey and Tianyi Wei in their violations of Section 13(d) of the Exchange Act and Rule 13d-1.

157.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Michaela Wey, Newman, and Erbek are deemed to be in violation of Section 13(d) of the Exchange Act and Rule 13d-1 thereunder to the same extent as Benjamin Wey and Tianyi Wei, and unless enjoined, will again aid and abet violations of those provisions.

## ELEVENTH CLAIM FOR RELIEF

**Violations of Section 16(a) of the Exchange Act and Rules 16a-2 and 16a-3 thereunder**
**(Against Defendants Benjamin Wey and Tianyi Wei)**

158.    Paragraphs 1 through 114 are realleged and incorporated herein by reference.

159.    Pursuant to Exchange Act Section 16(a) and Rules 16a-2 and 16a-3 thereunder, persons who are beneficial owners of greater than 10 percent of an issuer's securities registered under the Exchange Act are required to file timely and accurate Forms 3, 4, and 5 with the Commission disclosing information about their holdings and trading in the issuer's securities.

160.    Benjamin Wey was the beneficial owner of more than ten percent of shares in Deer from on or about April 29, 2008, to on or about April 13, 2010, and from on or about July 10, 2010, to on or about September 13, 2010; in SmartHeat from on or about January 30, 2008, to on or about May 11, 2008, and from on or about May 15, 2008, to on or about May 17, 2009; and in CleanTech from on or about March 22, 2010, to on or about April 15, 1010, from on or about December 13, 2010, to on or about September 28, 2014, and from on or about October 7, 2014, to at least on or about July 27, 2015.

161.    Tianyi Wei was the beneficial owner of more than ten percent of shares in Deer from on or about May 8, 2008, to on or about May 11, 2009, from on or about June 10, 2010, to on or about June 18, 2009, from on or about September 25, 2009, to on or about November 12, 2009, from on or about November 17, 2009, to on or about December 16, 2009, and from on or about July 26, 2010, to on or about July 28, 2010; SmartHeat from on or about January 30, 2008, to on or about April 13, 2008, and from on or about June 5, 2008, to on or about April 26, 2009; and in CleanTech from on or about October 10, 2013, to on or about September 28, 2014, and from on or about October 7, 2014, to at least on or about July 27, 2015.

162.    Accordingly, Benjamin Wey and Tianyi Wei were each under an obligation to file with the Commission true and accurate reports with respect to their ownership of the securities of the NYGG Clients, including those held by the Nominees they controlled, pursuant to Exchange Act Section 16(a) and Rules 16a-2 and 16a-3 thereunder and failed to do so.

163.    By reason of the foregoing, Benjamin Wey and Tianyi Wei each has violated, and unless enjoined and restrained will continue to violate, Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rules 16a-2 and 16a-3 thereunder [17 C.F.R. §§ 240.16a-2 and 240.16a-3].

## TWELFTH CLAIM FOR RELIEF

### Disgorgement By Relief Defendants

164.     Paragraphs 1 through 114 are realleged and incorporated herein by reference.

165.     Relief defendants Advantage Consultants, Ltd., York Capital Management, Ltd., Four Tong Investments, Ltd., Strong Growth Capital, Ltd., Median Assets Investments, Ltd., and Han Hua, Ltd. received unlawful proceeds arising from the violations alleged herein by defendants Benjamin Wey, Tianyi Wei, and Michaela Wey.

166.     These relief defendants should be compelled to return any unlawful proceeds received by them as a result of the violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A.     Finding that Defendants violated the federal securities laws and the Commission rules alleged in this Complaint;

B.     Permanently restraining and enjoining Defendants Benjamin Wey, NYGG, Tianyi Wei, Newman, and Uchimoto from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Defendants Tianyi Wei, Michaela Wey, Newman, Uchimoto, and Erbek from violating Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] and Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)]; Defendant Benjamin Wey from violating Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]; Defendants Benjamin Wey, Tianyi Wei, and Michaela Wey from violation Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 [17 C.F.R. § 240.13d-1] thereunder; and Defendants Benjamin Wey and Tianyi Wei from violating Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rules 16a-2 and 16a-3 [17 C.F.R. §§ 240.16a-2 and 240.16a-3] thereunder.

45

C.      Ordering Defendants to disgorge all illegal profits obtained as a result of their fraudulent misconduct, acts, or courses of conduct described in this Complaint, and to pay prejudgment interest thereon;

D.      Imposing civil monetary penalties on Defendants pursuant to Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t (d)(2)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

E.      Granting such equitable relief as may be appropriate or necessary for the benefit of investors pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

Dated:  November 9, 2015

Respectfully submitted,

Derek Bentsen (DB8369)
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
100 F St., N.E.
Washington, D.C. 20549-5985
202-551-6426
BentsenD@sec.gov

# EXHIBIT C

Robert L. Weigel
Robert F. Serio
Andrew R. Keats
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiff Discover Growth Fund*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
                                                    :
DISCOVER GROWTH FUND,                               :
                                                    :
                        Plaintiff,                  :
                                                    :
            -against-                               :
                                                    :
6D GLOBAL TECHNOLOGIES INC.; NEW                    :   **COMPLAINT**
YORK GLOBAL GROUP, INC.; NYGG                       :
(ASIA), LTD.; BENJAMIN TIANBING WEI                 :
A/K/A BENJAMIN WEY; TEJUNE KANG;                    :   **15 Civ. _____**
MARK SYNKOWSKI; ADAM HARTUNG;                       :
DAVID S. KAUFMAN; TERRY MCEWEN;                     :
ANUBHAV SAXENA; TIANYI WEI;                         :
MICHAELA WEI; SEREF DOGAN ERBEK,                    :
                                                    :
                        Defendants.                 :
                                                    :
--------------------------------------------------------x

Plaintiff Discover Growth Fund ("Plaintiff" or "Discover"), by and through its

undersigned attorneys, Gibson, Dunn & Crutcher LLP, for its complaint against defendants 6D

Global Technologies, Inc. ("6D Global" or the "Company"), New York Global Group, Inc.

("NYGG"), NYGG (Asia), Ltd.,  Benjamin Tianbing Wei, Tejune Kang, Mark Szynkowski,

Adam Hartung, David S. Kaufman, Terry McEwen, Anubhav Saxena, Tianyi Wei, Michaela

Wei, and Seref Dogan Erbek (collectively, "Defendants"), respectfully alleges as follows:

## SUMMARY OF ACTION

1.     On August 10, 2015, Discover entered into a Stock Purchase Agreement (the "SPA"), attached hereto as Exhibit A, with 6D Global, a publicly traded company listed on the NASDAQ under the ticker symbol "SIXD", pursuant to which Discover paid $10,000,000 in exchange for 1,088 convertible preferred shares of 6D Global.

2.     At the time of Discover's purchase of shares from 6D Global, on paper, including in filings with the Securities and Exchange Commission (the "SEC") and in investor presentations and marketing materials provided to Discover, 6D Global was a fast-growing, award-winning, digital business, marketing and technology company providing a portfolio of digital business solutions to Fortune 500 clients and other industry leaders across the country and globe.  Unbeknownst to the SEC, Discover and the rest of the investing public, 6D Global, along with its executives, officers and directors, was nothing more than a front for a multi-million dollar, cross-border ponzi scheme masterminded by Defendants Benjamin Wei and NYGG.

3.     On September 8, 2015, the Department of Justice ("DOJ") indicted Wei in this Court, *United States v. Benjamin Wey, et al.*, 15-crim-611 (the "Indictment"), on charges of securities fraud, stock manipulation, money laundering, and wire fraud, and on September 10, 2015, the DOJ arrested Wei and the SEC filed a civil action in this Court, *United States Securities and Exchange Commission v. Benjamin Wey*, et al., 15-cv-07116 (PKC) (the "SEC Action"), against Wei, NYGG and certain other Defendants for their roles in the fraudulent scheme to obtain and profit from undisclosed, controlling ownership interests in several U.S. companies spawned via "reverse Chinese mergers," including 6D Global, that were actually and secretly controlled and dominated by Wei and NYGG.

4.      The DOJ and SEC's investigation into the Weis' fraudulent activities was underway long before the SPA was executed.  Wei and others were subpoenaed by the government and asserted their Fifth Amendment rights against self-incrimination.  Defendants willfully concealed and never disclosed information about the investigation or the role of Wei and other defendants in controlling 6D Global, manipulating its stock price and siphoning of profits of NYGG-controlled companies such as 6D Global (through the receipt of millions of dollars in fees paid to Wei nominees for services purportedly related to private placements and secondary offerings), and despite their clear knowledge of all of these facts.  Both the Indictment and the SEC Action, attached hereto as Exhibits B and C respectively, detail the specifics of the fraud scheme as it pertains to 6D Global among other companies, and those allegations are incorporated herein by reference.

5.      Each and every one of the Defendants was complicit in the scheme to defraud Discover and the investing public and to secure $10 million from Discover on fraudulent pretenses in violation of U.S. securities laws and common law.

6.      By this action, therefore, Discover seeks, *inter alia*, to have the SPA rescinded and its $10M investment returned, with interest.

## THE PARTIES

7.      Plaintiff Discover is a Cayman Islands exempted mutual fund with its registered office in the Cayman Islands.

8.      Defendant 6D Global is a Delaware corporation headquartered in New York, New York.  6D Global has traded on the NASDAQ under the ticker symbol, "SIXD."

9.      Defendant NYGG is a Delaware corporation headquartered in New York, New York, with a second office located in Beijing, China.  According to 6D Global's most recent

filings with the SEC, as of March 19, 2015, NYGG is a holder of 45% of the outstanding shares of common stock of 6D Global.

10.     Defendant NYGG (Asia), Ltd. is a subsidiary of NYGG located in Beijing, China.

11.     Defendant Benjamin Wei (also known as Benjamin Wey and Tianbing Wei) is the founder and principal of NYGG.  On September 8, 2015, Wei was indicted by the United States Attorney for the Southern District of New York for stock manipulation and the amassing of undisclosed beneficial ownership of more than five percent of the stock of 6D Global, among other companies, and on September 10, 2015 was placed under arrest.  Wei resides in New York, New York.

12.     Defendant Tejune Kang is the Chairman and Chief Executive Officer of 6D Global.  According to the most recent filings with the SEC, as of March 19, 2015, Kang is a holder of 29.7% of the outstanding shares of common stock of 6D Global.  Kang resides in or around New York, New York.

13.     Defendant Mark Szynkowski is the Chief Financial Officer of 6D Global.  Szynkowski resides in or around New York, New York.

14.     Defendant Adam Hartung is a director of 6D Global.  Hartung resides in or around Chicago, Illinois.

15.     Defendant David S. Kaufman is a director of 6D Global.

16.     Defendant Terry McEwen is a director of 6D Global.  McEwen resides in or around Princeton, New Jersey.

17.     Defendant Anubhav Saxena is a director of 6D Global.  Saxena resides in or around San Francisco, California.

18.     Defendant Tianyi Wei (also known as Sarah Wei) is Wei's sister and an employee and manager of NYGG's office in Beijing, China.  Tianyi Wei resides in China.

19.     Defendant Michaela Wei is Wei's wife and an attorney licensed to practice in New York.  Michaela Wei held trading authority over Swiss Brokerage accounts in the names of her family members and others who held warrants or other positions in the shares of 6D Global. Michaela Wei resides in New York, New York.

20.     Defendant Serf Dogan Erbek was an employee of a firm based in Geneva, Switzerland that provided "financial and fiduciary services" for third parties controlled by the Weis, and assisted the Weis in concealing their control and structuring their holdings in 6D Global to evade securities reporting requirements.

## JURISDICTION AND VENUE

21.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, for claims arising under Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78aa].  This Court has supplemental jurisdiction over the common law claims asserted in this action pursuant to 28 U.S.C. § 1367.

22.     Venue is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### The SPA and 6D Global's Representations and Warranties

23.     On August 10, 2015, Discover entered into a SPA with 6D Global, a publicly traded company trading on the NASDAQ under the ticker symbol, "SIXD," pursuant to which Discover agreed to pay $10,000,000 in exchange for 1,088 shares of Series A Redeemable Convertible Preferred Stock of 6D Global (the "Preferred Shares"), convertible into Common

Stock at $5.25 per share.  Upon execution of the SPA, Discover delivered to 6D Global the sum of $10,000,000 by wire transfer and received the Preferred Shares on August 13, 2015.

24.     To induce Discover to enter into the SPA, 6D Global made representations in the SPA that it knew to be false when they were made, and omitted critical information it knew to be material, and willfully concealed the truth by rushing to close the transaction before Wei's arrest. Among other things, 6D Global made the material false representations and the material omissions discussed below.

25.     As a condition under the SPA to securing Discover's purchase of the Preferred Shares, 6D Global asserted not only that it was "in compliance with all requirements to maintain listing on the Trading Market" (Exhibit A § II.C.2) and that all of "[t]he representations and warranties of [6D Global] . . . set forth in this Agreement are true and correct in all material respects" (Exhibit A § II.C.3), but more specifically, and among other representations and warranties, that:

(a) **Litigation**.  There is no Action pending or, to the knowledge of the Company, threatened, which would reasonably be expected to result in a Material Adverse Effect.  Neither Company nor any Subsidiary, nor to the knowledge of Company any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty.  There has not been, and to the knowledge of Company, there is not pending or contemplated, any investigation by the Commission involving Company or any current or former director or officer of Company. (Exhibit A § III.B.5)

(b) **Public Reports; Financial Statements**. Company has filed all required Public Reports for the one year preceding the Effective Date. As of their respective dates or as subsequently amended, the Public Reports complied in all material respects with the requirements of the Act and the Exchange Act and the rules and regulations of the Commission promulgated thereunder, as applicable, and none of the Public Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The financial statements of Company included in the Public Reports, as amended, comply in all material respects with applicable

6

accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with GAAP, except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of Company and its consolidated subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments. (Exhibit A § III.B.3)

(c) **Material Changes.** Since the end of the most recent year for which an Annual Report on Form 10-K has been filed with the Commission, (a) there has been no event, occurrence or development that has had, or that would reasonably be expected to result in, a Material Adverse Effect[1] . . . (Exhibit A § III.B.4)

(d) **<u>Compliance.</u>** Neither Company nor any Subsidiary (a) is in material default under or in material violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by Company or any Subsidiary under), nor has Company or any Subsidiary received notice of a claim that it is in material default under or that it is in material violation of, any indenture, loan or credit agreement or any other similar agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (b) is in violation of any order of any court, arbitrator or governmental body, or (c) is or has been in violation of any statute, rule or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws applicable to its business, except in each case as would not reasonably be expected to have a Material Adverse Effect. (Exhibit A § III.B.8)

(e) **<u>Sarbanes-Oxley; Internal Accounting Controls</u>**. Company is in material compliance with all provisions of the Sarbanes-Oxley Act of 2002, which are applicable to it as of the date of the Closing. Company presented in its most recently filed periodic report under the Exchange Act the conclusions of the certifying officers about the ineffectiveness of Company's disclosure controls and procedures based on their evaluations as of the evaluation date. Since the date of the most recently filed periodic report under the Exchange Act, there have been no significant changes in Company's internal accounting controls or its disclosure controls and procedures or, to Company's knowledge, in other factors that could materially affect Company's internal accounting controls or its disclosure controls and procedures. (Exhibit A § III.B.14)

---

[1] The SPA defines "Material Adverse Effect" to include "any material adverse effect on (a) the legality, validity or enforceability of any Transaction Document, or (b) the results of operations, assets, business, or financial condition of [6D Global] and the Subsidiaries, taken as a whole, which is not disclosed in the Public Reports prior to the Effective Date, or (c) [6D Global's] ability to perform in any material respect on a timely basis its obligations under any Transaction Document." (Exhibit A, Ex. 1.)

(f) **Listing and Maintenance Requirements**. The Common Stock is registered pursuant to Section 12 of the Exchange Act, and Company has taken no action designed to, or which to its knowledge is likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act nor has Company received any notification that the Commission is contemplating terminating such registration. Company has not, in the 12 months preceding the Effective Date, received notice from any Trading Market on which the Common Stock is or has been listed or quoted to the effect that Company is not in compliance with the listing or maintenance requirements of such Trading Market. Company is, and has no reason to believe that it will not in the foreseeable future continue to be, in compliance with all such listing and maintenance requirements. (Exhibit A § III.B.17)

(g) **Foreign Corrupt Practices**. Neither Company, nor to the knowledge of Company, any agent or other person acting on behalf of Company, has (a) directly or indirectly, used any corrupt funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (b) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (c) failed to disclose fully any contribution made by Company, or made by any person acting on its behalf of which Company is aware, which is in violation of law, or (d) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended. (Exhibit A § III.B.20)

26. Each of the above written representations and warranties in the SPA were, and were intended to be, false at the time they were made because, on information and belief, (a) all Defendants were aware that the NASDAQ listing had been procured and maintained via Wei's stock manipulations, thus the representation about compliance with all "requirements to maintain the listing on the Trading Market" was false; (b) contrary to the Litigation representation, all Defendants were aware of an "investigation pending . . . affecting Company", to wit the DOJ and SEC investigations in which controlling person Wei had taken the Fifth and that would result in the Indictment and SEC action and the suspension of trading in the Company's stock; (c) the Company's most recent 10-K and proxy were materially misleading because (i) they do not identify Wei or disclose his total domination and control of the Company, its board and its officers via his 6D Global majority holdings both personally and through NYGG, NYGG-Asia

and other nominees and (ii) the 6D Global financial statements contained in the Company's SEC filings do not disclose the foregoing or Wei's siphoning off of funds via fees paid to his nominees or the Company's numerous other compliance and internal control violations; (d) the Material Changes representation was violated because there was an "event, occurrence or development that . . . would reasonably be expected to result in, a Material Adverse Effect" defined to include "any material adverse effect on . . . (b) the results of operations, assets, business or financial condition of the Company and the subsidiaries, taken as a whole, which is not disclosed in the Public Reports prior to the Effective Date . . . ."  Again, Defendants violated the Material Change representation because their knowledge of the investigation into Wei, his stock manipulations, asset siphoning, and the imminent Indictment, SEC Action and NASDAQ delisting was material information that was not disclosed to Discover prior to and in connection with the execution of the SPA.

27.    Also, in connection with and to willfully conceal the true facts so that Discover would close on its purchase of the Preferred Shares, 6D Global, and specifically its Chairman and CEO Tejune Kang, represented to Discover that the $10,000,000 purchase price was needed for 6D Global to fund two separate acquisitions, each valued at $10 million, each acquisition to be funded half in cash and half in stock.  The negotiations were fast paced, pushed by Kang and 6D Global's eagerness to close and secure the $10 million in financing, purportedly to enable it to pursue the pending acquisitions immediately upon receipt of funds.

28.    In reality, however, on information and belief, 6D Global needed to close the SPA quickly because the DOJ's and SEC's investigation of Wei and NYGG was wrapping up and the filing of the Indictment and SEC Action was imminent.  6D Global knew that once the Indictment and SEC Action were filed, it would be impossible for 6D Global to secure financing

needed to stay in business.  Given the absolute and total control Wei exerted over Kang and 6D

Global, it is clear that Wei, with the knowledge and assistance of Kang and 6D Global (among

others), was looking to cash in one last time before his Ponzi scheme was revealed.

29.    As Discover was to soon learn, these representations and others were false when

made.  6D Global had knowingly and intentionally made and would continue to knowingly and

intentionally make material misrepresentations and omissions rendering the SPA invalid.

**Discover Is Introduced to Defendant Benjamin Wei, Revealing Misrepresentations
and Ommissions in 6D Global's Proxy Statement and SEC Filings**

30.    Shortly after executing the SPA, Discover received an email on August 15, 2015,

from 6D Global's Chairman Tejune Kang, requesting a meeting in the offices of Discover's

investment advisor.  Kang informed Discover that he was bringing a representative of NYGG

Asia, 6D Global's largest shareholder.

31.    6D Global's proxy statement, filed in connection with issuance of the Preferred

Shares, and incorporated into the 6D Global's most recent Form 10-K, as filed with the SEC on

March 19, 2015, identifies NYGG Asia as holder of approximately 45% of the 6D Global's

outstanding shares.

32.    At the meeting on August 18, 2015, Tejune Kang introduced Benjamin Wei as his

controlling stockholder, saying "basically, I work for him."  Wei, whom Discover had never

heard of and never seen before, proceeded to inform Discover, for the first time, that he

controlled NYGG, and that through NYGG he controlled all of 6D Global, its stock, and its

operations, and that Kang worked for him.  Wei further stated that there was "no real public

float" and that virtually all free trading shares of the company were controlled by him and his

"friends in China."  He further explained that the rebound in stock price that had occurred for no

apparent reason shortly after Discover entered into the SPA was caused by Wei and his group,

further proving his control over the stock of 6D Global. Wei told Discover, in the presence of

Kang, that if Discover ever wanted to sell its shares, it should not sell them in the open market

but should instead sell them directly to Wei or to whom he directed.

33. This meeting proved to be just the tip of the iceberg. Discover subsequently

learned that 6D Global had a written agreement with Wei, pursuant to which he acted as a

"consultant" and was provided with material non-public information about the company. While

6D Global's most recent 10-K states that NYGG, as a holder of 45% of the Company's stock

"may effectively control the outcome of any stockholder vote," 6D Global nowhere disclosed

that actual day-to-day control of the Company was solely in the hands of Wei, as opposed to 6D

Global's CEO, board of directors and corporate officers. To the contrary, the 10-K falsely

represented that "the Board oversees the Company's management in the competent and ethical

operation of the Company, and assures that the long-term interests of the stockholders are being

served," while completely failing to inform investors that the board, the CEO and all other

officers were utterly dominated and controlled by Wei, who himself made all decisions (and

through his nominees held a majority of its stock).

34. Finally, nothing in 6D Global's 10-K and other SEC filings remotely identified

either directly or indirectly the fact 6D Global was in reality just one part of the global Ponzi

scheme masterminded by Wei to profit through stock price manipulation and to siphon funds for

himself and his family and certain co-Defendants. Likewise, additional material information that

was intentionally omitted from disclosure before the closing of the SPA included that certain of

the Defendants were the subject of a criminal investigation being conducted by the DOJ and the

SEC. Unfortunately for Discover, that knowledge and information would not surface until just a

few weeks later, upon the filing of the Indictment and SEC Action.

**The Indictment, Arrest and SEC Action.**

35.     On September 8, 2015, the DOJ filed the Indictment against Defendants Wei and Erbek on charges of stock manipulation and fraud, and on September 10, 2015, Wei was arrested by the DOJ and the SEC Action was filed against Wei, NYGG and certain other Defendants for their roles in the scheme to obtain and profit from undisclosed, controlling ownership interests in several U.S. companies spawned via "reverse Chinese mergers", including 6D Global, that were actually and secretly controlled by Wei and NYGG.

36.     As detailed in the Indictment and SEC Action, the fraud involving 6D Global goes back years.

37.     Before becoming 6D Global, CleanTech Innovations, Inc. ("CleanTech"), was a Chinese windmill manufacturer that retained NYGG to assist with the necessary steps required to go public in the United States.  (Exhibit C ¶¶ 64, 65).

38.     Wei directed Robert Newman—who represented both NYGG and CleanTech—to locate a publically traded U.S. shell company for the reverse merger with CleanTech.  Everton Capital Corporation ("Everton") was selected.  (Exhibit C ¶ 65).

39.     Prior to April 2009, the purchase price was negotiated, Wei approved the price, a bank account maintained in the name of Four Tong Investments, Ltd. ("Four Tong") wired funds into Newman's attorney trust account, and the purchase was completed in or about April 2009. (Exhibit C ¶¶ 33, 65).

40.     Wei's nominee Four Tong is a limited liability corporation incorporated in the Turks and Caicos Islands, and Tianyi Wei was its sole owner, director, and signatory.  (Exhibit C ¶ 33).

41.     Pursuant to the purchase arrangement, Everton's transfer agent transferred 5,000,000 shares—or 90.89 percent—of Everton's outstanding common stock to a 29-year-old "independent business consultant" from China, Everton's purported new CEO, President, CFO, Treasurer, and Secretary.  Wei, Tianyi Wei, and Michaela Wey indirectly owned most of the remaining 9.11 percent through their foreign nominees.  (Exhibit C ¶ 66).

42.     Newman has purportedly only communicated with Everton's supposed 29-year-old CEO through Wei or through email, never in person or over the telephone.  (Exhibit C ¶ 66).

43.     On July 2, 2010, NYGG facilitated a reverse merger between its client CleanTech and the shell company Everton, which Wei, Tianyi Wei, and Michaela Wey secretly owned through their nominees.  (Exhibit B ¶¶ 10, 12; Exhibit C ¶ 46).

44.     In connection with the merger, Everton's purported new 29-year-old CEO signed an agreement that cancelled his ownership of Everton's 5,000,000 shares for less than a penny per share, significantly below Everton's market value, transforming the remaining shareholders, who were almost exclusively Wei's nominees, into the beneficial owners of more than ten percent of CleanTech.  (Exhibit C ¶ 67).

45.     Defendants' conduct surrounding CleanTech's reverse merger is consistent with its wider fraudulent scheme, in which Wei, along with Tianyi Wei, (1) identified shell companies, (2) purchased ownerships interests using the names of individuals affiliated with Wei, Tianyi Wei, and NYGG, and (3) then transferred the shares of the shell companies to the foreign nominees controlled by Wei, Tianyi Wei, and Michaela Wey.  (Exhibit C ¶ 60).

46.     To further this fraudulent scheme, Wei made or had others make material misstatements and omissions to NASDAQ and the SEC in order to conceal Wei's beneficial ownership of CleanTech.  (Exhibit C ¶¶ 68, 69, 81).

47.     In December 2010, Wei was involved in a transfer of shares of CleanTech to Strong Growth Capital, Ltd. ("Strong Growth"), Han Hua, Ltd. ("Han Hua"), and Roosen Commercial Corp. ("Roosen").  All three entities were nominees controlled directly or indirectly by Wei.  (Exhibit C ¶ 81).

48.     On at least two separate occasions, Wei, with the assistance of Erbek and Tianyi Wei, also manipulated CleanTech's share price in order to maintain it at or above $5.00 per share.  (Exhibit C ¶¶ 91, 99).

49.     The first trades in CleanTech's stock during July 2010 were part of a match trade. A U.S. brokerage account in Tianyi Wei's name but managed by Wei purchased 1,000 shares for $5.10 from a foreign brokerage account maintained in the name of Guo Sheng, another nominee that lists Tianyi Wei as the owner and signatory.  The purchase price was 70 percent higher than CleanTech's recent $3.00 price per share, and Wei ensured that potential investors were made aware of the drastic price increase.  (Exhibit C ¶¶ 51, 99).

50.     Additionally, a seized February 2011 email from Wei to Erbek revealed Wei's unlawful desire to artificially raise CleanTech's stock price to $5.00 per share.  The email asked Erbek to "[p]lease make sure the trader buys the stock at $5 per share, stay at $5 per share bid price, not less.  Please make sure this happens right away."  Erbek responded, "Obviously, we need to be careful to give such orders/make such comments."  Swiss accounts managed by Erbek subsequently purchased CleanTech shares in tranches at $4.86 and $4.93.  (Exhibit B ¶ 18; Exhibit C ¶ 100).

51.     With the assistance of Erbek, Wei and Tianyi Wei never disclosed their greater-than five percent beneficial ownership in CleanTech, and Wei never disclosed is greater-than ten percent beneficial ownership interest.  (Exhibit C ¶ 103).

52.     According to the SEC, Wei, Tianyi Wei, and Michaela Wey, and all of their nominees are sufficiently interrelated to constitute a group "for the purposes of the filing requirements of Exchange Act Section 13(d) and Regulation 13D-G."  (Exhibit C ¶ 107).

53.     Emails between Wei and Erbek reveal Wei's knowledge of the beneficial ownership disclosure requirement and his active efforts to avoid them.  On July 21, 2010, Wei instructed Erbek to allocate the shares of NYGG Clients between various nominees because of the "five percent limit."  (Exhibit C ¶ 104).

54.     Wei's beneficial ownership in CleanTech exceeded five percent "on or about March 22, 2010, to on or about April 15, 2010, and from on or about December 13, 2010, until at least July 27, 2015."  (Exhibit C ¶ 144).

55.     Tianyi Wey's beneficial ownership in CleanTech exceeded five percent "on or about March 22, 2010, to on or about April 15, 2010, from on or about December 13, 2010, to on or about September 28, 2014, and from on or about October 7, 2014, to on or about July 27, 2015."  (Exhibit C ¶ 145).

56.     Wei's beneficial ownership in CleanTech exceeded ten percent "on or about March 22, 2010, to on or about April 15, 2010, from on or about December 13, 2010, to on or about September 28, 2014, and from on or about October 7, 2014, to on or about July 27, 2015." (Exhibit C ¶ 160).

57.     CleanTech ultimately became 6D Global in late 2014, and shortly thereafter it was listed and began trading on the NASDAQ under the ticker symbol "SIXD".  (Exhibit C ¶ 46).

58.     As part of its investigation, the DOJ subpoenaed and deposed Wei and his wife Michaela Wey.  They asserted their rights under the Fifth Amendment against self-incrimination.

The DOJ investigation, including into Wei's control and manipulation of 6D Global was being conducted long before Discover and 6D Global executed the SPA.  On information and belief, the investigation and information related to the investigation was known to 6D Global, Tang, the Board and the officers of the company at the time the SPA was executed.  Defendants thus were aware of and took advantage of misrepresentations and omissions in 6D Global's SEC Filings and in the representations made in the SPA to induce Discover to pay $10 million for the Preferred Shares.

59.     Had any of the foregoing been disclosed, as it had to be pursuant to the SPA and under U.S. securities and common law, Discover would never have entered into the SPA.  By inducing Discover to enter the SPA, the Defendants knowingly took advantage of the narrow window of time left before the Indictments and the SEC Action were filed, exposing the Defendants and their scheme for the fraud that it was.

60.     On account of the Indictment and SEC Action, trading in shares of SIXD has been halted by NASDAQ, as of September 12, 2015, and is currently priced at $2.90, almost 50% below the purchase price.

61.     On September 11, 2015, after the filing of the Indictment and the SEC Action, the arrest of Wei, the suspension of trading in 6D Global's stock, and repeated attempts by Discover to speak with Kang at 6D Global, Discover finally reached Kang and asked where the $10 million was.  At first, Defendant Kang lied and said that the full $10 million remained in the bank because the acquisitions the money was supposed to be used for had not closed, and that as a result of the halt on the stock, the acquisitions would not happen.  However, Kang then changed his answer, saying that the money was being depleted daily to fund operations, but that "almost all" of it was still in 6D Global's bank account.

62.     Kang also advised Discover in that conversation that NASAQ had asked 6D Global several questions about the involvement of Wei in the Company.  Kang then told Discover that the Company had a written agreement with Wei to act as a "consultant," pursuant to which he was given material non-public information about the company.  Kang also said that one of the current directors had been appointed to the board by Wei when the Company was known as CleanTech.

63.     On a follow up call on September 15, 2015, Discover informed Kang and Kang's attorney that the SPA must be rescinded and that 6D Global must return the $10 million payment it fraudulently induced.  Instead of responding then or to Discover's subsequent telephone calls, 6D Global sent an email to Discover on September 18, 2015, stating that "we do not agree that the transaction should be rescinded."

### FIRST CLAIM FOR RELIEF
### Securities Fraud – Misrepresentations
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

64.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 63 as if fully stated herein.

65.     Representations and warranties in the SPA made by and on behalf of 6D Global were knowingly false at the time they were made.  Specifically:

> (a) the representation about compliance with all "requirements to maintain the listing on the Trading Market" was false because 6D Global and all Defendants were aware that the NASDAQ listing had been procured and maintained via false statements and omissions related Wei's secret and absolute control and related stock manipulations;

(b) the Litigation representation was false because all Defendants were aware of an "investigation Pending . . . affecting Company," given the active DOJ and SEC investigations in which controlling person Wei and another Defendant had taken the Fifth and that shortly thereafter resulted in the Indictment and SEC Action and the suspension of trading in the Company's stock;

(c) the Company's most recent 10-K and proxy were materially false and misleading because (i) they do not identify Wei or disclose his total domination and control of 6D Global and its board and officers via his majority holdings both personally and through NYGG and other nominees and (ii) the financial statements do not disclose Wei's siphoning off of funds for personal use or the Company's numerous other compliance and internal control violations; and

(d) the Material Changes representation was violated because there was an "event, occurrence or development that . . . would reasonably be expected to result in, a Material Adverse Effect" given 6D Global and the Defendants' knowledge of the federal investigations, the pending Indictment and SEC Action, and Wei's undisclosed domination and control of the day to day operations of the Company and stock manipulation.

66.     At the time the SPA was executed on August 10, 2015, based on the allegations in the Indictment and SEC Action, Defendants knew these representations were false, but made them with the intent to defraud and induce Discover into purchasing the Preferred Shares.

67.     Discover relied entirely on the representations and warranties contained in the SPA and in the 10-K as incorporated into the SPA.

68.     Discover's reliance was the proximate cause of their injury.

## SECOND CLAIM FOR RELIEF
### Securities Fraud – Omissions
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

69.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 68 as if fully stated herein.

70.     As described above and as incorporated herein, 6D Global failed to disclose its knowledge of the federal investigations, the pending Indictment and SEC Action, and Wei's undisclosed domination and control of the day to day operations of the Company and his ongoing control and manipulation of 6D Global's stock.

71.     By virtue of their insider status, 6D Global and its defendant officers and directors had a duty to disclose all material information before selling the Preferred Shares; despite this knowledge they sold the Preferred Shares to Discover without disclosing this information.

72.     Any reasonable potential purchaser of 6D Global stock would deem these omissions to be material, and would want to know before purchasing stock if one person was committing or had committed fraud with respect to the securities, was exercising complete domination and control over the Company and was manipulating the Company's stock.

73.     Upon information and belief, and based on the Indictment and SEC Action, the Defendants nondisclosure was intentional or reckless.

74.     Discover relied entirely on the representations and warranties contained in the SPA and in the 10-K as incorporated into the SPA.

75.     Discover's reliance was the proximate cause of their injury.

## THIRD CLAIM FOR RELIEF
### Rescission of Contract Made in Violation of the Securities Laws
### - Section 29(b) of the Exchange Act
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

76.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 75 as if fully stated herein.

77.     The SPA is void (or voidable by Discover) because it was procured by fraudulent misrepresentations and omissions committed by and with the assistance of the Defendants in violation of Sections 10(b) and 29(b) of the Exchange Act.

78.     Upon execution of the SPA, Discover and 6D Global were in privity with one another.

79.     As a member of the investing public, Discover is in the class of persons the Exchange Act was designed to protect.

## FOURTH CLAIM FOR RELIEF
### Fraudulent Inducement
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

80.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 79 as if fully stated herein.

81.     Defendants made the misrepresentations and omissions described in the First and Second Causes of Action knowing them to be false and material at the time the SPA was executed, with the intention to induce Discover to purchase the Preferred Shares.

82.     Any reasonable investor would have thought the misrepresentations and omissions material information to the decision to purchase the Preferred Shares.

83.     Discover relied on the representations and warranties in purchasing the Preferred Shares, and has been directly injured as a result of the purchase.

## FIFTH CLAIM FOR RELIEF
### Common Law Fraud
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

84.    Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 83 as if fully stated herein.

85.    Defendants made the misrepresentations and omissions contained in the First and Second Causes of Action knowing them to be false and material at the time the SPA was executed, with the intention to deceive Discover as to the Preferred Shares.

86.    Any reasonable investor would have thought the misrepresentations and omissions material information to the decision to purchase the Preferred Shares.

87.    Discover relied on the representations and warranties in purchasing the Preferred Shares and have been directly injured as a result of the purchase.

## SIXTH CLAIM FOR RELIEF
### Conspiracy to Commit Common Law Fraud
**(Against All Defendants)**

88.    Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 87 as if fully stated herein.

89.    As described above and as incorporated herein, 6D Global made material misrepresentations and omissions to induce Discover to purchase the Preferred Shares.

90.    The remaining Defendants actively conspired with and aided and abetted and assisted 6D Global in defrauding Discover as described above and participated in the scheme by assisting to secure the SPA and collect the $10 million from Discover.

## SEVENTH CLAIM FOR RELIEF
### Breach of Contract
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

91.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 90 as if fully stated herein.

92.     The SPA clearly and expressly provided that 6D Global was "in compliance with all requirements to maintain listing on the Trading Market" and that all of the representations and warranties of 6D Global were "true and correct in all material respects."

93.     Based on the misrepresentations and omissions described above, 6D Global was in breach of the SPA.

94.     Discover performed its part of the SPA in paying $10,000,000 in exchange for the Preferred Shares, and relied on the representations and warranties contained in the SPA to its detriment.

95.     6D Global's breach has directly caused injury to Discover.

## EIGHTH CLAIM FOR RELIEF
### Indemnification
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

96.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 95 as if fully stated herein.

97.     The clear and express terms of the SPA (Exhibit A § IV.G)  are clear that 6D Global will indemnify the Discover for any "losses," that "result from (a) any breach of any of the representations, warranties, covenants or agreements made by Company in this agreement or in the other transaction documents and (b) any untrue statement or alleged untrue statement of a

material fact contained in the Registration Statement, Prospectus, Prospectus Supplement, or any

information incorporated by reference therein . . . ."

98.     Discover has suffered losses and incurred costs and fees for which it is entitled to

indemnification from 6D Global.

## NINTH CLAIM FOR RELIEF
### Common Law Rescission
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

99.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1

through 98 as if fully stated herein.

100.     Defendants made the misrepresentations and omissions described above knowing

them to be false and material at the time the SPA was executed, with the intention to induce

Discover to purchase the Preferred Shares.

101.     Any reasonable investor would have thought the misrepresentations and

omissions material information to the decision to purchase the Preferred Shares.

102.     Discover relied on the representations and warranties in purchasing the Preferred

Shares and have been directly injured as a result of the purchase.  By virtue of its status as a

publicly traded company 6D Global and its defendant officers and directors had a duty to

disclose all material information before selling the Preferred Shares and despite this knowledge

they sold the Preferred Shares to Discover without disclosing these facts.  6D Global and the

Defendants did this with the specific intent of deceiving Discover into purchasing the Preferred

Shares.

103.     Discover relied on the representations and warranties contained in the SPA to its

detriment and was injured directly as a result of its reliance.

104.     Plaintiff Discover has no adequate remedy at law and is entitled to rescission of the SPA and return of its $10 million.  Plaintiff Discover hereby tenders to GD Global the Preferred Shares.

## TENTH CLAIM FOR RELIEF
### Constructive Trust
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

105.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 104 as if fully stated herein.

106.     The SPA created a fiduciary relationship between Discover and 6D Global and its officers and directors and controlling persons, who made representations and warranties in the SPA that Discover relied on in purchasing the Preferred Shares and delivering $10 million to 6D Global and the Defendants.

107.     NASDAQ has since halted trading in the stock of 6D Global, and while Discover is holding illiquid and for all practicable purposes, non-transferable Preferred Shares, 6D Global has been unjustly enriched in the amount of $10 million.

## ELEVENTH CLAIM FOR RELIEF
### Common Law Negligence
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

108.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 107 as if fully stated herein.

109.     Defendant 6D Global and the Defendant officers and directors acted in their course of business, as a public company whose stock traded on the NASDAQ, when selling the Preferred Shares to Discover pursuant to the SPA.

110. As such, Defendants owed Discover a duty of care in their communications with and representations to Discover that were made to guide and induce Discover to enter into the SPA and pay $10 million to 6D Global, and which Discover ultimately did rely on in executing the SPA.

111. Defendants were negligent in making the material misrepresentations and omissions described above knowing them to be false at the time the SPA was executed, with the intention to induce Discover to purchase the Preferred Shares.

112. Defendants' negligence directly caused injury to Discover.

### TWELFTH CLAIM FOR RELIEF
### Common Law Misrepresentation
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

113. Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 112 as if fully stated herein.

114. Defendants, by and through the SPA and the misrepresentations and omissions committed in relation thereto, created a special relationship with Discover imposing a duty on Defendants to impart correct information to Discover.

115. As stated above, critical representations were misstated and material information omitted related to the Weis' domination and control of the Company and stock manipulation, and the ongoing investigations related thereto.

116. Discover relied on Defendants' misrepresentations and omissions in entering into the SPA, and would not have executed the SPA but for Defendants' misrepresentations and omissions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Discover respectfully requests judgment against Defendants as follows:

i. compensatory damages in an amount to be determined at trial;

ii. punitive damages in an amount to be determined at trial;

iii. rescission of the SPA;

iv. an order requiring Defendants to return to Discover the $10,000,000 payment for 6D Global preferred shares;

v. all of the costs of suit (including attorneys' fees and costs); and

vi. granting such other and further relief as this Court deems just and proper.

Dated:   New York, New York
September 28, 2015

GIBSON, DUNN & CRUTCHER LLP


By: */s Robert F. Serio*          
     Robert L. Weigel
     Robert F. Serio
     Andrew R. Keats

200 Park Avenue
New York, NY  10166-0193
Telephone:     212-351-4000
Facsimile:     212-351-4035

*Attorneys for Plaintiff Discover Growth Fund*

# EXHIBIT D

UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK
------------------------------------------------------------------ x
6D GLOBAL TECHNOLOGIES and SIX
DIMENSIONS, INC.,

                          Plaintiffs,

                v.                      Case No.: 1:16-CV-05625 (PAE)

ADAM WARE, JOHN KOENIG, MICHAEL
ARNESEN, MICHAEL WIENICK,
KATHERINE SACHSE, PETER RACHOR,

                          Defendants.
------------------------------------------------------------------ x
  ADAM WARE,

                 Third-Party Plaintiffs,

               v.                    Case No.:

6D GLOBAL TECHNOLOGIES, INC., NEW YORK
GLOBAL GROUP, INC., NYGG ASIA, LTD.,
TEJUNE KANG,TERRY MCEWEN, MARK
SZYNKOWSKI, and, BENJAMIN TIANBING WEI
A/K/A BENJAMIN WEY,

                    Third-Party Defendants.
------------------------------------------------------------------x

        The Third-Party Plaintiff, ADAM WARE (hereinafter referred to as "MR. WARE), by

and through Third-Party Plaintiffs' undersigned attorneys, allege as and for its Third-Party

Complaint against the Third-Party Defendants, 6D GLOBAL TECHNOLOGIES, INC.

("6DGLOBAL"), NEW YORK GLOBAL GROUP, INC. ("NYGG"), NYGG ASIA, LTD.

("ASIA"), TEJUNE KANG ("KANG"), TERRY MCEWEN ("MCEWEN"), MARK

SZYNKOWSKI ("SZYNKOWSKI"), BENJAMIN TIANBING WEI A/K/A BENJAMIN WEY

("WEI") alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs own

acts, and upon information and belief as to all other matters based on the investigation conducted

by Plaintiffs and Plaintiffs' attorneys, which, included among other things, a review of the

Defendants' public documents, Securities and Exchange Commission ("SEC") filings by 6DGlobal, as well as, media and analyst reports about the Third-Party Defendants, the Indictment of WEI in This Court, the pleadings filed in This Court by the SEC against WEI and others, as well as information readily obtained on the internet. Plaintiff believes that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery, does hereby alleges, as follows:

## NATURE OF THE ACTION

1.　　This Third-Party Complaint seeks to remedy wrongdoing committed by 6DGLOBAL, NYGG, ASIA, KANG, MCEWEN, SZYNKOWSKI, and WEI, for fraud, fraudulent inducement, securities fraud, and in the alternative breach of contract and negligence, for the failure to disclose material facts which caused MR. WARE, to sell his stock and good will in and to SWELLPATH to 6DGLOBAL, in exchange for what amounted to sham and fraud consideration.

2.　　The bargained for value of the shares of 6DGLOBAL that were issued to MR. WARE in exchange for conveyance of his 2,940,000 shares in SWELLPATH and its goodwill, was $1,860,000 based upon 6DGLOBAL's closing stock price of $7.75 per share, on the closing date. Once 6DGLOBAL was delisted from the NASDAQ the consideration paid to MR. WARE was pennies on the dollar.

3.　　From on or about November 3, 2010 through to March 20, 2015, 6DGLOBAL, NYGG, ASIA, KANG, MCEWEN, SZYNKOWSKI, and WEI failed to disclose that Third-Party Defendants were engaged in a stock manipulation scheme, related party transactions, that upon information and belief the Third-Party Defendants knew that there was an ongoing SEC and DOJ

investigation into WEI and the Third-Party Defendants, and that 6DGLOBAL made materially false and/or misleading public and private statements to the Third-Party Plaintiff which omitted the fact that MR. WEI had an ownership and/or a beneficial ownership in at least 5% of 6DGLOBAL shares, to induce him to contract.

4.      It is herein alleged that, Third-Party Defendant WEI, in effect, controlled all of 6DGLOBAL's stock through NYGG, and CleanTech, as well as, various nominees, and that WEI was engaged in a scheme to manipulate the price and trading volume of 6DGLOBAL stock, and that KANG, and the remaining named Second-Party, knew, should have known, and/or recklessly disregarded the truth as to the alleged misconduct of WEI and 6DGLOBAL.

5.      In the March 19, 2015 Securities Purchase Agreement, which closed on March 20, 2015, MR. WARE  agreed to sell and convey all of his then issued shares of SWELLPATH of his common stock (2,940,000) to 6DGLOBAL.

6.      In the March 20, 2015 Goodwill Purchase Agreement, MR. WARE, conveyed all of rights and interests in and to his Goodwill in SWELLPATH, to 6DGLOBAL.

7.      On September 8, 2015, the U.S. Attorney's Office of the Southern District of New York filed an Indictment against Third-Party Defendant WEI and others on charges including stock manipulation and fraud. See United States v. Benjamin Wei, et al. 15-crim-611 (2015)(the "Indictment"). The Indictment is attached hereto at **EXHIBIT A** and those allegation are incorporated herein by reference.

8.      The Indictment contains allegations that MR. WEI committed these wrongful acts with, and in respect to 6DGLOBAL.

9.      On September 10, 2015, the SEC filed a complaint (which was amended on November 9, 2015) in This Court against MR. WEI, his wife, his sister and Third-Party Defendant

3

NYGG, and others for their participation in a scheme to profit from undisclosed controlling ownership interests in several U.S. companies, including 6DGLOBAL, which were actually controlled by MR. WEI and NYGG(ASIA). The SEC Action is attached hereto at **EXHIBIT B** and those allegations are incorporated by reference herein.

10.     On September 12, 2015 the NASDAQ suspended trading of 6DGLOBAL common shares.

11.     Attached hereto at **EXHIBIT C** is the complaint filed by Discover Growth Fund against 6DGLOBAL, et al. under S.D.N.Y. Case Number 1:15-cv-07618-PKC, those allegations are incorporated herein by reference.

12.     Attached hereto at **EXHIBIT D** the complaint filed by Allan Scott Derivatively and on behalf of 6DGLOBAL against WEI, KANG, SZYNKOWSKI, MCEWEN, NYGG, and ASIA et al. under S.D.N.Y. Case Number 1:15-cv-09691-RWS, those allegations are incorporated herein by reference.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331(federal question) and 1332 (diversity), and that the matter in controversy exceeds $75,000, exclusive of interest and costs. Additionally, this Court has supplemental jurisdiction of the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

14.     Venue is also founded under 28 U.S.C. 1391 because the Third-Party Defendant 6DGLOBAL and Third Party Plaintiff have contractually consented to the jurisdiction of the federal courts located in Manhattan, City and State of New York.

15.     The Court has personal jurisdiction over each of the Third-Party Defendants because each Third-Party Defendant is either corporation conducting business and maintaining

operations in this District, or is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

16.     Venue is proper in this District pursuant to 28 US.C. 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resided or maintains executive offices in this District, and the Defendants have received a substantial compensation and/or profits in this District by engaging in numerous activities that had an effect in this District.

## PARTIES TO THE THIRD-PARTY COMPLAINT

### THIRD-PARTY PLAINTIFFS

17.     MR. WARE is a natural person and citizen domiciled in Minnesota.

### THIRD-PARTY DEFENDANTS

18.     6D GLOBAL is a Delaware corporation with a principal executive offices located in this District at 17 State Street, Suite 2550, New York, New York 10004. 6DGLOBAL is a citizen of Delaware.

19.     6D GLOBAL is the successor of CleanTech Innovations, Inc. ("CleanTech") a Nevada corporation, which became a publicly-traded company traded on the NASDAQ under ticker symbol "CTEK" through a reverse merger with shell company Everton Capital Corporation ("Everton"), prior to its merger with 6DGLOBAL.

20.     In September 2014, CleanTech merged with 6D, a Nevada corporation formerly known as Initial Koncepts, Inc. 6D became a wholly owned subsidiary of CleanTech.

21.     After the merger, CleanTech and 6D, the single entity converted into a Delaware corporation and changed its name to 6DGLOBAL.

5

22. NEW YORK GLOBAL GROUP, INC. ("NYGG"), is a Delaware Corporation headquartered in New York, New York. According to the SEC Filing of March 19, 2015, NYGG is the holder of 45% of the outstanding shares of 6DGLOBAL.

23. NYGG ASIA, LTD. ("ASIA"), is a subsidiary of NYGG located in Beijing, China.

24. MR. WEI is the founder and President of NYGG and oversaw the operations of NYGG ASIA at all relevant times hereto. Third-Party Defendant WEI was indicted by the United States Attorney for the Southern District of New York om September 8, 2015 for stock manipulation and the amassing of undisclosed beneficial ownership of more than five percent of the stock of 6DGLOBAL, among other companies, on September 10, 2015 placed under arrest. Defendant WEI is a citizen of New York.

25. MR. WEI controlled NYGG and NYGG ASIA, and controlled 6DGLOBAL.

26. KANG is the Chief Executive Officer of 6D and 6DGLOBAL, since 2004.

27. KANG was elected Chairman of the Board of Directors of 6DGLOBAL in September of 2014.

28. As of April 20, 2015 KANG beneficially owned 23,250,561 shares of 6DGLOBALS's issued and outstanding stock, which is 29.7% of the outstanding common stock of 6DGLOBAL. Upon information and belief KANG is domiciled in California.

29. MCEWEN is a natural person and was the CEO of CleanTech from July 10, 2010 through June 11, 20114.

30. MCEWEN served as interim Chief Executive Officer and Chairman of the Board of 6DGLOBAL from June 11, 2014 until September 2014.

31. Upon information and belief MCEWEN is domiciled in New York.

6

32. Defendant SZYNKOWSKI is the Chief Financial Officer of 6DGLOBAL, and upon information and belief resides in New York, New York.

## STATEMENT OF OPERATIVE FACTS

33. SWELL PATH was founded in 2008 by John Koenig.

34. Koenig met MR. WARE and the two began collaborating on projects, contracting with companies in the Portland, Oregon area.

35. Both Koenig and MR. WARE did the actual consulting themselves, but had aspirations to grow the company into something larger.

36. MR. WARE became a shareholder of SWELL PATH by the end of 2008, and the two moved forward into 2009 with the objective of creating a larger digital marketing agency.

37. SWELL PATH specialized in digital advertising, organic search optimization, and web analytics consulting.

38. By the end of 2009, SWELL PATH had several full-time employees, and had done roughly $250,000 in revenue.

39. In 2010, SWELL PATH grew to roughly $625,000 in revenue and began to establish a solid reputation in Portland and beyond.

40. From 2010 to 2014 SWELL PATH consistently grew, with 2014 being a year of substantial growth.

41. In 2013 SWELL PATH revenues were $1.285 million.

42. In 2014 SWELL PATH revenues were $1.84 million, with 52% gross margins and 7% net profit margins.

43. SWELL PATH revenues for 2015 was projected to be roughly $2.25 million.

7

44.     SWELL PATH reinvested a large amount of the gross margins into marketing and sales to spur growth, and operational expenses to create a foundation to scale more rapidly.

45.     This included SWELL PATH hiring a highly-qualified COO in August of 2014, to lead operational efforts.

46.     By this time the reputation of the firm extended beyond the West Coast and an office had been opened in Minneapolis to aid in growing business on the eastern half of the country.

47.     In mid-December 2014, Third-Party Defendants first began to inquire about acquisition of SWELL PATH.

48.     The long-term strategy for the SWELL PATH shareholders was to be acquired, and several suitors had expressed interest in or about 2013-2014.

49.     The plan of SWELL PATH management was to grow the company in 2015, and then solicit potential acquirers more aggressively in 2016.

50.     However, the Third-Party Defendants verbal offers, and eventual letter of intent, satisfied SWELL PATH management, which decided to proceed with due diligence and the eventual acquisition of its shares by 6DGLOBAL.

51.     It was agreed by the Third-Party Defendants and MR. WARE that the value of MR. WARE'S shares and goodwill in SWELLPATH was $1,680,000.

52.     MR. WARE agreed to sell his 2,940,000 shares of SWELL PATH stock and good will to 6DGLOBAL, in exchange for $240,000 and 240,000 restricted shares of 6DGLOBAL common stock.

53.     The value of the shares of 6DGLOBAL that were issued to MR. WARE was $1,860,000 based upon closing stock price of $7.75 per share on March 20, 2015, the date of the 6DGLOBAL/ MR. WARE transaction.

8

54.     The restriction placed upon MR. WARE'S stock was that he could not sell the stock before one (1) year of him being issued same- on or about March 20, 2016.

55.     Upon information and belief that value of the shares of 6DGLOBAL on or about March 20, 2016 was $0.08.

**Due Diligence and Defendants' False Misleading Statements**

56.     The Plaintiffs conducted their due diligence of the 6DGLOBAL and 6D, and proceeded to review public filings made by these entities, as well as, CleanTech.

57.     The Public filings that were of record at the time of the negotiations are contained in paragraphs below:

58.     On November 3, 2010, CleanTech filed a Form 10-Q of the third quarter of 1010 ending September 30, 2010 (the "3Q10 10-Q"). The 3Q10 10-Q was signed by an authorized agent.

59.     Attached to the 3Q10 1-Q were Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by non-party Bei Lu and Shuyuan Liu attesting to the accuracy of the financial statements and that all fraud was disclosed.

60.     On February 22, 2011, CleanTech filed with the SEC a From 10-K for the year ending December 2010 (the "2010 10-K"). The 2010 10-K was signed by a non-party Nan Liu, Arnold Staloff, Shuyuan Liu and Zilt Zhao.

61.     Attached to the 2010 10-K was SOX certifications signed by non-party Bie Lu and Nan Liu attesting to the accuracy of the financial statements and that all fraud was disclosed.

62.     On May 16, 2011, CleanTech filed with the SEC a Form 10-Q for the first quarter of 2011 ending March 31,2011 (the "1Q11 10-Q"). The 1Q11 10-Q was signed by the non-party Bei Lu.

9

63.     Attached to the 1Q11 10-K was SOX certifications signed by non-party Bie Lu and Nan Liu attesting to the accuracy of the financial statements and that all fraud was disclosed.

64.     On August 15, 2011, CleanTech filed with the SEC a Form 10-Q for the second quarter of 2011 ending June 30, 2011 (the "2Q11 10-Q"). The 2Q11 10-Q was signed by the non-party Bei Lu.

65.     Attached to the 2Q11 10-K was SOX certifications signed by non-party Nan Liu attesting to the accuracy of the financial statements and that all fraud was disclosed.

66.     On September 30, 2011, CleanTech filed with the SEC a Form 10-K/A for the year ending December 31, 2010 (the "2010 10 K/A"). The 2010 10-K/A was signed by the non-party Bei Lu, Sheng Ma, Dianfu Lu, Arnold Staloff, Shuyuan Liu, and Zilt Zhao.

67.     Attached to the 2010 10-K/A were SOX certifications signed by non-party Bei Lu and Sheng Ma attesting to the accuracy of the financial statements and that all fraud was disclosed.

68.     On November 14, 2011, CleanTech filed with the SEC a Form 10-Q or the third quarter of 2011 ending September 30, 2011 (the "3Q11 10-Q"). The 3Q11 10-Q was signed by the non-party Bei Lu.

69.     Attached to the 3Q11 10-Q were SOX certifications signed by non-party Bie Lu and Sheng Ma attesting to the accuracy of the financial statements and that all fraud was disclosed.

70.     On March 30, 2012, CleanTech filed with the SEC a form 10-K, for the year ending December 31, 2011 (the "2011 10-K"). The 2011 10-K was signed by non-parties Bei Lu, Sheng Ma, Arnold Staloff, Shuyuan Liu, and Zilt Zhao.

71.     Attached to the 2011 10-K was SOX certifications signed by non-party Bie Lu and Sheng Ma attesting to the accuracy of the financial statements and that all fraud was disclosed.

72. On May 13, 2014, CleanTech filed with the SEC a Form 10-Q for the first quarter of 2014 ending March 31, 2014 (the "1Q14 10-Q"). The 1Q14 10-Q was signed by the non-party Bei Lu.

73. Attached to the 1Q14 10-K was SOX certifications signed by non-party Bie Lu and Fengjun Sun attesting to the accuracy of the financial statements and that all fraud was disclosed.

74. On August 14, 2014, CleanTech filed with the SEC a Form 10-Q for the second quarter of 2014 ending June 30, 2011 (the "2Q14 10-Q"). The 2Q14 10-Q was signed by Third-Party Defendant MCEWEN.

75. Attached to the 2Q14 10-K were SOX certifications signed by Third-Party Defendant MCEWEN attesting to the accuracy of the financial statements and that all fraud was disclosed.

76. On November 12, 2014, CleanTech filed with the SEC a Form 10-Q for the third quarter of 2014 ending September 30, 2014 (the "3Q14 10-Q"). The 3Q14 10-Q was signed by Third-Party Defendant KANG.

77. Attached to the 3Q14 10-K was SOX certifications signed by Third-Party Defendant KANG attesting to the accuracy of the financial statements and that all fraud was disclosed.

78. The following public filings were of record After MR WARE and 6DGLOBAL entered into the Stock Purchase Agreement, Good-Will Purchase Agreement.

79. On March 30, 2015, 6DGLOBAL filed with the SEC a Form 10-K for the year ending December 31, 2014 (the "2014 10-K"). The 2014 10-K was signed by Third-Party Defendants KANG and SZYNKOWSKI, and non-parties, Adam Hartung, David S. Kaufman, and Anubhav Saxena.

80.     Attached to the 2014 10-K were SOX certifications signed by Third-Party Defendants KANG and SZYNKOWSKI, attesting to the accuracy of the financial statements and that all fraud was disclosed.

81.     On March 31, 2015, 6DGLOBAL filed with the SEC a Form 10-K/A for the year ending December 31, 2014 (the "2014 10-K/A"). The 2014 10-K/A was signed by Third-Party Defendant KANG.

82.     Attached to the 2014 10-K/A were SOX certifications signed by Third-Party Defendants KANG and SZYNKOWSKI attesting to the accuracy of the financial statements and that all fraud was disclosed.

83.     On April 17, 2015 the Third-Party Defendants caused a Preliminary proxy statement Form PRE 14A to be files with the Securities and Exchange committee.

84.     On April 30, 2015, 6DGLOBAL filed with the SEC the 2015 Proxy Statement, which was signed by Third-Party Defendant KANG.

85.     On May 15, 2015, 6DGLOBAL filed with the SEC a Form 10-Q for the first quarter of 2015 ending March 31, 2015 (the "1Q15 10-Q"). The 1Q15 10-K/A was signed by Third-Party Defendants KANG and SZYNKOWSKI.

86.     Attached to the 1Q15 10-Q were SOX certifications signed by Third-Party Defendants KANG and SZYNKOWSKI, attesting to the accuracy of the financial statements and that all fraud was disclosed.

87.     On August 14, 2015, 6DGLOBAL filed with the SEC a Form 10-Q for the second quarter of 2015 ending June 30, 2015 (the "2Q15 10-Q"). The 2Q15 10-K/A was signed by Third-Party Defendants KANG and SZYNKOWSKI.

12

88.     Attached to the 2Q15 10-Q were SOX certifications signed by Third-Party Defendants KANG and SZYNKOWSKI attesting to the accuracy of the financial statements and that all fraud was disclosed.

89.     At no time prior to the consummation of the Stock Purchase Agreement or the Good-Will Purchase Agreement did the Third-Party Defendants file or otherwise disclose to Third-Party Plaintiff that WEI had a controlling ownership interest in 6DGLOBAL.

90.     At no time prior to the consummation of the Stock Purchase Agreement or the Good-Will Purchase Agreement did the Third-Party Defendants file or otherwise disclose to Third-Party Plaintiff that WEI had a beneficial ownership of security interests in 6DGLOBAL for other persons.

91.     At no time after the consummation of the Stock Purchase Agreement or the Good-Will Purchase Agreement did the Third-Party Defendants file or otherwise disclose to Third-Party Plaintiff that WEI had a controlling ownership interest in 6DGLOBAL.

92.     At no time after the consummation of the Stock Purchase Agreement or the Good-Will Purchase Agreement did the Third-Party Defendants file or otherwise disclose to Third-Party Plaintiff that WEI had a beneficial ownership of security interests in 6DGLOBAL for other persons.

93.     MR. WARE reasonably relied upon the public filings made by the Third-Party Defendants, and the representations made therein.

94.     Based upon these representations, MR. WARE agreed to sell his 2,940,000 shares of SWELL PATH stock to 6DGLOBAL, in exchange for $240,000 and 240,000 restricted shares of 6DGLOBAL common stock.

**AS AND FOR A FIRST CAUSE OF ACTION:**
**BREACH OF CONTRACT**
*(Against Third-Party Defendant 6DGLOBAL)*

95.     SD MR. WARE repeats and realleges paragraphs "1" through "94" as if more fully

set forth herein.

96.     6DGLOBAL represented, covenanted, and warranted in the Stock Purchase

Agreement that it entered with Mr. WARE and 6DGLOBAL, as follows:

> "4.3 <u>Securities Act Exchange Act Filings</u>. Buyer has made available
> to the Company (SWELLPATH) and the Sellers (Mr. WARE and
> other equity owners of SWELLPATH) complete and accurate
> copies, as amended or supplemented, of all reports filed by Buyer
> under Section 13 or 15(d) of the Exchange Act and al proxy or
> information statements filed by Buyer under sections (a) or (c)
> Section 14 of the Exchange Act with the SEC since October 12,
> 2014 (such documents are collectively referred to herein as "Buyer
> Reports"). The Buyer Reports constitute all of the documents to be
> filed by Buyer under Section 13 or subsection (a) or (c) of Section
> 14 of the Exchange Act with the SEC From October 1, 2014 through
> the date of this Agreement. <u>Buyer Reports, complied in all material
> respects with the requirements of the Exchange Act and the rules
> and regulations thereunder when filed</u>."
> (emphasis added).

97.     6DGLOBAL promised in the Stock Purchase Agreement that it entered into with

Mr. WARE, that 6DGLOBAL would promptly notify MR. WARE in writing of any fact,

circumstance, event or action the existence, occurrence or taking of which (A) has had, or could

reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (B)

has resulted in, or could be expected to result in, the failure of any of the conditions set forth ion

Article IV to be satisfied.... (iv) any matter hereafter arising or discovered that , if existing or

known at the date of this Agreement (March 19, 2015), and the closing (March 20, 2015) that

would be required to be disclosed in the Disclosure Schedules, including any actions commenced,

14

or to Seller's knowledge, threatened against, relating to or involving or otherwise effecting the Company, the Securities or the Business.

98.     Upon information and belief the Third-Party Defendants knew that WEI the other Third-Party Defendants were being investigated by the SEC and the DOJ.

99.     The Third-Party Defendants failed to disclose in writing to MR. WARE the existence and their knowledge of the investigation.

100.     For the reasons stated, herein, as well as those, in the attached indictment and accompanying lawsuits pending against the Third-Party Defendants, 6DGLOBAL is in breach of the Stock Purchase Agreement, to wit the Buyer's reports did not comply in all material respects with the requirements of the Exchange Act and rules and regulations.

101.     MR. WARE has been damaged by 6DGLOBAL's breach of contract.

### AS AND FOR A SECOND CAUSE OF ACTION: FRAUDULENT INDUCEMENT TO CONTRACT
#### *(Against Third-Party Defendants)*

102.     MR. WARE repeats and realleges paragraphs "1" through "101" as if more fully set forth herein.

103.     The Third-Party Defendants represented, covenanted, and warranted that The Buyer Reports constitute all of the documents to be filed by Buyer under Section 13 or subsection (a) or (c) of Section 14 of the Exchange Act with the SEC from 2004 through the date of the Agreement, complied in all material respects with the requirements of the Exchange Act and the rules and regulations thereunder when filed."

104.     The Third-Party Defendants knew at the time that 6DGLOBAL and he made these representation to Third-Party Plaintiff that they were false.

105. The Third-Party Defendants were recklessly indifferent to the truth of the representation, covenant and warrant that were made in the Buyer Reports, at all times that the representations were made to Third-Party Plaintiff.

106. The Third-Party Defendants made the representations to MR. WARE so as to induce MR. WARE to enter into the Stock Purchase Agreement, Goodwill Purchase Agreement.

107. MR. WARE reasonably relied upon the Third-Party Defendants representation, covenant and warrant, which were material terms of the Stock Purchase Agreement.

108. But for this representation, covenant and warrant, Third-Party Plaintiffs would not have entered into the Stock Purchase Agreement, Goodwill Purchase Agreement.

109. The representation, covenant and warrant were not true and MR. WARE has been damaged by the fraudulent inducement of Third-Party Defendants.

## AS AND FOR A THIRD CAUSE OF ACTION
## SECURITIES FRAUD
### *(Against Third-Party Defendant 6DGLOBAL, NYGG, Wei, Kang, McEwen, Szynkowski)*

110. MR. WARE repeat and reallege paragraphs "1" through "109" as if more fully set forth herein.

111. The Third-Party Plaintiff relied upon the Form 10-Q's and the 10-K's and the 2015 Proxy statements made therein. That are referred to in paragraphs 58 to 77 above were materially false and/or misleading because they misinterpreted and failed to disclose the following adverse facts pertaining to 6DGLOBAL's business and operations which were known to the Third-Party Defendants or recklessly disregarded by them.

112. Specifically, 6DGLOBAL, NYGG, Wei, Kang, McEwen, Szynkowski made false and/or misleading statements and/or failed to disclose that: (1) 6DGLOBAL had deficient internal

controls, (2) that the deficient internal controls allowed Third-Party Defendant WEI to exert influence and control over the 6DGLOBAL, (3) Third-Party Defendants were engaged in a scheme to manipulate 6DGLOBAL's stock price; and (4) as a result 6DGLOBAL's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

113.    6DGLOBAL, NYGG, Wei, Kang, McEwen, Szynkowski acting individually and in concert, directly and indirectly, engaged in a common scheme, plan, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, courses of business which operated a fraud deceit upon MR. WARE and made various deceptive and untrue statements of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to MR. WARE.

114.    The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things to induce MR. WARE to sell his shares in and good will in and to, SWELLPATH to enter into the Stock Purchase Agreement, Good Will Purchase Agreement, and Employment Agreement with MR. WARE and SWELLPATH, to wit  artificially inflated, and manipulated shares of 6DGLOBAL were exchanged in part consideration.

115.    Third-Party Defendants, 6DGLOBAL, NYGG, Kang, Wei, McEwen, Szynkowski were motivated to commit the fraud described herein, at least in part by the substantial value that MR. WARE and SWELLPATH would provide to 6DGLOBAL and the increased value of the shares that KANG and WEI owned in 6DGLOBAL, and so as to ensure that MR. WARE and SWELLPATH would not be acquired by a competitor of 6DGLOBAL.

116.    Third-Party Defendants 6DGLOBAL, NYGG, Wei, Kang, McEwen, Szynkowski were motivated to commit the fraud described herein to induce MR. WARE and SWELLPATH to obtain exceptional goodwill for the benefit of itself, and of the shareholders of 6DGLOBAL, as

well as, to ensure that MR. WARE would agree to impart this goodwill on behalf of 6D and 6DGLOBAL, and for the benefit of its shareholders.

117.    Third-Party Defendant WEI acting in his capacity as "unpaid consultant" and beneficial owner of more than 5% of the outstanding shares of 6DGLOBAL, was motivated to commit the fraud described herein to enrich himself and his close family members, colleagues, and friends through the acquisition of SWELLPATH common stock, and goodwill and employment of MR. WARE.

118.    Third-Party KANG, acting in his capacity as Chief Executive Officer of 6D, the predecessor of 6DGLOBAL since the companies founding in 2004, and as Chairman of the Board of Directors of 6DGLOBAL and Chief Executive Officer of 6DGLOBAL in September 2014, was motivated to commit the fraud described herein to enrich himself through the acquisition of SWELLPATH common stock, and goodwill and employment of MR. WARE.

119.    The Third-Party Defendants 6DGLOBAL, NYGG, Wei, Kang, McEwen, Szynkowski pursuant to said scheme, plan and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance of deceptive and materially false and misleading statements to MR. WARE and SWELLPATH, and the public as described above.

120.    To his detriment MR. WARE relied on the Third-Part Defendants' misleading statements and omissions in agreeing to be sold to 6DGLOBAL not knowing the false and misleading nature of the statements and omissions.

121.    To his detriment MR. WARE relied on the Third-Part Defendants' misleading statements and omissions in agreeing to accept common stock in 6DGLOBAL as part

consideration for the sale of all the common stock and Good will held by WARE in and to SWELLPATH, not knowing the false and misleading nature of the statements and omissions.

122.    As a result of the foregoing, Third-Party Defendants violated the Securities Exchange Act and the rules promulgated thereunder in that they: (a) employed a device, scheme, or artifice to defraud (b) made an untrue statement of material fact or omitted a material fact necessary to make a statement not misleading or (c ) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit in connection with the purchase or sale of any security, to wit the exchange of 6DGLOBAL common stock as part consideration for the purchase of the Third-Party Plaintiffs' Goodwill, common stock in and to SWELLPATH, and employment contract.

123.    MR. WARES reliance was the proximate cause of his damages.

### AS AND FOR A FOURTH CAUSE OF ACTION
### COMMON LAW FRAUD
*(Against Third-Party Defendant 6DGLOBAL, NYGG, Wei, Kang, McEwen, Szynkowski)*

124.    MR. WARE repeats and realleges paragraphs "1" through "123" as if more fully set forth herein.

125.    Defendants omitted material facts and made the misrepresentations knowing them to be false and material at the time that they were made with the intention to induce MR. WARE to accept the shares of 6DGLOBAL as consideration.

126.    MR. WARE reasonably relied upon the misstatements and the omissions of material fact, when he decided to accept the 6DGLOBAL shares as consideration.

127.    MR. WARE relied upon the representations and omissions in accepting the 6DGLOBAL shares as good and valuable consideration, and he has been directly harmed as the result of the transaction.

## AS AND FOR A FIFTH CAUSE OF ACTION
## COMMON LAW NEGLIGENCE
*(Against Third-Party Defendant 6DGLOBAL, NYGG, Wei, Kang, McEwen, Szynkowski)*

128.    MR. WARE repeats and reallege paragraphs "1" through "127" as if more fully set forth herein.

129.    Third-Party Defendants, 6DGLOBAL, NYGG, Wei, Kang, McEwen, Szynkowski acted in their due course of business as a publicly traded company, and as officers and directors of a publicly traded company on the NASDAQ, when they conveyed shares of 6DGLOBAL to MR. WARE as part consideration.

130.    The Third-Party Defendants, 6DGLOBAL, NYGG, Wei, Kang, McEwen, Szynkowski, owed MR. WARE a duty of care with respect to their public filings, as well as, their representations to MR. WARE that were made to instruct and guide MR. WARE to accept 6DGLOBAL shares as part consideration.

131.    The Third-Party Defendants, 6DGLOBAL, NYGG, Wei, Kang, McEwen, Szynkowski, were negligent in preparing and publishing 6DGLOBAL public filings, and omitting material fact, and they were negligent in making representations and omissions of material fact to MR. WARE, which MR. WARE relied upon in executing the Securities Purchase Agreement and Goodwill Purchase Agreement.

132. The Third-Party Defendants, 6DGLOBAL, NYGG, Wei, Kang, McEwen, Szynkowski, were negligent when they made the material misrepresentations and omissions to MR. WARE.

133. MR. WARE would not have entered into, nor executed the Securities Purchase Agreement and Goodwill Purchase Agreement but for the Third-Party Defendants, 6DGLOBAL, NYGG, Wei, Kang, McEwen, Szynkowski's material misrepresentations and omissions.

## PRAYER FOR RELIEF

**WHEREFORE**, Third-Party Plaintiff, ADAM WARE respectfully requested that judgment be entered over and against the Third-Party Defendants, as follows:

I. As and for the First Cause of Action, an amount to be determined at trial but not expected to be less than Two Million ($2,000,000) Dollars;

II. As and for the Second Cause of Action, an amount to be determined at trial but not expected to be less than Two Million ($2,000,000) Dollars, plus punitive damages in an amount to be determined at trial but not expected to be less than Five Million ($5,000,000) Dollars;

III. As and for the Third Cause of Action, an amount to be determined at trial but not expected to be less than Two Million ($2,000,000) Dollars;

IV. As and for the Fourth Cause of Action, an amount to be determined at trial but not expected to be less than Two Million ($2,000,000) Dollars, plus punitive damages in an amount to be determined at trial but not expected to be less than Five Million ($5,000,000) Dollars;

V. As and for the Fifth Cause of Action, an amount to be determined at trial but not expected to be less than Two Million ($2,000,000) Dollars;

VI. All of the interest, and costs of suit including attorneys fees and costs; as well as,

VII.  granting any further relief that This Court deems just and proper.

Dated: New York, New York
          November 4, 2016

The Law Offices of Peter Sverd, PLLC

By: _____

           Peter Sverd, Esq.
225 Broadway, Suite 613
New York, New York 10007
Tel.: 646-751-8743
*Attorneys for Third-Party Plaintiff Adam Ware*

# EXHIBIT E

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

PLAINTIFFS
John Cottam

DEFENDANTS
Global Emerging Capital Group, LLC, Alexander Kibrik, William Uchimoto, 6D Global Technologies, Inc., 6D Acquisitions, Inc., and Tejune Kang

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER
Gottlieb & Gordon LLP
111 Broadway, Suite 701
New York, New York 10006
212.566.7766

ATTORNEYS (IF KNOWN)

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

15 USC 78j - securities fraud

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No[x] Yes[ ] Judge Previously Assigned

If yes, was this case Vol.[ ] Invol.[ ] Dismissed. No[ ] Yes[ ] If yes, give date _____ & Case No. _____

IS THIS AN INTERNATIONAL ARBITRATION CASE? No [x] Yes [ ]

*(PLACE AN [x] IN ONE BOX ONLY)*      NATURE OF SUIT

TORTS

ACTIONS UNDER STATUTES

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY | [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | [ ] 422 APPEAL 28 USC 158 | [ ] 375 FALSE CLAIMS |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | | | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 376 QUI TAM |
| [ ] 130 MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | [ ] 365 PERSONAL INJURY PRODUCT LIABILITY | [ ] 690 OTHER | | [ ] 400 STATE REAPPORTIONMENT |
| [ ] 140 NEGOTIABLE INSTRUMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | | PROPERTY RIGHTS | [ ] 410 ANTITRUST |
| [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 340 MARINE | PERSONAL PROPERTY | | [ ] 820 COPYRIGHTS | [ ] 430 BANKS & BANKING |
| | [ ] 345 MARINE PRODUCT LIABILITY | [ ] 370 OTHER FRAUD | | [ ] 830 PATENT | [ ] 450 COMMERCE |
| [ ] 151 MEDICARE ACT | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | | [ ] 840 TRADEMARK | [ ] 460 DEPORTATION |
| [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | | | | [ ] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| | [ ] 360 OTHER PERSONAL INJURY | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | LABOR | SOCIAL SECURITY | [ ] 480 CONSUMER CREDIT |
| [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | [ ] 710 FAIR LABOR STANDARDS ACT | [ ] 861 HIA (1395ff) | [ ] 490 CABLE/SATELLITE TV |
| | | | [ ] 720 LABOR/MGMT RELATIONS | [ ] 862 BLACK LUNG (923) | |
| [ ] 160 STOCKHOLDERS SUITS | | | | [ ] 863 DIWC/DIWW (405(g)) | [x] 850 SECURITIES/ COMMODITIES/ EXCHANGE |
| [ ] 190 OTHER CONTRACT | | PRISONER PETITIONS | [ ] 740 RAILWAY LABOR ACT | [ ] 864 SSID TITLE XVI | |
| [ ] 195 CONTRACT PRODUCT LIABILITY | | [ ] 463 ALIEN DETAINEE | [ ] 751 FAMILY MEDICAL LEAVE ACT (FMLA) | [ ] 865 RSI (405(g)) | [ ] 890 OTHER STATUTORY ACTIONS |
| | ACTIONS UNDER STATUTES | [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255 | | | [ ] 891 AGRICULTURAL ACTS |
| [ ] 196 FRANCHISE | CIVIL RIGHTS | [ ] 530 HABEAS CORPUS | [ ] 790 OTHER LABOR LITIGATION | FEDERAL TAX SUITS | |
| | [ ] 440 OTHER CIVIL RIGHTS (Non-Prisoner) | [ ] 535 DEATH PENALTY | [ ] 791 EMPL RET INC SECURITY ACT (ERISA) | [ ] 870 TAXES (U.S. Plaintiff or Defendant) | [ ] 893 ENVIRONMENTAL MATTERS |
| REAL PROPERTY | [ ] 441 VOTING | [ ] 540 MANDAMUS & OTHER | | [ ] 871 IRS-THIRD PARTY 26 USC 7609 | [ ] 895 FREEDOM OF INFORMATION ACT |
| [ ] 210 LAND CONDEMNATION | [ ] 442 EMPLOYMENT | | IMMIGRATION | | [ ] 896 ARBITRATION |
| [ ] 220 FORECLOSURE | [ ] 443 HOUSING/ ACCOMMODATIONS | PRISONER CIVIL RIGHTS | [ ] 462 NATURALIZATION APPLICATION | | [ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION |
| [ ] 230 RENT LEASE & EJECTMENT | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 550 CIVIL RIGHTS | [ ] 465 OTHER IMMIGRATION ACTIONS | | |
| [ ] 240 TORTS TO LAND | | [ ] 555 PRISON CONDITION | | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 245 TORT PRODUCT LIABILITY | [ ] 446 AMERICANS WITH DISABILITIES -OTHER | [ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT | | | |
| [ ] 290 ALL OTHER REAL PROPERTY | [ ] 448 EDUCATION | | | | |

*Check if demanded in complaint:*

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____ OTHER _____

*Check YES only if demanded in complaint*
JURY DEMAND: [x] YES [ ] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y. AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

JUDGE _____ DOCKET NUMBER _____

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

*(PLACE AN x IN ONE BOX ONLY)*          **ORIGIN**

[x] 1 Original Proceeding    [ ] 2 Removed from State Court    [ ] 3 Remanded from Appellate Court    [ ] 4 Reinstated or Reopened    [ ] 5 Transferred from (Specify District)    [ ] 6 Multidistrict Litigation    [ ] 7 Appeal to District Judge from Magistrate Judge Judgment

           [ ] a. **all parties represented**

           [ ] b. **At least one party is pro se.**

*(PLACE AN x IN ONE BOX ONLY)*      **BASIS OF JURISDICTION**      *IF DIVERSITY, INDICATE CITIZENSHIP BELOW.*

[ ] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT    [x] 3 FEDERAL QUESTION (U.S. NOT A PARTY)    [ ] 4 DIVERSITY

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF | DEF | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

**COURTHOUSE ASSIGNMENT**

I hereby certify that this case should be assigned to the courthouse indicated below pursuant to Local Rule for Division of Business 18, 20 or 21. DO NOT check either box if this is a PRISONER PETITION/PRISONER CIVIL RIGHTS COMPLAINT.

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] WHITE PLAINS    [x] MANHATTAN

DATE 6/16/2016    SIGNATURE OF ATTORNEY OF RECORD

         /s/ Derrelle M. Janey

RECEIPT #

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[x] YES (DATE ADMITTED Mo. April    Yr. 2012 )
Attorney Bar Code # DJ 6897

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

**GOTTLIEB & GORDON LLP**
Derrelle M. Janey
The Trinity Building
111 Broadway, Suite 701
New York, New York 10006
(212) 566-7766
(212) 374-1506 (fax)
*Attorneys for Plaintiff John Cottam*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

\-------------------------------------------------------- x

|  |  |  |
|---|---|---|
| **JOHN COTTAM,** | : | Case No. |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | |
| | : | **COMPLAINT AND** |
| **GLOBAL EMERGING CAPITAL GROUP,** | : | **DEMAND FOR JURY TRIAL** |
| **LLC, ALEXANDER KIBRIK, WILLIAM** | : | |
| **UCHIMOTO, 6D GLOBAL** | : | |
| **TECHNOLOGIES, INC., 6D** | : | |
| **ACQUISITIONS, INC., and TEJUNE** | : | |
| **KANG,** | : | |
| | : | |
| Defendants. | : | |

\-------------------------------------------------------- x

JOHN COTTAM ("Dr. Cottam" or "Plaintiff"), for his complaint against GLOBAL

EMERGING CAPITAL GROUP, LLC, ALEXANDER KIBRIK, WILLIAM UCHIMOTO,

6D GLOBAL TECHNOLOGIES, INC., 6D ACQUISITIONS, INC., and TEJUNE KANG

(collectively, "Defendants"), alleges as follows:

## JURSIDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 (federal question) and 1332 (diversity), and 15 U.S.C. § 78aa.  Additionally, this Court

has supplemental jurisdiction of the state law claims asserted herein pursuant to 28 U.S.C.

§ 1367(a).

2.      The amount of damages at issue exceeds $75,000.00, exclusive of interest and costs.

3.      This Court has personal jurisdiction over each of the Defendants because they reside in New York State, they regularly transact or have transacted business in New York State, their conduct giving rise to this complaint was directed towards and/or had an effect in New York State, or they agreed to be subjected to the jurisdiction of New York.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 78aa.  A substantial part of the events or omissions giving rise to the claim occurred in this District; one or more Defendants resides or maintains offices within New York State, generally, and this District, in particular; and one or more Defendants agreed that one or more of the claims asserted herein should be adjudicated in New York State.[1]

## PARTIES AND RELEVANT NON-PARTIES

5.      Plaintiff, Dr. Cottam, is a natural person who, at all relevant times, was over the age of 18.  Dr. Cottam is a dermatologist and maintains his residence in Florida.

6.      Defendant Global Emerging Capital Group, LLC ("GECG") is a Pennsylvania limited liability company with a principal office address of 44 Wall Street, 12th Floor, New York, New York 10005.  GECG is broker/dealer registered with the SEC under SEC No. 8-66308 and CRD No. 130120.  GECG is a resident of Pennsylvania and New York.  At all times relevant to this complaint, GECG operated under its former name, Radnor Research & Trading Company, LLC ("Radnor").[2]

---

[1]      The Subscription Agreement, as defined herein, provides that any claims arising from the Subscription Agreement are to be commenced in a federal or state court within New York State.

[2]      On or about February 25, 2016, Radnor officially changed its name to Global Emerging Capital Group, LLC by causing a certificate of amendment to be filed with Pennsylvania's Department of State.

2

7.      Defendant Alexander Kibrik ("Kibrik") is a registered representative with CRD No. 5557827.  Kibrik was employed by Radnor from May 2011 through July 2015, when, upon information and belief, he was terminated for cause.  Upon information and belief, Kibrik is a resident of New York.  At all relevant times, in his communications and dealings with Dr. Cottam as his investment advisor, Kibrik acted as Radnor's employee and agent.

8.      Defendant 6D Global Technologies, Inc. ("6D Global") is a Delaware corporation headquartered in New York at 17 State Street, Suite 2550, New York, New York 10004.  Accordingly, 6D Global is a citizen of New York and Delaware.  6D Global traded on the NASDAQ exchange under the ticker symbol "SIXD."  NASDAQ has suspended trading of 6D Global's shares.

9.      CleanTech Innovations, Inc. ("CleanTech") was a NASDAQ-listed company (ticker symbol "CTEK") domiciled in Nevada with operations in China.  CleanTech designed and manufactured structural towers for megawatt-class wind turbines.  As described more fully herein, CleanTech changed its name to 6D Global.

10.     Initial Koncepts, Inc., d/b/a Six Dimensions ("Six Dimensions"), was a California corporation with offices in California, Ohio and New York.  It operated as a technology services provider.

11.     Defendant 6D Acquisitions, Inc. ("6D Acquisitions"), a Nevada corporation, was a special purpose vehicle formed for the purpose of investing in the reorganized company that followed a share exchange between CleanTech and Six Dimensions.  The reorganized company was 6D Global.  6D Acquisitions dissolved on or around October 22, 2014.

12.     Defendant Tejune Kang ("Kang") has been 6D Global's Chairman and CEO since September 2014.  Kang resides in New York.  According to filings with the SEC, Kang owns

3

29.7% of 6D Global's outstanding shares of common stock. Kang was also the CEO and President of 6D Acquisitions.

13.     Non-Party Benjamin Tianbing Wei a/k/a Benjamin Wey ("Wey") resides in New York. He is the subject of numerous lawsuits related to his orchestration and manipulation of the stock prices of various companies through his undisclosed and controlling ownership therein. Among other matters, he is a defendant in a civil action in this District commenced by the United States Securities and Exchange Commission (the "SEC") alleging violations of the federal securities laws in connection with some of the entities named in this Complaint. *See SEC v. Wey, et al.,* 15-CV-7116 (S.D.N.Y.) (PKC) (the "SEC Action"). A copy of the Amended Complaint in the SEC Action, filed on November 9, 2015, is annexed hereto as Exhibit A and is incorporated herein by reference. Wey is also currently under Indictment in this District for, *inter alia*, conspiring to violate federal securities laws and commit money laundering (the "Criminal Action") as a result of his conduct underlying the allegations set forth in the SEC Action. A copy of the Indictment is attached hereto as Exhibit B and is incorporated herein by reference.

14.     Defendant William Uchimoto ("Uchimoto") is an attorney licensed to practice in Pennsylvania. Uchimoto is a citizen of Pennsylvania, where he resides. Uchimoto transacts business within New York State. During the relevant time period, he was Radnor's (now GECG) regulatory legal counsel, and, *inter alia*, advised Radnor regarding Radnor's conduct in New York in connection with the facts underlying this Complaint. Upon information and belief, during the relevant time period, Uchimoto also acted as Wey's personal legal counsel and as legal counsel for Wey's entities, including CleanTech, and was involved with the share exchange between CleanTech and Six Dimensions. Uchimoto is also a defendant in the SEC Action.

## FACTS

15.     In early September 2014, Dr. Cottam was approached by Kibrik, his investment representative at Radnor, who presented Dr. Cottam with a Private Confidential Offering (the "Offering") as a possible lucrative investment.  The Offering was an investment in 6D Acquisitions, a "special purpose vehicle" created for the purpose of investing in the reorganized company (6D Global) following a share exchange between CleanTech and Six Dimensions (the "Share Exchange").  As disclosed in the materials Kibrik presented to Dr. Cottam and filings with the SEC, the purpose of the Offering was to infuse capital of between a minimum of $3,000,000.00 and a maximum of $5,100,000.00 into 6D Global.  The materials and SEC filings further stated that the successful completion of the Offering was a mandatory prerequisite to the consummation of the Share Exchange.

16.     As set forth herein, to induce Dr. Cottam to invest money in the Offering, Defendants at various times made oral and written representations to Dr. Cottam knowing they were false when made and omitted material information in their communications with Dr. Cottam.

17.     In connection with the Offering, in early September 2014, Kibrik provided Dr. Cottam with a document, dated June 17, 2014, entitled "Confidential Subscription Documents" (the "Subscription Documents").[3]

18.     Included within the Subscription Documents was a subscription agreement (the "Subscription Agreement"), which set forth the terms of the Offering.  The Subscription Agreement explicitly represented that "[t]here are no material misstatements or omissions in this Subscription Agreement or any information provided in the Offering materials."

---

[3]     A copy of the Subscription Documents is attached hereto as Exhibit C and incorporated herein by reference.

19.     As described in the Subscription Agreement, the contemplated Share Exchange was for CleanTech to issue approximately 50% of its outstanding shares of common stock to the shareholders of Six Dimensions in exchange for all of Six Dimensions' outstanding shares, the net result of which was to render Six Dimensions a wholly-owned subsidiary of CleanTech as depicted in Diagram 1 below.

20.     As one of the conditions for the Share Exchange to occur, prior to or simultaneous with the Share Exchange, CleanTech was required to change its name to "6D Global Technologies, Inc." and obtain approval for its stock to be listed on the NASDAQ Capital Market.

**Diagram 1: Net Result of Share Exchange as Represented in Subscription Agreement**



21.     The Subscription Agreement identified Radnor as the exclusive placement agent (the "Placement Agent") for the Offering.  As Placement Agent, Radnor was set to earn a substantial economic windfall with a successful Offering.  The Subscription Agreement disclosed that Radnor's Placement Agent fee was 15% of the Offering, which represented up to

6

2,550,000 shares in 6D Global.  Although not disclosed to Dr. Cottam in the Subscription

Agreement or elsewhere, Radnor's fee also included a 10% cash commission based upon the

total proceeds invested through the Offering.

22.     With the intent to induce Dr. Cottam to invest in the Offering, in September 2014,

**prior** to Dr. Cottam's investment, Kibrik represented to Dr. Cottam that a return of 15 – 30 times

his investment through this Offering would not be unrealistic.

23.     Pursuant to the Offering, investors could purchase "Units" for $15,000.00 per

Unit.  Each Unit consisted of fifty-thousand (50,000) shares of 6D Acquisitions common stock.

24.     The terms of the Subscription Agreement were unequivocal: for every one share

of 6D Acquisitions stock purchased through the Offering, the investor would receive one share

of 6D Global stock.  In particular, the Subscription Agreement provided:

> **Immediately upon the closing and effectiveness of the Share Exchange, each
> share of Common Stock underlying the Units purchased herein shall be
> automatically converted on a 1:1 basis into shares of [6D Global's] Nasdaq
> listed common stock (the "Financing Security Exchange"), such shares shall
> be distributed to the Subscribers herein and [6D Acquisitions] shall
> subsequently be dissolved.**

25.     The Subscription Agreement also similarly stated:

> **WHEREAS, upon completion of the Offering and immediately upon the
> closing of the Share Exchange, all of the Company's common stock
> underlying the Units (as defined herein) offered hereby will be automatically
> exchanged into shares of [6D Global] on a 1:1 basis.**

26.     On or about September 18, 2014, relying on, *inter alia*, the clear terms of the

Subscription Agreement and Kibrik's promise of receiving a considerable return on his

investment, Dr. Cottam purchased a total of 58 Units through the Offering for $870,000.00,

representing 2,900,000 shares of common stock in 6D Acquisitions.  On or about September 25,

2016, Dr. Cottam caused $870,000.00 to be wired to the escrow agent identified in the Subscription Documents.

27.     Upon information and belief, Dr. Cottam was one of the largest investors, if not the largest investor, in the Offering.

28.     On September 29, 2014, CleanTech and Six Dimensions merged pursuant to a reverse merger.  As described more fully below, prior to Dr. Cottam's investment in the Offering, the undisclosed plan to engage in a reverse merger was not communicated to Dr. Cottam by any Defendant.

29.     Pursuant to the clear and explicit terms of the Subscription Agreement providing for a 1:1 share purchase, and the representations of Kibrik acting on behalf of Radnor, Dr. Cottam expected and should have obtained 2,900,000 shares of 6D Global following the September 29 Share Exchange, as depicted in Diagram 2 below.

**Diagram 2: Dr. Cottam's Investment as Represented in the Subscription Agreement**



30.     Dr. Cottam did not receive the correct number of shares.  Dr. Cottam instead received a total of 420,290 shares in 6D Global, 2,479,710 fewer shares than he should have received pursuant to the clear and unambiguous language of the Subscription Agreement.

31.     Defendants did not inform Dr. Cottam that he would be receiving 420,290 shares of 6D Global rather than 2,900,000 shares prior to his investment in the Offering.

32.     Relying on the clear language of the Subscription Agreement, following the Share Exchange, Dr. Cottam believed he owned 2,900,000 shares of 6D Global.  It was not until around April 2015, when he attempted to sell his shares, as set forth below, that he learned of the share deficiency.

33.     After learning of the share deficiency, in or around April 2015, Dr. Cottam demanded an explanation from Kibrik and Radnor as to why he did not receive the correct number of shares.  They failed to provide him with an explanation.  Over the next couple of months, Dr. Cottam made repeated demands to Kibrik and Radnor for an explanation as to why he had received over 2.47 million fewer shares in 6D Global than what he should have.

34.     On or about May 21, 2015, Dr. Cottam was eventually contacted by Uchimoto, who identified himself as Radnor's counsel and asked that Dr. Cottam call to discuss Dr. Cottam's questions.

35.     In text and email communications between Dr. Cottam and Uchimoto in the late spring/early summer 2015, Uchimoto provided Dr. Cottam with nothing more than a manufactured explanation designed to cover up the fraud and deceit that had occurred with respect to Dr. Cottam's investment.  According to Uchimoto, Dr. Cottam received fewer shares in 6D Global than what was set forth in the Subscription Agreement because of two reverse stock splits in CleanTech that had occurred prior to the Share Exchange.  According to Uchimoto, the

9

shares of 6D Global issued to Dr. Cottam were reduced proportionally with these two reverse stock splits.

36.     The first reverse stock split (on a 1:3 basis) of CleanTech stock occurred on July 14, 2014. The Subscription Agreement, which Kibrik and Radnor provided to Dr. Cottam in September 2014, did not disclose that this reverse stock split had occurred two months earlier.

37.     The second reverse stock split (on a 1:2.3 basis) occurred on September 25, 2014, after Dr. Cottam had signed the Subscription Agreement and only four days prior to the consummation of the Share Exchange. Even if Uchimoto's explanation was valid as to the effect on the shares allocated to Dr. Cottam, this fact was not communicated to Dr. Cottam at the time, and, in reality, is simply a red-herring.

38.     Dr. Cottam repeatedly asked Uchimoto to communicate with him in writing and, in particular, to provide documentation to support this contrived explanation; however, Uchimoto provided no such documentation.

39.     Contrary to Uchimoto's purported explanation, the status of CleanTech's stock, including whether it underwent any reverse stock split, was irrelevant to the number of shares Dr. Cottam was to receive in 6D Global, the reorganized entity (as defined in the Subscription Agreement). The Subscription Agreement was unambiguous; it contained no language predicating the number of shares of 6D Global that Dr. Cottam was to receive on the number of CleanTech shares.

40.     In fact, the Subscription Agreement clearly stated that the offering price of the Units was completely unrelated to the "value, assets or other objective criteria of value" of CleanTech. Thus, the number of 6D Acquisition shares to be purchased through the Offering

(which was based upon the Unit offering price of $15,000.00/Unit with each Unit representing 50,000 shares) in 6D Acquisitions was completely unrelated to the value of CleanTech.

41. Neither Kibrik nor Radnor disclosed the reverse share splits in any of their communications with Dr. Cottam prior to his investment in the Offering.

42. None of the Defendants bothered to amend the Subscription Agreement to correct its material misstatements and omissions or otherwise notify Dr. Cottam of its material misstatements and omissions.

43. Dr. Cottam invested in 6D Acquisitions, which by the clear terms of the Subscription Agreement, was intended to purchase shares on a 1:1 basis from the newly reorganized entity: 6D Global. Dr. Cottam purchased 2,900,000 shares of 6D Acquisitions, and, therefore, he should have received 2,900,000 shares of 6D Global.

**Additional Material Misrepresentations and Omissions Regarding the Offering**

44. In addition, Defendants individually and collectively made other material misrepresentations and omissions in connection with the Offering, as set forth below.

**Defendants misrepresented that the Share Exchange was not a reverse merger**

45. Dr. Cottam did not want to invest in a reverse merger; nor did he want to invest in any transaction involving a shell corporation. Before investing in the Offering, Dr. Cottam sought certain assurances from Kibrik and Radnor, as the Placement Agent and his financial advisors, that the Offering did not involve either of those situations. On several occasions, Dr. Cottam asked Kibrik whether the Offering was a reverse merger or involved a shell corporation. Kibrik denied that it was.

46. The terms of the Subscription Agreement confirmed that the transaction between CleanTech and Six Dimensions was to be a "Share Exchange," through which Six Dimensions

11

would become "a wholly-owned subsidiary of CleanTech." The Share Exchange, as defined in the Subscription Agreement, did not describe a reverse merger or the use of a shell corporation. Indeed, the Subscription Agreement described CleanTech as a

> **A NASDAQ-listed public company domiciled in the State of Nevada with its main operations in China. The Company designs and manufactures structural towers for megawatt-class wind turbines serving China's clean technology industry as well as highly engineered metal components used in China's steel and energy industries. This Offering contemplates, that CleanTech will acquire 6D and will conduct all its operations through 6D.**

47.     Under the section entitled "Risks Related to Investing in the Units, the Subscription Agreement states, in relevant part, that "[u]pon consummation of the Share Exchange, 6D will become the operational subsidiary of CleanTech." Elsewhere in the Subscription Agreement, it similarly states "upon completion of the Offering and Share Exchange, CleanTech's operations shall be conducted through its new subsidiary 6D (such post-Share Exchange Nasdaq listed parent entity to be referred to herein as '6DT')."

48.     Based upon the representations contained in the Subscription Agreement and the assurances from Kibrik, Dr. Cottam was led to believe that following the Share Exchange, CleanTech, operating under a new name, would continue its operations through its subsidiary, Six Dimensions.

49.     Relevant SEC filings prior to the Share Exchange provided further assurances to Dr. Cottam that he was not investing in a reverse merger or a shell company. For instance, in CleanTech's 10-Q for the period ending June 30, 2014, filed with the SEC, CleanTech reported that **it was not a shell company**.

50.     Similarly, in an Information Statement CleanTech filed with the SEC on September 4, 2014, pursuant to Section 14(c) of the Exchange Act, CleanTech unambiguously represented that the transaction between CleanTech and Six Dimensions "will not be a 'reverse

merger.'" Following the Share Exchange, the newly formed 6D Global filed an 8-K with the SEC on October 1, 2014, in which it continued to represent that the Share Exchange was not a "reverse merger."

51.     These characterizations presented in the Subscription Agreement and the SEC filings, however, were false, fraudulent and misleading.  In fact, prior to Dr. Cottam's investment in the Offering and the Share Exchange, the Defendants Kang, 6D Acquisitions, 6D Global (formerly CleanTech) knew and planned that the Share Exchange between CleanTech and Six Dimensions would be a reverse merger utilizing CleanTech as a shell corporation, a transaction and scheme that was orchestrated by Wey.  The Defendants hid this fact from Dr. Cottam in order to induce Dr. Cottam to invest in the Offering.

52.     Indeed, as of June 14, 2014, prior to Dr. Cottam's investment in the Offering, CleanTech had already divested itself of **all** its operations and assets and functioned solely as a shell corporation.  This was not disclosed to Dr. Cottam by any of the Defendants, nor was it disclosed in any SEC filing.  CleanTech reported in its 10Q for the period ending June 30, 2014, that it had disposed of its China subsidiaries as of June 12, 2014; however, in the same filing, CleanTech also represented that it was not a shell company.  The clear implication was that CleanTech had operations and business concerns other than its China subsidiaries that would continue following the Share Exchange.  This was false.

53.     The true characterization of the Share Exchange between CleanTech and Six Dimensions was not revealed until two months after the Defendants received Dr. Cottam's investment funds.  In 6D Global's 10-Q for the period ending September 30, 2014, filed with the SEC on November 12, 2014, and incorporated herein by reference, 6D Global described the Share Exchange:

13

The Exchange is being treated as a reverse recapitalization effected by a share exchange for financial accounting and reporting purposes since substantially all of CleanTech's operations were disposed of prior to the consummation of the transaction.  Six Dimensions is treated as the accounting acquirer as its stockholders control the Company after the Exchange Agreement, even though CleanTech was the legal acquirer.  As a result, the assets and liabilities and the historical operations that are reflected in these financial statements are those of Six Dimensions as if Six Dimensions had always been the reporting company and, on the date of the Exchange Agreement, changed its name and reorganized its capital stock.  Since CleanTech had no operations upon the Exchange Agreement taking place, the transaction was treated as a reverse recapitalization for accounting purposes and no goodwill or other intangible assets were recorded by the Company as a result of the Exchange Agreement.  Historical common stock amounts and additional paid-in capital have been retroactively adjusted using the exchange ratio of approximately 1.3 shares of CleanTech Common Stock for each one common share of Six Dimensions.[4]

### The Defendants made material misrepresentations and omissions regarding share restrictions and created unnecessary and artificial obstacles to selling the shares

54.     Upon finally learning of the number of shares in 6D Global he owned (albeit 2,479,710 fewer shares than what he should have owned, as set forth above), Dr. Cottam sought to liquidate his investment.  As of September 29, 2014 (the day Dr. Cottam obtained his shares), 6D Global shares were trading at approximately $8.30/share.  However, when he attempted to sell his 6D Global shares, he was informed for the first time that he could not sell because the stock was restricted.

55.     Prior to investing in the Offering, Dr. Cottam was never told by Kibrik or Radnor that his investment would be restricted in any fashion.  The Subscription Agreement similarly did not disclose that there would be restrictions placed upon his investment.  In fact, the Subscription Agreement explicitly stated that upon the consummation of the Share Exchange, the 6D Acquisition shares would be converted on a 1:1 basis into shares of 6D Global's NASDAQ

---

[4]     6D Global's 10-K, for the period ending December 31, 2014, contains very similar language except it changes all instances of "Six Dimensions" to "6D Global."

listed common stock, conveying the clear message that Dr. Cottam would be able to sell his 6D Global stock immediately upon receiving it.

56.     Upon learning of the restriction, Dr. Cottam was told by Kibrik that the shares would be restricted for six months, after which the restriction would be **automatically** lifted, and Dr. Cottam would be able to sell the shares.  As set forth below, this did not happen.

57.     Near the end of March 2015 – the end of the six-month period – Dr. Cottam sought to sell his shares of 6D Global common stock, which at that time, was trading at between $8 and $9/share.  However, when he tried to sell them, he was told by Kibrik that the shares continued to be restricted, and Dr. Cottam was told for the first time that the restriction would not be automatically removed.  In fact, Kibrik informed Dr. Cottam that 6D Global had "recently" changed the requirements for removing the restrictions and that certain hurdles needed to be overcome in order to effectuate the removal of the restriction.  This was a lie.

58.     Kibrik and Radnor did not "recently" learn of this change in requirements to have the restriction removed.  In fact, they knew no later than February 9, 2015, almost two months earlier.  Indeed, knowing full-well that Dr. Cottam wanted to sell his 6D Global stock as quickly as possible, neither Kibrik nor Radnor informed Dr. Cottam of these changes when they had first learned of them.

59.     Because of Kibrik's and Radnor's failure to timely inform Dr. Cottam that he would be required to undertake certain steps to remove the restrictions, Dr. Cottam was unnecessarily delayed in having the trading restrictions eventually removed.

60.     6D Global eventually provided Dr. Cottam with a written list of requirements necessary to have the restriction removed.  In fact, Dr. Cottam was informed by a 6D Global representative that one of the reasons for the imposition of the hurdles to remove the restriction

was because 6D Global had previously been a shell corporation, a fact which had been misrepresented in numerous SEC filings.

61.     Upon information and belief, 6D Global, operating under the thumb of Wey, sought to prevent investors such as Dr. Cottam from selling their shares in 6D Global in order to unlawfully control the market.  In so doing, 6D Global created arbitrary, fraudulent and unlawful hurdles that investors such as Dr. Cottam were required to overcome in order to have the restriction removed.

62.     From April 2015 through August 2015, Dr. Cottam sought to have the restriction removed so that he could finally sell his 6D Global stock.  However, each time he tried to obtain information from Radnor, Kibrik or 6D Global regarding the necessary process, he was confronted with confusing, misleading and ever-changing requirements.  On numerous occasions, although he had collected and presented to 6D Global the materials that 6D Global had indicated it needed in order to have the restriction removed, Dr. Cottam was told by 6D Global that he had to complete additional, previously undisclosed tasks.  For instance, Dr. Cottam was advised that in order to remove the restriction, he was required to obtain a sell order, a requirement that was not contained on the written list initially provided to Dr. Cottam.  Upon information and belief, 6D Global's goal was to make it as difficult as possible for Dr. Cottam to remove the restrictions to prevent him from selling his shares.

63.     In August 2015, the restrictions on Dr. Cottam's shares of 6D Global common stock were finally removed, and he was able to sell his shares.  However, by that time, 6D Global's share price was in the midst of a death spiral, plummeting from approximately $8/share to approximately $2/share.

64.     In August 2015, Dr. Cottam sold his shares in 6D Global for approximately

$940,000, at approximately $2.24/share.

**Defendants Misrepresented that Wey was not involved**

65.     Prior to investing in the Offering, in September 2014, Dr. Cottam sought and

received assurances from Kibrik that the Offering did not involve Benjamin Wey.

66.     Having been victimized by a previous scam orchestrated by Wey, Dr. Cottam

wanted to avoid investing in any transaction involving Wey, a fact of which Kibrik was well-

aware.

67.     As Kibrik and Radnor knew, Dr. Cottam had lost a substantial amount of money

in an earlier investment through another broker in Deer Consumer Products, Inc. ("Deer"), which

had become a publicly-traded entity through a reverse merger with a shell company, a

transaction that had been orchestrated by Wey.  Dr. Cottam had learned prior to his investment in

the Offering for 6D Acquisitions and 6D Global that the Deer transaction had involved Wey and,

accordingly, Dr. Cottam did not want to invest in any transaction that was associated with Wey.

68.     Prior to Dr. Cottam's investment, Kibrik denied that Wey was involved in any

way with the Share Exchange; the Subscription Agreement did not identify Wey as being

involved; none of the relevant SEC filings disclosed that Wey was involved or had any

ownership in any of the relevant entities.

69.     However, Wey was in fact very involved with the Offering, which Defendants

should have disclosed and were required under the law to disclose.  It has recently been

disclosed that Wey was the owner of NYGG (Asia) Ltd., the largest creditor of CleanTech.  As

set forth in the Subscription Agreement, NYGG (Asia) Ltd. was to receive almost 50% of the

shares of 6D Global following the Share Exchange, making it the largest shareholder of 6D

Global stock.  Following the Share Exchange, Wey, through NYGG (Asia) Ltd., controlled 6D Global.  Had the Defendants properly advised Dr. Cottam of this fact, which they knew or should have known, he never would have invested in the Offering.

70.     Indeed, Dr. Cottam's concerns regarding Wey's involvement were prophetic.  On September 10, 2015, the SEC commenced the SEC Action against Wey, Uchimoto, and others, and the United States Attorney's Office filed the Indictment against Wey, as described above. The same day, NASDAQ suspended the trading of 6D Global stock.

**AS AND FOR THE FIRST CAUSE OF ACTION**
**VIOLATION OF SECTION 10(b) OF**
**THE EXCHANGE ACT (15 U.S.C. § 78j(b)) AND RULE 10b-5**
**(Against All Defendants)**

71.     Dr. Cottam repeats and re-alleges paragraphs 1 - 70 as if set forth in full herein.

72.     Defendants, acting individually and in concert, directly and indirectly, engaged in a common scheme, plan, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated a fraud and deceit upon Dr. Cottam and made various deceptive and untrue statements of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Dr. Cottam.

73.     The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Dr. Cottam to invest in the Offering and to purchase shares of 6D Global.

74.     Defendants Radnor and Kibrik were motivated to commit the fraud described herein, at least in part, by the substantial financial incentives Radnor was set to receive as the Offering's Placement Agent.

75.     Defendants 6D Acquisitions, 6D Global and Kang were motivated to commit the fraud described herein in order to induce Dr. Cottam to invest in the Offering to supply 6D Global with funds to operate and to supply 6D Global with the minimum amount of funds required in order to consummate the Share Exchange.

76.     Defendant Uchimoto, acting in his capacity as legal counsel to Radnor, Wey or Wey's entities (including CleanTech/6D Global), was motivated to commit the fraud described herein to assist his clients obtain financial benefits and for him to share in those financial benefits.

77.     Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance of deceptive and materially false and misleading statements to Dr. Cottam and the public, as described above.

78.     To his detriment, Dr. Cottam relied on the Defendants' misleading statements and omissions in investing in the Offering, not knowing the false and misleading nature of the statements and omissions.

79.     As a result of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit in connection with the purchase or sale of any security, to wit: the Offering.

80.     Dr. Cottam was damaged as a result of the Defendants' conduct in an amount to be determined at trial.

### AND AS FOR A SECOND CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
#### (Against GECG and Kibrik)

81.     Dr. Cottam repeats and re-alleges paragraphs 1 - 80 as if set forth in full herein.

82.     GECG (acting then as Radnor) and Kibrik were under a duty to act for and give advice for the benefit of Dr. Cottam in accordance with their fiduciary duty as Dr. Cottam's financial investment advisor.  In particular, GECG and Kibrik had a duty to make truthful and complete disclosures and representations in connection with the Offering.

83.     GECG and Kibrik breached that duty by, *inter alia*,

    a.  placing their own financial interests above Dr. Cottam's interests in recommending and encouraging Dr. Cottam's investment in the Offering;

    b.  misrepresenting and omitting material information to Dr. Cottam in connection with the Offering;

    c.  recklessly or negligently communicating misinformation and omitting material information to Dr. Cottam in connection with the Offering; and

    d.  intentionally, recklessly or negligently engaging in conduct that prevented or otherwise delayed Dr. Cottam from obtaining the removal of the restriction necessary to sell the shares of 6D Global.

84.     As a result of GECG's and Kibrik's breaches of fiduciary duty, Dr. Cottam was damaged in an amount to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION
### BREACH OF CONTRACT
#### (Against 6D Global, 6D Acquisitions, and Kang)

85.     Dr. Cottam repeats and re-alleges paragraphs 1 - 84 as if set forth in full herein.

86.     Dr. Cottam and 6D Acquisitions entered into a legally binding and valid contract, signed by Kang on behalf of 6D Acquisitions and for the ultimate benefit of 6D Global, for Dr. Cottam to purchase 2,900,000 shares of 6D Acquisitions common stock (represented by 58 Units of 50,000 shares per Unit) for the explicitly stated purpose of receiving 2,900,000 shares of 6D Global common stock when they became available.

87.     Dr. Cottam fully complied with his obligations pursuant to the contract by causing $870,000.00 to be transmitted to the escrow agent identified in the Subscription Agreement.

88.     6D Acquisitions, Kang and 6D Global breached the contract with Dr. Cottam by failing to issue Dr. Cottam 2,900,000 shares of 6D Acquisitions and/or failing to issue Dr. Cottam 2,900,000 shares of 6D Global common stock.

89.     As a result of the foregoing, Dr. Cottam is entitled to an award of damages in an amount to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Uchimoto)

90.     Dr. Cottam repeats and re-alleges paragraphs 1-88 as if set forth in full herein.

91.     As set forth above, GECG and Kibrik owed Dr. Cottam a fiduciary duty and breached that fiduciary duty.

92.     Uchimoto substantially assisted GECG's and Kibrik's breaches of fiduciary duty to Dr. Cottam by affirmatively assisting, helping conceal or failing to act when he was required to do so, which enabled the breaches of fiduciary duty to occur. Uchimoto, *inter alia*, schemed with Radnor and Kibrik to cover up and conceal their misconduct related to the Offering. In communications with Dr. Cottam, Uchimoto provided unsubstantiated explanations for why Dr. Cottam received more than 2.47 million fewer shares in 6D Global than what he was supposed to

receive in an effort to dissuade Dr. Cottam from pursuing his rights and assist GECG and Kibrik continue and hide their breaches of fiduciary duty.

93.     As a result of the foregoing, Dr. Cottam was injured and is entitled to an award of damages in an amount to be determined at trial.

## JURY DEMAND

94.     Dr. Cottam hereby demands a trial by jury on all issues so triable.


WHEREFORE, Dr. Cottam's prayer for judgment and relief are as follows:

(a) An award of actual, compensatory and punitive damages from all Defendants, jointly and individually, for all damages Dr. Cottam sustained as a result Defendants' conduct, in an amount to be determined at trial, including interest thereon;

(b) An award of reasonable attorney's fees and the costs of this action; and

(c) Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       June 16, 2016


Respectfully submitted,


GOTTLIEB & GORDON LLP

By: _____
      Derrelle M. Janey

111 Broadway, Suite 701
New York, New York 10006
(212) 566-7766 (phone)
(212) 374-1506 (fax)
djaney@gottliebgordon.com

*Attorneys for Plaintiff John Cottam*

22

# EXHIBIT F

IN THE CIRCUIT COURT FOR THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

**DANIEL A. LARSON** and
**GREG W. NIELSEN,**

        Plaintiffs,                           CASE NO.:

                                              DIVISION:

vs.

**6D GLOBAL TECHNOLOGIES, INC.**
and **TEJUNE KANG,**

        Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Daniel A. Larson ("Larson") and Greg W. Nielsen ("Nielsen"), file this Complaint against Defendants 6D Global Technologies, Inc. ("6D Global" or the "Company") and Tejune Kang ("Kang") and allege upon personal knowledge with respect to themselves, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE AND SUMMARY OF THE ACTION

1.     This is a civil action for negligent misrepresentation and negligence brought by Plaintiffs against Defendants arising from Plaintiffs' purchase of restricted securities of 6D Global from Defendants.

2.     Restricted securities are securities acquired in an unregistered, private sale from an issuing company or from an affiliate of the issuer.  The Securities and Exchange Commission

has required, in the context of such a private transaction, that the certificate or other evidence of ownership of the securities must include a prominently displayed disclosure of the restrictions on transferability which attach to such securities. This disclosure is referred to as a "restrictive legend". The removal of a restrictive legend is a matter solely in the discretion of the issuer (in this case, 6D Global).

3.     Plaintiffs purchased several hundred thousand dollars of 6D Global's securities because they were repeatedly (and negligently) informed that the restrictions (and the restrictive legends) on the securities' transferability would be removed six months from the date of their purchase, at which time Plaintiffs would have freely tradeable and marketable securities. Plaintiffs reasonably relied on these express material representations when making their investment decisions. In fact, but for the repeated representations made by Defendants (and their agents) regarding Plaintiffs' ability to freely sell and/or transfer unrestricted securities 6 months after the date of their purchase, Plaintiffs never would have purchased the 6D Global securities at issue.

4.     Furthermore, prior to Plaintiffs' purchases of their restricted 6D Global securities, and subsequent thereto during the claimed 6-month holding period, Plaintiffs repeatedly informed Defendants that they intended to sell their 6D Global securities as soon as practically possible after the 6-month restriction period ended. Defendants repeatedly led Plaintiffs to believe that their short-term investment holding periods would be easily satisfied and accomplished.

5.     In sum, Defendants negligently, wrongfully, and without any legitimate purpose, withheld consent to remove the restrictive legends on the securities purchased by Plaintiffs at the end of the claimed 6-month restricted holding period. Instead, Defendants embarked on a

2

negligent campaign of obfuscation and delay that involved changing the unreasonable legend removal requirements Plaintiffs were forced to repeatedly meet, and which ultimately prevented Plaintiffs from obtaining freely tradeable securities prior to the Company having trading in its securities halted in September 2015, and then delisted by the NASDAQ exchange on or about December 19, 2016, rendering Plaintiffs' investment in 6D Global worthless.

6.      Consequently, Plaintiffs seek injunctive relief in the form of an order commanding specific performance by Defendants to immediately remove and/or order the removal of the restrictions on the transferability of Plaintiffs' securities.  Plaintiffs also seek monetary damages as result of Defendants' negligent and wrongful representations and conduct.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction because this is an action for damages, which, individually and in the aggregate, exceeds $15,000.00 exclusive of interest, costs, and attorneys' fees.

8.      This Court has personal jurisdiction over each defendant named herein, and due process is satisfied, because Defendants have, at all times relevant to this action, individually or through their agents, subsidiaries, parent, officers, directors, and/or representatives:  (a) solicited Plaintiffs in Florida for an investment in the Company; (b) operated, conducted, engaged in or carried on a business venture and/or commercial activities in this State; (c) committed common law violations within this State related to the allegations made in this Complaint; (d) knowingly offered and sold securities to residents of Florida; and (e) caused injuries to Plaintiffs, which arose out of the actions, inactions, conduct, statements, or omissions complained of herein and which occurred in the State of Florida. Further, Defendants have sufficient minimum contacts

with Florida so as to render the exercise of jurisdiction by the Florida courts permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper pursuant to Fla. Stat. § 47.051 in this Court because much of the conduct complained of herein and/or all causes of action took place or accrued in Hillsborough County, Florida.  Further, at all material times, Plaintiffs have resided in Hillsborough County, Florida.

10.     All conditions precedent to this action have been performed, have occurred, or have been waived.

### THE PARTIES

11.     Plaintiffs are, and have been continuously throughout all times relevant hereto, the owners of 6D Global common stock and residents of Hillsborough County, Florida.

12.     Defendant 6D Global, formerly known as the company CleanTech (which traded on NASDAQ under the ticker symbol "CTEK"), is a Delaware corporation headquartered in New York, NY.  6D Global maintains (or maintained) domestic office locations in California, Ohio, Minnesota, Oregon and New York that were intended to achieve a "global virtual reach" to investors and customers.

13.     The Company represents itself as being a "strategic holding company founded by Silicon Valley entrepreneurs."  The Company's primary business is in the industries of digital business and marketing information technology.

14.     6D Global's securities traded on NASDAQ under the ticker symbol "SIXD". NASDAQ halted trading of SIXD on September 10, 2015.  On or about December 19, 2016, 6D Global's common stock was delisted from the NASDAQ exchange.

15.     Defendant Tejune Kang founded 6D Global in 2004 and since then has served as its Chairman of the Board of Directors and Chief Executive Officer ("CEO").  According to 6D Global's 2015 Proxy, Defendant Kang owns 29.7% of 6D Global's outstanding shares.

16.     By virtue of his positions as founder and CEO of 6D Global, Kang is in a fiduciary relationship with Plaintiffs and the other stockholders of 6D Global.  Further, any representations made, approved or ratified by Kang are properly imputed to Defendant 6D Global.

17.     At all relevant times, Kang had the power to control and direct 6D Global and its agents to negligently engage in the wrongful misconduct alleged herein.  Further, Kang's fiduciary obligations required him to act solely in the best interest of Plaintiffs and all 6D Global stockholders.

## SUBSTANTIVE ALLEGATIONS

18.     6D Global is the product of a reverse merger.  In a reverse merger, a dormant domestic (and publicly-traded) shell company without operations acquires a privately held company.  As part of the process, the privately held company acquires substantially all of the shares of the publicly-traded company.

19.     Therefore, practically speaking, a reverse merger involves the acquisition of a private company by a publicly-traded company.  However, in economic substance, a reverse merger involves the acquisition of the publicly-traded company by the privately held company.

20.     In the case of reverse mergers involving Chinese companies, typically, mid-sized Chinese companies are taken public in the United States by acquiring the corporate shells of dormant U.S. companies that are no longer in operation and whose shares had previously been listed on an American equities exchange.

21.     6D Global's predecessor, CleanTech, became a publicly-traded company that traded on NASDAQ via a reverse merger with shell company Everton Capital Corporation ("Everton"), on July 2, 2010.

22.     On June 16, 2014 CleanTech filed a Form 8-K with the SEC announcing that on June 13, 2014, it had entered into a merger agreement with Initial Koncepts, Inc., d/b/a Six Dimensions ("Six Dimensions").   Defendant Kang was the founder, CEO and a significant shareholder of Six Dimensions.  After this merger, the surviving entity was named 6D Global Technologies, Inc., and consequently 6D Global became, and is, the successor entity of CleanTech.

23.     On September 24, 2014, an agent, promoter, and controlling shareholder of 6D Global, Benjamin Wey ("Wey"), solicited Larson in Tampa, Florida (by calling Larson's Tampa, Florida cell phone number) and provided him with information regarding a "friends and family" private placement offering of 6D Global.  Wey expressly and explicitly informed Larson that the restricted holding period of the securities being offered was only 6 months, after which Larson would be able to freely transfer and/or sell the securities on the open secondary market.  Wey further represented that this brief 6-month holding period was shorter than the 12-month holding period that restricted the ability of other investors to sell shares of 6D Global, and as such, was a valuable incentive and inducement on which Larson relied in making his investment decision. Defendants were aware of, and in fact, directed, approved and ratified the representations made by Wey, on their behalf, regarding the claimed 6-months holding period.  As such, Wey's representations in this regard are properly imputed to Defendant 6D Global.

24.     Consequently, Larson executed a Subscription Agreement, drafted by and/or with the express consent and approval of Defendants, which provided certain, but certainly not all,

information regarding Defendants' securities offering and was replete with boilerplate verbiage that the securities at issue were unregistered, risky, speculative, without an active trading market, and subject to restrictions on transferability.

25.   The Subscription Agreement was drafted, approved, and/or ratified by Defendants, not Plaintiffs.   Therefore, any ambiguity in any of the Subscription Agreement's provisions must be interpreted against Defendants.

26.   Further, the Subscription Agreement expressly acknowledged that the information set forth therein was "not intended to be exhaustive and [was] provided only as a guide to assist the Subscriber in making an independent investigation of the Company . . . [and that] the Offering materials does not contain all of the information that would normally be contained in a prospectus used in a public offering, or in an offering memorandum typically used in a private offering."

27.   Further, the **Subscription Agreement expressly contemplates that Larson would be provided material information about the securities at issue outside of and apart from the Subscription Agreement itself**, which is precisely what occurred.   Indeed, the Subscription Agreement further states:

> The Subscriber [Plaintiff] acknowledges having had the opportunity to ask questions of the Company concerning the Company's business and activities and prospects, the Units and the terms and conditions of this Offering, 6DT's planned operations and prospects, and obtained such additional information and reviewed such documents as the Subscriber deemed necessary.

28.   Therefore, any argument made by Defendants suggesting that the negligent oral representations made by them, upon which Plaintiffs relied, are either irrelevant or superseded by the written language of the Subscription Agreement must be rejected.

29.     Finally, there was nothing in the Subscription Agreement that specifically refuted the express representations made to Larson that the: (1) restricted holding period of the securities being offered to (and ultimately purchased by) Larson was only 6 months; or (2) the brief 6-month holding period applicable to the securities purchased by Larson was shorter than the 12-month holding period that restricted the ability of other investors to sell shares of 6D Global.

30.     On September 29, 2014, in reliance on the multiple representations made by Wey to Larson regarding the purported and claimed 6-month restricted holding period applicable to the 6D Global securities at issue, Larson purchased 101,450 shares of 6D Global (as identified by stock certificate 2372) at a price of $2.07 per share for a total investment of $210,000.00.

31.     Subsequently, after being contacted in Florida by Wey, on November 8 and 9, 2014, Plaintiff Larson personally met with Defendant Kang and Ben Wey in Ft. Lauderdale, Florida.  During these in person meetings, both Wey and Kang repeatedly reiterated to Larson that: (1) **they were actively soliciting buyers in Florida**; (2) Larson should purchase additional shares of 6D Global; and (3) the restricted holding period applicable to the 6D Global securities purchased by Larson was only 6 months; and (4) Larson should also invite his other "Florida friends and family" to invest.

32.     During these conversations, Larson stated to both Wey and Kang that his intention was to sell his securities as soon as the 6-month holding period expired in order to sell prior to the expiration of longer holding periods applicable to other investors.  In fact, Defendant Kang expressly encouraged Larson to sell, at a minimum, enough shares at the end of the 6-month holding period to recoup Larson's initial investment while letting "profits ride" on Larson's remaining holdings.

8

33.     Over the next few days, Defendant Kang called Larson in Florida twice.  During these conversations, Kang solicited Larson to, among other things, encourage additional "friends and family" to purchase in the offering.

34.     On November 10, 2014, Plaintiff Nielsen contacted Kang from Florida and spoke to him regarding Nielsen's possible investment in 6D Global.  During this conversation, and in response to a direct question from Kang as to Nielsen's investment time horizon, Plaintiff Nielsen expressly informed Defendant Kang that his intention was to sell the majority of his 6D Global securities immediately after the expiration of the six-month holding period applicable to his investment.  At no time during this conversation did Defendant Kang advise that the restriction period would be longer than six months, or that there would be any foreseeable delay in removing the restrictions.

35.     On November 13, 2014, Gerard Casazza Jr. ("Casazza"), a Corporate Development Senior Analyst with 6D, emailed Nielsen (in Florida) a Subscription Agreement and Investor Questionnaire.

36.     The Subscription Agreement received, reviewed, and executed by Nielsen that same day was identical to the Subscription Agreement received by Larson and described in paragraphs 24 through 29 above.  Consequently, all representations, claims, allegations, facts, or inferences made or represented in paragraphs 24 through 29, apply equally to Nielsen.

37.     On November 14, 2014, in reliance on Defendants' oral representations and assurances that the restricted securities at issue would be subject to only a 6-month holding period, Nielsen purchased 96,618 shares of 6D Global (as identified by stock certificate 2479) at $2.07 per share for a total investment of $200,000.00.

38.     On November 21, 2014 (after Nielsen purchased his 96,618 shares), Defendant Kang appears to have executed Nielsen's Subscription Agreement and "Agreed to and Accepted" the terms herein.

39.     Importantly, to date, Defendants have not provided Larson with any documents indicating that his Subscription Agreement was either formally executed or accepted by the Company prior to, or contemporaneously with, his purchase of 101,450 shares of 6D Global.

40.     Throughout November 2014, Defendant Kang and other agents and representatives of 6D Global (including Casazza, 6D Global's Director of Marketing and Communications – Hilary Smith, and Kang's Executive Assistant – Han Dang) continued to correspond and communicate with Plaintiffs via email and telephone and knew that Plaintiffs were residents of Tampa, Florida.

41.     On December 4, 2014, 6D Global received a letter from The Nasdaq Stock Market LLC approving of the Company's application to trade the Company's common stock on The Nasdaq Capital Market.

42.     On Friday, December 12, 2014, 6D Global's common stock began trading on the NASDAQ under the ticker symbol "SIXD". SIXD opened the trading day at $5.50 per share and closed at $6.35 per share.

43.     In early 2015, after Plaintiffs purchased the 6D Global securities at issue, but before the expiration of the claimed 6-month holding period, Defendants negligently and improperly began to alter the rules and processes that they forced Plaintiffs to attempt to comply with in order to remove the securities' restrictive legends. Consequently, as more fully outlined below, Defendants' negligence, actions, and inactions prevented Plaintiffs from freely trading and/or transferring their 6D Global securities 6 months from the date of their purchase.

44.     On March 30, 2015, approximately 6 months after Larson purchased his securities, 6D Global announced its audited financial results for the fiscal year ended December 31, 2014, which included revenue of $11.8 million, a purported increase of approximately 22% compared to 2013.  6D Global's shares closed at $8.64 per share.

45.     On April 13, 2015, 6D Global announced a partnership with Google as a Google Analytics Premium Reseller and Certified Partner.   Not surprisingly, the market reacted favorably to this announcement.  Indeed, on April 13, 2015, 6D Global's shares opened at $8.52 per share and closed at $8.71 per share.

46.     On April 23, 2015, Plaintiffs formally requested that 6D Global confirm that all restrictions on the free transferability of their securities would be removed in May 2015 (which would make the securities freely tradeable on the secondary market), the date that corresponded to the six-month anniversary of their purchase.  On this same day, shares of 6D Global closed at $8.63 per share.

47.     That same day, Han Dang (Defendant Kang's Executive Assistant) provided Plaintiffs with a corporate "checklist" to be followed to remove the restrictive legends from the securities purchased by Plaintiffs.   The checklist identified the following unreasonable requirements:  (1) a Rule 144 Seller's Representation Letter; (2) a legal opinion issued by an approved U.S. law firm that included a statement:  (a) from the law firm attesting that the selling shareholder is not in possession of any non-public information and is not an affiliate of 6D Global; (b) from the law firm attesting that it will take full responsibility and will accept full liabilities for the accuracy of its legal opinion and the law firm has verified the true identity of the selling shareholder; (c) attesting that the individual is not a licensed securities broker and is acting on the selling shareholder's own behalf, and not on behalf of others; and (d) from both the

law firm and the selling shareholder that specifically indemnify and hold harmless 6D Global, its affiliates, respective controlling persons, directors, officers, agents and employees of any of the foregoing, from any and all claims that are related or arise out of the removal of the restrictive legend from the stockholder's certificate; and (3) a certified copy of a valid government-issued identification.

48.     6D Global's restrictive legend checklist also stated that "[a]fter all documentation is received, gathered and verified by the Company's Corporate Secretary, the Company will correspond with its legal counsel for final approval.  The Company will make efforts to correspond with its stock transfer agent to remove the restrictive legend."

49.     However, Defendants repeatedly failed to honor this commitment to Plaintiffs.  In fact, and as outlined more fully below, Defendants embarked on an ever-changing course regarding the requirements that they insisted Plaintiffs meet in order to have the restrictive legends removed. By imposing, and then repeatedly changing, the restrictive legend removal requirements, Defendants changed the substance and essence of the deal that was the fundamental foundation of Plaintiffs' investment decision.

50.     Defendants engaged in this course of conduct for the sole purpose of preventing Plaintiffs from selling their securities immediately after the expiration of the promised and acknowledged 6-month holding period that was the fundamental basis of Plaintiffs' investment decision.

51.     Against this backdrop, beginning in May 2015, Plaintiffs (and their retained corporate counsel) repeatedly and vigilantly attempted to satisfy the Company's requirements. Along these lines, Plaintiffs repeatedly requested that Defendants remove the restrictions on their securities.  However, as outlined more fully below, not only did Defendants not act in good faith

and remove the restrictive legends at issue, but they made it impossible for Plaintiffs to comply with their changing requests.

52.     On May 14, 2015, approximately 6 months after Plaintiff Nielsen purchased his securities, 6D Global's shares closed at $8.60 per share.

53.     On May 29, 2015, Plaintiffs provided 6D Global (via their corporate counsel Thomas P. McNamara) all the requested and required documents (including sellers' representation letters and legal opinions) necessary to comply with 6D Global's corporate policies regarding the removal of the restrictive legends from Plaintiffs' stock certificates (allowing Plaintiffs' certificates to be freely tradeable).  6D Global's stock closed the trading day at $8.68 per share.

54.     However, despite Plaintiffs' efforts, Defendants wrongfully refused to comply with Plaintiffs' request to have the restrictive legends removed from their stock certificates. Instead, Defendants continued to impose additional, changing and unreasonable requirements, to which Plaintiffs repeatedly and unsuccessfully tried to satisfy.   Ultimately, Defendants unilaterally imposed a one-year holding period instead of the 6-month holding period that was the fundamental basis for Plaintiffs' investment decision.

55.     On June 8, 2015, Plaintiffs' corporate counsel provided 6D Global with the revised documents and legal opinion being sought.

56.     In response, on June 9, 2015, Han Dang informed Plaintiffs' counsel that **"Legal [h]as approved [the removal of all restrictions pertaining to Plaintiffs' investment].  Please send originals and all other requirements from corporate policy to the address below my signature."**  This same day, 6D Global's shares closed the trading day at $8.89 per share.

57.     However, remarkably, even after the Company expressly represented on June 9, 2015, that its legal department had "approved" of the removal of the restrictive legends on Plaintiffs' stock certificates, it subsequently changed course, unreasonably withdrew its "approval," and improperly imposed additional unreasonable requirements that were impossible for Plaintiffs (or any other investor) to satisfy.

58.     Consequently, Plaintiffs continuously and vigorously attempted to comply with the Company's seemingly ever-changing requirements.   On June 18, 2015, Han Dang acknowledges receipt of Plaintiffs' required documentation and once again states that she will be "passing on to legal for review.  I will keep you posted on status."

59.     Defendants' improper delay tactics continued for the next several weeks.

60.     On July 9, 2015, a date by which the restrictions on Plaintiffs' shares should have been completely removed, shares of 6D Global were trading at a high of $19.41 per share.

61.     On July 20, 2015, Han Dang belatedly emailed Plaintiffs' counsel and stated: "***Yes, it is approved***.  In order for me to move forward, I will need a copy of the stock certificate. Also, we will also need a seller's representation letter from your broker as well as a sale order before I can instruct the transfer agent to remove the restrictive legend." (Emphasis added.)

62.     In response, Plaintiffs once again provided all required and requested documentation and information.  However, despite meeting all of the Company's requests yet again, Defendants continued their improper and unlawful campaign of delay and refused to authorize the removal of the restrictive legends on Plaintiffs' stock certificates.

63.     On or about August 4, 2015, Plaintiffs continued to communicate with Defendant Kang regarding their frustration with 6D Global's refusal to remove the unreasonable restrictions

on their securities, and the seemingly ever-changing requirements being imposed by the Company.

64.     After repeated requests for explanations as to the unjustified removal of the restrictive legends, on August 12, 2015, the Company informed Plaintiffs that attorney Michael Pastor was "approved" by the Company to remove the restrictive legends at issue.  Regrettably, Mr. Pastor similarly proved to be incapable of removing the restrictive legends and the Company also refused to provide Plaintiffs with information regarding any instances in which restrictive legends had been successfully and timely removed from 6D Global securities.

65.     On September 10, 2015, NASDAQ halted trading of 6D Global, freezing the stock price at $2.90.  On or about December 19, 2016, 6D Global's common stock was delisted from the NASDAQ exchange.

66.     Today, the Company's stock is worthless.  Indeed, on December 22, 2016, the Company's stock closed (OTC) at a price of $.0001 per share.  Further, the restrictive legends on Plaintiffs' stock certificates have still yet to be removed.  Consequently, Plaintiffs' investments in the Company's illiquid stock are worthless.

67.     Had Defendants simply honored their representations and commitments to Plaintiffs that the restrictive legends on the securities at issue would be removed 6 months from the date of purchase, and then proceeded with due care in order to ensure that the restrictions were properly, timely, and fully removed, Plaintiffs would have realized a several fold increase in the value of their investments.

## COUNT I

### Claim for Negligent Misrepresentation Against Defendants 6D Global and Kang

68.     Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

69.     At all times material, Defendants owed a duty to the public, including Plaintiffs, to speak truthfully regarding the securities, and the restrictions on their sale and/or transferability.

70.     Defendants knew, or in the exercise of reasonable care should have known that their representations to Plaintiffs regarding the claimed 6-month restrictions on their investments in 6D Global were false and/or misleading when made.

71.     But for Defendants' negligent misrepresentations, Plaintiffs' purchases of 6D Global securities would not have occurred.

72.     As a result of this conduct, Plaintiffs' 6D Global securities are still improperly tainted with restrictions on transferability that should have been removed long ago.

73.     As such, Plaintiffs have been and will be damaged in that they have been and will be prevented from selling their 6D securities and from obtaining fair consideration for their purchases of 6D Global securities.

74.     Therefore, this Court should issue an injunction commanding Defendants to immediately remove, and/or take all necessary action to authorize the removal of, the restrictions on transferability currently pertaining to the 6D Global securities purchased by Plaintiffs, and award Plaintiffs all damages to which they are entitled in an amount to be proven at trial.

## COUNT II

### Claim for Negligence Against Defendants 6D Global and Kang

75.     Plaintiffs repeat and re-allege paragraphs 1 through 67 as if fully set forth herein.

76.     At all times material, Defendants had a duty to act diligently and properly with respect to the removal of the restrictions on transferability applicable to the securities at issue.

77.     Defendants should have, with the exercise of reasonable care, timely and fully removed, or authorized the removal of, the restrictions on the transferability of the securities purchased by Plaintiffs six-months after their purchase.

78.     Defendants failed to properly and timely remove all of the restrictions on the transferability of the securities purchased by Plaintiffs six-months after their purchase.

79.     As a result of this conduct, Plaintiffs' 6D Global securities are still improperly tainted with restrictions on transferability that should have been removed long ago.

80.     As such, Plaintiffs have been and will be damaged in that they have been and will be prevented from selling their 6D securities and from obtaining fair consideration for their purchases of 6D Global securities.

81.     Therefore, this Court should issue an injunction commanding Defendants to immediately remove, and/or take all necessary action to authorize the removal of, the restrictions on transferability currently pertaining to the 6D Global securities purchased by Plaintiffs, and award Plaintiffs all damages to which they are entitled in an amount to be proven at trial.

## COUNT III

### Claim for Unjust Enrichment Against Defendant 6D Global

82.     Plaintiffs repeat and re-allege paragraphs 1 through 67 as if fully set forth herein.

83.     This is a cause of action for unjust enrichment against Defendant 6D Global.

84.     Defendants solicited Plaintiffs for the purchase of hundreds of thousands of dollars of 6D Global securities.

85.     In connection with their solicitation efforts, Defendants negligently made material misrepresentations to Plaintiffs concerning the restrictions on transferability applicable to the 6D

Global securities purchased by Plaintiffs in order to induce Plaintiffs to spend hundreds of thousands of dollars on the purchase of 6D Global securities.

86.     By paying 6D Global hundreds of thousands of dollars for securities that were represented as being fully transferable and unrestricted six months after purchase, yet to date remain restricted, Plaintiffs have conferred a significant benefit on Defendant 6D Global, which 6D Global requested from Plaintiffs.

87.     Defendants had and have knowledge of the significant benefits Plaintiffs paid and conferred upon 6D Global in the form of hundreds of thousands of dollars and have freely, voluntarily and knowingly accepted those benefits.

88.     Under these circumstances, it would be inequitable and unjust for Defendant 6D Global to enjoy the benefits of the amounts paid by Plaintiffs to it.

89.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer damages, including those described above.

90.     Therefore, this Court should issue an injunction commanding Defendants to immediately remove, and/or take all necessary action to authorize the removal of, the restrictions on transferability currently pertaining to the 6D Global securities purchased by Plaintiffs, and Defendant should be required to reimburse Plaintiffs for amounts received for the virtually worthless securities at issue and purchased by Plaintiffs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand specific performance, injunctive relief, and monetary relief and judgment against Defendants, from this Court, as follows:

A.    Ordering Defendants to immediately remove, and/or take all necessary action to authorize the removal of, the restrictions on transferability pertaining to Plaintiffs' 6D Global securities;

B.    Rescinding Plaintiffs' purchases of 6D Global securities and returning all proceeds of such purchases to Plaintiffs;

C.    Awarding Plaintiffs compensatory damages against Defendants jointly and severally, along with pre-judgment and post-judgment interest thereon;

D.    Directing Defendants to account to Plaintiffs for their damages sustained because of the wrongs complained of herein;

E.    Awarding Plaintiffs all reasonable fees, costs, and expenses incurred in connection with this litigation, including reasonable attorneys' and experts' fees and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.


## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

Dated: February 10, 2017

**THE POLASZEK LAW FIRM, PLLC**

By: _____

Christopher S. Polaszek
Fla. Bar No. 116866
3407 W. Kennedy Blvd.
Tampa, Florida 33609
(813) 574-7678
Chris@polaszeklaw.com

*Counsel for the Plaintiffs*